Stephen D. Finestone (SBN 125675)
Jennifer C. Hayes (SBN 197252)
Ryan A. Witthans (SBN 301432)
FINESTONE HAYES LLP
456 Montgomery St., 20th Floor
San Francisco, California 94104
Telephone No.: 415.414.0466
Fax No.: 415.398.2830
sfinestone@fhlawllp.com
jhayes@fhlawllp.com

Attorneys for Kyle Everett,
Trustee in Bankruptcy

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>BENJA INCORPORATED, aka EPHE CORPORATION,<br><br>Debtor. | Case No. 20-30819-DM<br>Chapter 7 |
| KYLE EVERETT,<br>TRUSTEE IN BANKRUPTCY,<br><br>Plaintiff,<br><br>v.<br><br>MHC FINANCIAL SERVICES, INC.,<br><br>Defendant. | Adversary Proceeding No. 21-03036-DM<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing:<br>Date: April 15, 2022<br>Time: 10:30 A.M.<br>Place: Tele/video conference<br><br>*Please check www.canb.uscourts.gov for information regarding the Court's operations due to the COVID-19 pandemic.* |

Kyle Everett, ("Plaintiff" or the "Trustee"), hereby files this Motion for Partial Summary Judgment (the "Motion") on his preference claims and in support thereof states as follows:

**I.      SUMMARY OF THE PLAINTIFF'S MOTION**

On August 5, 2021, Plaintiff filed his complaint against MHC Financial Services, Inc. ("MHC" or the "Defendant") seeking the avoidance and recovery of allegedly preferential and fraudulent transfer payments made by Benja Incorporated ("Benja" or the "Debtor") to MHC. The

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT 1

known transfers from the Debtor to MHC total $4,923,664.05, of which the known preferential transfers total $3,083,036.21 (the "Preferential Transfers"). Plaintiff seeks entry of an order granting summary judgment to avoid and recover the Preferential Transfers because there are no disputed material facts with respect to the Trustee's right to avoid and recover the Preferential Transfers.

## II. MATERIAL UNDISPUTED FACTS

The material undisputed facts are as follows:

On or about March 25, 2020, MHC and Benja entered into a Factoring Services Agreement. Declaration of Kyle Everett in Support of the Motion ("Everett Declaration"), ¶2, Exhibit A. The Factoring Services Agreement was signed on behalf of MHC by Erin Murphy, Director of Factoring, and by Mr. Chapin, as President and CEO of Benja. *Id.* The Factoring Services Agreement provides, *inter alia*:

    a. for Benja to sell and assign its existing and future accounts receivable from the CPM Business (the "Factored Accounts Receivable") and for MHC to purchase the Factored Accounts Receivable;

    b. for Benja to notify its account debtors of the sale of its account or accounts to MHC; and

    c. for MHC to receive a purported first-priority security interest in specified property of Benja, including Benja's existing and future accounts receivable, general intangibles, securities, and contract rights associated with Benja's accounts receivable, proceeds of Benja's accounts receivable, and all personal property in which Benja had a present or future interest.

Despite the provision in the Factoring Services Agreement for MHC to receive a first priority security interest, Benja had already granted a first priority blanket lien to Busey Bank. Specifically, on or about July 19, 2019, a UCC-1 Financing Statement was recorded with the Delaware Secretary of State evidencing a blanket security interest in Benja's assets in favor of Busey Bank (the "Busey Bank Lien"). (Everett Declaration, ¶3, Exhibit B).

The Busey Bank Lien is valid and enforceable and has never been reconveyed. (Everett

Declaration, ¶4, Exhibit C-1). However, Andrew Chapin, who was the President and CEO of Benja, gave MHC a fraudulent UCC termination notice. (Everett Declaration, ¶¶4, 5, Exhibits C-2, D). MHC's Vice President, Mr. Dan Anderson, testified that MHC conducted its own separate UCC research and noted that the Busey Bank lien still appeared after the date of the purported termination of the Busey Bank's termination notice. In summary, Mr. Anderson testified that while MHC noted the Busey Bank lien still existed, MHC believed its apparent existence was a function of the recorded termination not yet appearing in the official records. (Everett Declaration, ¶6, Exhibit E).

