Stephen D. Finestone (SBN 125675)
Jennifer C. Hayes (SBN 197252)
Ryan A. Witthans (SBN 301432)
FINESTONE HAYES LLP
456 Montgomery St., 20th Floor
San Francisco, California 94104
Telephone No.: 415.414.0466
Fax No.: 415.398.2830
sfinestone@fhlawllp.com
jhayes@fhlawllp.com

Attorneys for Kyle Everett,
Trustee in Bankruptcy

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>BENJA INCORPORATED, aka EPHE CORPORATION,<br><br>      Debtor. | Case No. 20-30819-DM<br>Chapter 7 |
| KYLE EVERETT,<br>TRUSTEE IN BANKRUPTCY,<br><br>      Plaintiff,<br><br>v.<br><br>MHC FINANCIAL SERVICES, INC.,<br><br>      Defendant. | Adversary Proceeding No. 21-03036-DM<br><br>**DECLARATION OF KYLE EVERTT IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing:<br>Date:   April 15, 2022<br>Time:   10:30 A.M.<br>Place:  Tele/video conference<br><br>*Please check www.canb.uscourts.gov for information regarding the Court's operations due to the COVID-19 pandemic.* |

I, Kyle Everett, declare as follows:

    1.    I make this declaration in support of the Plaintiff's Motion for Partial Summary Judgment filed in the above-captioned adversary proceeding. The statements herein are based upon my own knowledge, or my information and belief where indicated. If called as a witness, I could and would testify competently to the matters set forth below.

EVERETT DEC ISO
MOTION FOR PARTIAL SUMMARY JUDGMENT

2. I am informed and believe that, on or about March 25, 2020, MHC Financial Services, Inc. ("MHC") and Benja Incorporated ("Benja" or the "Debtor") entered into a Factoring Services Agreement. A copy of the Factoring Services Agreement, which I am informed and believe is an authentic copy, is attached as **Exhibit A**.

3. On or about July 19, 2019, a UCC-1 Financing Statement was recorded with the Delaware Secretary of State evidencing a blanket security interest in Benja's assets in favor of Busey Bank as the secured party, filed as Document No. 2019 500 5348 (the "Busey Bank Lien"). A copy of the Busey Bank Lien, which I am informed and believe is an authentic copy, is attached as **Exhibit B**.

4. I am informed and believe that the Busey Bank Lien is valid and enforceable and that it has never been reconveyed. Attached as **Exhibit C-1** is what I am informed and believe is an authentic copy of the UCC lien search results for the Debtor via a Lexis public records search on March 2, 2022. Attached as **Exhibit C-2** is what I am informed and believe is an authentic copy of the UCC lien search results for Busey Bank as the Secured Party and Benja as the Debtor, via a Lexis public records search on March 2, 2022. According to these research results, the Busey Bank Lien was never terminated.

5. I am informed and believe that Andrew Chapin, as the President and CEO of Benja, gave MHC a purported UCC termination notice, which I am informed and believe was fraudulent. Attached as **Exhibit D** is an authentic copy of the purported Busey Bank Lien termination notice.

6. I attended the Rule 2004 exam of MHC's Vice President, Dan Anderson. In summary, Mr. Anderson testified that MHC conducted its own separate UCC research and noted that the Busey Bank lien still appeared after the date of the purported termination of the Busey Bank's termination notice. In summary, Mr. Anderson testified that while MHC noted the Busey Bank lien still existed, MHC believed its apparent existence was a function of the recorded termination not yet appearing in the official records. Attached as **Exhibit E** is the relevant portion of Mr. Anderson's examination.

7. Following execution of the Factoring Services Agreement, I am informed and believe that Chapin arranged to sell and MHC agreed to buy purported accounts receivable owned

Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 2 of 127

by Benja related to the CPM Business; however, no such accounts receivable existed. Attached as **Exhibit F** is an authentic copy of the Criminal Plea Agreement by Andrew Chapin.

8.    Pursuant to the Factoring Services Agreement, I am informed and believe that MHC advanced approximately $4,482,707.79 in funds to Benja on the following dates for the purported purchase of the Factored Accounts Receivable:

| Date | Amount Advanced by MHC to Benja |
| --- | --- |
| April 2, 2020 | $414,950.54 |
| April 6, 2020 | $1,243,604.49 |
| April 10, 2020 | $322,963.00 |
| April 29, 2020 | $994,774.76 |
| April 30, 2020 | $696,970.23 |
| May 27, 2020 | $268,872.52 |
| May 27, 2020 | $540,572.25 |
| Total | $4,482,707.79 |

Attached as **Exhibit G-1** are authentic copies of Benja's bank statements showing these transfers by MHC into Benja's bank account. These transfers from MHC were purportedly to purchase various Benja accounts receivable. I am informed and believe that in reality the accounts receivable did not exist, as Chapin presented MHC with fraudulent orders by the purported account debtors, such as those attached herein as **Exhibit G-2**.

9.    I am informed and believe that, on or about July 17, 2021, MHC transmitted a letter to Benja with respect to uncollectible invoices for services purportedly provided to Backcountry.com, Inc., Columbia Sportswear Company, Fanatics, Inc., New Balance Inc., and Nike, Inc., the rights to which Benja had assigned to MHC under the Factoring Services Agreement. Attached as **Exhibit H** is a copy of the July 17, 2020 letter from MHC to Benja, which I am informed and believe is an authentic copy.

10.    I am informed and believe that, on or about July 21, 2020, Mr. Chapin, on behalf of

EVERETT DEC ISO
MOTION FOR PARTIAL SUMMARY JUDGMENT

Benja, transmitted a document to MCH titled "Promise to Pay." Attached as **Exhibit I** is a copy of the July 21, 2020 Promise to Pay, which I am informed and believe is an authentic copy.

11.     I am informed and believe that, on or about August 7, 2020, MHC and Benja entered into a Forbearance and Standstill Agreement (the "Forbearance Agreement"). Attached as **Exhibit J** is a copy of the Forbearance Agreement, which I am informed and believe is an authentic copy.

12.     I am informed and believe that, on or about September 15, 2020, Seigfreid Bingham, as counsel for MHC, sent a letter to Benja notifying it of its breaches of the Forbearance Agreement. Attached as **Exhibit K** is a copy of the September 15, 2020 letter, which I am informed and believe is an authentic copy.

13.     I am informed and believe that the Debtor initiated a voluntary Chapter 11 bankruptcy case on October 15, 2020 (the "Petition Date"). I am informed and believe that, within 90 days of the Petition Date, Benja made the following payments to MHC, which payments were made pursuant to the Factoring Services Agreement:

| Date | Amount | Source |
|---|---|---|
| August 7, 2020 | $100,000.00 | Benja's account at Busey Bank |
| August 20, 2020 | $1,941,298.12 | Benja's account at Busey Bank |
| August 27, 2020 | $10,000.00 | Benja's account at Busey Bank |
| August 28, 2020 | $2,500.00 | Benja's account at Busey Bank |
| September 2, 2020 | $25,000.00 | Benja's account at Busey Bank |
| September 2, 2020 | $75,000.00 | Benja's account at Busey Bank |
| September 2, 2020 | $475,000.00 | Benja's account at Busey Bank |
| September 4, 2020 | $10,000.00 | Benja's account at Busey Bank |
| September 11, 2020 | $50,000.00 | Benja's account at Busey Bank |
| September 11, 2020 | $78,008.70 | Benja's account at Busey Bank |
| September 18, 2020 | $200,000.00 | Benja's account at Busey Bank |
| September 22, 2020 | $20,000.00 | Benja's account at Busey Bank |

EVERETT DEC ISO
MOTION FOR PARTIAL SUMMARY JUDGMENT

| September 25, 2020 | $96,229.39 | Andrew Chapin's account at J.P. Morgan Chase Bank |
|---|---|---|
| Total | $3,083,036.21 | |

Attached as **Exhibit L** are what I am informed and believe are authentic copies of the Busey Bank and J.P. Morgan Chase Bank accounts referenced above in this numbered paragraph 13, showing the wire information for the above-referenced payments totaling $3,083,036.21.

14.     Benja was insolvent at the time of the Preferential Transfers.  At the time of each transfer, Benja's debts exceeded its liabilities.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 18, 2022 in San Francisco, California.

/s/ *Kyle Everett*
Kyle Everett

EVERETT DEC ISO
MOTION FOR PARTIAL SUMMARY JUDGMENT

# Exhibit A

DocuSign Envelope ID: 929B2449-6CED-4F73-8898-4479A1C4116B

# FACTORING SERVICES AGREEMENT

     **THIS FACTORING SERVICES AGREEMENT** (this "**Agreement**") is made and entered into as of March 25th, 2020, by and between MHC Financial Services, Inc., a Missouri corporation ("**Purchaser**"), and Benja Incorporated, a Delaware corporation ("**Client**").

     In consideration of and for the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Client agree as follows:

     1.     **Purchase of Accounts**.  Client agrees to offer to sell, assign, transfer and convey to Purchaser, with recourse as provided herein, some or all of its existing and future accounts receivable arising from services performed in the regular course of Client's business; i.e., any right to payment from any party for services rendered by or on behalf of Client (the "**Accounts**").  Purchaser shall determine, in its sole discretion, which Accounts it agrees to purchase from Client (any such purchased Accounts, **"Factored Accounts"**); it being understood that Purchaser shall not be obligated to purchase any Accounts.  Client shall sell, assign, transfer and convey the Factored Accounts to Purchaser.  Client shall execute and deliver to Purchaser a Bill of Sale and Assignment, in the form attached hereto as **EXHIBIT A**, with respect to the Factored Accounts, which shall vest in Purchaser all of Client's right, title and interest in such Factored Accounts, together with any undercharges, securities and/or guarantees thereon.  Client shall retain all original paperwork related to the Factored Accounts (i.e., invoices, purchase orders and other documentation supporting the Factored Accounts) until the termination of the Agreement.  Client shall be required to produce original or copies of paperwork for Factored Accounts upon request to Purchaser within 2 business days.

     2.     **Purchase Price; Base Fee**.  The purchase price for each Factored Account purchased by Purchaser hereunder shall be the net amount of such Factored Account, less Purchaser's base fee, which fee shall be an amount equal to one and twenty-five hundredths percent **(1.25%)** of such net amount (the "**Base Fee**").  For purposes of the foregoing, the "net amount" of a Factored Account means the gross amount/face value of the Factored Account less any discount or allowance of any nature offered or provided to the person or entity obligated to pay the Factored Account ("**Account Debtor**").  Upon presentation by Client to Purchaser of an acceptable invoice for an Account to be purchased by Purchaser (along with all supporting documentation for such Account requested by Purchaser, including invoices and any other documents requested by Purchaser substantiating the Account), and provided that no claim or dispute shall then exist with the Account Debtor with respect to the Account, Purchaser will advance to Client the purchase price of the Account, less a security reserve equal to eight and seventy-five hundredths percent **(8.75%)** of the net amount of the Account.  Following Purchaser's receipt of full payment of the invoice for the Factored Account from the Account Debtor, and provided Client shall not otherwise be in default in any respect under this Agreement, Purchaser will remit to Client the security reserve, less any Late Fees (in lieu of the Base Fee) pursuant to Section 5 hereof, any other amounts owed by Client to Purchaser, and any and all shipping charges and transactional fees as set forth on **EXHIBIT B** attached hereto and incorporated herein by reference, in complete and full payment for the Factored Account.  Purchaser will account for all Factored Accounts and security reserves separately, but the parties expressly acknowledge and agree that Purchaser will aggregate the security reserves for all Accounts purchased from Client hereunder, and, with respect to those Accounts which Purchaser has received full payment, and provided Client shall not otherwise be in default in any respect under this Agreement, shall remit such security reserve balances in excess of the minimum reserve requirement (less the applicable deductions, fees and charges), if any, to Client on a monthly basis, in full payment for the applicable Accounts.  In the event Client's security reserve balance becomes negative, Purchaser may deduct amounts from future purchases to offset the deficit security reserve or, upon demand by Purchaser, Client shall within two (2) business days of such demand pay to Purchaser the full amount of the deficit.  By way of example with respect to the above-referenced security reserves, if, on any monthly settlement date, the amount of reserves otherwise due Client is $1,000 but Client owes Late Fees of $100, the amount of reserves due Client on such monthly settlement date shall instead be $900; it being understood, however, that the aggregate amount of reserves at any time must equal at least eight and seventy-five hundredths percent **(8.75%)** of the unpaid balance of Factored Accounts at such time.

     Notwithstanding the foregoing, if mutually agreed between the parties, Purchaser may advance all or a portion of the purchase price for future Account(s) as an early payment for the purchase of such Account(s). Upon the assignment, transfer and conveyance to Purchaser of the Factored Account(s), Purchaser shall pay the balance of the purchase price less the advanced amount and any applicable reductions pursuant to Section 2 hereof. In the event the Account(s), upon which the advance is based, is not subsequently purchased by Purchaser after remitting the advance to Client, Client shall be obligated to repay such advanced amounts to Purchaser immediately upon request from



DocuSign Envelope ID: 929B2449-6CED-4F73-8898-4479A1C4116B

Purchaser and such repayment obligation shall be secured by the security interests granted under Section 6 of this Agreement.

1.1  **3.**  **Notice to Account Debtors**.  Client will notify each Account Debtor for which Purchaser purchases a Factored Account from Client, of the sale of its Account or Accounts, to remit payment thereof solely to Purchaser at 4501 College Blvd., Suite 160, Leawood, KS 66211 (or at such other address as Purchaser may designate by giving Client reasonable prior written notice thereof). Such notices shall be in the form attached hereto as **EXHIBIT C**.  All remittances received by Client for payment of Factored Accounts are the property of Purchaser, and Client shall hold such proceeds in trust for Purchaser, and shall immediately deliver to Purchaser, in the identical form, all payments received by Client on each such Accounts, together with all documents accompanying the remittance to Client.  Client guarantees the timely payment of the monies and amounts represented by the Factored Accounts.  Client agrees that it will not attempt to direct any payments on Factored Accounts other than to Purchaser.

4.  **Power of Attorney**.  Client does hereby irrevocably make, constitute and appoint Purchaser as its attorney-in-fact with full power and authority to act in its stead for the following purposes: (a) invoice or bill for, collect, receive, and deposit to Client's and/or Purchaser's bank accounts any and all amounts which may be due or become due to Client from Account Debtors, and to use Client's name for purposes of billing and collection of any and all amounts due from Account Debtors; (b) negotiate any checks received in payment of Accounts whether payable to Client or Purchaser or both, and endorse the name of Client on any checks or other evidences of payment or other instruments or documents that may come into the possession of Purchaser on Accounts purchased by Purchaser and on any invoices or other documents or instruments relating to any of the Accounts or relating to any collateral or security hereby granted by Client to Purchaser; (c) in Client's name, or otherwise, demand, make claim for, sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on the Accounts; (d) execute and deliver receipts or acknowledgements to Account Debtors for such amounts due which shall be binding upon Client and Purchaser; (e) notify Account Debtors of the sale of Accounts to Purchaser and notify and instruct Account Debtors, in Client's name, of the address and procedures for making payments on any Accounts that are sold to Purchaser or which constitute collateral hereby granted by Client to Purchaser; (f) take all steps necessary to ensure payment of such amounts and monies due, and do any and all things in Client's name necessary or proper to carry out the purposes intended by this Agreement; (g) file financing statements and all amendments thereto, describing as collateral any or all of the collateral described in Section 6 hereof by any description Purchaser deems appropriate in any jurisdiction or office Purchaser deems appropriate to perfect its security interest in the collateral described in Section 6 hereof; and  (g) initiate debit or credit entries through the Federal Reserve Automated Clearing House System (ACH) to any deposit account maintained by Client or Purchaser wherever located in order to satisfy any obligations of Client to Purchaser under this Agreement.  It is understood that this power of attorney is coupled with an interest, and is irrevocable until all obligations of Client to Purchaser under this Agreement have been satisfied.  Exercise of the foregoing powers shall be in the sole and absolute discretion of Purchaser, but Purchaser shall have no obligation to exercise any of the foregoing powers.  Nothing contained in this Agreement shall in any way require Purchaser to initiate or become a party to any litigation or other legal proceedings. Purchaser shall not, under any circumstances, or in any event whatsoever, have any liability for any error, omission or delay of any kind occurring in the collection, payment or settlement of any Account or of any instrument received in full or in part payment thereof or in dealing with any lien, security or guaranty of any such Account (other in the case of gross negligence).

5.  **Late Fees; Full Recourse**.  All Factored Accounts are purchased with full recourse including Purchaser's right to require Client's repurchase of Account(s) as set forth in this Section 5.  However, if Purchaser has purchased credit insurance to insure against certain failures of certain Account Debtors to satisfy the payment of Factored Accounts ("Credit Insurance"), then, to the extent Purchaser chooses to file a claim with the insurer issuing the Credit Insurance, and Purchaser actually receives the amount it is entitled to recover under such Credit Insurance (up to the limit of such Credit Insurance), Accounts of such Account Debtor purchased by Purchaser shall be deemed non-recourse.  If Client breaches any warranty or otherwise violates or defaults on any of its obligations hereunder, or if Purchaser reasonably determines after consultation with Client at any time that any Account purchased by Purchaser hereunder is uncollectible, or if any Account purchased by Purchaser hereunder is not paid in full within 100 days after the Account invoice date (or such longer period as may be mutually agreed by Purchaser and Client with respect to Accounts from specific Account Debtors (such accounts, "**Extended Term Accounts**"), then upon request by Purchaser, Client shall immediately repurchase such Account(s) from Purchaser for an amount equal to the net amount of such Account(s), less any payments received by Purchaser on such Account(s) from the Account Debtor(s).  Further, Client expressly acknowledges and agrees that the Base Fee pursuant to Section 2 hereof shall increase to 2.5% if an Account invoice remains unpaid after 33 days (i.e., day 34 through day 66 from the invoice date), shall increase again



MHC000881

to 3.75 **%** if an invoice remains unpaid for an additional 33 day period (i.e., day 67 through day 99 from the invoice date), and solely with respect to Extended Term Accounts, shall increase again to such rate as may be mutually agreed by Purchaser and Client with respect to such Extended Term Accounts. The incremental increases in the Base Fee described above in this Section 5 shall be referred to herein as "**Late Fees**". Any security reserve held by Purchaser for such Account shall be released only in accordance with Section 2 hereof, and Purchaser shall, in any event, be entitled to and shall retain its Base Fee and all Late Fees for the Account as set forth herein.

If any Account Debtor with respect to a Factored Account that is past due remits any interest, late fee or similar amount with respect to such past-due Account and Purchaser receives such amount, such amount shall, if the net amount of the related invoice is paid in full, act to reduce, on a dollar-for-dollar basis, the amount of Late Fees otherwise payable by Client with respect to such Factored Account pursuant to the above paragraph.

6. **Security Interest**. Client hereby grants to Purchaser as collateral, to secure all of the debts, liabilities and obligations of Client to Purchaser under this Agreement, including all costs and expenses incurred by Purchaser in connection with the enforcement of its rights under this Agreement, a continuing security interest in the following property of Client: (a) all Accounts, wherever located or situated, and whether now existing or arising in the future, and whether now owned or at any time in the future acquired by Client; all guaranties and security for such Accounts; all of Client's rights and interest in the goods giving rise to such Accounts, and the rights associated with or related or pertaining to such goods, including without limitation the right of stoppage in transit and any and all related insurance, any items substituted therefor as replacements and all additions thereto; (b) all of Client's chattel paper, instruments, general intangibles, securities, contract rights, associated with or related to the Accounts; (c) all proceeds of any of the foregoing Accounts, and all rights and interests and monies due or becoming due on such Accounts; and (d) all other personal property in which Client has an interest, now or hereafter existing or acquired, and wheresoever located, tangible or intangible, including, but not limited to, all present and hereafter existing or acquired vehicles, equipment, tools, goods, inventory, furniture, fixtures, contract rights, chattel mortgages, deeds of trust, stocks, bonds, certificates of deposit, bank accounts, security deposits, intellectual property and other general intangibles. Upon request by Purchaser, Client shall execute a Security Agreement in a form provided by Purchaser evidencing the foregoing security interest. Purchaser may file financing statements and amendments thereto describing as the collateral any or all of the foregoing collateral by any description Purchaser deems appropriate in any jurisdiction or office Purchaser deems appropriate to perfect its security interest in foregoing collateral. In the event of Client's breach of any warranty made in this Agreement, Client's failure to observe or perform any of the provisions or obligations of this Agreement or Client's (including Client's affiliates) default of any other written agreement with Purchaser or Purchaser's affiliates as defined in section 17 of the Agreement, Client shall be in default, and Purchaser may enforce payment and exercise any and all of the rights and remedies provided by Article 9 of the Uniform Commercial Code and any rights under this Agreement, including the right to offset any security reserve or other amounts owed to Client (or Client's affiliates) with any obligation of Client (or Client's affiliate) to Purchaser (or Purchaser's affiliates). Client acknowledges that Purchaser may from time to time receive payment from an Account Debtor on an Account that was not purchased by Purchaser (the "Non-Factored Accounts"). Client hereby grants such payments/proceeds from the Non-Factored Accounts to Purchaser as collateral to secure all of the debts, liabilities and obligations of Client to Purchaser under this Agreement. In addition, upon default by Client, Purchaser shall also have the right to take all actions necessary to collect the Accounts directly from the Account Debtors. Client agrees that it will not interfere with or otherwise attempt to circumvent Purchaser's rights under this Section 6 or the security interest granted herein.