Following execution of the Factoring Services Agreement, Chapin arranged to sell, and MHC agreed to buy, purported accounts receivable owned by Benja related to the CPM Business; however, no such accounts receivable existed. (Everett Declaration, ¶7, Exhibit F).

Pursuant to the Factoring Services Agreement, MHC advanced approximately $4,482,707.79 in funds to Benja on the following dates for the purported purchase of the Factored Accounts Receivable:

| Date | Amount Advanced by MHC to Benja |
|---|---|
| April 2, 2020 | $414,950.54 |
| April 6, 2020 | $1,243,604.49 |
| April 10, 2020 | $322,963.00 |
| April 29, 2020 | $994,774.76 |
| April 30, 2020 | $696,970.23 |
| May 27, 2020 | $268,872.52 |
| May 27, 2020 | $540,572.25 |
| Total | $4,482,707.79 |

(Everett Declaration, ¶8, Exhibit G-1). These transfers from MHC were purportedly to purchase various Benja accounts receivable. In reality the accounts receivable did not exist, as Chapin presented MHC with fraudulent orders by the purported account debtors. (*Id*. G-2).

On or about July 17, 2021, MHC transmitted a letter to Benja stating that MHC was contacting Benja with respect to uncollectible invoices for services Benja purportedly provided to

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Backcountry.com, Inc., Columbia Sportswear Company, Fanatics, Inc., New Balance Inc., and Nike, Inc., the rights to which were assigned to MHC under the Factoring Services Agreement. (Everett Declaration, ¶9, Exhibit H). The letter states that the total amount of these uncollectible invoices is $1,793,227.56 and the alleged accounts were being transferred back to Benja, thereby requiring Benja to pay MHC the amounts it had paid for the alleged purchase of these Factored Accounts.

On or about July 21, 2021, Mr. Chapin, on behalf of Benja, transmitted a document to MCH titled "Promise to Pay." (Everett Declaration, ¶10, Exhibit I). This document stated that Benja expressly promised to pay MHC $3,018,389.80 to MHC by wire on or before July 31, 2020.

On or about August 7, 2020, MHC and Benja entered into a Forbearance and Standstill Agreement (the "Forbearance Agreement") (Everett Declaration, ¶11, Exhibit J). Pursuant to the Forbearance Agreement:

    a. Benja acknowledged owing MHC the principal sum of $3,582,333.72 (the "Repurchase Balance").

    b. Benja agreed to make the following payments to MHC, with each such payment to be applied against the Repurchase Balance:

        i. $2,191,298.12 on or before August 14, 2020; and

        ii. $657,656.89 on or before August 21, 2020.

    c. Upon receipt of the two payments from Benja, MHC would then apply the security reserve it held pursuant to the Factoring Agreement, in the amount of $563,943.92 against the Repurchase Balance and Benja agreed after that to pay the remaining amount outstanding, calculated at $69,434.79.

The Trustee is informed and believes that, on September 15, 2020, Seigfreid Bingham, as counsel for MHC, sent a letter to Benja notifying it of its breaches of the Forbearance Agreement. (Everett Declaration, ¶12, Exhibit K).

The Debtor initiated a voluntary Chapter 11 bankruptcy case on October 15, 2020 (the "Petition Date"). Within 90 days of the Petition Date, Benja made the following payments to MHC:

| Date | Amount | Source |
|---|---|---|
| August 7, 2020 | $100,000.00 | Benja's account at Busey Bank |
| August 20, 2020 | $1,941,298.12 | Benja's account at Busey Bank |
| August 27, 2020 | $10,000.00 | Benja's account at Busey Bank |
| August 28, 2020 | $2,500.00 | Benja's account at Busey Bank |
| September 2, 2020 | $25,000.00 | Benja's account at Busey Bank |
| September 2, 2020 | $75,000.00 | Benja's account at Busey Bank |
| September 2, 2020 | $475,000.00 | Benja's account at Busey Bank |
| September 4, 2020 | $10,000.00 | Benja's account at Busey Bank |
| September 11, 2020 | $50,000.00 | Benja's account at Busey Bank |
| September 11, 2020 | $78,008.70 | Benja's account at Busey Bank |
| September 18, 2020 | $200,000.00 | Benja's account at Busey Bank |
| September 22, 2020 | $20,000.00 | Benja's account at Busey Bank |
| September 25, 2020 | $96,229.39 | Andrew Chapin's account at JP Morgan Chase |
| Total | $3,083,036.21 | |

(Everett Declaration, ¶13, Exhibit L). These Preferential Transfers total $3,083,036.21.

On June 16, 2021, Mr. Chapin pled guilty to bank fraud, wire fraud, and securities fraud (the "Plea Agreement"). The Plea Agreement, which is lengthy, provides, *inter alia*, as follows:

> During the relevant time period (June 2019 through September 2020), I looked for additional investors and credit lines for Benja. I told creditors and prospective investors that Benja generated $6,200,000 and $13,200,000 in revenue in 2018 and 2019, respectively, and had signed large contracts with numerous well-known companies including Nike, Fanatics, Patagonia, and Backcountry, to place advertisements for their excess inventory. In truth, I knew that my representations to creditors and investors were false, as I had fabricated Benja's revenue and did not have contracts with any of these companies.
>
> To perpetuate the fraud scheme, beginning in June of 2019 and continuing until August of 2019, I made a series of false statements to Busey Bank to secure lines of credit totaling $5,000,000. For example, on June 24, 2019, I applied for a $1,000,000 line of credit for Benja with Busey Bank. I provided financial statements, a balance sheet, incorporation documents, and tax information in support of the application. I designated Benja's assets as collateral for the loan and submitted a July 2019 Aged Receivables Report listing $2,027,290 in receivables, including

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

$1,600,000 in current receivables from Nike, Patagonia, Backcountry, and Fanatics. In truth, I falsified the aged receivables report, as I knew Benja did not have contracts with Nike, Patagonia, Backcountry, or Fanatics. In truth, I received an advance on my line of credit from Busey Bank and used most of the money to pay off other creditors and investors, to pay my personal credit cards, and transferred funds to my crypto-currency exchange account.

Everett Declaration, ¶7, Exhibit F at 3:25-4:14.

Benja was insolvent when it made the Preferential Transfers. Everett Declaration ¶14.

### III. LEGAL ANALYSIS

#### A. Standards for Granting Summary Judgment

Summary judgment shall be granted when there is no genuine issue of material fact and Plaintiff is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056. A party seeking summary judgment must first establish that there are no genuine disputes concerning material facts upon which the claim lies, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c).

A triable issue of fact exists when material facts specifically averred by the movant are contradicted by facts specifically averred by the respondent. *Lujan v. National Wildlife Federation*, 497 U.S. 883 (1990). If the respondent presents controverting evidence, then the court must determine if the evidence is sufficient, considering the facts in the light of the applicable standard of proof, to permit a reasonable jury to resolve the issue in the respondent's factor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In doing so, the respondent is entitled to have all reasonable inferences drawn in its favor. *Lujan*, 497 U.S. at 903 (dissent). However, the Court need not ignore the entirety of the record in determining whether an inference is reasonable, or whether the evidence is sufficient to meet the applicable burden. *United States v. Grayson*, 879 F.2d 620 (9th Cir. 1989) (although noting that some conflicting evidence was adduced, court affirmed summary judgment because no rational trier of fact considering the entirety of the record could have resolved the issue in respondent's favor).