7. **Personal Guaranty; Background Check**. To induce Purchaser to enter into this Agreement and to purchase the Accounts from Client, and as additional security for all of the debts, liabilities and obligations of Client to Purchaser under this Agreement, one or more owners of Client shall execute the Personal Guaranty form attached hereto as **EXHIBIT D**, pursuant to which said owner(s) shall unconditionally guaranty the obligations of Client under this Agreement. Such owner(s) must also consent to a personal credit check and comprehensive background investigation.

8. **Term and Termination**. The term of this Agreement shall commence as of the day and year first above written, and shall continue for an initial term of 12 months. Thereafter, this Agreement shall automatically renew for additional consecutive 12-month terms, unless either party provides the other party with written notice of its intent not to renew at least 30 days prior to expiration of the then-current term. Notwithstanding the stated term hereof or anything else herein to the contrary, (a) Purchaser may terminate this Agreement immediately upon written notice thereof to Client in the event Client breaches this Agreement or in the event of the insolvency of Client or the filing of a petition in bankruptcy by or against Client, (b) Purchaser may terminate this Agreement without cause by



DocuSign Envelope ID: 929B2449-6CED-4F73-8898-4479A1C4116B

providing Client with at least 60 days' prior written notice thereof, and (c) after the initial term of 9 months, Client may terminate this Agreement, without cause and without premium or penalty, by providing Purchaser with at least 30 days' prior written notice thereof. Further, Client may prepay, without premium or penalty, any advance made by Purchaser against any Factored Account (including any purchase price paid by Purchaser for such Factored Account) by paying to Purchaser all amounts then due Purchaser with respect to such Factored Account, including any Late Fees or other amounts (or, as applicable, Client may repurchase any Factored Account from Purchaser, free of any lien or claim originated by or through Purchaser, by paying to Purchaser all amounts then due Purchaser with respect to such Factored Account, including any Late Fees or other amounts). Expiration or earlier termination of this Agreement shall not affect, waive or release the rights and obligations of the parties hereunder with respect to any Accounts purchased by Purchaser prior to such expiration or termination, and Client shall remain liable to Purchaser for all amounts and monies as may be owed to Purchaser under the terms and conditions of this Agreement. Upon termination, any security reserve, and any other funds or monies from any source whatsoever which Purchaser would otherwise owe to Client, may be retained by Purchaser until such time as all obligations and debts of Client to Purchaser have been fully satisfied, and Purchaser's security interest provided in Section 6 hereof shall continue until all obligations of Client to Purchaser are paid in full. Purchaser shall have the right, in its sole discretion, to set off against the security reserve and any other sums owing to Client by Purchaser all obligations and debts of Client to Purchaser. All of Client's covenants, warranties and agreements under this Agreement made to Purchaser, as well as Purchaser's security interest pursuant to Section 6 above, shall continue in full force and effect until all Factored Accounts purchased hereunder and all debts and debts and obligations of Client to Purchaser are paid in full. Upon termination of this Agreement and payment in full of all debts and obligations of Client to Purchaser, Purchaser shall promptly (i) provide Client with an executed letter of release with respect to the Factored Accounts, which Client may share with Account Debtors (ii) return to Client any security reserves not previously applied by Purchaser to Client's obligations to Purchaser under this Agreement, (iii) terminate any UCC financing statements or other lien filings against Client showing Purchaser or its assigns as secured party or the like, and (iv) provided that Client shall have prepaid any and all advances, made by Purchaser against any Factored Account (including any purchase price paid by Purchaser for such Factored Account) re-convey to Client, free of any lien or claim originated by or through Purchaser, any Factored Accounts previously sold to Purchaser to the extent Purchaser has not collected such Factored Accounts and applied the proceeds thereof to Client's obligations to Purchaser under this Agreement; it being understood that Purchaser's obligations under this sentence shall survive the termination of this Agreement.

9. **Representations and Warranties**. Client represents, covenants, warrants and agrees as follows:

(a) That it is duly incorporated, existing and in good standing under the laws of the state of its incorporation, and that the execution, delivery and performance of this Agreement are in every respect within its corporate powers and have been duly authorized by appropriate corporate action.

(b) That this Agreement, when duly executed and delivered by Client and Purchaser, will constitute a legal, valid and binding agreement of Client fully enforceable in accordance with its terms and conditions.

(c) Client's address set out in Section 12 of this Agreement is, as of the date hereof, the address of Client's principal office. Client shall give Purchaser immediate written notice of any change in the location of its principal office or any name change or the addition of any name under which Client does business. If requested by Purchaser from time to time, Client shall provide Purchaser the address or addresses of such other locations where Client has operations or offices.

(d) As to each Factored Account: (1) such Account is not yet past due, arose in the ordinary course of Client's business and represents a bona fide completed transaction; (2) Client owns the Account free and clear of all liens, security interests and/or any other encumbrance, Client's ownership of and right and title to the Account is absolute and subject to no assignment or claim, and Client shall not assign, grant a security interest in or encumber the Account contrary to this Agreement; (3) the Account, as shown on Client's books and records, and on any invoices or statements delivered to Purchaser, is a legally enforceable debt owed by the related Account Debtor to Client in its full face amount, and is not contingent upon the fulfillment of any condition whatsoever; (4) no partial payment has been made by anyone on such Account, except as shown on Client's books and records; and (5) no set off, credit, allowance, adjustment, counterclaim or defense to such Account exists or will exist and no agreement has been made or will be made with any person or entity under which any deduction or discount may be claimed on such Account, except as shown on Client's books and



MHC000883

DocuSign Envelope ID: 929B2449-6CED-4F73-8898-4479A1C4116B

records; and (6) the Account is payable on the due date indicated in the related invoice provided by Client to Purchaser most recently prior to Purchaser's purchase of the Account.

(e)     Client shall execute any and all financing statements, Uniform Commercial Code forms or other documents or instruments which Purchaser reasonably deems necessary and/or appropriate to protect its interest under this Agreement.

(f)     Client shall indemnify, defend and hold harmless Purchaser from and against any and all misrepresentations or breaches of warranty or other defaults hereunder by Client; from any dispute or claim resulting in liability, loss, expense, cost or attorneys' fees caused by or arising out of the rejection of any work performed or services rendered by Client; or from any alleged claim, dispute, action, defense or set off of every kind and nature asserted by any Account Debtor;

(g)     Client shall not, without the express written consent of Purchaser, release, compromise, settle or adjust any Factored Account, or grant any discounts, allowances or credits thereon.

The representations, covenants and warranties set forth in this Section 9 above shall survive expiration or termination of this Agreement, regardless of reason.

10.    **Recordkeeping**. All of Client's books, accounts, ledgers, correspondence, records and papers pertaining to all of the Accounts and Client's business shall be accurately and properly prepared and maintained by Client and shall, in the case of Factored Accounts, disclose the sale of such Accounts to Purchaser. All such books, ledgers, accounts, records, correspondence and papers shall be made available by Client upon reasonable notice and at all reasonable times for Purchaser's inspection, audit and copying. Client shall, upon the reasonable request of Purchaser, furnish Purchaser with financial statements, including income statements and balance sheets showing Client's financial condition.

11.    **Attorneys' Fees**. If Purchaser retains the services of an attorney to enforce any obligation of Client to Purchaser under this Agreement, Purchaser shall be entitled to recover from Client all reasonable out-of-pocket attorneys' fees, court costs and expenses, regardless of whether or not an action is commenced.

12.    **Notice**. Notices under this Agreement shall be in writing and mailed postage prepaid, registered or certified mail, return receipt requested, or sent by overnight delivery service, or by facsimile transmission to the recipient's facsimile machine, addressed to the addresses set forth below, or to such other addresses as either party notifies the other in writing. All such notices shall be effective upon receipt if delivered by hand or facsimile or overnight delivery service; otherwise upon five (5) business days after the notice is placed in the U.S. Mail. Addresses for notices are as follows:

If to PURCHASER:                       If to Client:

MHC Commercial Finance         Benja, Inc,
4501 College Blvd., Suite 160     845 Market St. Suite 450A
Leawood, KS 66211           San Francisco, CA 9410
Fax: (816) 242-6249          Attn: Andrew Chapin, CEO

13.    **Governing Law**. This Agreement is accepted and made in the state of Kansas and this Agreement and the rights of the parties hereunder shall be interpreted under and governed as to construction, enforcement and validity by the laws of the state of Kansas. Purchaser and Client agree that any legal suit, action or proceeding arising out of or related to this Agreement shall be instituted, heard and resolved solely and exclusively in a state court located in Johnson County, Kansas or a federal court located in the District of Kansas. Purchaser and Client submit to the jurisdiction of such state and federal courts for the purpose of deciding any questions, disputes or causes, arising under this Agreement. In the event that any one or more of the provisions in this Agreement should be held by any court of competent jurisdiction to be unenforceable, the holding or decision shall not affect or impair any of the other provisions of this Agreement.

14.    **Waiver**. No delay or omission on the part of Purchaser in enforcing or exercising any right hereunder shall operate as a waiver of such right or any other right. The waiver by Purchaser of the breach by Client

MHC000884

of any provision of this Agreement shall not be construed as a waiver of any other breach. No waiver or modification of the Agreement shall be enforceable or chargeable against Purchaser unless it is in writing, signed by Purchaser and delivered by Purchaser to Client.

15. **Miscellaneous Provisions**. This Agreement shall binding upon and inure to the benefits of the parties hereto and their respective successors and assigns; provided, however, that this Agreement may not be assigned by Client without the prior written consent of Purchaser. The waiver, compromise, discharge, extension or release by Purchaser of any duty or obligation of any Account Debtor, in each case made in compliance with the provisions of this Agreement, shall not reduce, diminish, limit or restrict in any way Client's obligations and liabilities to Purchaser. Duties and obligations imposed by this Agreement and rights and remedies available hereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law. The parties agree to do all acts and things, and to make, execute and deliver such written instruments, as shall from time to time be reasonably required to carry out the terms and provisions of this Agreement. All headings, titles and section captions are inserted in this Agreement for convenience of reference only, are descriptive only and shall not be deemed or construed to add to, detract from or otherwise modify the meaning of the sections or provisions hereof. This Agreement constitutes the exclusive statement of the agreement of the parties with respect to the subject matter hereof, and this Agreement supersedes and replaces all prior and contemporaneous agreements, discussions and representations, whether written or oral, relating to the subject matter hereof. The terms and provisions of this Agreement can only be amended, altered, changed, modified, supplemented or waived pursuant to a writing signed by the parties hereto; provided, however, that Purchaser may waive any obligation of or requirement affecting Client under this Agreement by giving Client written notice thereof. Client consents to contract electronically with Purchaser for purposes of this Agreement and any subsequent agreement between Client and Purchaser or Purchaser's affiliates and understands that Client is entering into a legal agreement by agreeing to this Agreement and intends to be legally bound by such agreement. Any termination of Client's consent to conduct business electronically shall not affect the legal enforceability of any Agreement entered into prior to such withdrawal of consent. This Agreement may be executed in one or more counterparts and each counterpart with a mark demonstrating intent to be bound by the terms thereof, whether an original handwritten signature, facsimile, electronic acknowledgement, or any other mark accepted to bind parties to an agreement under applicable law is considered an original and all counterparts shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, effective as of the day and year first above written.

"Purchaser":                                      "Client":

**MHC Financial Services, Inc.**                  **Benja, Inc**

By _Erin Murphy_                                  By _Andrew J. Chapin_
   9DD2E26CF3A8465...                    7FD0E63A9C9544B...
Name _Erin Murphy_                                Name _Andrew J. Chapin_
Title _Director of Factoring_                     Title _President & CEO_

**EXHIBIT A**

**BILL OF SALE AND ASSIGNMENT**

     **FOR VALUE RECEIVED**, the receipt and sufficiency of which is hereby acknowledged, Benja Incorporated, a Delaware corporation ("**Assignor**"), does hereby grant, sell, assign, transfer and convey unto MHC Financial Services, Inc., a Missouri corporation ("**Purchaser**"), its successors and assigns, the accounts receivable arising from services performed in the regular course of Assignor's business, as described on the schedule of accounts attached hereto and/or evidenced by the invoices attached hereto, which are incorporated herein by this reference (the "**Factored Accounts**").

     **TO HAVE AND TO HOLD** the same unto Purchaser, its successors and assigns, forever, Assignor hereby representing and warranting that it conveys good and merchantable title to the Factored Accounts, free and clear of all liens, encumbrances, and security interests, and that it will warrant and defend the title to the Factored Accounts unto Purchaser, its successors and assigns, forever against the claims and demands of all persons whomsoever.

     **IN WITNESS WHEREOF**, Assignor has executed this Bill of Sale and Assignment effective as of the  25th day of  March, 2020.

"Assignor":

**Benja Incorporated**

By     *Andrew J. Chapin*
         7FD0E83A9C9544B...

Name    Andrew J. Chapin

Title    President & CEO

MHC000886

DocuSign Envelope ID: 929B2449-6CED-4F73-8898-4479A1C4116B

## EXHIBIT B

### Transaction Fees

- Transaction Fees (ACH and/or Fuel Card)          $  0.00

- Minimum Invoice Fee          $  0.00

### One Time Fees and Charges

- Origination Fee          $  1,000

### Additional Fees and Charges
**\*note these charges only occur if you ask for these services\***

- Bank Wire Fee          $  15.00

Client expressly acknowledges and agrees that such fees and charges are subject to change by Purchaser from time to time, and that certain additional fees/charges may be assessed based on increased cost to Purchaser and/or third party charges.  In the event of any such change, Purchaser will provide Client written notice thereof, and the new fee schedule shall be incorporated herein by this reference. The foregoing is expressly agreed to and accepted by Client:

**Benja Incorporated**

By _Andrew J. Chapin_
7FD0E63A9C9544B...

Name  Andrew J. Chapin

Title  President & CEO

DocuSign Envelope ID: 929B2449-6CED-4F73-8898-4479A1C4116B

**EXHIBIT C**
**NOTICE OF ASSIGNMENT**

TO: [                                    ]

ATTN:  **ACCOUNTS PAYABLE MANAGER**                    E-MAIL:

REGARDING:    Benja Incorporated                    DATE:  3/25/2020

The purpose of this Notice of Assignment is to inform you that the above-named company has assigned all of its current and future accounts receivable and the proceeds thereof to Purchaser.  Accordingly, Purchaser now owns ALL of above-named company's accounts receivable and has the sole and exclusive right to collect and retain the same. The amount due or to become due under each such account has been assigned and payment is to be made to Purchaser. You may have received, or will be receiving, invoices for services rendered by this company.  **Please be advised that ALL such invoices (past, present, and future) must be paid directly to Purchaser as indicated below:**

Payments by mail:                    Electronic Payments:
                                    Account:  987 222 4221
    Murphy Hoffman Company            Routing:  101 000 695
    P.O. Box 874091                    Reference: Benja
    Kansas City, MO 64187            *Please submit supporting documents*
                                    *via email to:*
                                    Email: ACH.payments@mhc.com

Your compliance with this assignment is authorized and directed by the above-named company, as evidenced by the duly authorized signature of the company below.  This assignment can only be revoked in writing signed by both Purchaser and the above-named company.  In the event there is any claim or dispute that may affect payment of any invoice, or if any person or entity other than Purchaser attempts to collect or claims any right to any such invoices/accounts receivable, then please notify Purchaser immediately, and do not make any payment on such accounts to any other party (including the above-named company).  **Payment to the company or any other party will not discharge or relieve you of your obligation to pay Purchaser following your receipt of this notice.**

Your cooperation with this Notice of Assignment and timely payment of all such invoices as directed will be greatly appreciated, and will help to avoid duplicate payments and/or legal action.  Although all funds and payments will be redirected to Purchaser, please continue to send all 1099's directly to the company. Please make the proper notations on your ledger. Lastly, by sending payment to Purchaser you acknowledge invoices are not subject to any claims or defenses or right to offset you may have against the company.  Thank you.
***IF YOU HAVE QUESTIONS OR WOULD LIKE ADDITIONAL INFORMATION PLEASE CONTACT US AT 844-891-3509.***

**Purchaser**                        The foregoing is authorized and directed
**MHC Financial Services, Inc.**            by the above-named company:

*Erin Murphy*                        By   *Andrew J. Chapin*
                                    Name  Andrew J. Chapin
                                    Title  President & CEO

## ACKNOWLEDGMENT OF ASSIGNMENT

The undersigned hereby acknowledges receipt of the foregoing Notice of Assignment from Purchaser, and acknowledges that Benja Incorporated has assigned all of its current and future accounts receivable and the proceeds thereof to MHC Financial Services. Accordingly, the undersigned expressly acknowledges and agrees that all invoices for services rendered by this company shall be paid directly to Purchaser at the following address:

**The undersigned agrees <u>not</u> to make any payment on such accounts to any other party (including the above-named company). <u>The undersigned expressly acknowledges and agrees that payment of any such account to the above-named company or to any party other than Purchaser shall not relieve or discharge its payment obligation to Purchaser, and the undersigned shall remain responsible and liable for such payment to Purchaser.</u> The undersigned hereby waives any right to offset against payment of any such account.**

The foregoing is acknowledged and agreed to by:

By _____

Name _____

Title _____

MHC000889

**EXHIBIT D**

**PERSONAL GUARANTY**

For valuable consideration and to induce MHC Financial Services, Inc. ("Purchaser") to enter into that certain Factoring Services Agreement dated March 25th, 2020 (the "Agreement") with Benja Incorporated (Client"), I/we, the undersigned Guarantor(s), jointly and severally, do hereby unconditionally guarantee to Purchaser, its successors and assigns, the full, prompt and complete performance by Client of all of the provisions, conditions, covenants and agreements contained in the Agreement, including the full and complete payment of all monies that became due thereunder to Purchaser by Client, and do hereby waive all notice of default by Client and notice of acceptance of this guaranty by Purchaser, and do hereby consent to any extension of time that may be given by Purchaser to Client of time for payment or performance. If, at any time, Client shall fail to timely pay any amounts owed to Purchaser under the Agreement or otherwise fail to perform any of its obligations under the Agreement, then the undersigned shall promptly pay the same or perform the same in the place and stead of Client. This guaranty is not limited to any particular period of time, but shall continue until all of the terms, covenants, and conditions of the Agreement have been fully and completely performed by Client, and the undersigned shall not be released of any obligation or liability hereunder so long as there is any claim of Purchaser against Client arising out of or relating to the Agreement that has not been settled or discharged in full. The undersigned waive(s) any right to require Purchaser to proceed against Client, any account debtors or customers of Client, or any other person, debtor or guarantor, or to proceed against or exhaust any security or pursue any other remedy in Purchaser's power. Whether or not a suit is initiated, the undersigned shall pay all reasonable attorneys' fees and all other costs and expenses incurred by Purchaser in enforcing this guaranty and in any actions or proceedings arising out of or relating to this guaranty. This guaranty shall be governed and construed in accordance with the laws of the state of Kansas. The undersigned hereby consents to the sole and exclusive jurisdiction of any state or Federal court within the state of Kansas in connection with the enforcement of this guaranty.