#### B. The Preferential Payments Are Avoidable and Recoverable By the Trustee

The Bankruptcy Code provides that a trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable

affirmative defenses under section 547(c), avoid any transfer of the debtor in property (1) to or for the benefit of a creditor; (2) for or on account of any antecedent debt owed to the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5) that enables such creditor to receive more than such creditor would receive if the case were a case under chapter 7, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code. 11 U.S.C. § 547(b).

### 1. *The Preferential Transfers Were Made To MHC*

As set forth in the bank statements attached to the accompanying Declaration of Kyle Everett in support of the Motion, the Preferential Transfers were made by the Debtor to MHC. (Everett Declaration, ¶13, Exhibit L).

### 2. *The Preferential Transfers Were on Account of an Antecedent Debt Owed by the Debtor*

The Preferential Payments were made on account of an antecedent debt owed by the Debtor to MHC, pursuant to the Factoring Services Agreement and the Forbearance Agreement. (Everett Declaration, ¶13).

### 3. *The Preferential Transfers Were Made Within 90 Days Before the Petition Date*

Ninety days prior to the October 15, 2020 Petition Date is July 16, 2020. The Preferential Transfers were all made between August 7, 2020 and September 25, 2020. (Everett Declaration, ¶13).

### 4. *The Debtor was Insolvent When it Made the Preferential Transfers*

There is a presumption of insolvency in the ninety days before the Petition Date. 11 U.S.C. §547(f). Given that the Debtor was not a legitimate business, but rather was a Ponzi scheme, this presumption of insolvency is not controvertible. (Everett Declaration, ¶14).

### 5. *The Preferential Transfers Enabled MHC to Receive More than MHC Would Receive if the Transfer Had Not Been Made and MHC Received Payment on its Debt Pursuant to the Bankruptcy Code's Priorities*

Although MHC purported to obtain a security interest in Benja's accounts receivable, no such accounts receivable existed, and in any event Busey Bank had a security interest senior to MCH. Accordingly, there was no collateral to which MHC's security interest could attached. Cal. U. Comm. Code §9-203.

### 6. *Taking Account of MHC's Known Defenses Under 11 U.S.C. §547(c), MHC is Liable on the Trustee's Preference Claims*

MHC's answer to the complaint included two defenses under 11 U.S.C. § 547(c)- contemporaneous exchange for value and subsequent new value. The Trustee is unaware of any facts that support these two defenses. The Preferential Transfers were on account of the existing debt, as established above and were not a contemporaneous exchange. MHC's advances to Benja occurred during a brief period from August 3, 2020 through September 25, 2020. MHC provided no new value to Benja subsequent to any of the Preferential Transfers. Accordingly, taking into account these known defenses, MHC is liable on the Preference Claims.

### C. The Avoidable Preference Claims are Recoverable by the Estate

The Trustee may recover the avoidable preferences for the estate pursuant to 11 U.S.C. §550(a), which provides that a trustee may recover the property transferred, or, if the court so orders, the value of such property, from— "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

### D. In the Alternative, the Plaintiff Requests that the Court Make Findings of Undisputed Facts Pursuant to Rule 56(f)

Rule 56(f) provides that the Court may consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. Fed. R. Bankr. Proc. 7056(f)(3). To the extent the Court does not grant partial summary judgment avoiding and recovering the Preferential Transfers, Plaintiff requests that the Court enter an order making findings of undisputed facts pursuant to Rule 7056(f)(3).

### IV. CONCLUSION

Based on the foregoing, the Plaintiff requests that the Court enter an order granting

Plaintiff seeks entry of an order granting summary judgment to avoid and recover the Preferential Transfers, which total $3,083,036.21, because there are no disputed material facts with respect to the Trustee's right to avoid and recover the Preferential Transfers. To the extent the Court does not grant partial summary judgment avoiding and recovering the Preferential Transfers, Plaintiff requests that the Court enter an order making findings of undisputed facts pursuant to Rule 7056(f)(3).

Dated: March 18, 2022  FINESTONE HAYES LLP

By: /s/ Jennifer C. Hayes
Jennifer C. Hayes
Attorneys for Kyle Everett, Trustee in Bankruptcy