Guarantor(s):

*Andrew J. Chapin*
—7F20E53A8C854A9...
[Signature]
Andrew J. Chapin
[Printed Name]
3/25/2020
[Date]

*Thomas Goode*
—D03573F13BA042A...
[Signature]
Thomas Goode
[Printed Name]
3/25/2020
[Date]

MHC000890

# Exhibit B



# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**LIEN SOLUTIONS 800-331-3282**

B. E-MAIL CONTACT AT FILER (optional)
**UCCFILINGRETURN@WOLTERSKLUWER.COM**

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

**P.O. BOX 29071**

**GLENDALE, CA 91209-9071**

**US**

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 10:43 AM 07/19/2019**
**U.C.C. Initial Filing No: 2019 5005348**

**Service Request No:  20196055619**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME **BENJA INCORPORATED** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS **845 MARKET STREET 450A** | CITY **SAN FRANCISCO** | STATE **CA** | POSTAL CODE **94103** | COUNTRY **US** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME **BUSEY BANK** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS **12300 OLIVE BLVD** | CITY **CREVE COEUR** | STATE **MO** | POSTAL CODE **63141** | COUNTRY **US** |

4. COLLATERAL: This financing statement covers the following collateral:
**All assets of debtor**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**DE-0-70865712-57448499**

International Association of Commercial Administrators

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# Exhibit C-1

| | | UCC - LIEN FINANCING STMT | BB LENDING, LLC, A |
|---|---|---|---|

**BENJA INCORPORATED**
845 MARKET ST STE 450A
SAN FRANCISCO, CA 94103-1932

UCC - LIEN FINANCING STMT
NUMBER: U200022441424
DATE: 09/29/2020
JURISDICTION: CA

BB LENDING, LLC, A NEVADA LIMITED LIABILITY COMPANY
4230 PABLO PROFESSIONAL CT
JACKSONVILLE, FL 32224-3222

**CHAPIN, ANDREW J**
26 CRAGMONT AVE
SAN FRANCISCO, CA 94116-1308

NUMBER: U200022441424

---

☐ 2.

**BENJA INCORPORATED**
845 MARKET ST STE 450A
SAN FRANCISCO, CA 94103-1932

**CHAPIN, ANDREW J**
26 CRAGMONT AVE
SAN FRANCISCO, CA 94116-1308

INITIAL FILING
DATE: 09/29/2020
NUMBER: 2020 6718375
JURISDICTION: DE

BB LENDING, LLC, A NEVADA LIMITED LIABILITY COMPANY
4230 PABLO PROFESSIONAL CT STE 250
JACKSONVILLE, FL 32224-3228

---

☐ 3.

**BENJA INCORPORATED**
845 MARKET ST STE 450A
SAN FRANCISCO, CA 94103-1932

INITIAL FILING
DATE: 07/23/2020
NUMBER: 2020 5082476
JURISDICTION: DE

E-REVSHARE CORE, LLC
223 WALL ST # 416
HUNTINGTON, NY 11743-2060

---

☐ 4.

**BENJA INCORPORATED**
845 MARKET ST STE 450A
SAN FRANCISCO, CA 94103-1932

INITIAL FILING
DATE: 07/01/2020
NUMBER: 2020 4558419
JURISDICTION: DE

UMB BANK, N.A.
333 S GRAND AVE STE 2200
LOS ANGELES, CA 90071-1526

---

☐ 5.

**BENJA INCORPORATED**
845 MARKET ST
SAN FRANCISCO, CA 94103-1923

FINANCING STATEMENT
NUMBER: 207783129877
DATE: 05/29/2020
JURISDICTION: CA

U.S. SMALL BUSINESS ADMINISTRATION
10737 GATEWAY BLVD W STE 300
EL PASO, TX 79935-4910

---

☐ 6.

**BENJA INCORPORATED**
10 LYON ST APT 210
SAN FRANCISCO, CA 94117-3043

**BENJA**

FINANCING STATEMENT
NUMBER: 207769944341
DATE: 03/26/2020
JURISDICTION: CA

FIRST CORPORATE SOLUTIONS, AS REPRESENTATIVE
914 S STREET
SPRS@FICOSO COM
SACRAMENTO, CA 95811

<table>
<tr><td></td><td colspan="3"><u>INCORPORATED</u><br>251 LITTLE FALLS DR<br>WILMINGTON, DE<br>19808-1674<br><u>CHAPIN, ANDREW</u><br>10 LYON ST APT 210<br>SAN FRANCISCO, CA<br>94117-3043<br><u>GOODE, THOMAS</u><br>2901 BARTON SKWY APT<br>1105<br>AUSTIN, TX 78746-7554</td></tr>
</table>

| | | | | |
|---|---|---|---|---|
| ☐ | 7. | <u>BENJA</u><br><u>INCORPORATED</u><br>10 LYON ST APT 210<br>SAN FRANCISCO, CA<br>94117-3043<br><u>BENJA</u><br><u>INCORPORATED</u><br>251 LITTLE FALLS DR<br>WILMINGTON, DE<br>19808-1674<br><u>CHAPIN, ANDREW</u><br>10 LYON ST APT 210<br>SAN FRANCISCO, CA<br>94117-3043<br><u>GOODE, THOMAS</u><br>2901 BARTON SKWY APT<br>1105<br>AUSTIN, TX 78746-7554 | INITIAL FILING<br>DATE: 03/26/2020<br>NUMBER: 2020<br>2212308<br>JURISDICTION: DE | FIRST CORPORATE<br>SOLUTIONS, AS<br>REPRESENTATIVE<br>914 S ST<br>SACRAMENTO, CA<br>95811-7025 |
| ☐ | 8. | <u>BENJA</u><br><u>INCORPORATED</u><br>845 MARKET ST STE<br>450A<br>SAN FRANCISCO, CA<br>94103-1932 | STATE TAX LIEN<br>NUMBER:<br>207766603623<br>DATE: 03/09/2020<br>JURISDICTION: CA | EMPLOYMENT<br>DEVELOPMENT<br>DEPARTMENT<br>722 CAPITOL MALL<br>SACRAMENTO, CA<br>95814-4703 |
| ☐ | 9. | <u>BENJA</u><br><u>INCORPORATED</u><br>845 MARKET ST STE<br>450A<br>SAN FRANCISCO, CA<br>94103-1932 | INITIAL FILING<br>DATE: 01/24/2020<br>NUMBER: 2020<br>0563470<br>JURISDICTION: DE<br><br>TERMINATION<br>DATE: 03/27/2020<br>NUMBER: 2020<br>2240424 | GIBRALTAR BUSINESS<br>CAPITAL, LLC<br>400 SKOKIE BLVD STE<br>375<br>NORTHBROOK, IL<br>60062-7928 |
| ☐ | 10. | <u>BENJA</u><br><u>INCORPORATED</u><br>845 MARKET ST STE | STATE TAX LIEN<br>NUMBER:<br>207757167648<br>DATE: 01/14/2020 | EMPLOYMENT<br>DEVELOPMENT<br>DEPARTMENT<br>722 CAPITOL MALL |

| | | | | |
|---|---|---|---|---|
| | 450A<br>SAN FRANCISCO, CA<br>94103-1932 | JURISDICTION: CA<br><br>ERRONEOUS<br>TERMINATION<br>DATE: 09/23/2021<br>NUMBER:<br>U210087798338 | SACRAMENTO, CA<br>95814-4703 | |
| | BENJA INCORPORATED<br>845 MARKET ST STE 450A<br>SAN FRANCISCO, CA 94103-1932 | INITIAL FILING<br>DATE: 12/02/2019<br>NUMBER: 2019 8506409<br>JURISDICTION: DE<br><br>TERMINATION<br>DATE: 02/21/2020<br>NUMBER: 2020 1291667 | C & S ASSOCIATES,<br>INC. AS<br>REPRESENTATIVE<br>PO BOX 24101<br>CLEVELAND, OH<br>44124-0101 | |
| ☐ 12. | BENJA INCORPORATED<br>845 MARKET ST STE 450A<br>SAN FRANCISCO, CA 94103-1932 | INITIAL FILING<br>DATE: 07/19/2019<br>NUMBER: 2019 5005348<br>JURISDICTION: DE | BUSEY BANK<br>12300 OLIVE BLVD<br>SAINT LOUIS, MO<br>63141-6402 | |
| ☐ 13. | BENJA<br>1161 MISSION ST STE 208<br>SAN FRANCISCO, CA 94103-1571<br>EPHE CORP<br>1161 MISSION ST STE 208<br>SAN FRANCISCO, CA 94103-1571 | UCC-1 ORIGINAL<br>NUMBER:<br>201846074790<br>DATE: 05/01/2018<br>JURISDICTION: MA<br><br>NUMBER:<br>201846074790 | JUNO FINANCIAL LLC<br>3575 RINGSBY CT STE 411<br>DENVER, CO 80216-5030 | |
| ☐ 14. | BENJA ENTERPRISES LLC<br>19090 MARSH LN<br>DALLAS, TX 75287-2162<br>4 SEASONS FOOD MART<br>19090 MARSH LN<br>DALLAS, TX 75287-2162 | ORIGINAL FILING<br>NUMBER:<br>140031371020<br><br>JURISDICTION: TX<br><br>MASTER RECORD<br>(ORIGINAL FILING UCC-1)<br>DATE: 10/01/2014<br>NUMBER:<br>140031371020<br><br>TERMINATION<br>DATE: 07/07/2016<br>NUMBER: 1600222068 | WILSHIRE BANK<br>3200 WILSHIRE BLVD FL 7TH<br>LOS ANGELES, CA 90010-1333 | |

| 15. | **BENJA INCORPORATED**<br>10 LYON ST APT 210<br>SAN FRANCISCO, CA 94117-3043<br>**BENJA INCORPORATED**<br>251 LITTLE FALLS DR<br>WILMINGTON, DE 19808-1674<br>CHAPIN, ANDREW<br>10 LYON ST APT 210<br>SAN FRANCISCO, CA 94117-3043<br>GOODE, THOMAS<br>2901 BARTON SKWY APT 1105<br>AUSTIN, TX 78746-7554 | ORIGINAL FILING NUMBER: 200011676871<br>JURISDICTION: TX<br>MASTER RECORD (ORIGINAL FILING UCC-1)<br>DATE: 03/26/2020<br>NUMBER: 200011676871 | FIRST CORPORATE SOLUTIONS, AS REPRESENTATIVE<br>914 S STREET<br>SPRS@FICOSO COM<br>SACRAMENTO, CA 95811 |
| --- | --- | --- | --- |
| 16. | **BENJA PAKEE, CORP.**<br>129 JERSEY ST<br>BOSTON, MA 02215-5116 | UCC-1 ORIGINAL<br>NUMBER: 95345888<br>DATE: 10/20/1995<br>JURISDICTION: MA<br><br>NUMBER: 95345888 | MESBAHI, INC.<br>HEMENWAY ST<br>BOSTON, MA 02109 |
| 17. | **BENJA PAKEE, CORP.**<br>129 JERSEY ST<br>BOSTON, MA 02215-5116 | UCC-1 ORIGINAL<br>NUMBER: 95345889<br>DATE: 10/20/1995<br>JURISDICTION: MA<br><br>NUMBER: 95345889 | MESBAHI, INC.<br>HEMENWAY ST<br>BOSTON, MA 02109 |
| 18. | **BENJA TRUCKING**<br>82801 62ND AVE<br>THERMAL, CA 92274-9672<br>MARTINEZ, BEN<br>82801 62ND AVE<br>THERMAL, CA 92274-9672<br>MARTINEZ, BENJAMIN<br>82801 62ND AVE<br>THERMAL, CA 92274-9672 | FINANCING STATEMENT<br>NUMBER: 187682305828<br>DATE: 11/12/2018<br>JURISDICTION: CA | |

# Exhibit C-2



# UCC Filings

**1:DELAWARE UCC Record**
**Debtor Information**

|  |  |
|---|---|
| **Name:** | BENJA INCORPORATED |
| **Standardized Address:** | 845 MARKET ST STE 450A<br>SAN FRANCISCO, CA 94103 |
| **Original Address:** | 845 MARKET STREET 450A<br>SAN FRANCISCO, CA 94103-1932 |

**Secured Party Information**

|  |  |
|---|---|
| **Name:** | BUSEY BANK |
| **Standardized Address:** | 12300 OLIVE BLVD<br>SAINT LOUIS, MO 63141 |
| **Original Address:** | 12300 OLIVE BLVD<br>SAINT LOUIS, MO 63141-6402 |

**Filing Information**

|  |  |
|---|---|
| **Original Filing Number:** | 2019 5005348 |
| **Original Filing Date:** | 07/19/2019 |
| **Filing Agency:** | SECRETARY OF STATE/UCC DIVISION |
| **Filing Agency Address:** | FEDERAL & DUKE OF YORK STS<br>DOVER, DE 19901 |
| **Filing Type:** | INITIAL FILING |
| **Filing Number:** | 2019 5005348 |
| **Filing Date:** | 07/19/2019 |
| **Filing Time:** | 10:43 |
| **Vendor Entry Date:** | 08/28/2019 |
| **Vendor Update Date:** | 2021 |

# UCC Filings

**Collateral**

      **Collateral Description:** 07/19/2019 2019 5005348 - ALL ASSETS

**Important:** The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

Your DPPA Permissible Use: Litigation
Your GLBA Permissible Use: I have no permissible use

Copyright © 2022 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**End of Document**

# Exhibit D

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
LIEN SOLUTIONS 800-332-3282

B. E-MAIL CONTACT AT FILER (optional)
UCCFILINGRETURN@WOLTERSKLUWER.COM

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

⌐
P.O. BOX 29071
GLENDALE, CA 91209-9071
US

L                                                            ⌐

Delaware Secretary of State
File Number: 20195005348
File Date: 03/23/2020 01:06 PM
(This document was electronically filed)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
20195005348      7/19/2019

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☑ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes:                    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c

☐ ADD name: Complete item 7a or 7b, and item 7c

☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR 7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
**BUSEY BANK**

OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10. OPTIONAL FILER REFERENCE DATA:

MHC000448

# Exhibit E

**Page 101**

1   that they weren't moving forward.

2     Q.  And if I understood your comments, Mr.

3   Chapin wanted you, again, "you" being MHC, not

4   necessarily Dan Anderson, but you, to send something

5   to UMB about your relationship with Benja; is that

6   right?

7     **A.  That's what I recall, yes.**

8     Q.  And what was that, that you were asked to

9   send?

10     **A.  I believe it was something to the effect**

11  **of Andrew had conveyed to us that UMB, in order to**

12  **move forward, that they wanted to know, for us to**

13  **confirm that, not only to know about him receiving**

14  **payments directly from account debtors, but that we**

15  **also approved of it.**

16     Q.  And was that something communicated to you

17  via e-mail or was that a conversation over the

18  phone?

19     **A.  I believe Andrew sent an e-mail on that**

20  **and wanted a response.**

21     Q.  And MHC said, "We are not sending that

22  kind of verification"?

23     **A.  Yes.  It wasn't accurate.**

24     Q.  Okay.  Take a look, I don't know if the

25  exhibit numbers got confused or not, but it's my

**Page 102**

1   Exhibit 29.  I think it's called "Final updated

2   final UCC search."

3   BY MR. EVERETT:

4     Q.  I have a question back on Exhibit 14,

5   which is the client activity statement.  On the last

6   page, five of five, the last transaction is a

7   negative $1350 with an adjustment of $1350.  Is that

8   the totality of all the transactions with Benja?

9     **A.  Sorry.  Could you just restate the**

10  **question?**

11     Q.  Sure.  I just want to make sure that this

12  is all of the transactions that you had with Benja,

13  that there aren't any other payments or advances

14  that didn't make it to this sheet.

15     **A.  Thank you for clarifying.  Yes, that's**

16  **correct.**

17     Q.  Is the payment from Benja for counsel's

18  fees in here somewhere?

19     **A.  Yes.**

20     Q.  Okay.

21     **MR. EVERETT:**  That's all I have on that.

22  Thanks.

23   BY MR. FINESTONE:

24     Q.  Kyle, I think if you just look right

25  above, $1350 entry is the counsel fee.

**Page 103**

1     **MR. EVERETT:**  It's hard for me to see.  Okay.

2   Got it.

3     **MR. FINESTONE:**  Anything else, Kyle?

4     **MR. EVERETT:**  Thanks.  That's it.

5   BY MR. FINESTONE:

6     Q.  Were you able to find the updated UCC

7   search?

8     **A.  Yes.**

9     Q.  Okay.  And then the top right corner of

10  the first page, I see Blake Hillman there.  Correct?

11     **A.  Correct, yes.**

12     Q.  This is something he either ordered or

13  obtained via First Corporate Solutions?

14     **A.  Yes.**

15     Q.  And this is dated, it says, "Index through

16  July 16, 2020."  Do you see that a little ways down

17  the first page?

18     **A.  Yes.**

19     Q.  Do you recall discussing with Mr. Hillman

20  or anybody else sort of this process that we had

21  talked about some time ago about updating the UCC

22  search?  Is that something that was done as a matter

23  of course or something that was requested in July of

24  2020?

25     **A.  I don't recall specifically.**

**Page 104**

1     Q.  And do you see the first entry there,

2  which is Busey Bank?

3     **A.  Yes.**

4     Q.  Do you recall if in a Busey Bank

5  obligation, was there on any UCC MHC pole prior to

6  entering into the agreement?

7     **A.  Yes.**

8     Q.  And it was, in other words, some report

9  that was pulled in February or March of 2020, the

10  Busey Bank obligation there.  Correct?

11     **A.  Yes.**

12     Q.  And did you discuss that with Mr. Chapin

13  at all?

14     **A.  We did.  We told him before we were able**

15  **to purchase any accounts, that we had to have**

16  **terminations from the UCC's that were filed.**

17     Q.  And did you obtain such a termination?

18     **A.  Yes.**

19     Q.  Let's look at exhibit, what I have for 30.

20  It's entitled "UCC 3DE-term of Busey filing."  Do

21  you have that in front of you, Mr. Anderson?

22     **A.  Yes.**

23     Q.  That document has something on the first

24  page.  It says, "File date, March 23, 2020."  Do you

25  see that?

Bridget Mattos & Associates
www.bmareporting.com
Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 31 of 127

1    A.  Yes.
2    Q.  And was this the termination that you
3  talked about?
4    A.  Yes.
5    Q.  And this is something that was provided to
6  you by Mr. Chapin?
7    A.  Yes.
8    Q.  Did you ever run an updated UCC between
9  March of 2020 and the July date to see if it still
10 reflected a Busey Bank obligation?
11   **A.  I don't recall.  It would have been**
12 **customary that would have already had a follow up**
13 **search at some point, though.**
14   Q.  Were you surprised?  I think you saw in
15 July, 2020 the UCC search that we were looking at
16 just a moment ago, the one with Blake Hillman's name
17 at the top?
18   **A.  Are you asking if I saw it?**
19   Q.  Yeah.  Did you see that on or about July
20 of 2020, July 16, 2020?
21   **A.  I guess to clarify, I can't say for sure**
22 **that index's through necessarily the date that we**
23 **pulled this report.  I believe that's referring to**
24 **where the state of Delaware had updated their**
25 **systems.**

1    Q.  Fair point.  Do you have any idea when
2  this was pulled?  I didn't see another date on this.
3  Maybe I missed it.
4    **A.  I don't recall specifically when this**
5  **report was pulled.**
6    Q.  Presumably some time after July 16th.
7  Correct?
8    **A.  I would say that would probably be**
9  **accurate, yes.**
10   Q.  And you saw search results at some point?
11   A.  Yes.
12   Q.  Do you recall being surprised or concerned
13 that it showed Busey Bank still existing?
14   A.  Yes.
15   Q.  All right.  Did you have a discussion with
16 anybody about that?  And I'll caution you before you
17 answer that, I'm not asking for the contents of
18 conversations with you and counsel for MHC.
19   **A.  Are you asking if I had conversation about**
20 **this?**
21   Q.  Yes.  Yeah.  You talked about being
22 surprised to see Busey Bank there, and I'm asking
23 what conversations you had with anybody about Busey
24 Bank still being on this report, and I was just
25 cautioning you, when I ask for conversation, I don't

1  want to get communications with your counsel.  I'm
2  just talking internally at MHC or with Benja or some
3  outside party.
4    **A.  Yes.  I recall there being some internal**
5  **communications around this topic.**
6    Q.  And can you tell me what those were?
7    **A.  Again, trying to understand what we had in**
8  **referencing the file stamped termination we received**
9  **early on in the process trying to reconcile what had**
10 **happened.**
11   Q.  Let's take a look at exhibit, I have
12 Exhibit 32.  It says, "E-mail re: Busey UCC
13 termination."
14   **A.  Okay.**
15   Q.  This a letter, it looks like it was
16 printed from Miss Murphy's system, but it's from an
17 e-mail, I should say from Chaz Rumage, to Erin
18 Murphy, Blake Hillman and copied to you.  Do you see
19 that?
20   **A.  Yes.**
21   Q.  Does this refresh your recollection about
22 some of the discussions you had in house about this
23 Busey filing?
24   **A.  It does, yes.**
25   Q.  And Mr. Rumage talks about, I'm looking

1  about two thirds of the way into the second
2  paragraph.  He talks about, "However, the date filed
3  on the fraudulent UCC filing is 3-23-20.  Should
4  have appeared on the final search that was completed
5  April 6."  Do you see that sentence?
6    **A.  I do see that sentence, yes.**
7    Q.  Did MHC finally conclude that the exhibit
8  that we were looking at before, I think it was
9  Exhibit 30, concerning the termination of the Busey
10 filing was, in fact, a forged document, that there
11 was no such filing?
12   **A.  Around this time, we believed that file**
13 **stamped UCC, it was altered, yes.**
14   Q.  And prior to this time, late September,
15 2020, did you have any reason to believe that was
16 the case before that?
17   **A.  No.**
18   Q.  If you look further down on this on the
19 same exhibit, take a look at the e-mail chain
20 starting on page five.  It's what purports to be an
21 e-mail from Andrew Chapin to Wade T-O-N-K-I-N.  Do
22 you see that?
23   **A.  Yes.**
24   Q.  And I'll represent to you that some of the
25 documents you've produced included a letter from you

1  to Wade Tonkin at Fanatics if that refreshes your
2  recollection about who Wade Tonkin is?
3      A.  Yes.
4      Q.  All right.  And was this the sort of
5  communication you were talking about before that you
6  understood went from Benja to its clients?
7          And just to be clear, you talked about how
8  Mr. Chapin asked to sort of be the lead in sort of
9  introducing Murphy Hoffman, and you know, client
10 sensitivities wanting to be the person to
11 communicate those sorts of things.  Is this an
12 example of what you were talking about?
13     A.  Yes.
14     Q.  And then if you look at the bottom of page
15 three of this document, there's an e-mail from Mr.
16 Chapin dated April 1st, 2020 to Jennifer Li and Mike
17 Simonett and Madison Pyle.  Do you see that?
18     A.  Yes.
19     Q.  And that was -- I think what -- I think
20 that's the e-mail by which the last page was
21 communicated to MHC.  For example, "Here is what we
22 are doing, is this appropriate," that kind of thing?
23     A.  Yes.
24     Q.  Okay.  And then excuse me.  Again, just
25 going further up that page, you'll see an April 1st

1  e-mail from Mr. Simonett saying, "Just confirm the
2  e-mail is great and we can go forward.  One, I
3  believe you were already planning to do so, but
4  please copy us on the original e-mails with
5  attachments going to your customers and asking for
6  another forwarding of the original e-mail to
7  Fanatics," and then it says, "Once you are able to
8  resend the UCC release, we will get the wiring to
9  the system for payment today."  Do you see that?
10     A.  Yes.
11     Q.  Was that UCC release to the best of your
12 recollection the Busey release or something
13 different?
14     A.  I recall that being the Busey release that
15 we were looking for.
16     Q.  Okay.  And then there's, going up to page
17 two, there's still, up on April, an e-mail from
18 Jennifer Li to Mike Simonett copied to Mr. Chapin
19 and Miss Pyle saying, "Mike, does this work for you?
20 I ran this through a PDF repair service to see if we
21 could head this off ahead of my catch up.  Check
22 this off."  Do you see that?
23     A.  Yes.
24     Q.  And was that referring to the UCC
25 termination?

1      A.  I would be speculating.  I don't know for
2  sure.
3      Q.  Fair enough.  Let me give you a few names
4  of people who have been involved in, I think I did
5  it before.  Gave you some names, but just a few
6  follow up names from people who were related or
7  connected to Benja in any way to see if you have any
8  communications with them.  I think I already asked
9  you about Mr. Goode and Jennifer Li and Nick Foppe.
10 What about Joe Alouf?  Did you ever have
11 communications with Mr. Alouf?
12     A.  Not directly.
13     Q.  Did anyone at MHC, to your knowledge?
14     A.  I think Erin Murphy had some communication
15 with him.
16     Q.  Do you remember the time frame of those
17 communications and what they were about?
18     A.  I recall towards the end of our
19 relationship, there was an e-mail where Joe was on
20 it and had interjected and mentioned that Andrew had
21 resigned his position as CEO and that Joe had
22 stepped in to handle the business matters at Benja
23 and so I believe we received an e-mail, and I don't
24 recall if I was party to that e-mail, but I recall
25 seeing it and then I think there was a subsequent

1  phone call that Erin and Joe had around that same
2  time.
3      Q.  Okay.  And what about someone by the name
4  of Brett Buerck?  Last name B-U-E-R-C-K?
5      A.  I'm not familiar with that name.
6      Q.  Was it a custom and practice for MHC to
7  receive, I'm going back to the UCC we were talking
8  about.  Was it custom and practice for MHC to
9  receive UCC terminations directly from the borrower?
10     A.  Yes.  If they were file stamped UCC's, we
11 would accept those.
12     Q.  Has MHC changed any of its policies or
13 procedures with respect to transactions as a result
14 of its dealings with Benja and its transaction with
15 Benja?
16     A.  Specifically what are you referring to?
17     Q.  Well, you know, I mean, we've talked about
18 some of the things that have happened in connection
19 with MHC's dealing with Benja with respect to
20 accounts receivable and the UCC's, and I was just
21 wondering if MHC has changed any of its policies as
22 a result of any of those things.
23     A.  We've reviewed our original policies.  I
24 think we have -- I can't say specifically if there's
25 any clear processes that have been rewritten because

1   **of it, specifically due to this account, but I do**
2   **think that we learned throughout this entire**
3   **process.**
4     **MR. FINESTONE:** I do not think I have any
5   further questions, Mr. Anderson. I really
6   appreciate your time and your responses to my
7   questions. I don't know if anybody else on the Zoom
8   has any follow up or clean up, but now would be the
9   time to ask them if you do. Deafening silence, I
10   think. Kyle, anything further from your end?
11     **MR. EVERETT:** No. I'm good.
12     **MR. FINESTONE:** Mr. Anderson, thanks again.
13   Ben, thanks so much for your assistance and
14   cooperation.
15     **MR. REED:** Thanks, Steve.
16     (Examination is concluded at 12:53 p.m.)

Page 113

1   available at the same time to all parties or their
2   attorneys. (Civ. Proc. 2025.320(b))
3     I shall not provide any service or product
4   consisting of the deposition officer's notations or
5   comments regarding the demeanor of any witness,
6   attorney or party present at the deposition to any
7   attorney or party present at the deposition to any
8   party or any party's attorney or third party who is
9   financing all or part of the action, nor shall I
10   collection any personal identifying information
11   about the witness as a service or product to be
12   provided to a party or third party who is financing
13   all or part of the action. (Civ. Proc. 2025.320 (c))
15   DATED April 21, 2021.
18   KRISHANNA M. DERITA
19   CSR # 11945

Page 115

1   DEPOSITION OFFICER'S CERTIFICATE
2   STATE OF CALIFORNIA   )
3   COUNTY OF CONTRA COSTA   ) ss.
5   I, KRISHANNA DERITA, hereby certify:
6     I am a duly qualified Certified Shorthand
7   Reporter in the State of California, holder of
8   Certificate Number CSR 11945 issued by the Court
9   Reporter's Board of California and which is in full
10   force and effect. (Civ. Proc. 2025.320 (a))
11     I am authorized to administer oaths or
12   affirmations pursuant to California Code of Civil
13   Procedure, Section 2093 (b) and prior to being
14   examined, the witness was first placed under oath or
15   affirmation by me. (Civ. Proc. 2025.320, 2025.540)
16     I am the deposition officer that
17   stenographically recorded the testimony in the
18   foregoing deposition and the foregoing transcript is
19   a full true record of the testimony given. (Civ.
20   Proc. 2025.540 (a))
21     I have not and shall not offer to provide any
22   services or products to any party's attorney nor
23   party who is financing all or part of the action
24   without first offering same to all parties or their
25   attorneys attending the deposition and making same

Page 114

Bridget Mattos & Associates
www.bmareporting.com
Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 34 of 127

# Exhibit F

**E-filing**

1 | STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

2

3 | HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

4 | KIMBERLY HOPKINS (MABN 668608)
SCOTT JOINER (CABN 223313)
5 | Assistant United States Attorneys

6 |     450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
7 |     Telephone: (415) 436-7200
    FAX: (415) 436-7234
8 |     Kimberly.Hopkins@usdoj.gov
    Scott.Joiner@usdoj.gov

9

Attorneys for United States of America

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

SAN FRANCISCO DIVISION

13

14

15 | UNITED STATES OF AMERICA,     )   NO. CR 21-00217 MMC
    )
16 |     Plaintiff,     )   PLEA AGREEMENT
    )
17 |     v.     )
    )
18 | ANDREW CHAPIN,     )
    )
19 |     Defendant.     )
    )

20

21 |     I, Andrew Chapin, and the United States Attorney's Office for the Northern District of California

22 | (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule

23 | 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

24 | The Defendant's Promises

25 |     1.     I agree to plead guilty to Counts One, Two and Three, of the captioned Information

26 | charging me with Bank Fraud in violation of 18 U.S.C. § 1344 (Count One), Wire Fraud in violation of

27 | 18 U.S.C. § 1343 (Count Two), and Securities Fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17

28

PLEA AGREEMENT                        1                          v. 05/14/2020
CR 21-00217 MMC

C.F.R. § 240.10b-5 (Count Three).

<u>Bank Fraud</u>

I agree that the elements of 18 U.S.C. § 1344 are as follows: (1) I knowingly executed a scheme to defraud a financial institution as to a material matter; (2) I did so with the intent to defraud the financial institution; and (3) the financial institution was insured by the Federal Deposit Insurance Corporation.

I agree that the maximum penalties are as follows:

| | | |
|---|---|---|
| a. | Maximum prison term | 30 years |
| b. | Maximum fine | $1,000,000 |
| c. | Restitution | |
| d. | Maximum supervised release term | 3 years |
| e. | Mandatory special assessment | $100 per felony count |
| f. | Forfeiture | |

<u>Wire Fraud</u>

I agree that the elements of 18 U.S.C. § 1343 are as follows: (1) I knowingly participated in, devised, or intended to devise a scheme or artifice to defraud, or a scheme or artifice for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) I acted with the intent to defraud; that is, the intent to deceive and cheat; and (4) I used, or caused to be used, a wire communication to carry out or attempt to carry out an essential part of the scheme.

I agree that the maximum penalties are as follows:

| | | |
|---|---|---|
| a. | Maximum prison term | 20 years |
| b. | Maximum fine | $250,000 or not more than the greater of twice the gross gain or twice the gross loss (18 U.S.C. § 3571) |
| c. | Restitution | |
| d. | Maximum supervised release term | 3 years |

PLEA AGREEMENT                                    2                                    v. 05/14/2020
CR 21-00217 MMC

| | e. | Mandatory special assessment | $100 per felony count |
|---|---|---|---|
| | f. | Forfeiture | |

Securities Fraud

I agree that the elements of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5 are as follows: (1) I knowingly and willfully used or employed a manipulative or deceptive device; (2) the manipulation or deception was in connection with the sale of a security; and (3) the manipulation or deception constituted a false statement or misleading omission of material fact.

I agree that the maximum penalties are as follows:

| | a. | Maximum prison term | 20 years |
|---|---|---|---|
| | b. | Maximum fine | $5,000,000 |
| | c. | Restitution | |
| | d. | Maximum supervised release term | 3 years |
| | e. | Mandatory special assessment | $100 per felony count |
| | f. | Forfeiture | |

I understand that I am pleading guilty to multiple violations and that the Court may order that my sentence for each violation run consecutively.

2.     I agree that I am guilty of the offenses to which I am pleading guilty, and I agree that the following facts are true:

In approximately 2014, I started a company called EPHE Corporation in Boston, Massachusetts. In 2016, I moved the company to San Francisco, California, in the Northern District of California, and changed the name of the company to Benja Inc. I was the CEO of Benja.  Benja was a digital advertising company that provided "shoppable media," by placing digital advertisements for companies with overstocked goods on websites that allowed shoppers to purchase products in the advertisement itself without being redirected to another website.

During the relevant time period (June 2019 through September 2020), I looked for additional investors and lines of credit for Benja.  I told creditors and prospective investors that Benja generated $6,200,000 and $13,200,000 in revenue in 2018 and 2019, respectively, and had signed large contracts with numerous well-known companies including Nike, Fanatics, Patagonia, and Backcountry, to place

PLEA AGREEMENT                                    3                                    v. 05/14/2020
CR 21-00217 MMC

1  advertisements for their excess inventory.  In truth, I knew that my representations to creditors and
2  investors were false, as I had fabricated Benja's revenue and did not have contracts with any of these
3  companies.

4        To perpetuate the fraud scheme, beginning in June of 2019 and continuing until August of 2019,
5  I made a series of false statements to Busey Bank to secure lines of credit for Benja totaling $5,000,000.
6  For example, on June 24, 2019, I applied for a $1,000,000 line of credit for Benja with Busey Bank.  I
7  provided financial statements, a balance sheet, incorporation documents, and tax information in support
8  of the application.  I designated Benja's assets as collateral for the loan and submitted a July 2019 Aged
9  Receivables Report listing $2,027,290 in receivables, including $1,600,000 in current receivables from
10  Nike, Patagonia, Backcountry, and Fanatics.  In truth, I falsified the aged receivables report, as I knew
11  that Benja did not have contracts with Nike, Patagonia, Backcountry, or Fanatics.  I received an advance
12  on my line of credit from Busey Bank and used most of the money to pay off other creditors and
13  investors, to pay my personal credit cards, and transferred funds to my crypto-currency exchange
14  account.

15        I agree that Busey Bank is a financial institution insured by the Federal Deposit Insurance
16  Corporation.  I agree that I acted with the intent to defraud Busey Bank, and that the falsified
17  information that I provided about Benja was material to the bank's decision to issue lines of credit
18  totaling $5,000,000.  I further agree that the loss amount attributable to my scheme for purposes of
19  U.S.S.G. §2B1.1(b)(1)(J), is $5,000,000.

20        I also made a series of false statements and material omissions to induce investments from
21  venture capital firms, including $1,000,000 from VC Firm E and $1,800,000 raised during a SAFE
22  (simple agreement for future equity) fundraising round from multiple investors.  To secure investments,
23  I provided materially false information to investors, and I fabricated millions in revenue and account
24  receivables from companies that never had a business relationship with Benja.  For example, beginning
25  on March 23, 2020, I contacted VC Firm E, a venture capital firm headquartered in New York, and
26  expressed interest in partnering with the firm.  VC Firm E expressed interest in investing in Benja and
27  started the due diligence process.  That same day, I emailed M.S., a manager at VC Firm E, a link to a
28  virtual data room with information on Benja, including a spreadsheet showing Benja's total revenue for

PLEA AGREEMENT                                4                                v. 05/14/2020
CR 21-00217 MMC

2019 was more than $13,000,000.  The spreadsheet also listed contracts with Nike, Fanatics, Backcountry, and Patagonia that represented more than $7,000,000 of the total income for 2019.  In truth, I fabricated the spreadsheet, as I knew that Benja did not have contracts with Nike, Patagonia, Backcountry, or Fanatics.  As relevant conduct, I admit that I instructed and paid a Benja employee to impersonate a representative from Nike and I instructed an individual to impersonate a representative from Fanatics, during reference calls with VC Firm E.  VC Firm E relied on my misrepresentations and invested $1,000,000 in Benja.  I admit I used the money to pay off another creditor.

I agree that I acted with the intent to defraud, and made materially false and fraudulent representations and concealed material facts to secure the $1,000,000 investment from VC Firm E.  I further agree that in connection with the scheme to defraud, I used interstate wires to email the fabricated spreadsheet to VC Firm E, as the email traveled from California to New York.

I also made materially false and fraudulent representations and concealed material facts about Benja's revenue and existing investors to induce money from individual investors in exchange for shares of common stock in Benja.  For example, in November of 2018, I was introduced to Investor R.H., an individual who resided in the Northern District of California.  I emailed financial statements to Investor R.H. that falsely listed more than $4,000,000 in revenue for Benja in 2018.  I also informed Investor R.H. that VC Firm CC, an institutional venture capital firm based in St. Louis, Missouri, was considering a $1,500,000 investment in Benja.  In truth, I knew that VC Firm CC was not investing in Benja.  In 2018, I contacted Manager C.H., the founder of VC Firm CC, about investing in Benja and he declined the investment opportunity.  I admit that I also instructed an individual to impersonate Manager C.H. during a reference call with Investor R.H.  The individual falsely told Investor R.H. that VC Firm CC used a third party to verify Benja's financials and had made customer reference calls, which were positive.  I sent Investor R.H. a shareholder's agreement.  Investor R.H. had additional questions about the agreement and asked me for Manager C.H.'s contact information.  I admit that I created a fictitious email address to impersonate Manager C.H. and respond to Investor R.H.'s questions about the shareholder's agreement.  Relying on my false statements, Investor R.H. signed a shareholder's agreement to purchase 1,278 shares of common stock in Benja for $100,000.  I agree I used the money for company payroll, to pay my personal credit cards, and transferred funds to my personal bank and

crypto-currency exchange accounts.  I further agree that the investment I sold to Investor R.H. was an investment contract and therefore securities under Title 15, and that the scheme and false statements were in connection with the purchase and sale of those securities.

I admit that I acted with the intent to defraud and made materially false and fraudulent representations and concealed material facts about Benja's revenue and existing investors to induce individuals to invest in Benja in exchange for shares of common stock.

I also agree that from June 2019 through September 2020, that the total loss amount attributable to my scheme for purposes of U.S.S.G. §2B1.1(b)(1)(J) is more than \$3,500,000 but not greater than \$9,500,000.

3.      I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence.  I also agree to waive venue, if necessary, for the charges filed in this case.

4.      I agree to give up my right to appeal my conviction, including constitutional challenges to the statutes of conviction.  I agree to give up my right to appeal the judgment and all orders of the Court.  I also agree to give up my right to appeal any aspect of my sentence, including any orders relating to forfeiture and/or restitution, reserving only my right to claim that my sentence violated this plea agreement, applicable law, or the Constitution.  I reserve my right to claim that my counsel was ineffective.  I understand that this waiver includes, but is not limited to, any and all constitutional or legal challenges to my convictions and guilty pleas, including arguments that the statutes to which I am pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support my pleas of guilty.

5.      I agree not to file any collateral attack on my conviction or sentence, including a petition under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was ineffective.  I acknowledge that the Sentencing Commission may in the future amend the Sentencing Guidelines and I agree not to seek relief under 18 U.S.C. § 3582(c)(2).

6.      I agree not to ask the Court to withdraw my guilty pleas at any time after they are entered. In the event I violate any of the terms of the Agreement, I agree that the facts set forth in Paragraph 2 of this Agreement and, if applicable, the fact that I made a sworn admission to them in a previous court proceeding, shall be admissible against me in any subsequent proceeding, including at trial. In any subsequent proceeding conducted after I violate any of the terms of the Agreement, I expressly waive any and all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in Paragraph 2 of the Agreement and, if applicable, the fact that I made a sworn admission to them at a previous court proceeding.

7.      I understand that the Court must consult the United States Sentencing Guidelines and take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a). I also understand that the Court is not bound by the Guidelines calculations below; the Court may conclude that a higher Guidelines range applies to me, and, if it does, I will not be entitled, nor will I ask, to withdraw my guilty pleas. I further agree that regardless of the sentence that the Court imposes on me, I will not be entitled, nor will I ask, to withdraw my guilty pleas. I agree that the loss amount attributable to my scheme, for purposes of U.S.S.G. § 2B1.1(b)(1)(J), is more than $3,500,000 but not greater than $9,500,000. I agree that the Sentencing Guidelines offense level should be calculated as set forth below, and that I will not request a downward departure under the Sentencing Guidelines from that offense level, although I reserve the right to seek a downward variance based on the factors set forth in 18 U.S.C. § 3553(a). I understand that the government is free to oppose any such request. I agree that an appropriate disposition of this case under the Sentencing Guidelines and 18 U.S.C. § 3553(a), and the sentencing range to which the parties have agreed is, 12 to 36 months' imprisonment. The parties have reached no agreement regarding my Criminal History Category.

**Count 1 – Bank Fraud**

a.     Base Offense Level, U.S.S.G. §2B1.1(a)(2):                                                    6

b.     Specific offense characteristics under U.S.S.G. Ch. 2B1.1(b)(1)(J)              + 18
       (Loss more than $3,500,000)

c.     Specific offense characteristics under U.S.S.G. Ch. 2B1.1(b)(10)(C)            +2
       (Sophisticated means)

d.     Bank Fraud Offense Level:                                                                       26

PLEA AGREEMENT                                          7                                    v. 05/14/2020
CR 21-00217 MMC

**Count 2 – Wire Fraud**

a.      Base Offense Level, U.S.S.G. §2B1.1(a)(2):                                          6

b.      Specific offense characteristics under U.S.S.G. Ch. 2B1.1(b)(1)(H)       + 14
        (Loss more than $550,000)

c.      Specific offense characteristics under U.S.S.G. Ch. 2B1.1(b)(10)(C)       +2
        (sophisticated means)

d.      Wire Fraud Offense Level:                                                              22

**Count 3 – Securities Fraud**

a.      Base Offense Level, U.S.S.G. §2B1.1(a)(2):                                          6

b.      Specific offense characteristics under U.S.S.G. Ch. 2B1.1(b)(1)(F)        + 10
        (Loss more than $150,000)

c.      Specific offense characteristics under U.S.S.G. Ch. 2B1.1(b)(10)(C)       +2
        (sophisticated means)

d.      Securities Fraud Offense Level:                                                        18

**Grouping**

        Counts One, Two, and Three are grouped together pursuant to U.S.S.G. §3D1.1(a)(1).  Pursuant to U.S.S.G. §3D1.1(a)(2) and §3D1.3, the offense level applicable to the group will be the highest offense level of the three counts in the group.  The highest offense level of the three counts in the group is the offense level applicable to Count One.

a.      Group Offense Level (Count One):                                                    26

b.      Acceptance of Responsibility:                                                          - 3
        If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a
        three-level reduction for acceptance of  responsibility, provided that I
        forthrightly admit my guilt, cooperate with the Court and the Probation
        Office in any presentence investigation ordered by the Court, and continue
        to manifest an acceptance of responsibility through and including the time
        of sentencing.

c.      Adjusted Offense Level:                                                                23

        8.      I agree that regardless of any other provision of this Agreement, the government may and will provide the Court and the Probation Office with all information relevant to the charged offenses and the sentencing decision, including Victim Impact Statements.  I agree that, based on the nature of the offenses, the Court should impose the following special condition of supervised release which is reasonably related to deterrence and rehabilitation:

Special Condition (Searches)
The defendant shall submit his person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), and any property under defendant's control to a search. Such a search shall be conducted by a United States Probation Officer or any federal, state, or local law enforcement officer at any time, with or without suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

9.     I agree that I will make a good-faith effort to pay any fine, forfeiture, or restitution I am ordered to pay. I agree to pay the special assessment at the time of sentencing.

I agree to pay full restitution for all losses caused by all the schemes or offenses with which I was charged in this case, and I understand that the amount of restitution will not be limited to the loss attributable to the counts to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I understand that the Court will not consider my economic circumstances in determining the restitution amount. I agree to pay restitution in an amount to be set by the Court at the time of sentencing, or at a subsequent restitution hearing.

Any restitution payments shall be paid through the Office of the Clerk of the District Court by bank or cashier's check or money order made payable to the "Clerk, United States District Court."

I understand that the restitution described above creates a lien in favor of the United States on all property and rights to property I may possess upon entry of judgment and continues for the later of 20 years from the entry of judgment or 20 years after release from imprisonment or until the debt is paid in full. I further understand the government will record a notice of the lien in any county where I reside or have property. I further understand that this order of restitution cannot be discharged in bankruptcy and that if I default on the payment of a fine or restitution, the Court may revoke probation or a term of supervised release, modify the terms or conditions of probation or supervised release, resentence me, hold me in contempt of court, order the sale of property, enter or adjust a payment schedule, or take any other action necessary to obtain compliance.

Within thirty days of the execution of this Plea Agreement, if asked by the Financial Litigation Unit ("FLU") of the United States Attorney's Office, I agree to complete, under penalty of perjury, a financial statement provided by the U.S. Attorney's Office and to update that statement with material changes within seven days of the change. I understand that I must identify all assets and financial

PLEA AGREEMENT                                        9                                        v. 05/14/2020
CR 21-00217 MMC

1  interests valued at more than $1,000. I further understand that these assets and financial interests

2  include all assets and financial interests in which I have an interest, direct or indirect, whether held in

3  my own name or in the name of another, in any property, real or personal. I agree that if the information

4  I provide in the financial statement or subsequent updates are found to be false, I will have breached this

5  Agreement and may be subject to prosecution for perjury, false statement, and/or obstruction of justice.

6        I agree to surrender assets I obtained as a result of my crimes, and release funds and property

7  under my control in order to pay any fine, forfeiture, or restitution. I further agree to notify the FLU

8  before transferring any interest in property owned directly or indirectly by me, including any interest

9  held or owned under any other name or entity, including trusts, partnerships, and/or corporations. I also

10  agree to notify the FLU of any interest in property I may obtain, directly or indirectly, which is valued at

11  more than $1,000, and which includes any interest obtained under any other name, or entity, including a

12  trust, partnership, or corporation, after the execution of this Plea Agreement until the fine or restitution

13  is paid in full.

14        I agree that any fine, forfeiture, or restitution imposed by the Court against me will be due

15  immediately and subject to immediate enforcement by the government as authorized by 18 U.S.C.

16  § 3613. I further understand that the government may seek immediate collection of the entire fine,

17  forfeiture, or restitution from any assets without regard to any schedule of payments imposed by the

18  Court or established by the Probation Office and that monetary penalties imposed by the Court will be

19  submitted to the Treasury Offset Program so that any federal payment or transfer of returned property I

20  receive may be offset and applied to federal debts.

21        10.     I agree not to commit or attempt to commit any crimes before sentence is imposed or

22  before I surrender to serve my sentence. I also agree not to violate the terms of my pretrial release; not

23  to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the

24  government; and not to fail to comply with any of the other promises I have made in this Agreement. I

25  agree not to have any contact with any victims or witnesses in this case, either directly or indirectly,

26  before and after I am sentenced. This includes, but is not limited to, personal contact, telephone, mail,

27  or electronic mail contact, or any other written form of communication, and includes any harassing,

28  annoying, or intimidating conduct by me directed to any victims or witnesses. I agree that the Court

PLEA AGREEMENT                                  10                                    v. 05/14/2020
CR 21-00217 MMC

1    may also include this no-contact provision as a condition of my supervised release term.  I agree that if I
2    fail to comply with any promises I have made in this Agreement, then the government will be released
3    from all of its promises in this Agreement, including those set forth in The Government's Promises
4    Section below, but I will not be released from my guilty plea.

5          11.    I agree that this Agreement contains all of the promises and agreements between the
6    government and me, and I will not claim otherwise in the future.  No modification of this Agreement
7    shall be effective unless it is in writing and signed by all parties.

8          12.    I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of
9    California only, and does not bind any other federal, state, or local agency.

10   The Government's Promises

11         13.    The government agrees to move to dismiss any open charges pending against the
12   defendant in the captioned Information at the time of sentencing.

13         14.    The government agrees not to file any additional charges against the defendant that could
14   be filed as a result of the investigation that led to the captioned Information.

15         15.    Based on the promises contained herein, the defendant's pre-Indictment resolution of the
16   case, and notwithstanding the Guidelines calculations above, the government agrees that it will
17   recommend a sentence of no more than 36 months in custody, unless the defendant violates the terms of
18   the Agreement above or fails to accept responsibility.

19   The Defendant's Affirmations

20         16.    I agree that my participation in the District Court's Conviction Alternative Program is not
21   appropriate and that I will not request to be considered for and will not participate in that program as a
22   result of my conviction for these offenses.

23         17.    I confirm that I have had adequate time to discuss this case, the evidence, and the
24   Agreement with my attorney and that my attorney has provided me with all the legal advice that I
25   requested.

26         18.    I confirm that while I considered signing this Agreement, and at the time I signed it, I
27   was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand
28   the Agreement.

PLEA AGREEMENT                                    11                                      v. 05/14/2020
CR 21-00217 MMC

1       19.    I confirm that my decision to enter a guilty plea is made knowing the charges that have

2 been brought against me, any possible defense, and the benefits and possible detriments of proceeding to

3 trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or

4 threatened me to enter into this Agreement.

5

6 Dated: _____6/16/21_____                         _____

                                                ANDREW CHAPIN

7                                                   Defendant

8

                                                  STEPHANIE M. HINDS

9                                                   Acting United States Attorney

10

11 Dated: _____June 16, 2021_____                _____

                                                  KIMBERLY HOPKINS

                                                  SCOTT JOINER

12                                                   Assistant United States Attorneys

13       20.    I have fully explained to my client all the rights that a criminal defendant has and all the

14 terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all

15 the rights my client is giving up by pleading guilty, and, based on the information now known to me, my

16 client's decision to plead guilty is knowing and voluntary.

17

18 Dated: _____6/16/21_____                    Randy Sue Pollock

                                                  RANDY SUE POLLOCK

19                                                   Attorney for Defendant

20

21

22

23

24

25

26

27

28

# Exhibit G-1



100 W University Ave
Champaign IL 61820

11386266

BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  4/30/20          Page    1
Primary Account        ████4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | ████4766 | Statement Dates  4/01/20 thru  4/30/20 | |
| Previous Balance | 11,599.47 | Days in the statement period | 30 |
| 28 Deposits/Credits | 4,290,724.02 | Average Ledger | 143,808.36 |
| 101 Checks/Debits | 4,106,916.78 | Average Collected | 143,808.36 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 195,406.71 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $805.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 4/02 | Wire Transfer Credit | 414,950.54 |
| | MHC FINANCIAL SERVICES INC DBA | |
| | 11120 TOMAHAWK CREEK PKWY SUIT | |
| | LEAWOOD, KS 662112695 | |
| | FACTORING PURCHASE | |
| | MHC FINANCIAL SERVICES | |
| | 20200401J1B7841C002985 | |
| | 20200401MMQFMPUN000330 | |
| | 04011745FT01 | |
| | ████████████████████████████████ | |
| 4/06 | Wire Transfer Credit | 1,243,604.49 |
| | MHC FINANCIAL SERVICES INC DBA | |
| | 11120 TOMAHAWK CREEK PKWY SUIT | |
| | LEAWOOD, KS 662112695 | |
| | FACTORING PURCHASE | |
| | MHC FINANCIAL SERVICES | |
| | 20200403J1B7841C001682 | |
| | 20200403MMQFMPUN000275 | |
| | 04031800FT01 | |
| | ████████████████████████████████ | |

# CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts.

Customer Name: _____  (Account Number)

New Address: _____

(Street Address) _____  (Unit #)

(City) _____ (State) _____ (Zip Code)

Member FDIC

(Telephone Number) _____  (Social Security Number)

(Customer Signature) _____

## Please return this form to the address listed below or bring it to our office

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | | |
|---|---|---|---|---|---|
| Check No. | $ | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |
| | | ADD (+) | | ADD (+) | |
| | | Deposits, Loan Advances, Credit Memos, And | $ _____ | Interest Earned From This Statement | $ _____ |
| | | Other Automatic Deposits Not Shown On This | $ _____ | | |
| | | Statement | $ _____ | SUBTRACT (-) | |
| | | | | Misc. Charges From This Statement | $ _____ |
| | | SUBTRACT (-) | $ _____ | | |
| | | Total of Checks Outstanding, Automatic Loan | $ _____ | NEW CHECKBOOK BALANCE | |
| | | Payments, Automatic Stop Transfers, Service | $ _____ | Should Agree With BALANCE Line | $ _____ |
| | | Charges, Debit Memos And Other Automatic | $ _____ | | |
| | | Deductions Not Shown On This Statement | $ _____ | | |
| TOTAL | $ | BALANCE | $ _____ | | |

## IMPORTANT INFORMATION

### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

#### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and we correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

#### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate, your questions, we cannot report you as delinquent or take any action to collect the amount you question.

#### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate (Average Daily Balance – We figure the interest charge on your account by applying the periodic rate to the "AVERAGE DAILY BALANCE" of your account (including current transactions). To get the "AVERAGE DAILY BALANCE" we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the "AVERAGE DAILY BALANCE" and INTEREST CHARGE. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the AVERAGE DAILY BALANCE but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "AVERAGE DAILY BALANCE". Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

#### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8759 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.



100 W University Ave
Champaign IL 61820

Date  4/30/20        Page    2
Primary Account      ████4766

BUSINESS ANALYSIS          ████4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| | | |
| 4/10 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200410J1B7841C000516<br>20200410MMQFMPUN000166<br>04101427FT03 | 322,963.00 |





**Busey**

100 W University Ave
Champaign IL 61820

Date  4/30/20          Page      3
Primary Account     ████4766

BUSINESS ANALYSIS          ████4766  (Continued)



| DEPOSITS AND OTHER CREDITS | | |
| --- | --- | --- |
| DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 4/29 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200429J1B7841C001317<br>20200429MMQFMPUN000356<br>04291639FT03 | 994,774.76 |
| 4/30 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200430J1B7841C000733<br>20200430MMQFMPUN000198<br>04301138FT03 | 696,970.23 |

| CHECKS AND OTHER DEBITS | | |
| --- | --- | --- |
| DATE | TRANSACTION DESCRIPTION | AMOUNT |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS              ████4766  (Continued)



Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 53 of 127



**100 W University Ave**
**Champaign IL 61820**

BUSINESS ANALYSIS                 ████4766  (Continued)





**Busey**

100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS          ▉▉▉4766  (Continued)



| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| DATE | TRANSACTION DESCRIPTION | AMOUNT |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS        ████4766   (Continued)





100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS              ███████4766  (Continued)





100 W University Ave
Champaign IL 61820

Date   4/30/20        Page      9
Primary Account        ████4766

BUSINESS ANALYSIS            ████4766   (Continued)





**Busey**

100 W University Ave
Champaign IL 61820

Date  4/30/20      Page   10
Primary Account    ████4766

BUSINESS ANALYSIS            ████4766  (Continued)





100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS        ████4766  (Continued)



## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 4/01 | 11,120.36 | 4/02 | 74,825.87 | 4/03 | 21,484.51 |
| 4/06 | 563,203.87 | 4/07 | 561,575.34 | 4/08 | 111,549.27 |
| 4/09 | 111,570.89 | 4/10 | 334,610.60 | 4/13 | 77,559.53 |
| 4/14 | 67,056.03 | 4/15 | 66,681.52 | 4/16 | 65,346.16 |
| 4/17 | 75,361.22 | 4/20 | 375,353.09 | 4/21 | 231,543.96 |
| 4/22 | 76,837.96 | 4/23 | 70,088.42 | 4/24 | 70,215.61 |
| 4/27 | 65,214.36 | 4/28 | 45,537.15 | 4/29 | 38,764.56 |
| 4/30 | 195,406.71 | | | | |



100 W University Ave
Champaign IL 61820

| | | | |
|---|---|---|---|
| 12344742 | | Date 5/29/20 | Page 1 |
| BENJA INC | | Primary Account | ████4766 |
| 845 MARKET ST 450A | | | |
| SAN FRANCISCO CA 94117 | | | |

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | |
|---|---|---|
| Account Number | ████4766 | Number of Enclosures 6 |
| Previous Balance | 195,406.71 | Statement Dates 5/01/20 thru 5/31/20 |
| 24 Deposits/Credits | 965,024.70 | Days in the statement period 31 |
| 91 Checks/Debits | 1,157,415.19 | Average Ledger 68,384.33 |
| Service Charge | .00 | Average Collected 68,384.33 |
| Interest Paid | .00 | |
| Ending Balance | 3,016.22 | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $805.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|



Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 61 of 127

# CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts

Customer Name: _____

                                                                    (Account Number)

New Address: _____

              (Street Address)                                      (Unit #)

              (City)                    (State)                     (Zip Code)

Member FDIC   (Telephone Number)                        (Social Security Number)

              (Customer Signature)

## Please return this form to the address listed below or bring it to our office

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

CHECKS or WITHDRAWALS OUTSTANDING
Not Charged To Your Account

| Check No. | $ |
|-----------|---|
|           |   |
|           |   |
|           |   |
|           |   |
|           |   |
|           |   |
|           |   |
|           |   |
| TOTAL     | $ |

ENDING BALANCE
Shown On This Statement                          $ _____

ADD (+)                                          $ _____
Deposits, Loan Advances, Credit Memos, And
Other Automatic Deposits Not Shown On This
Statement                                        $ _____

SUBTRACT (-)                                     $ _____
Total of Checks Outstanding, Automatic Loan
Payments, Automatic Savings Transfers, Service   $ _____
Charges, Debit Memos And Other Automatic
Deductions Not Shown On This Statement            $ _____

BALANCE                                          $ _____

Current Checkbook Balance                        $ _____

ADD (+)
Interest Earned From This Statement              $ _____

SUBTRACT (-)
Misc. Charges From This Statement                $ _____

NEW CHECKBOOK BALANCE
Should Agree With BALANCE Line                   $ _____

### IMPORTANT INFORMATION

#### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstances, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

#### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

#### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this item or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

#### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the AVERAGE DAILY BALANCE but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

#### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4026, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.



**Busey**

100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS              ██████4766   (Continued)



## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| 5/27 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200527J1B7841C001627<br>20200527MMQFMPUN000319<br>05271651FT03 | 268,872.52 |
| 5/27 | MHC FIN SERVICES CHKNAM<br>Benja Incorporated<br>56762 | 540,572.25 |



100 W University Ave
Champaign IL 61820

Date   5/29/20        Page      3
Primary Account     ████4766

BUSINESS ANALYSIS              ████4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|



## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|



100 W University Ave
Champaign IL 61820

Date 5/29/20          Page      4
Primary Account          ▮▮▮4766

BUSINESS ANALYSIS          ▮▮▮4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|





100 W University Ave
Champaign IL 61820

Date 5/29/20          Page      5
Primary Account      ████4766

BUSINESS ANALYSIS          ████4766   (Continued)





100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS              ████4766  (Continued)





100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS        ████766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|





**Busey**

100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS          ████4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|





100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                ████4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      |                        |        |

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 5/28 | 5005 | 44.99 | 5/22 | 5008* | 107.24 |
| 5/29 | 5009 | 128.37 | 5/20 | 5011* | 134.99 |
| 5/18 | 5012 | 51.50 | 5/22 | 5014* | 12.24 |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 5/01 | 51,411.43 | 5/04 | 50,702.69 | 5/05 | 48,113.44 |
| 5/06 | 47,869.08 | 5/07 | 47,859.64 | 5/08 | 47,844.32 |
| 5/11 | 46,769.54 | 5/12 | 46,895.18 | 5/13 | 46,928.77 |
| 5/14 | 47,038.31 | 5/15 | 46,691.95 | 5/18 | 46,495.32 |
| 5/19 | 46,785.97 | 5/20 | 37,700.70 | 5/21 | 40,379.51 |
| 5/22 | 40,414.80 | 5/26 | 188,634.26 | 5/27 | 734,375.34 |
| 5/28 | 34,815.65 | 5/29 | 3,016.22 | | |



Exhibit G-2

# BENJA INCORPORATED
## INSERTION ORDER

This agreement made on 1/1/2020 between Benja Incorporated (herein referred to as "Network") and Lululemon Athletica Inc. (herein referred to as "Vendor") is binding to the following terms and conditions.

Lululemon Athletica Inc. agrees to purchase advertising space on the Benja Incorporated commerce network, which includes various mobile applications, online publishers, social media networks, short message service offerings, and other technology products.

| | |
|---|---|
| Vendor Business Address | 1818 Cornwall Avenue, Vancouver, BC V6J1C7 |
| Duration | 1/1/2020 through 1/1/2021 |
| Territory | USA |

Term & Termination

| | |
|---|---|
| Term | Through 1/1/2021 |
| Termination | Shall occur on the end date defined in the Term section. Any termination prior to this date is subject to the terms and penalties defined below. |
| Obligation on Termination | Each party must destroy or return (at party's election) all confidential information disclosed under the agreement. Termination prior to the end date defined in the Term section must be made in writing to Network management thirty (30) days prior to the revised termination date, and must be accompanied by a cash penalty of an amount equal to the average of the two most recent invoices issued by Network to Vendor. |

Commercial Terms

| | |
|---|---|
| Vendor Obligations | Vendor agrees to provide product information including name, description, MSRP, sale price, product images, daily, via FTP upload. Vendor further agrees to provide product shipping and fulfillment within 72 hours of orders placed through Benja and to provide customer support, including returns and exchanges. Vendor agrees to a $10.00 CPM rate. Vendor agrees to a maximum impression budget of 100,000 monthly impressions. Vendor agrees to a minimum impression order of 200,000 monthly impressions. Vendor agrees to remit payment within sixty (60) days of invoice receipt. |
| Restrictions on Vendor | None |
| Benja Obligations | Network will promote Vendor product through the Benja Incorporated commerce network, which includes various mobile applications, online publishers, social media networks, short message service offerings, and other technology products. |

MHC000671

|  | At the conclusion of each monthly billing period, Benja will provide an invoice detailing impression and sales activity for the prior billing period, and comprehensive sales performance data. |
|---|---|
| Restrictions on Benja | None |

## Marketing and Intellectual Property

| Marketing | Both parties to secure prior written approval over uses of trademarks in creative, advertising, and other public-facing materials. |
|---|---|
| Trademark and Intellectual Property License | Mutual grant of license to both parties subject to compliance with brand guidelines and prior written approval. |

## Representations and Warranties

| General | Each party has the full power and authority to enter into and fully perform the terms of this agreement. Each party will at all times comply with applicable laws, rules, and regulations as it relates to the subject matter of this Insertion Order. Each party holds all necessary rights and permission to grant the rights and licenses granted herein. Network will endeavor to publish advertisements promptly and accurately. Network is not responsible for damages due to clerical errors or incorrect insertions. |
|---|---|

## Miscellaneous Terms

| Change of Control | This agreement is generally not transferable or assignable by the undersigned without express written consent. |
|---|---|
| Confidentiality | All proposed terms and conditions contained in this Insertion Order shall be deemed confidential information that may not be disclosed by either party to any third party. |
| Governing Law | This Agreement and any matters relating to it will be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws. |
| Additional Terms | Any Agreement based on this Insertion Order will additionally contain standard terms and conditions of similar agreements of this nature, including, without limitation, limitation of liability, severability, and customary representations, warranties and indemnities. |

*(Signature Page to Follow)*

MHC000672

The parties have agreed and execute this Insertion Order and general agreement as of the date first above written.


Lululemon Athletica Inc.


By: JS _____ INITIAL HERE
Name: Jilian Spaeth


Benja Incorporated


By: AJC _____
Name: Andrew J. Chapin, Co-Founder & CEO

MHC000673

# BENJA INCORPORATED
## INSERTION ORDER

This agreement made on 1/1/2020 between Benja Incorporated (herein referred to as "Network") and Fanatics, Inc. (herein referred to as "Vendor") is binding to the following terms and conditions.

Fanatics, Inc. agrees to purchase advertising space on the Benja Incorporated commerce network, which includes various mobile applications, online publishers, social media networks, short message service offerings, and other technology products.

| | |
|---|---|
| Vendor Business Address | 8100 Nations Way, Jacksonville, FL 32256 |
| Contact | • Wade Tonkin |
| Duration | 1/1/2020 through 1/1/2022 |
| Territory | USA & Canada |

Term & Termination

| | |
|---|---|
| Term | Through 1/1/2022 |
| Termination | Shall occur on the end date defined in the Term section. Any termination prior to this date is subject to the terms and penalties defined below. |
| Obligation on Termination | Each party must destroy or return (at party's election) all confidential information disclosed under the agreement. Termination prior to the end date defined in the Term section must be made in writing to Network management thirty (30) days prior to the revised termination date, and must be accompanied by a cash penalty of an amount equal to the average of the two most recent invoices issued by Network to Vendor. |

Commercial Terms

| | |
|---|---|
| Vendor Obligations | Vendor agrees to provide product information including name, description, MSRP, sale price, product images, daily, via FTP upload. Vendor further agrees to provide product shipping and fulfillment within 72 hours of orders placed through Benja and to provide customer support, including returns and exchanges. |
| | Vendor agrees to a $9.69 CPM rate. |
| | Vendor agrees to a maximum impression budget of 20,639,835 monthly impressions. Vendor agrees to a minimum impression order of 103,199,174 monthly impressions. |
| | Vendor agrees to remit payment within ninety (90) days of invoice receipt. |
| Restrictions on Vendor | None |
| Benja Obligations | Network will promote Vendor product through the Benja Incorporated commerce network, which includes various mobile applications, online publishers, social media networks, short message service offerings, and other technology products. |

MHC000659

|  | At the conclusion of each monthly billing period, Benja will provide an invoice detailing impression and sales activity for the prior billing period, and comprehensive sales performance data. |
|---|---|
| Restrictions on Benja | None |

## Marketing and Intellectual Property

| Marketing | Both parties to secure prior written approval over uses of trademarks in creative, advertising, and other public-facing materials. |
|---|---|
| Trademark and Intellectual Property License | Mutual grant of license to both parties subject to compliance with brand guidelines and prior written approval. |

## Representations and Warranties

| General | Each party has the full power and authority to enter into and fully perform the terms of this agreement. Each party will at all times comply with applicable laws, rules, and regulations as it relates to the subject matter of this Insertion Order. Each party holds all necessary rights and permission to grant the rights and licenses granted herein. Network will endeavor to publish advertisements promptly and accurately. Network is not responsible for damages due to clerical errors or incorrect insertions. |
|---|---|

## Miscellaneous Terms

| Change of Control | This agreement is generally not transferable or assignable by the undersigned without express written consent. |
|---|---|
| Confidentiality | All proposed terms and conditions contained in this Insertion Order shall be deemed confidential information that may not be disclosed by either party to any third party. |
| Governing Law | This Agreement and any matters relating to it will be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws. |
| Additional Terms | Any Agreement based on this Insertion Order will additionally contain standard terms and conditions of similar agreements of this nature, including, without limitation, limitation of liability, severability, and customary representations, warranties and indemnities. |

*(Signature Page to Follow)*

MHC000660

The parties have agreed and execute this Insertion Order and general agreement as of the date first above written.


Fanatics, Inc.


By: WT _____ [INITIAL HERE]
Name: Wade Tonkin


Benja Incorporated


By: AJC _____
Name: Andrew J. Chapin, Co-Founder & CEO

MHC000661

# BENJA INCORPORATED
## INSERTION ORDER

This agreement made on 1/1/2020 between Benja Incorporated (herein referred to as "Network") and Nike, Inc. (herein referred to as "Vendor") is binding to the following terms and conditions.

Nike, Inc. agrees to purchase advertising space on the Benja Incorporated commerce network, which includes various mobile applications, online publishers, social media networks, short message service offerings, and other technology products.

| Vendor Business Address | 1 Bowerman Drive, Beaverton, OR 97005 |
|---|---|
| Duration | 1/1/2020 through 1/1/2021 |
| Territory | USA |

Term & Termination

| Term | Through 1/1/2021 |
|---|---|
| Termination | Shall occur on the end date defined in the Term section. Any termination prior to this date is subject to the terms and penalties defined below. |
| Obligation on Termination | Each party must destroy or return (at party's election) all confidential information disclosed under the agreement. Termination prior to the end date defined in the Term section must be made in writing to Network management thirty (30) days prior to the revised termination date, and must be accompanied by a cash penalty of an amount equal to the average of the two most recent invoices issued by Network to Vendor. |

Commercial Terms

| Vendor Obligations | Vendor agrees to provide product information including name, description, MSRP, sale price, product images, daily, via FTP upload. Vendor further agrees to provide product shipping and fulfillment within 72 hours of orders placed through Benja and to provide customer support, including returns and exchanges. |
|---|---|
| | Vendor agrees to a $9.59 CPM rate for billing periods January, February, March, April, May, and June. Vendor agrees to a $10.55 CPM rate for billing periods July, August, September, October, November, and December. |
| | Vendor agrees to remit payment within sixty (60) days of invoice receipt. |
| Restrictions on Vendor | None |
| Benja Obligations | Network will promote Vendor product through the Benja Incorporated commerce network, which includes various mobile applications, online publishers, social media networks, short message service offerings, and other technology products. |
| | At the conclusion of each monthly billing period, Benja will provide an invoice detailing impression and sales activity for the prior billing period, and comprehensive sales performance data. |

MHC000680

| Restrictions on Benja | None |
|---|---|

## Marketing and Intellectual Property

| Marketing | Both parties to secure prior written approval over uses of trademarks in creative, advertising, and other public-facing materials. |
|---|---|
| Trademark and Intellectual Property License | Mutual grant of license to both parties subject to compliance with brand guidelines and prior written approval. . |

## Representations and Warranties

| General | Each party has the full power and authority to enter into and fully perform the terms of this agreement. Each party will at all times comply with applicable laws, rules, and regulations as it relates to the subject matter of this Insertion Order. Each party holds all necessary rights and permission to grant the rights and licenses granted herein. Network will endeavor to publish advertisements promptly and accurately. Network is not responsible for damages due to clerical errors or incorrect insertions. |
|---|---|

## Miscellaneous Terms

| Change of Control | This agreement is generally not transferable or assignable by the undersigned without express written consent. |
|---|---|
| Confidentiality | All proposed terms and conditions contained in this Insertion Order shall be deemed confidential information that may not be disclosed by either party to any third party. |
| Governing Law | This Agreement and any matters relating to it will be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws. |
| Additional Terms | Any Agreement based on this Insertion Order will additionally contain standard terms and conditions of similar agreements of this nature, including, without limitation, limitation of liability, severability, and customary representations, warranties and indemnities. |

*(Signature Page to Follow)*

MHC000681

The parties have agreed and execute this Insertion Order and general agreement as of the date first above written.

Nike, Inc.

By: AS            INITIAL HERE
Name: Adam Spangler

Benja Incorporated

By: AJC
Name: Andrew J. Chapin, Co-Founder & CEO

MHC000682

# Exhibit H



4501 College Blvd
Suite 190
Leawood, KS 66211
(p) 844-891-3509

July 17, 2020

SENT BY EMAIL AND CERTIFIED MAIL

Benja Incorporated

845 Market St, Suite 450A
San Francisco, CA 94103
ATTN: Andrew Chapin
*andrew@benja.co*
ATTN: Thomas Goode
*tommy@benja.co*

Re:    *$1,793,227.56 in uncollectible balances owed by Benja Incorporated ("Benja") to MHC Financial Services, Inc. ("MHCFS")*

Messrs. Chapin & Goode :

I am contacting you with respect to uncollectible invoices for services provided to Backcountry.com, Inc., Columbia Sportswear Company, Fanatics Inc., New Balance Inc., and Nike, Inc. by Benja. The right to collect on these invoices was assigned to MHCFS by Benja, pursuant to a Factoring Services Agreement between Benja and MHCFS, dated March 25, 2020.

As you recall, under the terms of the Factoring Services Agreement, Benja agreed that "if Purchaser reasonably determines after consultation with Client at any time that any Account purchased by Purchaser hereunder is uncollectible, … then upon request by Purchaser, Client shall immediately repurchase such Account(s) from Purchaser for an amount equal to the net amount of such Account(s)".

As of the date of this letter, $1,793,227.56 in uncollectible invoices purchased from Benja remains unpaid by Backcountry.com, Inc., Columbia Sportswear Company, Fanatics Inc., New Balance Inc., and Nike, Inc. MHCFS is demanding that Benja immediately repurchase these invoices in accordance with its obligations under the Factoring Services Agreement. Please note – this is only the uncollectible balance as of the date of this letter. The amount does not include all assets held by MHCFS or any fees whether previously incurred or yet to be incurred.

Please contact me by July 27, 2020 at (816) 242-6289 or dan.anderson@mhc.com, to arrange for the repurchasing of these invoices for $1,793,227.56  or MHCFS will have no option but to initiate legal action.

Regards,

By _____
Dan Anderson
Vice President & General Manager
MHC Financial Services, Inc.

*Enclosures:*
*1) Aging Detail by Days – Benja Incorporated*

| Debtor.. | Invoice# | PO# | Invoice Date | Sch# | Invoice Amount | Paid Date | Balances | Age | Current | 31-60 Days | 61-90 Days | 91-120 Days | 121+ Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Backcountry.com, Inc.(287175) | | | | | | | | | | | | | |
| | INV-0523 | INV-0208 | 4/29/2020 | 106311 | 371,854.80 | | 371,854.80 | 80 | | | 371,854.80 | | |
| | INV-0542 | INV-0208 | 4/30/2020 | 108374 | 24,847.80 | | 24,847.80 | 79 | | | 24,847.80 | | |
| * | | | | | | | 396,702.60 | | 0.00 | 0.00 | 396,702.60 | 0.00 | 0.00 |
| Columbia Sportswear Company(287161) | | | | | | | | | | | | | |
| | INV-0524 | INV-0204 | 4/29/2020 | 106311 | 208,453.60 | | 208,453.60 | 80 | | | 208,453.60 | | |
| | INV-0541 | INV-0204 | 4/30/2020 | 108374 | 13,967.72 | | 13,967.72 | 79 | | | 13,967.72 | | |
| | INV-0547 | INV-0204 | 5/24/2020 | 108374 | 259,931.74 | | 259,931.74 | 55 | | 259,931.74 | | | |
| * | | | | | | | 482,353.06 | | 0.00 | 259,931.74 | 222,421.32 | 0.00 | 0.00 |
| Fanatics Inc.(287146) | | | | | | | | | | | | | |
| | INV-0515 | 0203 | 3/31/2020 | 104302 | 464,238.21 | 6/24/2020 | 464,238.21 | 109 | | | | 464,238.21 | |
| | INV-0522 | INV-0203 | 4/29/2020 | 106394 | 457,464.90 | | 457,464.90 | 80 | | | 457,464.90 | | |
| | INV-0540 | INV-0203 | 4/30/2020 | 108245 | 31,962.47 | | 31,962.47 | 79 | | | 31,962.47 | | |
| | INV-0546 | INV-0203 | 5/24/2020 | 108245 | 568,010.36 | | 568,010.36 | 55 | | 568,010.36 | | | |
| * | | | | | | | 1,521,675.94 | | 0.00 | 568,010.36 | 489,427.37 | 464,238.21 | 0.00 |
| New Balance Inc(287177) | | | | | | | | | | | | | |
| | INV-0518 | INV-0197 | 4/29/2020 | 106394 | 316,963.13 | | 316,963.13 | 80 | | | 316,963.13 | | |
| * | | | | | | | 316,963.13 | | 0.00 | 0.00 | 316,963.13 | 0.00 | 0.00 |
| Nike Inc(287156) | | | | | | | | | | | | | |
| | INV-0519 | EM-889 | 4/29/2020 | 106311 | 368,265.59 | | 368,265.59 | 80 | | | 368,265.59 | | |
| | INV-0538 | EM-889 | 4/30/2020 | 108245 | 24,636.71 | | 24,636.71 | 79 | | | 24,636.71 | | |
| | INV-0544 | EM-889 | 5/24/2020 | 108245 | 451,048.68 | | 451,048.68 | 55 | | 451,048.68 | | | |

Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 85 of 127

| Debtor.. | Invoice# | PO# | Invoice Date | Sch# | Invoice Amount | Paid Date | Balances | Age | Current | 31-60 Days | 61-90 Days | 91-120 Days | 121+ Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| * | | | | | | | 843,950.98 | | 0.00 | 451,048.68 | 392,902.30 | 0.00 | 0.00 |
| Zappos LLC(288392) | | | | | | | | | | | | | |
| | INV-0521 | | 4/29/2020 | 106311 | 54,729.73 | | 54,729.73 | 80 | | | 54,729.73 | | |
| | INV-0123 | | | | | | | | | | | | |
| * | | | | | | | 54,729.73 | | 0.00 | 0.00 | 54,729.73 | 0.00 | 0.00 |
| | | | | | **Client Total** | | 3,616,375.44 | | 0.00 | 1,278,990.78 | 1,873,146.45 | 464,238.21 | 0.00 |
| | | | | | **Grand Total** | | 3,616,375.44 | | 0.00 | 1,278,990.78 | 1,873,146.45 | 464,238.21 | 0.00 |

# Exhibit I



Commerce Network

Benja Incorporated
845 Market Street, 450A
San Francisco, California 94103

MHC Financial Services, Inc.
11120 Tomahawk Creek Parkway
Leawood, Kansas 66211

July 21, 2020

**PROMISE TO PAY**

To whom it may concern:

The purpose of this memo is to express a promise to pay the amount Benja Incorporated currently owes MHC Financial Services, Inc. totalling $3,018,389.80 ("Amount"). This Amount, shared by MHC Financial Services, Inc. representatives on July 20, 2020, represents the total amount due, including outstanding invoices, misdirected payment fees, early termination fees, less cash reserves. It is understood this is the entirety of the amount due.

Per our rights granted in the mutually-agreed upon Factoring Services Agreement in March 2020, Benja Incorporated may terminate the Factoring Services Agreement by "by paying to Purchaser all amounts then due Purchaser with respect to such Factored Account, including any Late Fees, or other amounts." Benja Incorporated will complete a wire transfer of $3,018,389.80 prior to Friday, July 31, 2020 in order to satisfy the aforementioned requirements and terminate the Factoring Services Agreement.

If you have any questions or concerns, please contact me directly at (415) 326 4167 or andrew@benja.co. You may also reach legal representation through our legal inbox, legal@benja.co.

Best regards,

Andrew J. Chapin
Co-Founder & CEO
Benja Incorporated

MHC000936

# Exhibit J



SEIGFREID
BINGHAM
A PROFESSIONAL CORPORATION

2323 Grand Boulevard, Suite 1000
Kansas City, Missouri 64108
816.421.4460  F: 816.474.3447
www.sb-kc.com

Mark U. Opara
816.265.4140
mopara@sb-kc.com

September 15, 2020

**Sent via Certified Mail and E-Mail**
Benja, Inc.
Attn: Andrew Chapin, CEO
845 Market St. Suite 450A
San Francisco, CA 9410
E-mail: andrew@benja.co

Benja, Inc.
c/o Eric Shedlosky
801 California Street
Mountain View, CA 94041
Email: eshedlosky@fenwick.com

      Re:    **Notice of Forbearance Default**

Dear Sir:

      This law firm represents MHC Financial Services, Inc. ("MHC").  MHC, Benja Incorporated ("Benja"), Andrew Chapin and Thomas Goode entered into that certain Forbearance and Standstill Agreement, dated August 7, 2020 ("Forbearance Agreement"). Under the Forbearance Agreement, MHC agreed to forbear from certain collection activities and from exercising its legal rights against Benja, Mr. Chapin and Mr. Goode so long as Benja made timely payments to MHC as set forth in the Forbearance Agreement. The Forbearance Agreement is enclosed with this letter for your reference.

      As you know, Benja is in breach of the Forbearance Agreement for failure to repurchase certain accounts by making timely payments to MHC as required under the schedule set forth in Section 5.1 of the Forbearance Agreement, and for failure to pay MHC in full before 3:00 p.m., Central Time, on September 1, 2020 as required under Section 5.1(c).

      Accordingly, this letter hereby serves as notice to Benja in accordance with Section 6.1(a) of the Forbearance Agreement that Benja has failed to abide by the terms of the Forbearance Agreement and such failure constitutes a Forbearance Default as defined in the Forbearance Agreement. Accordingly, pursuant to Section 1.1 and Section 6.1 of the Forbearance Agreement, this letter also serves as notice of the occurrence of the Termination Date as defined in the Forbearance Agreement. Consequently, MHC has no further obligation to forbear from any collection activities against Benja,

1616478v5

MHC000921



Mr. Chapin and/or Mr. Goode and is able to exercise any and all of the legal rights and remedies available to it, including but not limited to, its rights under the Forbearance Agreement and the Factoring Services Agreement, dated March 25, 2020, between MHC and Benja, including the Personal Guaranty thereunder.

If you have any questions regarding this letter please do not hesitate to contact the undersigned.

Regards,

SEIGFREID BINGHAM, P.C.

Mark U. Opara

CC: Erin Murphy (via e-mail)
    Dan Anderson (via e-mail)
    Bryan Murphy (via e-mail)

Enclosure

1616478v5

MHC000922

# FORBEARANCE AND STANDSTILL AGREEMENT

**THIS FORBEARANCE AND STANDSTILL AGREEMENT** (this "**Agreement**") is made and entered into as of this 7th day of August, 2020, by and among MHC Financial Services, Inc. ("**MHC**"), Benja Incorporated ("**Benja**"), Andrew J. Chapin ("**Chapin**"), and Thomas Goode ("**Goode**") ("**Chapin**" and "**Goode**" are each a "**Guarantor**" and collectively the "**Guarantors**").

## RECITALS

**A.**     MHC and Benja entered into that certain Factoring Services Agreement dated March 25, 2020 (the "**Factoring Agreement**"), whereby MHC purchased invoices ("**Accounts**") from Benja resulting from bona-fide services rendered by Benja to certain account debtors.

**B.**     Pursuant to the terms of the Factoring Agreement, Benja agreed to repurchase Accounts from MHC upon failure by account debtors to make payment on the Accounts and/or upon the breach by Benja of the terms of the Factoring Agreement.

**C.**     Pursuant to the terms of the Factoring Agreement MHC has demanded that Benja repurchase Accounts and, as of date of this agreement, Benja has not repurchased Accounts from MHC.

**D.**     As of the date of this Agreement, Benja owes MHC the principal sum of $3,582,333.72 ("**Current Repurchase Balance**"). The Current Repurchase Balance and any other amounts which become due under the Factoring Agreement are sometimes collectively referred to as the "**Factoring Agreement Obligations**".

**E.**     The Guarantors jointly and severally guaranteed the payment and performance obligations of Benja under the Factoring Agreement pursuant to that certain Personal Guaranty dated March 25, 2020 (the "**Guaranty**").

**F.**     Benja and the Guarantors have requested that MHC forbear for a certain period of time from exercising its legal rights and remedies to collect the amounts Benja owes MHC and to provide a period of time to repay the Current Repurchase Balance to MHC.

**G.**     MHC is willing to forbear in the exercise of its legal rights and remedies against Benja and the Guarantors, to cease collection activities directed at Account Debtors, to cease contacting Account Debtors, and to provide a period of time to repay the Current Repurchase Balance to MHC on the terms and conditions set forth herein.

**H.**     Capitalized terms not otherwise defined herein shall have the meanings given such terms in the Factoring Agreement.

**NOW, THEREFORE**, in consideration of the Recitals of the mutual promises and covenants contained herein, MHC and Benja agree as follows:

## ARTICLE I
## AGREEMENT TO FORBEAR

**1.1**     **Forbearance**. Subject to compliance by Benja and the Guarantors with the terms and conditions of this Agreement, during the period (the "**Forbearance Period**") commencing on the Effective Date and ending on the earlier to occur of (a) 11:59 p.m., Central Time, on September 1, 2020, or (b) the date that any Forbearance Default (as defined in Article VI herein) occurs, MHC agrees to forbear from (i) any collection activities directed at Account Debtors, (ii) from contacting or otherwise communicating with any Account Debtors[1], and (iii) from initiating a lawsuit for collection of the Current Repurchase Balance against Benja and the Guarantors.. MHC's forbearance, as

---

[1] In the event MHC is contacted by an Account Debtor during the Forbearance Period, it shall state only that it is in the process of resolving its dispute with Benja.

1612476v6

provided for herein, shall immediately and automatically cease upon written notice of the occurrence of the earlier to occur of (a) or (b) above (the "**Termination Date**").

**ARTICLE II**
**CONDITIONS PRECEDENT TO EFFECTIVENESS OF AGREEMENT**

This Agreement shall not become effective unless and until the date ("**Effective Date**") that the following condition has been satisfied:

**2.1** **Initial Forbearance Payment**. Benja agrees that to induce MHC to forbear from (i) any collection activities directed at Account Debtors during the Forbearance Period, (ii) contacting any Account Debtors during the Forbearance Period and (iii) from initiating a lawsuit for collection of the Current Repurchase Balance against Benja and the Guarantors during the Forbearance Period, Benja shall pay the sum of One Hundred Thousand Dollars ($100,000.00) ("**Initial Forbearance Payment**") to MHC by 3:00 p.m., Central Time, on August 7, 2020, payable via wire transfer to the account designated by MHC attached to **Exhibit A** hereto. The Initial Forbearance Payment shall be applied against the Current Repurchase Balance.

**ARTICLE III**
**ACKNOWLEDGMENTS**

**3.1** **Benja's Acknowledgment**. Benja expressly acknowledges and agrees that:

    **(a)** Benja currently owes MHC the Current Repurchase Balance;

    **(b)** All of the remedies, warranties, and release granted hereunder is consideration for MHC agreeing to forbear from exercising its rights and remedies against Benja and the Guarantors; and

    **(c)** MHC would not have agreed to forbear from exercising its rights without the consideration provided by Benja and the Guarantors under this Agreement.

**3.2** **Guarantor Acknowledgments**. Each Guarantor expressly acknowledges and agrees that:

    **(a)** Benja currently owes MHC the Current Repurchase Balance;

    **(b)** Guarantor affirms the validity, legality and enforceability of the Guaranty and Guarantor remains obligated to pay MHC the Factoring Agreement Obligations, including the Current Repurchase Balance;

    **(c)** All of the remedies, warranties, and release granted hereunder is consideration for MHC agreeing to forbear from exercising its rights and remedies against Benja and Guarantor; and

    **(d)** MHC would not have agreed to forbear from exercising its rights without the consideration provided by Benja and the Guarantor under this Agreement.

**3.3** **Other Acknowledgments**. Benja and the Guarantors further acknowledge and agree that:

    **(a)** The Recitals in this Agreement are true and current;

    **(b)** Neither this Agreement, nor any action taken in accordance with this Agreement, the Factoring Agreement or the Guaranty, shall be construed as a waiver of any of MHC's rights and remedies of any kind or character whatsoever;

    **(c)** In the event the Current Repurchase Balance is not paid in full by expiration of the Forbearance Period (as defined in Section 1.1 of this Agreement), MHC shall have the absolute right to pursue all of its rights and remedies to collect any remaining amounts due under the Factoring Agreement and the Guaranty as acknowledged hereunder without restriction or modification;

(d) MHC has fully and timely performed all of its obligations and duties in compliance with the Factoring Agreement and applicable law; and

(e) Benja and the Guarantors have requested MHC's forbearance as provided herein, which shall inure to their direct and substantial benefit.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

Benja and the Guarantors represent and warrant to MHC as follows:

**4.1** **Recitals**. The Recitals in this Agreement are true and correct in all respects.

**4.2** **Executing Power; Authorization**. Benja has the right and power, and has been duly authorized by all requisite entity action, to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly executed and delivered by Benja. Each Guarantor has the right and power and has been duly authorized by all requisite entity action, to execute this Agreement. This Agreement has been duly executed and delivered by each Guarantor.

**4.3** **Enforceability**. This Agreement is the legal, valid and binding obligations of Benja and the Guarantors, enforceable against Benja and each Guarantor in accordance with its terms.

**4.4** **No Violation**. Benja's execution, delivery and performance of this Agreement does not and will not (i) violate any law, rule, regulation or court order to which Benja is subject; (ii) conflict with or result in a breach of Benja's organizational documents or any agreement or instrument to which Benja is party or by which it or its properties are bound; or (iii) result in the creation or imposition of any lien, security interest or encumbrance on any property of Benja, whether now owned or hereafter acquired, other than liens in favor of MHC.

**4.5** **Obligations Absolute**. The obligations of Benja and the Guarantors to pay amounts due MHC acknowledged pursuant to Article III of this Agreement are absolute and unconditional and there exists no right of setoff (other than with respect to the security reserve amount held by MHC, as described in Section 5.1(c)) or recoupment, counterclaim or defense of any nature whatsoever.

**ARTICLE V**
**COVENANTS OF BENJA**

**5.1** **Repurchase of Accounts**. Benja agrees to repurchase the Accounts by making the following payments to MHC on the following schedule, with each such payment to be applied against the Current Repurchase Balance:

(a) $2,191,298.12 on or before 3:00 p.m., Central Time, on August 14, 2020;

(b) $657,656.89 on or before 3:00 p.m., Central Time, on August 21, 2020;

(c) Upon payment by Benja of the amounts described in Sections 5.1(a) and 5.1(b) above, MHC shall apply the security reserve it holds pursuant to the Factoring Agreement, in the amount of $563,943.92 (the "Security Reserve"), against (i) the amount of the unpaid Current Repurchase Balance, which would equal $633,378.71 assuming timely payments are made by Benja pursuant to Sections 5.1(a) and 5.1(b) above, and (ii) any additional accrued interest, fees, and attorney's fees required pursuant to the Factoring Agreement. After application of the Security Reserve, Benja shall pay such outstanding Current Repurchase Balance amount remaining, which would equal $69,434.79 assuming timely payments were made by Benja pursuant to Sections 5.1(a) and 5.1(b) above, plus any reasonable attorney's fees in an amount not to exceed $15,000 required pursuant to the Factoring Agreement (the "Final Payment"). The records of MHC shall be received by Benja and Guarantors as conclusive evidence of the amount of any such reasonable attorney's fees (not to

exceed $15,000) absent manifest error. Such final payment by Benja shall be due on or before 3:00 p.m., Central Time, on September 1, 2020. In the event the Final Payment is made earlier than September 1, 2020, the interest component of the Final Payment shall be recalculated by MHC and reduced accordingly, with MHC's records serving as conclusive evidence of the amount of interest due absent manifest error.

All payments by Benja required pursuant to this Section 5.1 shall be made via wire transfer to the account designated by MHC attached to **Exhibit A** hereto. Benja and the Guarantors acknowledge and agree that time is of the essence of this Agreement.

**5.2** **MHC's Release of Claims**. Upon Benja's making of all payments in full in accordance with Section 5.1, MHC, on behalf of itself and its directors, officers, employees, legal successors and assigns, releases Benja and the Guarantors (including, as applicable, their respective directors, officers, employees, legal successors and assigns) from any and all claims, causes of action, demands, liability, losses, damages, legal fees, costs and any other claims of liability whatsoever, known or unknown, that arise under or relate to the Factoring Agreement.

**5.3** **Benja's Release of Claims**. Upon MHC's compliance with its forbearance obligations set forth in Section 1.1, Benja and the Guarantors, on behalf of themselves and their respective directors, officers, employees, legal successors and assigns, release MHC and its directors, officers, employees, legal successors and assigns from any and all claims, causes of action, demands, liability, losses, damages, legal fees, costs and any other claims of liability whatsoever, known or unknown, that arise under or relate to the Factoring Agreement.

**ARTICLE VI**
**DEFAULT AND REMEDIES**

**6.1** **Events of Default**. The occurrence of one or more of the following shall constitute a **"Forbearance Default"** under this Agreement:

    **(a)** MHC provides written notice to Benja and the Guarantors of the occurrence of the Termination Date;

    **(b)** Benja or the Guarantors shall fail to abide by or observe any term, condition, covenant, or other provision contained in this Agreement or any document related to or executed in connection with this Agreement;

    **(c)** Benja ceases to conduct business in the ordinary course;

    **(d)** A Guarantor challenges the validity or enforceability of its liability to MHC as acknowledged pursuant to Article III of this Agreement;

    **(e)** A Guarantor has filed against it any case proceeding or other action seeking to collect a debt, obligation or liability unrelated to the Factoring Agreement Obligations;

    **(f)** A tax lien, warrant or levy unrelated to the Factoring Agreement Obligations is imposed on Benja, a Guarantor or any of the collateral under the Factoring Agreement;

**6.2** **Remedies**. Immediately upon the occurrence of a Forbearance Default:

    **(a)** The Forbearance Period shall immediately and automatically cease without notice or further action, without notice to, or action by, any party;

    **(b)** MHC shall be entitled to exercise any and all of its rights and remedies under the Factoring Agreement, this Agreement or applicable laws;

4

1612476v6

MHC000926

(c)     MHC may setoff or apply to the payment of the obligation amounts owed to MHC by Benja and the Guarantors, any deposit balances, Security Reserves, any or all of the collateral or proceeds thereof, or other money now or hereafter owed to Benja or the Guarantors by MHC.

## ARTICLE VII
## BANKRUPTCY

**7.1     Consent to Relief from Automatic Stay.**  Benja and the Guarantors hereby agree that if any of them shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended, (ii) be the subject of any order for relief issued under such Title 11 of the U.S. Code as amended, (iii) file or be the subject of any petition seeking the reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (iv) seek, consent to acquiesce in the appointment of any trustee, receiver, conservator or liquidator, (v) be the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state action relating to bankruptcy, insolvency, or relief for debtors, MHC shall thereupon be entitled to relief from any automatic stay imposed by Section 362 of Title 11 of the U.S. Code, as amended from any other stay or suspension of remedies imposed in any other manner, with respect to the exercise of the rights and remedies otherwise available to MHC.

## ARTICLE VIII
## MISCELLANEOUS

**8.1     Integration; Modification of Agreement.**  This Agreement and related documents, the Factoring Agreement and the Guaranty, embody the entire understanding between the parties hereto and supersedes all prior agreements and understandings (whether written or oral) relating to the subject matter hereof and thereof.  The terms of this Agreement may not be waived, modified, altered, or amended except by agreement in writing signed by all the parties hereto.

**8.2     Severability.**  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**8.3     Full Force and Effect.**  The Factoring Agreement and the Guaranty shall remain in full force and effect and continue to govern and control the relationship between the parties hereto, except to the extent they are inconsistent with, superseded, or expressly modified herein.  To the extent of any inconsistency, amendment, or superseding provision, this Agreement shall govern and control.

**8.4     Successors and Assigns.**  This Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors, and assigns, provided that Benja's and the Guarantors' rights under this Agreement are not assignable without the prior written consent of MHC.  MHC may assign its rights and interests in this Agreement and related documents, the Factoring Agreement and the Guaranty, at any time without the consent of Benja or the Guarantors, provided, however, no such assignment shall be effective unless Benja or the Guarantors, as applicable, shall have received prior written notice of such assignment.

**8.5     Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Kansas without regard to conflict of laws principals thereof.

**8.6     No Waiver.**  No failure to exercise and no delay in exercising, on the part of MHC any right, remedy, power, or privilege hereunder or under the Factoring Agreement or the Guaranty shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**8.7     Cumulative Rights.**  The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

1612476v6

Case: 21-03036    Doc# 22    Filed: 03/18/22    Entered: 03/18/22 16:43:39    Page 96 of 127

MHC000927

**8.8** **Application of Payments**.  MHC may apply any and all payments it receives from Benja, the Guarantors, or any other party, and any proceeds of any collateral under the Factoring Agreement, to such portion of the Factoring Agreement Obligations as MHC shall determine in its sole discretion.

**8.9** **Recommendation of Counsel**.  Benja and the Guarantors acknowledge that MHC has recommended that they each consult with counsel prior to execution of this Agreement and represent that they either have done so or have knowingly waived the right to do so despite the express recommendation of MHC.

**8.10** **Headings**.  The section headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**8.11** **Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

      **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their authorized representatives, as of the day and year first above written.

**MHC Financial Services, Inc.**
**"MHC"**

By: _____

Name: _____Bryan Murphy_____

Title: __Executive Vice President__

**Benja Incorporated**
**"Benja"**

By: _____Andrew J. Chapin_____

Name: ____Andrew J. Chapin____

Title: ____Co-Founder & CEO____

**"Guarantors"**

_____Andrew J. Chapin_____
Andrew J. Chapin, an individual

_____Thomas Goode_____
Thomas Goode, an individual

DocuSign Envelope ID: 3D32D39A-7CA2-4F95-9686-F6D9FB1C0DEB

# **EXHIBIT A**

See attached.

1612476v6

7

MHC000929

# Exhibit K

# FORBEARANCE AND STANDSTILL AGREEMENT

**THIS FORBEARANCE AND STANDSTILL AGREEMENT** (this "**Agreement**") is made and entered into as of this 7th day of August, 2020, by and among MHC Financial Services, Inc. ("**MHC**"), Benja Incorporated ("**Benja**"), Andrew J. Chapin ("**Chapin**"), and Thomas Goode ("**Goode**") ("**Chapin**" and "**Goode**" are each a "**Guarantor**" and collectively the "**Guarantors**").

## RECITALS

**A.**    MHC and Benja entered into that certain Factoring Services Agreement dated March 25, 2020 (the "**Factoring Agreement**"), whereby MHC purchased invoices ("**Accounts**") from Benja resulting from bona-fide services rendered by Benja to certain account debtors.

**B.**    Pursuant to the terms of the Factoring Agreement, Benja agreed to repurchase Accounts from MHC upon failure by account debtors to make payment on the Accounts and/or upon the breach by Benja of the terms of the Factoring Agreement.

**C.**    Pursuant to the terms of the Factoring Agreement MHC has demanded that Benja repurchase Accounts and, as of date of this agreement, Benja has not repurchased Accounts from MHC.

**D.**    As of the date of this Agreement, Benja owes MHC the principal sum of $3,582,333.72 ("**Current Repurchase Balance**"). The Current Repurchase Balance and any other amounts which become due under the Factoring Agreement are sometimes collectively referred to as the "**Factoring Agreement Obligations**".

**E.**    The Guarantors jointly and severally guaranteed the payment and performance obligations of Benja under the Factoring Agreement pursuant to that certain Personal Guaranty dated March 25, 2020 (the "**Guaranty**").

**F.**    Benja and the Guarantors have requested that MHC forbear for a certain period of time from exercising its legal rights and remedies to collect the amounts Benja owes MHC and to provide a period of time to repay the Current Repurchase Balance to MHC.

**G.**    MHC is willing to forbear in the exercise of its legal rights and remedies against Benja and the Guarantors, to cease collection activities directed at Account Debtors, to cease contacting Account Debtors, and to provide a period of time to repay the Current Repurchase Balance to MHC on the terms and conditions set forth herein.

**H.**    Capitalized terms not otherwise defined herein shall have the meanings given such terms in the Factoring Agreement.

**NOW, THEREFORE**, in consideration of the Recitals of the mutual promises and covenants contained herein, MHC and Benja agree as follows:

## ARTICLE I
## AGREEMENT TO FORBEAR

**1.1**    **Forbearance**. Subject to compliance by Benja and the Guarantors with the terms and conditions of this Agreement, during the period (the "**Forbearance Period**") commencing on the Effective Date and ending on the earlier to occur of (a) 11:59 p.m., Central Time, on September 1, 2020, or (b) the date that any Forbearance Default (as defined in Article VI herein) occurs, MHC agrees to forbear from (i) any collection activities directed at Account Debtors, (ii) from contacting or otherwise communicating with any Account Debtors[1], and (iii) from initiating a lawsuit for collection of the Current Repurchase Balance against Benja and the Guarantors.. MHC's forbearance, as

---

[1] In the event MHC is contacted by an Account Debtor during the Forbearance Period, it shall state only that it is in the process of resolving its dispute with Benja.

1612476v6

Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 100 of 127

MHC000896

provided for herein, shall immediately and automatically cease upon written notice of the occurrence of the earlier to occur of (a) or (b) above (the "**Termination Date**").

## ARTICLE II
## CONDITIONS PRECEDENT TO EFFECTIVENESS OF AGREEMENT

This Agreement shall not become effective unless and until the date ("**Effective Date**") that the following condition has been satisfied:

**2.1**     **Initial Forbearance Payment**.  Benja agrees that to induce MHC to forbear from (i) any collection activities directed at Account Debtors during the Forbearance Period, (ii) contacting any Account Debtors during the Forbearance Period and (iii) from initiating a lawsuit for collection of the Current Repurchase Balance against Benja and the Guarantors during the Forbearance Period, Benja shall pay the sum of One Hundred Thousand Dollars ($100,000.00) ("**Initial Forbearance Payment**") to MHC by 3:00 p.m., Central Time, on August 7, 2020, payable via wire transfer to the account designated by MHC attached to **Exhibit A** hereto. The Initial Forbearance Payment shall be applied against the Current Repurchase Balance.

## ARTICLE III
## ACKNOWLEDGMENTS

**3.1**     **Benja's Acknowledgment**.  Benja expressly acknowledges and agrees that:

  **(a)**     Benja currently owes MHC the Current Repurchase Balance;

  **(b)**     All of the remedies, warranties, and release granted hereunder is consideration for MHC agreeing to forbear from exercising its rights and remedies against Benja and the Guarantors; and

  **(c)**     MHC would not have agreed to forbear from exercising its rights without the consideration provided by Benja and the Guarantors under this Agreement.

**3.2**     **Guarantor Acknowledgments**.  Each Guarantor expressly acknowledges and agrees that:

  **(a)**     Benja currently owes MHC the Current Repurchase Balance;

  **(b)**     Guarantor affirms the validity, legality and enforceability of the Guaranty and Guarantor remains obligated to pay MHC the Factoring Agreement Obligations, including the Current Repurchase Balance;

  **(c)**     All of the remedies, warranties, and release granted hereunder is consideration for MHC agreeing to forbear from exercising its rights and remedies against Benja and Guarantor; and

  **(d)**     MHC would not have agreed to forbear from exercising its rights without the consideration provided by Benja and the Guarantor under this Agreement.

**3.3**     **Other Acknowledgments**.  Benja and the Guarantors further acknowledge and agree that:

  **(a)**     The Recitals in this Agreement are true and current;

  **(b)**     Neither this Agreement, nor any action taken in accordance with this Agreement, the Factoring Agreement or the Guaranty, shall be construed as a waiver of any of MHC's rights and remedies of any kind or character whatsoever;

  **(c)**     In the event the Current Repurchase Balance is not paid in full by expiration of the Forbearance Period (as defined in Section 1.1 of this Agreement), MHC shall have the absolute right to pursue all of its rights and remedies to collect any remaining amounts due under the Factoring Agreement and the Guaranty as acknowledged hereunder without restriction or modification;

1612476v6

2

MHC000897

**(d)** MHC has fully and timely performed all of its obligations and duties in compliance with the Factoring Agreement and applicable law; and

**(e)** Benja and the Guarantors have requested MHC's forbearance as provided herein, which shall inure to their direct and substantial benefit.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

Benja and the Guarantors represent and warrant to MHC as follows:

**4.1**    <u>Recitals</u>. The Recitals in this Agreement are true and correct in all respects.

**4.2**    <u>Executing Power; Authorization</u>. Benja has the right and power, and has been duly authorized by all requisite entity action, to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly executed and delivered by Benja. Each Guarantor has the right and power and has been duly authorized by all requisite entity action, to execute this Agreement. This Agreement has been duly executed and delivered by each Guarantor.

**4.3**    <u>Enforceability</u>. This Agreement is the legal, valid and binding obligations of Benja and the Guarantors, enforceable against Benja and each Guarantor in accordance with its terms.

**4.4**    <u>No Violation</u>. Benja's execution, delivery and performance of this Agreement does not and will not (i) violate any law, rule, regulation or court order to which Benja is subject; (ii) conflict with or result in a breach of Benja's organizational documents or any agreement or instrument to which Benja is party or by which it or its properties are bound; or (iii) result in the creation or imposition of any lien, security interest or encumbrance on any property of Benja, whether now owned or hereafter acquired, other than liens in favor of MHC.

**4.5**    <u>Obligations Absolute</u>. The obligations of Benja and the Guarantors to pay amounts due MHC acknowledged pursuant to <u>Article III</u> of this Agreement are absolute and unconditional and there exists no right of setoff (other than with respect to the security reserve amount held by MHC, as described in <u>Section 5.1(c)</u>) or recoupment, counterclaim or defense of any nature whatsoever.

**ARTICLE V**
**COVENANTS OF BENJA**

**5.1**    <u>Repurchase of Accounts</u>. Benja agrees to repurchase the Accounts by making the following payments to MHC on the following schedule, with each such payment to be applied against the Current Repurchase Balance:

**(a)**    $2,191,298.12 on or before 3:00 p.m., Central Time, on August 14, 2020;

**(b)**    $657,656.89  on or before 3:00 p.m., Central Time, on August 21, 2020;

**(c)**    Upon payment by Benja of the amounts described in Sections 5.1(a) and 5.1(b) above, MHC shall apply the security reserve it holds pursuant to the Factoring Agreement, in the amount of $563,943.92 (the "Security Reserve"), against (i) the amount of the unpaid Current Repurchase Balance, which would equal $633,378.71 assuming timely payments are made by Benja pursuant to Sections 5.1(a) and 5.1(b) above, and (ii) any additional accrued interest, fees, and attorney's fees required pursuant to the Factoring Agreement.  After application of the Security Reserve, Benja shall pay such outstanding Current Repurchase Balance amount remaining, which would equal $69,434.79 assuming timely payments were made by Benja pursuant to Sections 5.1(a) and 5.1(b) above, plus any reasonable attorney's fees in an amount not to exceed $15,000 required pursuant to the Factoring Agreement (the "Final Payment"). The records of MHC shall be received by Benja and Guarantors as conclusive evidence of the amount of any such reasonable attorney's fees (not to

1612476v6

3

MHC000898

exceed $15,000) absent manifest error. Such final payment by Benja shall be due on or before 3:00 p.m., Central Time, on September 1, 2020. In the event the Final Payment is made earlier than September 1, 2020, the interest component of the Final Payment shall be recalculated by MHC and reduced accordingly, with MHC's records serving as conclusive evidence of the amount of interest due absent manifest error.

All payments by Benja required pursuant to this Section 5.1 shall be made via wire transfer to the account designated by MHC attached to **Exhibit A** hereto. Benja and the Guarantors acknowledge and agree that time is of the essence of this Agreement.

5.2 **MHC's Release of Claims**. Upon Benja's making of all payments in full in accordance with Section 5.1, MHC, on behalf of itself and its directors, officers, employees, legal successors and assigns, releases Benja and the Guarantors (including, as applicable, their respective directors, officers, employees, legal successors and assigns) from any and all claims, causes of action, demands, liability, losses, damages, legal fees, costs and any other claims of liability whatsoever, known or unknown, that arise under or relate to the Factoring Agreement.

5.3 **Benja's Release of Claims**. Upon MHC's compliance with its forbearance obligations set forth in Section 1.1, Benja and the Guarantors, on behalf of themselves and their respective directors, officers, employees, legal successors and assigns, release MHC and its directors, officers, employees, legal successors and assigns from any and all claims, causes of action, demands, liability, losses, damages, legal fees, costs and any other claims of liability whatsoever, known or unknown, that arise under or relate to the Factoring Agreement.

## ARTICLE VI
## DEFAULT AND REMEDIES

6.1 **Events of Default**. The occurrence of one or more of the following shall constitute a **"Forbearance Default"** under this Agreement:

    **(a)** MHC provides written notice to Benja and the Guarantors of the occurrence of the Termination Date;

    **(b)** Benja or the Guarantors shall fail to abide by or observe any term, condition, covenant, or other provision contained in this Agreement or any document related to or executed in connection with this Agreement;

    **(c)** Benja ceases to conduct business in the ordinary course;

    **(d)** A Guarantor challenges the validity or enforceability of its liability to MHC as acknowledged pursuant to Article III of this Agreement;

    **(e)** A Guarantor has filed against it any case proceeding or other action seeking to collect a debt, obligation or liability unrelated to the Factoring Agreement Obligations;

    **(f)** A tax lien, warrant or levy unrelated to the Factoring Agreement Obligations is imposed on Benja, a Guarantor or any of the collateral under the Factoring Agreement;

6.2 **Remedies**. Immediately upon the occurrence of a Forbearance Default:

    **(a)** The Forbearance Period shall immediately and automatically cease without notice or further action, without notice to, or action by, any party;

    **(b)** MHC shall be entitled to exercise any and all of its rights and remedies under the Factoring Agreement, this Agreement or applicable laws;

4

Case: 21-03036    Doc# 22    Filed: 03/18/22    Entered: 03/18/22 16:43:39    Page 103 of 127

MHC000899

(c)      MHC may setoff or apply to the payment of the obligation amounts owed to MHC by Benja and the Guarantors, any deposit balances, Security Reserves, any or all of the collateral or proceeds thereof, or other money now or hereafter owed to Benja or the Guarantors by MHC.

## ARTICLE VII
## BANKRUPTCY

**7.1      Consent to Relief from Automatic Stay**.  Benja and the Guarantors hereby agree that if any of them shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended, (ii) be the subject of any order for relief issued under such Title 11 of the U.S. Code as amended, (iii) file or be the subject of any petition seeking the reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (iv) seek, consent to acquiesce in the appointment of any trustee, receiver, conservator or liquidator, (v) be the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state action relating to bankruptcy, insolvency, or relief for debtors, MHC shall thereupon be entitled to relief from any automatic stay imposed by Section 362 of Title 11 of the U.S. Code, as amended from any other stay or suspension of remedies imposed in any other manner, with respect to the exercise of the rights and remedies otherwise available to MHC.

## ARTICLE VIII
## MISCELLANEOUS

**8.1      Integration; Modification of Agreement**.  This Agreement and related documents, the Factoring Agreement and the Guaranty, embody the entire understanding between the parties hereto and supersedes all prior agreements and understandings (whether written or oral) relating to the subject matter hereof and thereof.  The terms of this Agreement may not be waived, modified, altered, or amended except by agreement in writing signed by all the parties hereto.

**8.2      Severability**.  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**8.3      Full Force and Effect**.  The Factoring Agreement and the Guaranty shall remain in full force and effect and continue to govern and control the relationship between the parties hereto, except to the extent they are inconsistent with, superseded, or expressly modified herein.  To the extent of any inconsistency, amendment, or superseding provision, this Agreement shall govern and control.

**8.4      Successors and Assigns**.  This Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors, and assigns, provided that Benja's and the Guarantors' rights under this Agreement are not assignable without the prior written consent of MHC.  MHC may assign its rights and interests in this Agreement and related documents, the Factoring Agreement and the Guaranty, at any time without the consent of Benja or the Guarantors, provided, however, no such assignment shall be effective unless Benja or the Guarantors, as applicable, shall have received prior written notice of such assignment.

**8.5      Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Kansas without regard to conflict of laws principals thereof.

**8.6      No Waiver**.  No failure to exercise and no delay in exercising, on the part of MHC any right, remedy, power, or privilege hereunder or under the Factoring Agreement or the Guaranty shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**8.7      Cumulative Rights**.  The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

1612476v6

5

Case: 21-03036    Doc# 22    Filed: 03/18/22    Entered: 03/18/22 16:43:39    Page 104 of 127

MHC000900

**8.8    Application of Payments**.  MHC may apply any and all payments it receives from Benja, the Guarantors, or any other party, and any proceeds of any collateral under the Factoring Agreement, to such portion of the Factoring Agreement Obligations as MHC shall determine in its sole discretion.

**8.9    Recommendation of Counsel**.  Benja and the Guarantors acknowledge that MHC has recommended that they each consult with counsel prior to execution of this Agreement and represent that they either have done so or have knowingly waived the right to do so despite the express recommendation of MHC.

**8.10    Headings**.  The section headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**8.11    Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

  **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their authorized representatives, as of the day and year first above written.

**MHC Financial Services, Inc.**
**"MHC"**

By: _Bryan Murphy_ (signature)

Name: _Bryan Murphy_

Title: _Executive Vice President_

**Benja Incorporated**
**"Benja"**

By: _____

Name: _____

Title: _____

**"Guarantors"**

_____
Andrew J. Chapin, an individual

_____
Thomas Goode, an individual

1612476v6

6

MHC000901

See attached.

1612476v6

7

MHC000902

# Exhibit L



100 W University Ave
Champaign IL 61820

15810992

BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  8/31/20      Page    1
Primary Account      ████4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 2 |
|---|---|---|---|
| Account Number | ████4766 | Statement Dates   8/03/20 thru  8/31/20 | |
| Previous Balance | 27,538.59- | Days in the statement period | 29 |
| 38 Deposits/Credits | 2,289,795.77 | Average Ledger | 8,477.06 |
| 35 Checks/Debits | 2,260,282.38 | Average Collected | 8,477.06 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 1,974.80 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $910.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|



AC-002991



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS            ████4766   (Continued)



AC-002992



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS    ████ 4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
| --- | --- | --- |



AC-002993



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS          ████4766   (Continued)



AC-002994



**Busey**™

100 W University Ave
Champaign IL 61820

Date 8/31/20    Page    5
Primary Account    ████4766

BUSINESS ANALYSIS    ████4766    (Continued)



## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| 8/07 | Wire Transfer Debit<br>MHC Financial Services, Inc.<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200807MMQFMPUN000348<br>20200807J1B7841C001254<br>08071459FT03 | 100,000.00- |

AC-002995



Busey™

100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS        ████4766   (Continued)



| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 8/20 | Wire Transfer Debit MHC Financial Services, Inc. 101000695 9872224221 UMB BANK, N.A. 20200820MMQFMPUN000031 20200820J1B7841C000325 08200926FT03 | 1,941,298.12- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS          ████4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| | ████████████████████████████ | |
| 8/27 | Wire Transfer Debit | 10,000.00- |
| | MHC Financial Services Inc. | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 2020827MMQFMPUN000115 | |
| | 20200827J1B7841C000678 | |
| | 08271150FT03 | |
| 8/28 | Wire Transfer Debit | 2,500.00- |
| | MHC Financial Services, Inc. | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200828MMQFMPUN000308 | |
| | 20200828J1B7841C001659 | |
| | 08281546FT03 | |

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 8/04 | 5015 | 110.46 | 8/07 | 5016 | .91 |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 8/03 | 29,023.02- | 8/04 | 34,950.30- | 8/05 | 15,873.01- |
| 8/06 | 4,168.15 | 8/07 | 13,778.56 | 8/10 | 38,397.34 |
| 8/11 | 42,552.69 | 8/12 | 5,173.69 | 8/13 | 673.69 |
| 8/14 | 659.09 | 8/17 | 635.46 | 8/18 | 1,793.31 |
| 8/19 | 22,778.47 | 8/20 | 40,103.71 | 8/21 | 31,000.33 |
| 8/24 | 14,159.92 | 8/25 | 5,493.02 | 8/26 | 5,525.82 |
| 8/27 | 3,233.88 | 8/28 | 819.44 | 8/31 | 1,974.80 |



AC-002998



100 W University Ave
Champaign IL 61820

17154336

BENJA INCORPORATED
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  9/30/20        Page    1
Primary Account        ████4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 2 |
|---|---|---|---|
| Account Number | ████4766 | Statement Dates  9/01/20 thru  9/30/20 | |
| Previous Balance | 1,974.80 | Days in the statement period | 30 |
| 26 Deposits/Credits | 1,051,063.40 | Average Ledger | 6,444.21 |
| 41 Checks/Debits | 1,049,026.28 | Average Collected | 6,444.21 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 4,011.92 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $910.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS



AC-002983



196 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS          ████4766  (Continued)



DEPOSITS AND OTHER CREDITS

AC-002984



150 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS          ████4766  (Continued)



## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|

AC-002985



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS              ████4766  (Continued)



## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 9/02 | Wire Transfer Debit<br>MHC Financial Services Inc<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200902MMQFMPUN000322<br>20200902J1B7841C001326<br>09021618FT03 | 25,000.00- |
| 9/02 | Wire Transfer Debit<br>MHC Financial Services, Inc.<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200902MMQFMPUN000332<br>20200902J1B7841C001346<br>09021626FT03 | 75,000.00- |
| 9/02 | Wire Transfer Debit<br>MHC Financial Services Inc<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200902MMQFMPUN000327<br>20200902J1B7841C001341<br>09021624FT03 | 475,000.00- |
| 9/04 | Wire Transfer Debit<br>MHC Financial Services, Inc. | 10,000.00- |

AC-002986



**Busey**
100 W University Ave
Champaign IL 61820

Date 9/30/20     Page     5
Primary Account          ███4766

BUSINESS ANALYSIS          ███4766  (continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200904MMQFMPUN000490 | |
| | 20200904J1B7841C001633 | |
| | 09041653FT03 | |



| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 9/11 | Wire Transfer Debit | 50,000.00- |
| | MHC Financial Services | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200911MMQFMPUN000196 | |
| | 20200911J1B7841C000941 | |
| | 09111322FT03 | |
| 9/11 | Wire Transfer Debit | 78,008.70- |
| | MHC Financial Services Inc | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200911MMQFMPUN000034 | |

Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 120 of
127
AC-002987



**Busey**

100 W University Ave
Champaign IL 61820

Date 9/30/20 Page 6
Primary Account ████4766

BUSINESS ANALYSIS ████4766 (continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | 20200911J1B7841C000331 | |
| | 09110933FT03 | |



| 9/18 | Wire Transfer Debit | 200,000.00- |
| | MHC Financial Services, Inc. | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200918MMQFMPUN000252 | |
| | 20200918J1B7841C000973 | |
| | 09181350FT03 | |

Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 121 of 127

AC-002988



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS          ████4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | ██████████████████ | |
| | 488797400Z | |
| 9/22 | Wire Transfer Debit | 20,000.00- |
| | MHC Financial Services Inc | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200922MMQFMPUN000219 | |
| | 20200922J1B7841C000934 | |
| | 09221403FT03 | |

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 9/15 | 5017 | 928.12 | 9/24 | 5018 | .91 |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 9/01 | 21,162.94- | 9/02 | 4,420.67 | 9/03 | 4,602.79 |
| 9/04 | 4,377.27 | 9/08 | 3,067.58- | 9/09 | 2,814.51- |
| 9/10 | 97,154.28 | 9/11 | 6,645.58 | 9/14 | 906.00- |
| 9/15 | 2,065.13- | 9/16 | 2,021.31- | 9/17 | 2,060.70- |
| 9/18 | 7,323.07 | 9/21 | 24,512.83 | 9/22 | 4,512.83 |
| 9/24 | 4,011.92 | | | | |



AC-002990

 **CHASE**

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

September 05, 2020 through October 06, 2020

Account Number: ▬▬▬▬5257

00052681 DRE 703 219 26129 NNNNNNNNNNN  1 000000000 04 0000
ANDREW J CHAPIN
26 CRAGMONT AVE
SAN FRANCISCO CA 94116-1308

| CUSTOMER SERVICE INFORMATION | |
| --- | --- |
| Web site: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |



**Good news — We're including more deposit options to help meet monthly service fee waiver requirements for Chase Total® Checking, Chase College Checking^SM, and Chase Checking^SM accounts**

Beginning September 13, we'll automatically include additional electronic deposit payments to waive the monthly service fee. This includes payroll deposits that many independent or freelance employees (ride-sharing services, restaurant delivery services, etc.) receive through the Real Time Payment network or third-party services that facilitate payments to your debit card using the Visa® or Mastercard® network. If you have questions, please call the number at the top of your statement or review the Additional Banking Services and Fees disclosure at chase.com/disclosures for specific requirements for your account.

**We'll no longer offer the Visa Benefits Package on Chase debit cards**

Effective December 1, 2020, we'll no longer offer the Visa Benefits Package (such as Concierge Services and Purchase Security) on eligible Chase debit cards. This doesn't affect any benefit packages on Chase credit cards. Benefits you may have with this package will remain in effect for eligible purchases made prior to December 1.

**We want to remind you about the overdraft service options that are available for your personal checking account(s)**

We've included information on the last page of this statement to remind you about our overdraft services and associated fees. As a reminder, overdraft services are not available for Chase Secure Checking^SM or Chase First Checking^SM. Our Standard Overdraft Practice and Chase Debit Card Coverage^SM are not available for Chase High School Checking^SM.

We're changing when we waive overdraft fees for Chase Private Client Checking^SM accounts. Please see the last page of this statement for more information.

If you have questions, please visit chase.com/overdraft or call us at the number on your statement. We accept operator relay calls.

*Como cortesía hacia usted, le proporcionamos esta traducción. Si existe alguna diferencia de significado entre este mensaje y la versión en inglés del mismo, usted acepta los términos de la versión en inglés. Por favor, consulte con un traductor si tiene alguna pregunta.*

**Queremos recordarle las opciones de servicio de sobregiro disponibles para su cuenta o cuentas de cheques personales**

Hemos incluido información en la última página de este estado de cuenta para recordarle nuestros servicios de sobregiro y sus cargos asociados. Recuerde que nuestros servicios de sobregiro no están disponibles para Chase Secure Checking^SM o Chase First Checking^SM. Nuestra Práctica de Sobregiros Estándar y la cobertura Chase Debit Card Coverage^SM no están disponibles para Chase High School Checking^SM.

Page 1 of 4

SB1170330-F1

275

**CHASE** 

September 05, 2020 through October 06, 2020
Account Number: ▮▮▮▮5257

Estamos cambiando cuándo le eximimos los cargos por sobregiro para las cuentas Chase Private Client Checking$^{SM}$. Por favor, consulte la última página de este estado de cuenta para obtener más información.

Si tiene preguntas, por favor, visite chase.com/overdraft o llámenos al número que aparece en su estado de cuenta. Aceptamos llamadas por operador de retransmisión.

## CHECKING SUMMARY | Chase Total Checking

| | AMOUNT |
|---|---|
| Beginning Balance | $10,465.64 |
| Deposits and Additions | 390,170.48 |
| ATM & Debit Card Withdrawals | -17.43 |
| Electronic Withdrawals | -397,776.79 |
| Fees | -120.00 |
| Ending Balance | $2,721.90 |

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $10,465.64 |
| 09/25 | 09/25 Domestic Wire Transfer Via: Umb Bk NA/101000695 A/C: Mhc Financial Services Imad: 0925B1Qgc08C012561 Trn: 3405530269Es | -96,229.39 | 40,810.23 |
| | Ending Balance | | $2,721.90 |

Page 2 of 4

SB1170330-F1

276

Case: 21-03036    Doc# 22    Filed: 03/18/22    Entered: 03/18/22 16:43:39    Page 125 of 127
AC-002155

 **CHASE**

September 05, 2020 through October 06, 2020
Account Number: ████████5257



A Monthly Service Fee was **not** charged to your Chase Total Checking account. Here are the three ways you can avoid this fee during any statement period.

- Have electronic deposits made into this account totaling $500.00 or more, such as payments from payroll providers or government benefit providers, by using (i) the ACH network, (ii) the Real Time Payment network, or (iii) third party services that facilitate payments to your debit card using the Visa or Mastercard network. (Your total electronic deposits this period were $6,804.27. Note: some deposits may be listed on your previous statement.)

- OR, keep a balance at the beginning of each day of $1,500.00 or more in this account. (Your balance at the beginning of each day was $39.62)

- OR, keep an average beginning day balance of $5,000.00 or more in qualifying linked deposits and investments. (Your average beginning day balance of qualifying linked deposits and investments was $6,342.98)

## OVERDRAFT AND RETURNED ITEM FEE SUMMARY

|  | Total for This Period | Total Year-to-date |
|---|---|---|
| Total Overdraft Fees * | $.00 | $34.00 |
| Total Returned Item Fees | $.00 | $68.00 |

* Total Overdraft Fees Includes Insufficient Funds Fees, and Extended Overdraft Fees

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC

Page 3 of 4

Case: 21-03036    Doc# 22    Filed: 03/18/22    Entered: 03/18/22 16:43:39    Page 126 of 127
AC-002156

This Page Intentionally Left Blank

Case: 21-03036   Doc# 22   Filed: 03/18/22   Entered: 03/18/22 16:43:39   Page 127 of
127
AC-002157