THEODORE B. STOLMAN (BAR NO. 52099)
ted.stolman@ffslaw.com
CAROL CHOW (BAR NO. 169299)
carol.chow@ffslaw.com
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
Telephone: (310) 255-6100
Facsimile: (310) 255-6200

GREGORY S. GERSTNER (Admitted Pro Hac Vice)
GGerstner@sb-kc.com
BENJAMIN A. REED (Admitted Pro Hac Vice)
BReed@sb-kc.com
SEIGFREID BINGHAM, P.C.
2323 Grand Blvd., Suite 1000
Kansas City, Missouri 64108
Telephone: (816) 421-4460
Facsimile: (816) 474-3447

Attorneys for Defendant
MHC FINANCIAL SERVICES, INC.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re<br><br>BENJA INCORPORATED, aka EPHE CORPORATION,<br><br>        Debtors.<br><br>KYLE EVERETT, TRUSTEE IN BANKRUPTCY,<br><br>        Plaintiff,<br><br>        vs.<br><br>MHC FINANCIAL SERVICES, INC.,<br><br>        Defendant. | Case No. 20-30819 DM<br>Chapter 7<br><br>Adv No. 21-03036<br><br>**DEFENDANT MHC FINANCIAL SERVICES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Declaration of Erin Murphy*]<br><br>Date: July 29, 2022<br>Time: 10:30 a.m.<br>Place: Via Tele/Videoconference |

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ iii

I. SUMMARY OF OPPOSITION ............................................................................................... 1

II. MATERIAL FACTS ............................................................................................................... 1

III. LEGAL ARGUMENT ............................................................................................................ 5

    1. LEGAL STANDARD ........................................................................................................ 5

    2. PLAINTIFF IS UNABLE TO MEET ELEMENTS OF 11 USC § 547 (b) ......................... 6

        A. The Payments were not made on account of an antecedent debt as required under 11 USC § 547 (b)(2) ........................................................................................................ 6

        B. The Trustee is not able to rely on the characterization of Benja as a Ponzi Scheme ....... 8

            a. Nearly all of Benja's funding was derived from sources other than investors ........... 9

            b. Benja operated as a legitimate business ................................................................. 10

        C. The Payments cannot be avoided as preferences as MHC has a perfected secured interest in the Payments ................................................................................................. 11

    3. MHC'S AFFIRMATIVE DEFENSES ............................................................................. 12

        a. The Payments were not part of the bankruptcy estate ................................................ 13

        b. The Trustee has no authority to avoid transfers of property outside the bankruptcy estate ......................................................................................................... 13

        c. The Trustee has no authority to avoid transfers of property held in constructive trust by Benja for the benefit of MHC ...................................................................... 14

            A. The Payments were held in a constructive trust under California Law.................... 15

            B. The Payments were held in a constructive trust under the terms of the Factoring Services Agreement ............................................................................................... 15

        d. The $1,941,298.12 paid to MHC on August 20, 2022 were earmarked by Busey Bank to be paid to MHC ................................................................................. 17

IV. CONCLUSION ..................................................................................................................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986) ................................................................................................................ 6

*Calistoga Civic Club v. City of Calistoga*, 143 Cal.App.3d 111, 191 Cal.Rptr. 571, 576 (Cal. 1983)............................................................................................................ 16, 17

*Carter v. Four Seasons Funding Corp.*, 351 Ark. 637 (2003) ...................................... 7, 8

*Chase Agri-Credit System, Inc. v. Jack Spears Drilling Co.*; 2003 WL 22880304 at 7 (N.D. Tex. Dec. 3, 2003) ........................................................................................... 7

*F.T.C. v. Crittenden*, 823 F.Supp. 699, 703 (C.D. Cal. 1993) ..................................... 16

*In re Adbox, Inc.*, 488 F.3d 836, 841 (9th Cir. 2007)........................................... 20, 23

*In re Bonham*, 229 F.3d 750, 759 n. 1 (9th Cir. 2000) ................................................. 9

*In re ECS Refining, Inc.*, 626 B.R. 425, 457 (2020) ................................................... 14

*In re Fox Ortega Enterprises, Inc.*, 631 B.R. 425, 441-42 (Bankr. N.D. Cal. 2021)...... 9

*In re Kemp*, 16 F.3d 313, 316 (9th Cir. 1994)........................................................... 20

*In re Nizolek Furniture & Carpet Co.*, 71 F. Supp. 1012, 1014 (D.N.J. 1947) .............. 7

*In re North Am. Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985) ............ 16

*In re Qualia Clinical Serv., Inc.*, 441 B.R. 325, 329 (B.A.P. 8th Cir. 2011) .................. 7

*In re Smith's Home Furnishings, Inc.*, 265 F.3d 959, 963 (9th Cir. 2001)................... 13

*In re Superior Stamp & Coin Co., Inc.*, 223 F.3d 1004, 1008 (9th Cir. 2000) ............. 20

*In re TriGem America Corp.*, 431 B.R. 855, 861 (Bankr. C.D. Cal. 2010) ................... 21

*In re Unicom Computer Corp.*, 13 F.3d 321, 324 (9th Cir. 1994) ............................... 15

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-1103 (9th Cir. 2000) ......................................................................................................... 5

*Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ............................................. 6

*Taylor v. First Advantage Background Servs. Corp*, 207 F. Supp. 3d 1095, 1099 (N.D. Cal. 2016) ........................................................................................................ 6

*True Traditions, LC v. Wu*, 552 B.R. 826, 840 (N.D. Cal. 2015) ................................ 15

**Statutes**

11 U.S.C.A. §§ 541 ................................................................................................... 13

11 USC § 547 ..................................................................................... 6, 8, 12, 13, 15, 17

11 USC § 577 ............................................................................................................. 5

Cal. Civ. Code § 2223 .......................................................................................... 14, 15

Cal. Civ. Code § 2224 .......................................................................................... 14, 15

Fed. R. Civ. P. 56(a) ................................................................................................. 5

UCC § 9-313 ........................................................................................................... 12

MHC Financial Services, Inc. ("MHC") submits this Opposition to Plaintiff's Motion for Partial Summary Judgment (the "Motion").

## I. SUMMARY OF OPPOSITION

The Trustee's preference claim seeks to misconstrue the payment of $3,083,036.21 from Benja to MHC (the "Payments") as payments made in satisfaction of an antecedent debt while also disregarding that MHC held a perfected security interest in the Payments barring an avoidance action. Further, the Trustee has failed to meet a condition precedent to its preference claim as MHC asserted valid affirmative defenses which prevent the Trustee from avoiding the Payments which the Trustee fails to address. For these reasons, the Motion must be denied.

## II. MATERIAL FACTS

1. On or about March 26, 2020, MHC and Benja entered into the Factoring Services Agreement and MHC filed a corresponding UCC-1 financing statement. (Declaration of Erin Murphy in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment, attached as Exhibit A, ¶ 6, Ex. A)

2. MHC's intent was to purchase certain accounts receivable from Benja pursuant to the Factoring Services Agreement. (Declaration of Erin Murphy, Exhibit A, ¶ 8)

3. Prior to purchasing any accounts receivable, MHC researched and reviewed the credit of each account debtor. (Declaration of Erin Murphy, Exhibit A, ¶ 9)

4. MHC required Benja, as part of the Factoring Services Agreement, to direct its account debtors to make payments on any purchased invoices directly to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 10)

5. MHC repeatedly emphasized with Benja that the notice of assignment must be provided to each account debtor directly and that each account debtor must make any payments on purchased accounts directly to MHC. (Declaration of Erin Murphy, Exhibit A, ¶11)

6. Prior to the purchase of any account, MHC required each account debtor to acknowledge that payments were to be made directly to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 12)

7. Andrew Chapin of Benja had informed MHC that issues with Busey Bank were

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

preventing payment from being made from Benja to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 13)

**8.** In July of 2020, MHC began communicating with Busey Bank personnel regarding Benja's relationship with MHC and the expectation that Benja would be making payment to MHC via Busey Bank. (Declaration of Erin Murphy, Exhibit A, ¶¶ 14-21)

**9.** On or around August 18, 2020, Erin Murphy of MHC communicated via telephone with Patrick Ricke, Busey's Relationship Manager for Benja, regarding MHC's relationship with Benja and MHC's expectation that it would soon be receiving a large wire transfer from Benja via Busey Bank. (Declaration of Erin Murphy, Exhibit A, ¶¶ 18-19)

**10.** Erin Murphy informed Patrick Ricke that MHC was told by Benja that an issue with Busey was preventing payment of a large wire from Benja to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 18)

**11.** Patrick Ricke responded to Erin Murphy by stating that Busey was working with Benja. (Declaration of Erin Murphy, Exhibit A, ¶ 18)

**12.** On August 18, 2020, Erin Murphy forwarded to Patrick Ricke a voicemail from a Compliance Representative from the State of California Franchise Tax Board regarding Benja's status of good standing with the state of California. (Declaration of Erin Murphy, Exhibit A, ¶ 19)

**13.** The purpose of Erin Murphy's August 18, 2020, email to Patrick Ricke was to facilitate the large wire transfer from Benja to MHC via Busey Bank that she had previously communicated about with Patrick Ricke. (Declaration of Erin Murphy, Exhibit A, ¶ 20)

**14.** On or around August 18, 2020, after Erin Murphy sent the email to Patrick Ricke containing the voicemail from the State of California, Murphy followed up with Ricke and asked to confirm his receipt of the voicemail from the State of California and inquired about the status of the large wire transfer from Benja. (Declaration of Erin Murphy, Exhibit A, ¶ 21)

**15.** On August 20, 2020, Busey Bank increased Benja's line of credit with the bank from $3 million to $5 million. (Declaration of Michael McElhone in Support of Creditor Busey Bank's Motion for the Appointment of a Chapter 11 Trustee or, in the Alternative, for Conversion of Case to Chapter 7 of the Bankruptcy Code, filed October 20, 2020, attached hereto as Exhibit

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

B, ¶ 6, Ex. 1).

16. Pursuant to that increase, Busey Bank transferred $1,979,296.50 into Benja's account at Busey Bank on August 20, 2020. (Declaration of Michael McElhone, Exhibit B, Ex. 8, p. 79).

17. On or about August 20, 2020, Benja paid MHC $1,941,298.12 via wire transfer from Busey Bank. (Declaration of Erin Murphy, Exhibit A, ¶ 22); (Trustee's Motion, p. 5); (Declaration of Michael McElhone, Exhibit B, Ex. 8, p. 82)

18. The funds transferred to MHC on August 20, 2020, were the same funds that Busey Bank made available to Benja via the line of credit increase. (Declaration of McElhone, Exhibit B, Ex. 8, pp. 79, 82).

19. Busey Bank had knowledge that the funds from the increase in Benja's line of credit would be used to pay MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 23)

20. Prior to processing the wire transfer on August 20, 2020, Busey Bank had knowledge that those specific funds would be paid to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 23)

21. Benja obtained approximately $11.5 million from financial institutions and purchasers of its accounts receivable. (Case No. 20-30819, California Northern Bankruptcy Court Claims Register, attached as Exhibit C.)

22. Benja's CEO, Andrew Chapin, testified during his 2004 examination that:

    a. "Benja was a collection of E-commerce companies, and also an advertising technology format." (Transcript of September 23, 2021, Rule 2004 Examination of Andrew Chapin, attached as Exhibit D, 5:4-7).

    b. Benja "operated a number of E-commerce stores, just traditionally commerce stores. And then also delivered an advertising technology product that would, to various degrees, enable and encourage E-commerce transactions through advertising." (Chapin Transcript, Exhibit D, 5:9-13).

23. Benja's CFO, Thomas Goode, testified during his 2004 examination that:

    a. Benja "built an app that the user can sign into and give [Benja] their shirt

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    size, pants size, shoe size, and some interests, you know, football teams or

2    sports or outdoor activity type things, and then [Benja] would try to match

3    them with products that [Benja] though would be interesting to them that

4    were at a discount." (Transcript of March 5, 2021, Rule 2004 Examination

5    of Thomas Goode III, attached as Exhibit E, 15:10-16).

6    b.    Benja "would buy ad space on sports blogs, things like that and . . . would

7    show sporting apparel and team gear and other things that [Benja] could

8    advertise . . . from the publishers [Benja] had access to." (Goode Transcript,

9    Exhibit E, 18:1-8).

10    c.    In 2019 Benja "had multiple Shopify stores . . ." (Goode Transcript, Exhibit

11    E, 34:24 – 35:3). Mr. Goode "administered the Shopify stores, worked on

12    Teams, did some work, basically maintaining the Shopify stores as well as

13    continuing maintaining [Benja's] servers and the IPhone app." (Goode

14    Transcript, Exhibit E, 35:3-6).

15    d.    Goode maintained Affordable Jerseys and Coverage Gear, two of Benja's

16    Shopify stores, and "helped load in product, set up imports at times, worked

17    on the changing the look and feel of the website, technical support things."

18    (Goode Transcript, Exhibit E, 35:9-20).

19    e.    Benja was "selling jerseys and selling hats through those stores." (Goode

20    Transcript, Exhibit E, 35:25 – 36:1).

21    f.    Benja made "hundreds" of sales through Affordable Jerseys and Coverage

22    Gear in 2019 and 2020. (Goode Transcript, Exhibit E, 38:10-14).

23    g.    At the time of his examination, Mr. Goode noted that Benja still had sports

24    jerseys in a warehouse in Texas. (Goode Transcript, Exhibit E, 160:7-19).

25    h.    Benja conducted additional legitimate business. Mr. Goode also oversaw

26    the development of Sunny Beach House, "a blog that [he] helped set up for

27    Benja that was going to be a kind of like travel affiliate site which would

28    make money by linking customers to [VRBO] or Air BNB properties for

Case: 21-03036   Doc# 29   Filed: 07/15/22   Entered: 07/15/22 16:54:58   Page 7 of
241   4
5441142.1

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

rental." (Goode Transcript, Exhibit E, 36:11-15).

        i.     Benja also "sold a number of gift cards throughout the years." (Goode Transcript, Exhibit E, 147:14-15).

**24.** MHC objects to the Trustee's characterization of the Busey Bank Lien as "valid and enforceable and has never been reconveyed" as an unsupported legal conclusion appropriate to be considered a material fact.

**25.** MHC objects to the Trustee's characterization of Benja as "insolvent" as this conclusion is not adequately supported on the record.

## III.    <u>LEGAL ARGUMENT</u>

### 1.    **LEGAL STANDARD**

Summary judgment cannot be granted where there is a genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). The party moving for summary judgment has the burden of persuading the court that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

"In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. … In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact. [¶] If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. … In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102-1103 (9th Cir. 2000).

In evaluating the evidence on a summary judgment motion, "[a] court must view the evidence in the light most favorable to the non-moving party and draw any reasonable inferences in the non-moving party's favor. … Summary judgment is proper only if no genuine issue of material fact exists and only if the moving party is entitled to judgment as a matter of law. Where

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   material factual disputes exist, the court must allow a jury to resolve the factual disputes." *See*

2   *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (citations omitted) (negative treatment on

3   other grounds).  At the summary judgment stage, "[c]redibility determinations, the weighing of the

4   evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

5   judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The

6   evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

7   favor." *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed.

8   2d 202 (1986) (emphasis added).

9   "Because summary judgment is a 'drastic device,' cutting off a party's right to present its

10  case to a jury, the moving party bears a 'heavy burden' of demonstrating the absence of any triable

11  issue of material fact." *See Taylor v. First Advantage Background Servs. Corp*, 207 F. Supp. 3d

12  1095, 1099 (N.D. Cal. 2016).

13  In this case, as conclusively demonstrated herein, the Trustee has failed to sustain his

14  heavy burden of demonstrating the absence of any triable issue of material fact.  The Trustee's

15  Motion for Partial Summary Judgment must therefore be denied.

16  **2.      PLAINTIFF IS UNABLE TO MEET ELEMENTS OF 11 USC § 547 (b)**

17  The Trustee must be able to demonstrate that the Payments meet the elements set forth in

18  11 USC § 547(b) in order prevail on its Motion.  Here, the Payments fail to meet the elements set

19  forth on 11 USC § 547(b)(2) and (5), and Trustee relies upon a false characterization of Benja's

20  business in order to meet 11 USC § 547(b)(3).  As a result, the Motion should be denied.

21  A.   The Payments were not made on account of an antecedent debt as required under 11
22       USC § 547 (b)(2)

23  The Payments were not made on account of an antecedent debt.  The transaction between

24  MHC and Benja was a true sale of receivables. Under a true sale of accounts receivable, the

25  elements of a Section 547 preference action are not met. *In re Nizolek Furniture & Carpet Co.*, 71

26  F. Supp. 1012, 1014 (D.N.J. 1947); *In re Qualia Clinical Serv., Inc.*, 441 B.R. 325, 329 (B.A.P.

27  8th Cir. 2011).

28  The factoring agreement between MHC and Benja is a full recourse agreement in that

MHC was permitted to charge back any unpaid accounts to Benja. While such factoring agreements can be construed as creating an antecedent debt, the factoring agreement between MHC and Benja is clearly a true sale of receivables.

The determination of whether a sale of account receivables is indeed a true sale turns principally on the intent of the parties. *Carter v. Four Seasons Funding Corp.*, 351 Ark. 637 (2003) (whether a factoring agreement is, in fact, a disguised loan turns principally on the intent of the parties.) See also *Chase Agri-Credit System, Inc. v. Jack Spears Drilling Co.*; 2003 WL 22880304 at 7 (N.D. Tex. Dec. 3, 2003) (finding that a factoring agreement that provides on its face for the purchase of receivables is not a loan).

The factoring agreement between Benja and MHC clearly states that the parties intended that the transactions between the parties be sales of receivables as opposed to any lending relationship:

> **Purchase of Accounts**. Client agrees to offer to sell, assign, transfer and convey to Purchaser, with recourse as provided herein, some or all of its existing and future accounts receivable arising from services performed in the regular course of Client's business; i.e., any right to payment from any party for services rendered by or on behalf of Client (the "**Accounts**").

(Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 1)

Moreover, the Factoring Services Agreement repeatedly refers to the "purchase" of accounts and makes no mention whatsoever of a loan or loans or any other terms which would indicate that the parties intended for the Factoring Services Agreement to serve as a lending transaction. (Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A)

The structure of the Factoring Services agreement also reflects that of a true sale of accounts. The accounts were sold at a fixed rate of 1.25% of the net amount of each account, not at a fluctuating rate similar to a commercial loan. (Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 2) See *Carter* at 399.  Benja represented to MHC the validity of each account sold. (Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 9(d)) Benja was not authorized to settle, adjust or compromise any accounts sold to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 9)  And Benja was required to direct all account debtors to make all payments on

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

purchased accounts directly to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 3)

In addition to the terms of the Factoring Services Agreement, MHC and Benja conducted themselves in a manner consistent with the true sale of receivables. MHC purchased certain accounts from Benja only after researching the credit of each account debtor and after receiving acknowledgment from account debtors that payments were to BE made directly to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 9), See *Carter* at 658. The Payments are not avoidable preferences as they were not paid on account of an antecedent debt.

B.  The Trustee is not able to rely on the characterization of Benja as a Ponzi Scheme

There is a presumption of insolvency in the ninety days before the date of the petition per 11 USC § 547(f). However, the Trustee relies upon the conclusion that Benja operated as a Ponzi Scheme in support of its Motion. To be clear, MHC is not asserting that Benja was solvent at the time of the Payments. However, MHC strenuously objects to the notion that Benja operated as a Ponzi Scheme as this clearly was not the case.

In support of that assertion, the Trustee simply states in his own declaration in support that "Benja was insolvent at the time of the Preferential Transfers. At the time of each transfer, Benja's debts exceeded its liabilities." (Trustee's Motion, p. 7; Everett Declaration, ¶ 14). The Trustee's contention that Benja operated a Ponzi Scheme and not a legitimate business is a conclusory allegation without evidentiary support. Benja operated a legitimate business—the fact that the business ultimately failed does not render it a Ponzi Scheme.

The hallmark of a Ponzi Scheme is "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *In re Bonham*, 229 F.3d 750, 759 n. 1 (9th Cir. 2000). Ponzi Schemes generally have two important characteristics that set them apart from other types of fraud: (1) a promise of profit that is disconnected from any legitimate business activity, and (2) use of new investor funds,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

rather than legitimate profit, to provide a return to earlier investors. *In re Fox Ortega Enterprises, Inc.*, 631 B.R. 425, 441-42 (Bankr. N.D. Cal. 2021).

Thus, finding a Ponzi Scheme requires that the business's capital raising efforts be investor-focused and that no legitimate business is conducted. The Trustee cannot meet its burden to demonstrate Benja operated a Ponzi Scheme. As explained below, the majority of Benja's capital was raised via loan agreements with financial institutions or the sale of its receivables to MHC, and Benja conducted legitimate business.

### a. Nearly all of Benja's funding was derived from sources other than investors.

Benja did not operate a "phony investment plan." It was a startup that never could get off the ground, but it did not use money paid by later investors to pay artificially high returns to early investors, with the goal of attracting additional investment. Rather, the vast majority of Benja's capital was derived from its $5 million loan from Busey Bank and its sale of accounts receivable.

Benja obtained approximately $11.5 million from financial institutions and purchasers of its accounts receivable. (Case No. 20-30819, California Northern Bankruptcy Court Claims Register, attached as Exhibit C). Busey Bank provided approximately $5 million of funding to Benja. (Claims Register, Exhibit C). Approximately $1.21 million came from Benja's sale of its accounts receivable to E-Revshare Core, LLC. (Claims Register, Exhibit C). Another $750,000 came from Benja's sale of its accounts receivable to BB Lending, LLC. (Claims Register, Exhibit C). Finally, it is undisputed that MHC provided the remaining approximately $4.5 million to Benja. (Trustee's Motion, p. 3, Everett Declaration, ¶8, Exhibit G-1). In contrast, only approximately $2.2 million came from individual and entity investors. (Claims Register, Exhibit C).

Based on that data, approximately 84% of the claims made in the bankruptcy action come from financial institutions and purchasers of Benja's accounts receivable. Only 16% of claims made come from individual or entity investors. That data establishes that Benja was not operating a Ponzi

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Scheme based on a phony investment plan. Benja was instead reliant on funding derived from the Busey Bank loan (line of credit) and various purchasers of its accounts receivable, including MHC.

For that reason, the hallmark of a Ponzi Scheme is absent. Although Benja may have been overleveraged, it was not built on a phony investment plan, and the Trustee has no evidence that it was. The Trustee's assertion that Benja operated as a Ponzi Scheme must be rejected.

### b. Benja operated as a legitimate business.

The Trustee's assertion that Benja operated a Ponzi Scheme is also undone by the fact that Benja conducted legitimate business before it ultimately failed. The fact that the business was poorly run, or that its CEO may have engaged in fraudulent conduct in the operation thereof, does not negate the fact that Benja was conducting real business and offering real products to customers. Thus, another hallmark of a Ponzi Scheme is absent.

In Benja's CEO's own words, "Benja was a collection of E-commerce companies, and also an advertising technology format." (Chapin Transcript, Exhibit D, 5:4-7). Benja "operated a number of E-commerce stores, just traditionally commerce stores. And then also delivered an advertising technology product that would, to various degrees, enable and encourage E-commerce transactions through advertising." (Chapin Transcript, Exhibit D, 5:9-13).

Benja's CFO, Thomas Goode, confirmed that Benja "built an app that the user can sign into and give [Benja] their shirt size, pants size, shoe size, and some interests, you know, football teams or sports or outdoor activity type things, and then [Benja] would try to match them with products that [Benja] though would be interesting to them that were at a discount." (Goode Transcript, Exhibit E, 15:10-16). In its early years, Benja (referred to as Ephe at that time) "would buy ad space on sports blogs, things like that and . . . would show sporting apparel and team gear and other things that [Benja] could advertise . . . from the publishers [Benja] had access to." (Goode Transcript, Exhibit E, 18:1-8).

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

In 2019, Benja "had multiple Shopify stores . . ." (Goode Transcript, Exhibit E, 34:24 – 35:3). Mr. Goode "administered the Shopify stores, worked on Teams, did some work, basically maintaining the Shopify stores as well as continuing maintaining [Benja's] servers and the IPhone app." (Goode Transcript, Exhibit E, 35:3-6). Mr. Goode maintained Affordable Jerseys and Coverage Gear, two of Benja's Shopify stores, and "helped load in product, set up imports at times, worked on the changing the look and feel of the website, technical support things." (Goode Transcript, Exhibit E, 35:9-20). Benja was "selling jerseys and selling hats through those stores." (Goode Transcript, Exhibit E, 35:25 – 36:1). Benja made "hundreds" of sales through Affordable Jerseys and Coverage Gear in 2019 and 2020. (Goode Transcript, Exhibit E, 38:10-14). At the time of his examination, Mr. Goode noted that Benja still had sports jerseys in a warehouse in Texas. (Goode Transcript, Exhibit E, 160:7-19).

Benja conducted additional legitimate business. Mr. Goode also oversaw the development of Sunny Beach House, "a blog that [he] helped set up for Benja that was going to be a kind of like travel affiliate site which would make money by linking customers to [VRBO] or Air BNB properties for rental." (Goode Transcript, Exhibit E, 36:11-15). Benja also "sold a number of gift cards throughout the years." (Goode Transcript, Exhibit E, 147:14-15).

Accordingly, the Trustee's assertion that Benja operated as a Ponzi Scheme is not supported by the evidence. Benja operated a legitimate business that offered real products and services to its customers. Benja was not a Ponzi Scheme. For those reasons, the Trustee's assertion that Benja operated as a Ponzi Scheme should be given no consideration by the Court.

C. The Payments cannot be avoided as preferences as MHC has a perfected secured interest in the Payments.

In order to prevail, the Trustee must show that MHC received a greater amount than it would have if the transfer had not been made and there had been a hypothetical chapter 7 liquidation as of the petition date. *In re Smith's Home Furnishings, Inc.,* 265 F.3d 959, 963 (9th

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Cir. 2001). Prepetition transfers to fully secured creditors are not generally preferential as a secured creditor is entitled to its claims under a Chapter 7 bankruptcy. *Id.*

Here, MHC has a perfected security interest in the funds paid to MHC by Benja. Pursuant to the Factoring Services Agreement, Benja granted a broad security interest to MHC in all of Benja's assets:

> (a) All Accounts, wherever located or situated, and whether now existing or arising in the future, and whether now owned or at any time in the future acquired by Client; all guaranties and security for such Accounts; all of Client's rights and interest in the goods giving rise to such Accounts, and the rights associated with or related or pertaining to such goods, including without limitation the right of stoppage in transit and any and all related insurance, any items substituted therefor as replacements and all additions thereto; (b) all of Client's chattel paper, instruments, general intangibles, securities, contract rights, associated with or related to the Accounts; (c) all proceeds of any of the foregoing Accounts, and all rights and interests and monies due or becoming due on such Accounts; and (d) all other personal property in which Client has an interest, now or hereafter existing or acquired, and wheresoever located, tangible or intangible, including, but not limited to, all present and hereafter existing or acquired vehicles, equipment, tools, goods, inventory, furniture, fixtures, contract rights, chattel mortgages, deeds of trust, stocks, bonds, certificates of deposit, bank accounts, security deposits, intellectual property and other general intangibles.

(Declaration of Erin Murphy, Exhibit A, ¶¶ 6-7, Ex. A, B)

The Trustee asserts that Busey had an earlier filed UCC-1 lien which is superior to MHC's lien interest. However, the assets in question are $3,083,036.21. A security interest in money may only be perfected by taking possession of the collateral. UCC § 9-313(a). Thus, MHC, by taking possession of the payments from Benja, perfected its security interest in these funds. As a result, the Trustee cannot establish that MHC received an amount greater than MHC would have received under a Chapter 7 bankruptcy.

### 3.    MHC'S AFFIRMATIVE DEFENSES

The Trustee has failed to meet a condition precedent under 11 USC 547 (b) by failing to take into account "a party's known or reasonably knowable affirmative defenses". This condition precedent is an element of the Trustee's prima facie case and must be met in order for the Trustee to prevail on its Motion. *In re ECS Refining, Inc.*, 626 B.R. 425, 457 (2020). The Trustee asserts that MHC's known affirmative defenses were taken into account in his Motion. However, MHC

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   has asserted a number of affirmative defenses in its Answer that are ignored in the Trustee's

2   Motion. (Answer, attached as Exhibit F)  While the Trustee's failure to address these defenses is a

3   proper basis on which to deny the Motion, MHC offers the following in support of the

4   constructive trust and earmarking defenses set forth in its Answer.

5               a.    The Payments were not part of the bankruptcy estate.

6       A bankruptcy trustee is authorized to move for avoidance of a transfer under § 547 only if

7   the property transferred by the debtor was the debtor's property as defined by the bankruptcy code.

8   11 U.S.C.A. §§ 541(a)(1); 547(b)(1), (d). The funds that comprise Benja's alleged "Preferential

9   Transfers" were never Benja's property and, thus, were never part of the bankruptcy estate. Instead,

10  the alleged "Preferential Transfers" were held in trust for the benefit of MHC because (1) the funds

11  MHC initially transferred to Benja were obtained via Benja's wrongful acts and (2) the FSA entered

12  into by MHC and Benja provided that Benja would repurchase accounts receivable from MHC that

13  proved uncollectible.

14

15      For those reasons, the constructive trust doctrine exempts the alleged "Preferential

16  Transfers" from the purview of § 547, and the Trustee's Motion must be denied.

17              b.    The Trustee has no authority to avoid transfers of property outside the
                     bankruptcy estate.

18

19      The premise of the Trustee's Motion is that the alleged "Preferential Transfers" were

20  property of the bankruptcy estate (i.e., property of the debtor transferred to MHC) subject to

21  avoidance per § 547. The definition of "property" in the bankruptcy code suggests otherwise.

22

23      "In its simplest terms, property of the debtor may be said to be that which would have been

24  property of the bankruptcy estate had the transfer not taken place." *In re Unicom Computer Corp.*,

25  13 F.3d 321, 324 (9th Cir. 1994). The bankruptcy code generally defines "property of the estate" to

26  include "all legal or equitable interest of the debtor in property as of the commencement of the case."

27  11 U.S.C.A. § 541(a)(1). The definition of "property" under the code does not include "any power

28  that the debtor may exercise solely for the benefit of an entity other than the debtor" or "[p]roperty

in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest[.]" 11 U.S.C.A. § 541(b)(1), (d).

Funds held by a debtor "'for another person' wherein 'the equitable interest in the trust funds belongs to the trust beneficiary, not the debtor' are not part of the bankruptcy estate." *True Traditions, LC v. Wu*, 552 B.R. 826, 840 (N.D. Cal. 2015) (citations omitted); *see also In re Unicom Computer Corp.*, 13 F.3d at 324 ("something held in trust by a debtor for another is neither property of the bankruptcy estate under section 541(d), nor property of the debtor for purposes of section 547(b)").

> c. <u>The Trustee has no authority to avoid transfers of property held in constructive trust by Benja for the benefit of MHC.</u>

Under California law, "[o]ne who wrongfully detains a thing" or otherwise "gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Cal. Civ. Code §§ 2223; 2224. Bankruptcy courts have relied on those statutes in implementing constructive trusts that protect property outside the bankruptcy estate from avoidance.

A constructive trust is a remedy "'flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems to call for it.'" *F.T.C. v. Crittenden*, 823 F.Supp. 699, 703 (C.D. Cal. 1993) (*quoting In re North Am. Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985)). "When the debtor's fraud or other wrongful conduct gives rise to a constructive trust under state law, the bankruptcy estate also holds the property subject to the constructive trust." *Crittenden*, 823 F.Supp. at 703.

"Under California law, a court may find that a constructive trust exists if it finds merely that 'the acquisition of property was wrongful and that the keeping of the property by the defendant would constitute unjust enrichment.'" *Crittenden*, 823 F.Supp. at 703 (*quoting Calistoga Civic Club*

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

*v. City of Calistoga*, 143 Cal.App.3d 111, 191 Cal.Rptr. 571, 576 (Cal. 1983)). "In a constructive trust, a person who has engaged in fraud or other wrongful conduct holds only bare legal title to the property subject to a duty to reconvey it to the rightful owner." *Id.* When a debtor in bankruptcy has wrongfully obtained property such that a constructive trust is created, the bankruptcy estate also holds the property subject to the constructive trust. *Id.*

As established below, the circumstances here are such that Benja held MHC's initial funds in trust for the benefit of MHC under California law and the language of the FSA.

**A. The Payments were held in a constructive trust under California Law**

A constructive trust was established each time MHC initially transferred funds to Benja for the purchase of its accounts receivable. Under California law and the bankruptcy code, the funds underlying the alleged "Preferential Transfers" totaling $3,083,036.21 were never Benja's property and, thus, cannot be considered part of the bankruptcy estate. The funds were never part of the bankruptcy estate because, by the Trustee's allegations, they were wrongfully obtained.

The Trustee expressly and repeatedly pleads and alleges that Benja's sale of its accounts receivable to MHC was fraudulent. If the Trustee's allegations of fraud prove true, then Benja quite obviously obtained the initial payments from MHC via wrongful means, and allowing Benja (or the bankruptcy estate) to retain those funds would unjustly enrich Benja (or the bankruptcy estate). Under established California law, the circumstances for a constructive trust have been met. *See* Cal. Civ. Code §§ 2223; 2224.

Accordingly, even though the funds were transferred by MHC to Benja as noted at page 3 of the Trustee's Motion, those funds were wrongfully obtained and were never Benja's property. For that reason, the alleged "Preferential Transfers" are not subject to avoidance under § 547.

**B. The Payments were held in a constructive trust under the terms of the Factoring Services Agreement.**

The language of the FSA entered into by Benja and MHC establishes that until MHC

collected on the accounts receivable that it purchased from Benja, the funds MHC transferred to Benja to pay for the accounts receivable were held in trust for MHC. In the FSA, Benja guaranteed "the timely payment of the monies and amounts represented by the Factored Accounts." (Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 3). MHC purchased Benja's accounts receivable with full recourse including Purchaser's right to require Client's repurchase of Account(s) as set forth in this Section 5." (Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 3)

To that end, the FSA provided that

If Client breaches any warranty or otherwise violates or defaults on any of its obligations hereunder, or if Purchaser reasonably determines after consultation with Client at any time that any Account purchased by Purchaser is uncollectible, or if any Account purchased hereunder is not paid in full within 100 days after the Account invoice date (or such longer period as may be mutually agreed by Purchaser and Client with respect to Accounts from specific Account Debtors) . . ., then upon request by Purchaser, Client shall immediately repurchase such Account(s) from Purchaser for an amount equal to the net amount of such Account(s), less any payments received by Purchaser on such Account(s) from the Account Debtor(s).

(Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 5).

Section 9(d) of the FSA provides that Benja represented, covenanted, warranted and agreed that

[a]s to each Factored Account: (1) such Account is not yet past due, arose in the ordinary course of Client's business and represents a bona fide completed transaction; . . . (3) the Account, as shown on Client's books and records, and on any invoices or statements delivered to Purchaser, is a legally enforceable debt owed by the related Account Debtor to Client in its full face amount, and is not contingent upon the fulfillment of any condition whatsoever; . . . and (6) the Account is payable on the due date indicated in the related invoice provided by Client to Purchaser most recently prior to Purchaser's purchase of the Account.

(Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 9).

If the Trustee's allegations regarding Benja's fraud prove true, then MHC provided value to Benja for accounts that did not exist. As discussed above, the funds MHC used to purchase accounts that did not exist would have been wrongfully obtained by Benja, and those funds would never have been Benja's property. The funds would only have served to unjustly enrich Benja and, now, the

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  bankruptcy estate. Accordingly, those funds were held in trust by Benja, and the alleged

2  "Preferential Transfers" by Benja to MHC cannot be avoided. In essence, Benja was simply

3  refunding MHC the money it used to purchase Benja's accounts receivable, per the FSA.

4      Furthermore, the FSA provided that Benja's accounts were purchased by MHC with full

5  recourse, meaning MHC had the right to require Benja to repurchase accounts that ultimately proved

6  uncollectible. (Declaration of Erin Murphy, Exhibit A, ¶ 6, Ex. A, Section 5). Thus, under the

7  language of the FSA, the funds MHC used to purchase Benja's accounts were effectively held in

8  trust by Benja until MHC collected on the accounts receivable from Benja's account debtors. Once

9  MHC collected from Benja's account debtors, then the funds MHC used to purchase Benja's

10 accounts would become Benja's property, as Benja would no longer be subject to recourse under

11 the FSA.

12     In sum, the alleged "Preferential Transfers" were never part of the bankruptcy estate but

13 were held in trust for the benefit of MHC because (1) the funds MHC transferred to Benja were

14 obtained via Benja's wrongful acts and (2) the FSA entered into by MHC and Benja provided that

15 Benja would repurchase accounts receivable from MHC that proved uncollectible. Property held

16 in trust by a bankruptcy debtor is excluded from the bankruptcy estate and, thus, exempted from

17 avoidance by a bankruptcy trustee under § 547. Genuine issues of material fact exist relating to

18 whether the alleged "Preferential Transfers" were held in trust for the benefit of MHC, and the

19 Trustee has not demonstrated he is entitled to judgment as a matter of law. Thus, the Trustee has

20 failed to show his entitlement to summary judgment, and the Trustee's Motion must be denied.

21         d.    The $1,941,298.12 paid to MHC on August 20, 2022 were earmarked by
               Busey Bank to be paid to MHC.

22     On August 20, 2020, Busey Bank extended an additional line of credit to Benja with

23 knowledge that Benja would use those funds to pay MHC. On the same day that Busey Bank

24 provided Benja with the additional funding, Benja transferred $1,941,298.12 to MHC. Before Busey

25 Bank extended those additional funds to MHC, Busey Bank had knowledge that Benja would use

the funds to pay MHC. Pursuant to the earmarking doctrine, the funds transferred to MHC on August 20, 2020, were never part of Benja's estate and, thus, cannot be avoided by the Trustee as an alleged "Preferential Transfer" under § 547.

The earmarking doctrine is a court-made exception to the preferential transfer rules found in 11 U.S.C.A. § 547. *In re Adbox, Inc.*, 488 F.3d 836, 841 (9th Cir. 2007). "[T]he earmarking doctrine applies 'when a third party lends money to a debtor for the specific purpose of paying a selected creditor.'" *In re Superior Stamp & Coin Co., Inc.*, 223 F.3d 1004, 1008 (9th Cir. 2000) (*quoting In re Kemp*, 16 F.3d 313, 316 (9th Cir. 1994)). If funds are earmarked for the selected creditor, they are not considered part of the bankruptcy estate. *In re Adbox, Inc.,* 488 F.3d at 841. If the funds are never part of the bankruptcy estate, the transfer of the funds cannot be avoided by the bankruptcy trustee under § 547.

A "written agreement is not required for earmarking to apply" and in most circumstances "such a requirement would be unrealistic." *In re TriGem America Corp.*, 431 B.R. 855, 861 (Bankr. C.D. Cal. 2010) ("case authorities make clear that the obvious or incriminating evidence of a 'smoking gun' *written* agreement is not required for earmarking to apply."). Rather, an oral instruction by the debtor to the lender that the funds will be used to pay the creditor is sufficient for the purpose of an earmarking defense, and "[e]ven a mere 'understanding' rather than a formal agreement may suffice." *Id.* (money transferred from debtor subsidiary's parent company to debtor, without written agreement, earmarked for payment to certain creditors).

Here, Busey Bank understood that the funds it was providing to Benja via the additional line of credit would be paid to MHC. Accordingly, the earmarking doctrine prevents the Trustee from avoiding Benja's August 20, 2020, transfer of $1,941,298.12 to MHC.

Busey Bank understood that the increase in Benja's line of credit would be used by Benja to pay MHC. Prior to the extension of the line of credit, Mr. Chapin informed MHC that issues with

Busey Bank were preventing payment from being made by Benja to MHC. (Declaration of Erin Murphy, Exhibit A, ¶ 12). Thus, MHC began communicating with Busey Bank on or about July 28, 2020, regarding Benja's relationship with MHC and the expectation that Benja would be making payments to MHC via Busey Bank. (Declaration of Erin Murphy, Exhibit A, ¶ 13). MHC again communicated with Busey Bank on August 5, 2020, regarding Benja's relationship with MHC and the expectation that Benja would be making payments to MHC via Busey Bank. (Declaration of Erin Murphy, Exhibit A, ¶ 14).

During MHC's communications with Busey Bank, MHC learned that Patrick Ricke was the Relationship Manager for Benja at Busey Bank. (Declaration of Erin Murphy, Exhibit A, ¶ 15). On or around August 18, 2020, MHC communicated with Patrick Ricke and explained its relationship with Benja and that it was expecting a large wire transfer from Benja via Busey Bank. (Declaration of Erin Murphy, Exhibit A, ¶ 16). During a conversation with Mr. Ricke on or around August 18, 2020, MHC informed Mr. Ricke that Benja told MHC that an issue at Busey Bank was holding up the expected wire transfer from Benja, and Mr. Ricke stated that Busey Bank was working with Benja. (Declaration of Erin Murphy, Exhibit A, ¶ 17). On August 18, 2020, in an effort to facilitate the large wire transfer from Benja via Busey Bank, MHC emailed Mr. Ricke a voicemail from a Compliance Representative from the State of California Franchise Tax Board regarding Benja's status of good standing in California. (Declaration of Erin Murphy, Exhibit A, ¶¶ 18, 19). On or around August 18, 2020, MHC followed up with Mr. Ricke to confirm his receipt of the California voicemail and to inquire about the status of the large wire transfer from Benja via Busey Bank. (Declaration of Erin Murphy, Exhibit A, ¶ 20).

Immediately thereafter, on August 20, 2020, Busey Bank increased Benja's line of credit with the bank from $3 million to $5 million. (Declaration of Michael McElhone, Exhibit B, ¶ 6, Ex. 1). Pursuant to that increase, Busey Bank transferred $1,979,296.50 into Benja's account at Busey

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   Bank on August 20, 2020. (Declaration of Michael McElhone, Exhibit B, Ex. 8, p. 79). It is

2   undisputed that on that same day, Benja wire transferred $1,941,298.12 out of its bank account at

3   Busey Bank to MHC. (Trustee's Motion, p. 5); (Declaration of Michael McElhone, Exhibit B, p.

4   82); (Declaration of Erin Murphy, Exhibit A, ¶ 21). The funds transferred to MHC on August 20,

5   2020, were the same funds that Busey Bank made available to Benja via the line of credit increase.

6   (Declaration of McElhone, Exhibit B, Ex. 8, pp. 79, 82).

7

8           The funds transferred from Benja's account at Busey Bank to MHC via wire transfer on

9   August 20, 2020, were derived from the increase in Benja's line of credit at Busey Bank, and Busey

10  Bank increased Benja's line of credit with knowledge that MHC was expecting a "large wire" from

11  Benja. With that knowledge, Busey Bank understood that it was providing the additional line of

12  credit in order for Benja to make the payment to MHC. Thus, the funds provided by Busey Bank

13  were earmarked for payment to MHC and were never Benja's property or part of the bankruptcy

14  estate. Funds that are not included in the bankruptcy estate cannot be avoided by the Trustee. *See In*

15  *re Adbox, Inc.*, 488 F.3d at 841 (earmarked funds "not considered part [of] debtor's estate" subject

16  to § 547(b) preference action).

17

18          Accordingly, the Trustee has failed to show his entitlement to summary judgment, as genuine

19  issues of material fact exist relating to whether the increase in Benja's line of credit was earmarked

20  for payment to MHC, and the Trustee is not entitled to judgment as a matter of law as it relates to

21  Benja's $1,941,298.12 payment to MHC on August 20, 2020. For those reasons, the Trustee's

22  Motion should be denied.

23

24  **IV.    <u>CONCLUSION</u>**

25          For the reasons set forth herein, Defendant MHC Financial Services, Inc. respectfully

26  requests that the Court deny Plaintiff's Motion for Partial Summary Judgment.

27

28

| | |
|---|---|
| 1 | DATED: July 15, 2022 |

FREEMAN, FREEMAN & SMILEY, LLP

By: _____
Theodore B. Stolman
Carol Chow

– and –

SEIGFREID BINGHAM, P.C.
Gregory S. Gerstner
Benjamin A. Reed

Attorneys for Defendant
MHC FINANCIAL SERVICES, INC.

5441142.1

# EXHIBIT A

1 | THEODORE B. STOLMAN (BAR NO. 52099)
ted.stolman@ffslaw.com
2 | CAROL CHOW (BAR NO. 169299)
carol.chow@ffslaw.com
3 | FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
4 | Los Angeles, California 90067
Telephone: (310) 255-6100
5 | Facsimile: (310) 255-6200

6 | GREGORY S. GERSTNER (Admitted Pro Hac Vice)
GGerstner@sb-kc.com
7 | BENJAMIN A. REED (Admitted Pro Hac Vice)
BReed@sb-kc.com
8 | SEIGFREID BINGHAM, P.C.
2323 Grand Blvd., Suite 1000
9 | Kansas City, Missouri 64108
Telephone: (816) 421-4460
10 | Facsimile: (816) 474-3447

11 | Attorneys for Defendant
MHC FINANCIAL SERVICES, INC.
12

13 | **UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
14 | **SAN FRANCISCO DIVISION**

15

16 | In re

Case No. 20-30819 DM
Chapter 7

17 | BENJA INCORPORATED, aka EPHE
CORPORATION,

Adv No. 21-03036

18

Debtors.

19

**DECLARATION OF ERIN MURPHY IN
SUPPORT OF DEFENDANT'S
OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

20 | KYLE EVERETT, TRUSTEE IN
BANKRUPTCY,

21

Plaintiff,

22

vs.

Date:       July 29, 2022
Time:      10:30 a.m.
Place:     Via Tele/Videoconference

23 | MHC FINANCIAL SERVICES, INC.,

24

Defendant.

25

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

I, Erin Murphy, declare as follows:

1. I make this declaration in opposition to Plaintiff Kyle Everett's Motion for Partial Summary Judgment filed in the above-captioned adversary proceeding.

2. The statements in this declaration are made upon my own personal knowledge.

3. At all times relevant herein, I was employed by MHC Financial Services, Inc. ("MHC") as the Director of Commercial Finance.

4. Through my employment with MHC, I have personal knowledge of the business relationship between MHC and Benja Incorporated ("Benja").

5. If called as a witness, I would testify competently to the matters set forth herein.

6. On or about March 26, 2020, MHC and Benja entered into the Factoring Services Agreement attached as Exhibit A.

7. On or about March 26, 2020, MHC filed the UCC-1 Financing Statement attached as Exhibit B.

8. MHC's intent was to purchase certain accounts receivable from Benja pursuant to the Factoring Services Agreement.

9. Prior to purchasing any accounts receivable, MHC researched and reviewed the credit of each account debtor.

10. MHC required Benja, as part of the Factoring Services Agreement, to direct its account debtors to make payments on any purchased invoices directly to MHC.

11. MHC repeatedly emphasized with Benja that the notice of assignment must be provided to each account debtor directly and that each account debtor must make any payments on purchased accounts directly to MHC.

12. Prior to the purchase of any account, MHC required each account debtor to acknowledge that payments were to be made directly to MHC.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-5100

1    13.    Andrew Chapin of Benja had informed MHC that issues with Busey Bank were

2 preventing payment from being made from Benja to MHC.

3    14.    On or about July 28, 2020, I began communicating with Busey Bank personnel

4 regarding Benja's relationship with MHC and the expectation that Benja would be making payment

5 to MHC via Busey Bank.

6

7    15.    On or about August 5, 2020, I again communicated with Busey Bank personnel

8 regarding Benja's relationship with MHC and the expectation that Benja would be making payment

9 to MHC via Busey Bank.

10    16.    In my communications with Busey Bank personnel, I learned that Patrick Ricke was

11 Busey Bank's Relationship Manager for Benja.

12    17.    On or around August 18, 2020, I communicated via phone with Patrick Ricke

13 regarding MHC's relationship with Benja and MHC's expectation that it would soon be receiving a

14 large wire transfer from Benja via Busey Bank.

15

16    18.    On or around August 18, 2020, during my conversation with Patrick Ricke, I

17 informed Patrick Ricke that MHC was told by Benja that an issue with Busey was preventing

18 payment of a large wire from Benja to MHC. Patrick Ricke responded by stating that Busey was

19 working with Benja.

20

21    19.    On August 18, 2020, I emailed to Patrick Ricke a voicemail from a Compliance

22 Representative from the State of California Franchise Tax Board regarding Benja's status of good

23 standing with the state of California. A true and accurate copy of that email is attached hereto as

24 Exhibit C.

25    20.    The purpose of my August 18, 2020, email to Patrick Ricke was to facilitate the large

26 wire transfer from Benja to MHC via Busey Bank that I had previously communicated about with

27 Patrick Ricke.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1     21.     On or around August 18, 2020, after I sent the email to Patrick Ricke containing the

2 voicemail from the State of California, I followed up with Patrick Ricke and I asked to confirm his

3 receipt of the voicemail from the State of California and inquired about the status of the large wire

4 transfer from Benja.

5

6     22.     On or about August 20, 2020, Benja paid MHC $1,941,298.12 via wire transfer from

7 Busey Bank.

8     23.     Based on the foregoing, I am informed and believe that Busey Bank had knowledge

9 of the relationship between Benja and MHC, that Busey Bank had knowledge that the funds from

10 the increase in Benja's line of credit would be used to pay MHC, and that prior to processing the

11 wire transfer on August 20, 2020, Busey Bank had knowledge that those specific funds would be

12 paid to MHC.

13

14     I declare under penalty of perjury that the foregoing is true and correct. Executed on July 14,

15 2022, in Leawood, Kansas.

16

17                               Erin Murphy, MHC Financial Services, Inc.

18

19

20

21

22

23

24

25

26

27

28

5441208.1                        4

DocuSign Envelope ID: 929B2449-6CED-4F73-8898-4479A1C4116B

# FACTORING SERVICES AGREEMENT

**THIS FACTORING SERVICES AGREEMENT** (this "**Agreement**") is made and entered into as of March 25th, 2020, by and between MHC Financial Services, Inc., a Missouri corporation ("**Purchaser**"), and Benja Incorporated, a Delaware corporation ("**Client**").

In consideration of and for the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Client agree as follows:

1. **Purchase of Accounts**. Client agrees to offer to sell, assign, transfer and convey to Purchaser, with recourse as provided herein, some or all of its existing and future accounts receivable arising from services performed in the regular course of Client's business; i.e., any right to payment from any party for services rendered by or on behalf of Client (the "**Accounts**"). Purchaser shall determine, in its sole discretion, which Accounts it agrees to purchase from Client (any such purchased Accounts, "**Factored Accounts**"); it being understood that Purchaser shall not be obligated to purchase any Accounts. Client shall sell, assign, transfer and convey the Factored Accounts to Purchaser. Client shall execute and deliver to Purchaser a Bill of Sale and Assignment, in the form attached hereto as **EXHIBIT A**, with respect to the Factored Accounts, which shall vest in Purchaser all of Client's right, title and interest in such Factored Accounts, together with any undercharges, securities and/or guarantees thereon. Client shall retain all original paperwork related to the Factored Accounts (i.e., invoices, purchase orders and other documentation supporting the Factored Accounts) until the termination of the Agreement. Client shall be required to produce original or copies of paperwork for Factored Accounts upon request to Purchaser within 2 business days.

2. **Purchase Price; Base Fee**. The purchase price for each Factored Account purchased by Purchaser hereunder shall be the net amount of such Factored Account, less Purchaser's base fee, which fee shall be an amount equal to one and twenty-five hundredths percent (**1.25%**) of such net amount (the "**Base Fee**"). For purposes of the foregoing, the "net amount" of a Factored Account means the gross amount/face value of the Factored Account less any discount or allowance of any nature offered or provided to the person or entity obligated to pay the Factored Account ("**Account Debtor**"). Upon presentation by Client to Purchaser of an acceptable invoice for an Account to be purchased by Purchaser (along with all supporting documentation for such Account requested by Purchaser, including invoices and any other documents requested by Purchaser substantiating the Account), and provided that no claim or dispute shall then exist with the Account Debtor with respect to the Account, Purchaser will advance to Client the purchase price of the Account, less a security reserve equal to eight and seventy-five hundredths percent (**8.75%**) of the net amount of the Account. Following Purchaser's receipt of full payment of the invoice for the Factored Account from the Account Debtor, and provided Client shall not otherwise be in default in any respect under this Agreement, Purchaser will remit to Client the security reserve, less any Late Fees (in lieu of the Base Fee) pursuant to Section 5 hereof, any other amounts owed by Client to Purchaser, and any and all shipping charges and transactional fees as set forth on **EXHIBIT B** attached hereto and incorporated herein by reference, in complete and full payment for the Factored Account. Purchaser will account for all Factored Accounts and security reserves separately, but the parties expressly acknowledge and agree that Purchaser will aggregate the security reserves for all Accounts purchased from Client hereunder, and, with respect to those Accounts which Purchaser has received full payment, and provided Client shall not otherwise be in default in any respect under this Agreement, shall remit such security reserve balances in excess of the minimum reserve requirement (less the applicable deductions, fees and charges), if any, to Client on a monthly basis, in full payment for the applicable Accounts. In the event Client's security reserve balance becomes negative, Purchaser may deduct amounts from future purchases to offset the deficit security reserve or, upon demand by Purchaser, Client shall within two (2) business days of such demand pay to Purchaser the full amount of the deficit. By way of example with respect to the above-referenced security reserves, if, on any monthly settlement date, the amount of reserves otherwise due Client is $1,000 but Client owes Late Fees of $100, the amount of reserves due Client on such monthly settlement date shall instead be $900; it being understood, however, that the aggregate amount of reserves at any time must equal at least eight and seventy-five hundredths percent (**8.75%**) of the unpaid balance of Factored Accounts at such time.

Notwithstanding the foregoing, if mutually agreed between the parties, Purchaser may advance all or a portion of the purchase price for future Account(s) as an early payment for the purchase of such Account(s). Upon the assignment, transfer and conveyance to Purchaser of the Factored Account(s), Purchaser shall pay the balance of the purchase price less the advanced amount and any applicable reductions pursuant to Section 2 hereof. In the event the Account(s), upon which the advance is based, is not subsequently purchased by Purchaser after remitting the advance to Client, Client shall be obligated to repay such advanced amounts to Purchaser immediately upon request from

DocuSign Envelope ID: 929B2449-6CED-4F73-8898-4479A1C4116B

Purchaser and such repayment obligation shall be secured by the security interests granted under Section 6 of this Agreement.

    1.1    3.    **Notice to Account Debtors**.  Client will notify each Account Debtor for which Purchaser purchases a Factored Account from Client,  of the sale of its Account or Accounts, to remit payment thereof solely to Purchaser at 4501 College Blvd., Suite 160, Leawood, KS 66211 (or at such other address as Purchaser may designate by giving Client reasonable prior written notice thereof). Such notices shall be in the form attached hereto as **EXHIBIT C**.  All remittances received by Client for payment of Factored Accounts are the property of Purchaser, and Client shall hold such proceeds in trust for Purchaser, and shall immediately deliver to Purchaser, in the identical form, all payments received by Client on each such Accounts, together with all documents accompanying the remittance to Client.  Client guarantees the timely payment of the monies and amounts represented by the Factored Accounts.  Client agrees that it will not attempt to direct any payments on Factored Accounts other than to Purchaser.

    4.    **Power of Attorney**.  Client does hereby irrevocably make, constitute and appoint Purchaser as its attorney-in-fact with full power and authority to act in its stead for the following purposes: (a) invoice or bill for, collect, receive, and deposit to Client's and/or Purchaser's bank accounts any and all amounts which may be due or become due to Client from Account Debtors, and to use Client's name for purposes of billing and collection of any and all amounts due from Account Debtors; (b) negotiate any checks received in payment of Accounts whether payable to Client or Purchaser or both, and endorse the name of Client on any checks or other evidences of payment or other instruments or documents that may come into the possession of Purchaser on Accounts purchased by Purchaser and on any invoices or other documents or instruments relating to any of the Accounts or relating to any collateral or security hereby granted by Client to Purchaser; (c) in Client's name, or otherwise, demand, make claim for, sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on the Accounts; (d) execute and deliver receipts or acknowledgements to Account Debtors for such amounts due which shall be binding upon Client and Purchaser; (e) notify Account Debtors of the sale of Accounts to Purchaser and notify and instruct Account Debtors, in Client's name, of the address and procedures for making payments on any Accounts that are sold to Purchaser or which constitute collateral hereby granted by Client to Purchaser; (f) take all steps necessary to ensure payment of such amounts and monies due, and do any and all things in Client's name necessary or proper to carry out the purposes intended by this Agreement; (g) file financing statements and all amendments thereto, describing as collateral any or all of the collateral described in Section 6 hereof by any description Purchaser deems appropriate in any jurisdiction or office Purchaser deems appropriate to perfect its security interest in the collateral described in Section 6 hereof; and  (g) initiate debit or credit entries through the Federal Reserve Automated Clearing House System (ACH) to any deposit account maintained by Client or Purchaser wherever located in order to satisfy any obligations of Client to Purchaser under this Agreement.  It is understood that this power of attorney is coupled with an interest, and is irrevocable until all obligations of Client to Purchaser under this Agreement have been satisfied.  Exercise of the foregoing powers shall be in the sole and absolute discretion of Purchaser, but Purchaser shall have no obligation to exercise any of the foregoing powers.  Nothing contained in this Agreement shall in any way require Purchaser to initiate or become a party to any litigation or other legal proceedings.  Purchaser shall not, under any circumstances, or in any event whatsoever, have any liability for any error, omission or delay of any kind occurring in the collection, payment or settlement of any Account or of any instrument received in full or in part payment thereof or in dealing with any lien, security or guaranty of any such Account (other in the case of gross negligence).

    5.    **Late Fees; Full Recourse**.  All Factored Accounts are purchased with full recourse including Purchaser's right to require Client's repurchase of Account(s) as set forth in this Section 5.  However, if Purchaser has purchased credit insurance to insure against certain failures of certain Account Debtors to satisfy the payment  of Factored Accounts ("Credit Insurance"), then, to the extent Purchaser chooses to file a claim with the insurer issuing the Credit Insurance, and Purchaser actually receives the amount it is entitled to recover under such Credit Insurance (up to the limit of such Credit Insurance), Accounts of such Account Debtor purchased by Purchaser shall be deemed non-recourse.  If Client breaches any warranty or otherwise violates or defaults on any of its obligations hereunder, or if Purchaser reasonably determines after consultation with Client at any time that any Account purchased by Purchaser hereunder is uncollectible, or if any Account purchased by Purchaser hereunder is not paid in full within 100 days after the Account invoice date (or such longer period as may be mutually agreed by Purchaser and Client with respect to Accounts from specific Account Debtors (such accounts, "**Extended Term Accounts**"), then upon request by Purchaser, Client shall immediately repurchase such Account(s) from Purchaser for an amount equal to the net amount of such Account(s), less any payments received by Purchaser on such Account(s) from the Account Debtor(s).  Further, Client expressly acknowledges and agrees that the Base Fee pursuant to Section 2 hereof shall increase to 2.5% if an Account invoice remains unpaid after 33 days (i.e., day 34 through day 66 from the invoice date), shall increase again



to 3.75 **%** if an invoice remains unpaid for an additional 33 day period (i.e., day 67 through day 99 from the invoice date), and solely with respect to Extended Term Accounts, shall increase again to such rate as may be mutually agreed by Purchaser and Client with respect to such Extended Term Accounts. The incremental increases in the Base Fee described above in this Section 5 shall be referred to herein as "**Late Fees**". Any security reserve held by Purchaser for such Account shall be released only in accordance with Section 2 hereof, and Purchaser shall, in any event, be entitled to and shall retain its Base Fee and all Late Fees for the Account as set forth herein.

If any Account Debtor with respect to a Factored Account that is past due remits any interest, late fee or similar amount with respect to such past-due Account and Purchaser receives such amount, such amount shall, if the net amount of the related invoice is paid in full, act to reduce, on a dollar-for-dollar basis, the amount of Late Fees otherwise payable by Client with respect to such Factored Account pursuant to the above paragraph.

6. **Security Interest**. Client hereby grants to Purchaser as collateral, to secure all of the debts, liabilities and obligations of Client to Purchaser under this Agreement, including all costs and expenses incurred by Purchaser in connection with the enforcement of its rights under this Agreement, a continuing security interest in the following property of Client: (a) all Accounts, wherever located or situated, and whether now existing or arising in the future, and whether now owned or at any time in the future acquired by Client; all guaranties and security for such Accounts; all of Client's rights and interest in the goods giving rise to such Accounts, and the rights associated with or related or pertaining to such goods, including without limitation the right of stoppage in transit and any and all related insurance, any items substituted therefor as replacements and all additions thereto; (b) all of Client's chattel paper, instruments, general intangibles, securities, contract rights, associated with or related to the Accounts; (c) all proceeds of any of the foregoing Accounts, and all rights and interests and monies due or becoming due on such Accounts; and (d) all other personal property in which Client has an interest, now or hereafter existing or acquired, and wheresoever located, tangible or intangible, including, but not limited to, all present and hereafter existing or acquired vehicles, equipment, tools, goods, inventory, furniture, fixtures, contract rights, chattel mortgages, deeds of trust, stocks, bonds, certificates of deposit, bank accounts, security deposits, intellectual property and other general intangibles. Upon request by Purchaser, Client shall execute a Security Agreement in a form provided by Purchaser evidencing the foregoing security interest. Purchaser may file financing statements and amendments thereto describing as the collateral any or all of the foregoing collateral by any description Purchaser deems appropriate in any jurisdiction or office Purchaser deems appropriate to perfect its security interest in foregoing collateral. In the event of Client's breach of any warranty made in this Agreement, Client's failure to observe or perform any of the provisions or obligations of this Agreement or Client's (including Client's affiliates) default of any other written agreement with Purchaser or Purchaser's affiliates as defined in section 17 of the Agreement, Client shall be in default, and Purchaser may enforce payment and exercise any and all of the rights and remedies provided by Article 9 of the Uniform Commercial Code and any rights under this Agreement, including the right to offset any security reserve or other amounts owed to Client (or Client's affiliates) with any obligation of Client (or Client's affiliate) to Purchaser (or Purchaser's affiliates). Client acknowledges that Purchaser may from time to time receive payment from an Account Debtor on an Account that was not purchased by Purchaser (the "Non-Factored Accounts"). Client hereby grants such payments/proceeds from the Non-Factored Accounts to Purchaser as collateral to secure all of the debts, liabilities and obligations of Client to Purchaser under this Agreement. In addition, upon default by Client, Purchaser shall also have the right to take all actions necessary to collect the Accounts directly from the Account Debtors. Client agrees that it will not interfere with or otherwise attempt to circumvent Purchaser's rights under this Section 6 or the security interest granted herein.

7. **Personal Guaranty; Background Check**. To induce Purchaser to enter into this Agreement and to purchase the Accounts from Client, and as additional security for all of the debts, liabilities and obligations of Client to Purchaser under this Agreement, one or more owners of Client shall execute the Personal Guaranty form attached hereto as **EXHIBIT D**, pursuant to which said owner(s) shall unconditionally guaranty the obligations of Client under this Agreement. Such owner(s) must also consent to a personal credit check and comprehensive background investigation.

8. **Term and Termination**. The term of this Agreement shall commence as of the day and year first above written, and shall continue for an initial term of 12 months. Thereafter, this Agreement shall automatically renew for additional consecutive 12-month terms, unless either party provides the other party with written notice of its intent not to renew at least 30 days prior to expiration of the then-current term. Notwithstanding the stated term hereof or anything else herein to the contrary, (a) Purchaser may terminate this Agreement immediately upon written notice thereof to Client in the event Client breaches this Agreement or in the event of the insolvency of Client or the filing of a petition in bankruptcy by or against Client, (b) Purchaser may terminate this Agreement without cause by

providing Client with at least 60 days' prior written notice thereof, and (c) after the initial term of 9 months, Client may terminate this Agreement, without cause and without premium or penalty, by providing Purchaser with at least 30 days' prior written notice thereof. Further, Client may prepay, without premium or penalty, any advance made by Purchaser against any Factored Account (including any purchase price paid by Purchaser for such Factored Account) by paying to Purchaser all amounts then due Purchaser with respect to such Factored Account, including any Late Fees or other amounts (or, as applicable, Client may repurchase any Factored Account from Purchaser, free of any lien or claim originated by or through Purchaser, by paying to Purchaser all amounts then due Purchaser with respect to such Factored Account, including any Late Fees or other amounts). Expiration or earlier termination of this Agreement shall not affect, waive or release the rights and obligations of the parties hereunder with respect to any Accounts purchased by Purchaser prior to such expiration or termination, and Client shall remain liable to Purchaser for all amounts and monies as may be owed to Purchaser under the terms and conditions of this Agreement. Upon termination, any security reserve, and any other funds or monies from any source whatsoever which Purchaser would otherwise owe to Client, may be retained by Purchaser until such time as all obligations and debts of Client to Purchaser have been fully satisfied, and Purchaser's security interest provided in Section 6 hereof shall continue until all obligations of Client to Purchaser are paid in full. Purchaser shall have the right, in its sole discretion, to set off against the security reserve and any other sums owing to Client by Purchaser all obligations and debts of Client to Purchaser. All of Client's covenants, warranties and agreements under this Agreement made to Purchaser, as well as Purchaser's security interest pursuant to Section 6 above, shall continue in full force and effect until all Factored Accounts purchased hereunder and all debts and debts and obligations of Client to Purchaser are paid in full. Upon termination of this Agreement and payment in full of all debts and obligations of Client to Purchaser, Purchaser shall promptly (i) provide Client with an executed letter of release with respect to the Factored Accounts, which Client may share with Account Debtors (ii) return to Client any security reserves not previously applied by Purchaser to Client's obligations to Purchaser under this Agreement, (iii) terminate any UCC financing statements or other lien filings against Client showing Purchaser or its assigns as secured party or the like, and (iv) provided that Client shall have prepaid any and all advances, made by Purchaser against any Factored Account (including any purchase price paid by Purchaser for such Factored Account) re-convey to Client, free of any lien or claim originated by or through Purchaser, any Factored Accounts previously sold to Purchaser to the extent Purchaser has not collected such Factored Accounts and applied the proceeds thereof to Client's obligations to Purchaser under this Agreement; it being understood that Purchaser's obligations under this sentence shall survive the termination of this Agreement.

9. **Representations and Warranties**. Client represents, covenants, warrants and agrees as follows:

(a) That it is duly incorporated, existing and in good standing under the laws of the state of its incorporation, and that the execution, delivery and performance of this Agreement are in every respect within its corporate powers and have been duly authorized by appropriate corporate action.

(b) That this Agreement, when duly executed and delivered by Client and Purchaser, will constitute a legal, valid and binding agreement of Client fully enforceable in accordance with its terms and conditions.

(c) Client's address set out in Section 12 of this Agreement is, as of the date hereof, the address of Client's principal office. Client shall give Purchaser immediate written notice of any change in the location of its principal office or any name change or the addition of any name under which Client does business. If requested by Purchaser from time to time, Client shall provide Purchaser the address or addresses of such other locations where Client has operations or offices.

(d) As to each Factored Account: (1) such Account is not yet past due, arose in the ordinary course of Client's business and represents a bona fide completed transaction; (2) Client owns the Account free and clear of all liens, security interests and/or any other encumbrance, Client's ownership of and right and title to the Account is absolute and subject to no assignment or claim, and Client shall not assign, grant a security interest in or encumber the Account contrary to this Agreement; (3) the Account, as shown on Client's books and records, and on any invoices or statements delivered to Purchaser, is a legally enforceable debt owed by the related Account Debtor to Client in its full face amount, and is not contingent upon the fulfillment of any condition whatsoever; (4) no partial payment has been made by anyone on such Account, except as shown on Client's books and records; and (5) no set off, credit, allowance, adjustment, counterclaim or defense to such Account exists or will exist and no agreement has been made or will be made with any person or entity under which any deduction or discount may be claimed on such Account, except as shown on Client's books and



records; and (6) the Account is payable on the due date indicated in the related invoice provided by Client to Purchaser most recently prior to Purchaser's purchase of the Account.

(e)     Client shall execute any and all financing statements, Uniform Commercial Code forms or other documents or instruments which Purchaser reasonably deems necessary and/or appropriate to protect its interest under this Agreement.

(f)     Client shall indemnify, defend and hold harmless Purchaser from and against any and all misrepresentations or breaches of warranty or other defaults hereunder by Client; from any dispute or claim resulting in liability, loss, expense, cost or attorneys' fees caused by or arising out of the rejection of any work performed or services rendered by Client; or from any alleged claim, dispute, action, defense or set off of every kind and nature asserted by any Account Debtor;

(g)     Client shall not, without the express written consent of Purchaser, release, compromise, settle or adjust any Factored Account, or grant any discounts, allowances or credits thereon.

The representations, covenants and warranties set forth in this Section 9 above shall survive expiration or termination of this Agreement, regardless of reason.

10.     **Recordkeeping**.  All of Client's books, accounts, ledgers, correspondence, records and papers pertaining to all of the Accounts and Client's business shall be accurately and properly prepared and maintained by Client and shall, in the case of Factored Accounts, disclose the sale of such Accounts to Purchaser.  All such books, ledgers, accounts, records, correspondence and papers shall be made available by Client upon reasonable notice and at all reasonable times for Purchaser's inspection, audit and copying.  Client shall, upon the reasonable request of Purchaser, furnish Purchaser with financial statements, including income statements and balance sheets showing Client's financial condition.

11.     **Attorneys' Fees**.  If Purchaser retains the services of an attorney to enforce any obligation of Client to Purchaser under this Agreement, Purchaser shall be entitled to recover from Client all reasonable out-of-pocket attorneys' fees, court costs and expenses, regardless of whether or not an action is commenced.

12.     **Notice**.  Notices under this Agreement shall be in writing and mailed postage prepaid, registered or certified mail, return receipt requested, or sent by overnight delivery service, or by facsimile transmission to the recipient's facsimile machine, addressed to the addresses set forth below, or to such other addresses as either party notifies the other in writing.  All such notices shall be effective upon receipt if delivered by hand or facsimile or overnight delivery service; otherwise upon five (5) business days after the notice is placed in the U.S. Mail.  Addresses for notices are as follows:

If to PURCHASER:                          If to Client:

MHC Commercial Finance                    Benja, Inc,
4501 College Blvd., Suite 160             845 Market St. Suite 450A
Leawood, KS 66211                         San Francisco, CA 9410
Fax: (816) 242-6249                       Attn:  Andrew Chapin, CEO

13.     **Governing Law**.  This Agreement is accepted and made in the state of Kansas and this Agreement and the rights of the parties hereunder shall be interpreted under and governed as to construction, enforcement and validity by the laws of the state of Kansas.  Purchaser and Client agree that any legal suit, action or proceeding arising out of or related to this Agreement shall be instituted, heard and resolved solely and exclusively in a state court located in Johnson County, Kansas or a federal court located in the District of Kansas.  Purchaser and Client submit to the jurisdiction of such state and federal courts for the purpose of deciding any questions, disputes or causes, arising under this Agreement.  In the event that any one or more of the provisions in this Agreement should be held by any court of competent jurisdiction to be unenforceable, the holding or decision shall not affect or impair any of the other provisions of this Agreement.

14.     **Waiver**.  No delay or omission on the part of Purchaser in enforcing or exercising any right hereunder shall operate as a waiver of such right or any other right.  The waiver by Purchaser of the breach by Client

of any provision of this Agreement shall not be construed as a waiver of any other breach.  No waiver or modification of the Agreement shall be enforceable or chargeable against Purchaser unless it is in writing, signed by Purchaser and delivered by Purchaser to Client.

15.  **Miscellaneous Provisions**.  This Agreement shall binding upon and inure to the benefits of the parties hereto and their respective successors and assigns; provided, however, that this Agreement may not be assigned by Client without the prior written consent of Purchaser.  The waiver, compromise, discharge, extension or release by Purchaser of any duty or obligation of any Account Debtor, in each case made in compliance with the provisions of this Agreement, shall not reduce, diminish, limit or restrict in any way Client's obligations and liabilities to Purchaser. Duties and obligations imposed by this Agreement and rights and remedies available hereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.  The parties agree to do all acts and things, and to make, execute and deliver such written instruments, as shall from time to time be reasonably required to carry out the terms and provisions of this Agreement.  All headings, titles and section captions are inserted in this Agreement for convenience of reference only, are descriptive only and shall not be deemed or construed to add to, detract from or otherwise modify the meaning of the sections or provisions hereof.  This Agreement constitutes the exclusive statement of the agreement of the parties with respect to the subject matter hereof, and this Agreement supersedes and replaces all prior and contemporaneous agreements, discussions and representations, whether written or oral, relating to the subject matter hereof.  The terms and provisions of this Agreement can only be amended, altered, changed, modified, supplemented or waived pursuant to a writing signed by the parties hereto; provided, however, that Purchaser may waive any obligation of or requirement affecting Client under this Agreement by giving Client written notice thereof.  Client consents to contract electronically with Purchaser for purposes of this Agreement and any subsequent agreement between Client and Purchaser or Purchaser's affiliates and understands that Client is entering into a legal agreement by agreeing to this Agreement and intends to be legally bound by such agreement.  Any termination of Client's consent to conduct business electronically shall not affect the legal enforceability of any Agreement entered into prior to such withdrawal of consent.  This Agreement may be executed in one or more counterparts and each counterpart with a mark demonstrating intent to be bound by the terms thereof, whether an original handwritten signature, facsimile, electronic acknowledgement, or any other mark accepted to bind parties to an agreement under applicable law is considered an original and all counterparts shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, effective as of the day and year first above written.

"Purchaser":                                                        "Client":

**MHC Financial Services, Inc.**                                   **Benja, Inc**

By _____Erin Murphy_____              By _____Andrew J. Chapin_____

Name ____Erin Murphy_____             Name ____Andrew J. Chapin_____

Title ____Director of Factoring_____           Title ____President & CEO_____

## EXHIBIT A

### BILL OF SALE AND ASSIGNMENT

**FOR VALUE RECEIVED**, the receipt and sufficiency of which is hereby acknowledged, Benja Incorporated, a Delaware corporation ("**Assignor**"), does hereby grant, sell, assign, transfer and convey unto MHC Financial Services, Inc., a Missouri corporation ("**Purchaser**"), its successors and assigns, the accounts receivable arising from services performed in the regular course of Assignor's business, as described on the schedule of accounts attached hereto and/or evidenced by the invoices attached hereto, which are incorporated herein by this reference (the "**Factored Accounts**").

**TO HAVE AND TO HOLD** the same unto Purchaser, its successors and assigns, forever, Assignor hereby representing and warranting that it conveys good and merchantable title to the Factored Accounts, free and clear of all liens, encumbrances, and security interests, and that it will warrant and defend the title to the Factored Accounts unto Purchaser, its successors and assigns, forever against the claims and demands of all persons whomsoever.

**IN WITNESS WHEREOF**, Assignor has executed this Bill of Sale and Assignment effective as of the 25th day of March, 2020.

"Assignor":

**Benja Incorporated**

By _Andrew J. Chapin_
    DocuSigned by:
    7FD0E63A9C9544B...

Name Andrew J. Chapin

Title President & CEO

## EXHIBIT B

**Transaction Fees**

- Transaction Fees (ACH and/or Fuel Card)    $ 0.00

- Minimum Invoice Fee    $ 0.00

**One Time Fees and Charges**

- Origination Fee    $ 1,000

**Additional Fees and Charges**
**\*note these charges only occur if you ask for these services\***

- Bank Wire Fee    $ 15.00

Client expressly acknowledges and agrees that such fees and charges are subject to change by Purchaser from time to time, and that certain additional fees/charges may be assessed based on increased cost to Purchaser and/or third party charges. In the event of any such change, Purchaser will provide Client written notice thereof, and the new fee schedule shall be incorporated herein by this reference. The foregoing is expressly agreed to and accepted by Client:

**Benja Incorporated**

By  *Andrew J. Chapin*
    7FD0E63A9C9544B...

Name  Andrew J. Chapin

Title  President & CEO

<center>EXHIBIT C
<u>NOTICE OF ASSIGNMENT</u></center>

TO: [                        ]

ATTN: **ACCOUNTS PAYABLE MANAGER**      E-MAIL:

REGARDING:   Benja Incorporated         DATE: 3/25/2020

The purpose of this Notice of Assignment is to inform you that the above-named company has assigned all of its current and future accounts receivable and the proceeds thereof to Purchaser. Accordingly, Purchaser now owns ALL of above-named company's accounts receivable and has the sole and exclusive right to collect and retain the same. The amount due or to become due under each such account has been assigned and payment is to be made to Purchaser. You may have received, or will be receiving, invoices for services rendered by this company. **Please be advised that ALL such invoices (past, present, and future) must be paid directly to Purchaser as indicated below:**

| **Payments by mail:** | **Electronic Payments:** |
|---|---|
| | Account: 987 222 4221 |
| Murphy Hoffman Company | Routing: 101 000 695 |
| P.O. Box 874091 | Reference: Benja |
| Kansas City, MO 64187 | *Please submit supporting documents via email to:* |
| | Email: <u>ACH.payments@mhc.com</u> |

Your compliance with this assignment is authorized and directed by the above-named company, as evidenced by the duly authorized signature of the company below. This assignment can only be revoked in writing signed by both Purchaser and the above-named company. In the event there is any claim or dispute that may affect payment of any invoice, or if any person or entity other than Purchaser attempts to collect or claims any right to any such invoices/accounts receivable, then please notify Purchaser immediately, and do <u>not</u> make any payment on such accounts to any other party (including the above-named company). **<u>Payment to the company or any other party will not discharge or relieve you of your obligation to pay Purchaser following your receipt of this notice.</u>**

Your cooperation with this Notice of Assignment and timely payment of all such invoices as directed will be greatly appreciated, and will help to avoid duplicate payments and/or legal action. Although all funds and payments will be redirected to Purchaser, please continue to send all 1099's directly to the company. Please make the proper notations on your ledger. Lastly, by sending payment to Purchaser you acknowledge invoices are not subject to any claims or defenses or right to offset you may have against the company. Thank you.
***<u>IF YOU HAVE QUESTIONS OR WOULD LIKE ADDITIONAL INFORMATION PLEASE CONTACT US AT 844-891-3509.</u>***

**Purchaser**
**MHC Financial Services, Inc.**

DocuSigned by:
*Erin Murphy*
0DD2E26CF3A8465...

The foregoing is authorized and directed by the above-named company:

DocuSigned by:
*Andrew J. Chapin*
7FD0E63A9C9544B...

By   _____
Name   Andrew J. Chapin
Title   President & CEO

## ACKNOWLEDGMENT OF ASSIGNMENT

The undersigned hereby acknowledges receipt of the foregoing Notice of Assignment from Purchaser, and acknowledges that Benja Incorporated has assigned all of its current and future accounts receivable and the proceeds thereof to MHC Financial Services. Accordingly, the undersigned expressly acknowledges and agrees that all invoices for services rendered by this company shall be paid directly to Purchaser at the following address:

**The undersigned agrees <u>not</u> to make any payment on such accounts to any other party (including the above-named company). <u>The undersigned expressly acknowledges and agrees that payment of any such account to the above-named company or to any party other than Purchaser shall not relieve or discharge its payment obligation to Purchaser, and the undersigned shall remain responsible and liable for such payment to Purchaser.</u> The undersigned hereby waives any right to offset against payment of any such account.**

The foregoing is acknowledged and agreed to by:

By _____

Name _____

Title _____

**EXHIBIT D**

**PERSONAL GUARANTY**

For valuable consideration and to induce MHC Financial Services, Inc. ("Purchaser") to enter into that certain Factoring Services Agreement dated March 25th, 2020 (the "Agreement") with Benja Incorporated (Client"), I/we, the undersigned Guarantor(s), jointly and severally, do hereby unconditionally guarantee to Purchaser, its successors and assigns, the full, prompt and complete performance by Client of all of the provisions, conditions, covenants and agreements contained in the Agreement, including the full and complete payment of all monies that became due thereunder to Purchaser by Client, and do hereby waive all notice of default by Client and notice of acceptance of this guaranty by Purchaser, and do hereby consent to any extension of time that may be given by Purchaser to Client of time for payment or performance. If, at any time, Client shall fail to timely pay any amounts owed to Purchaser under the Agreement or otherwise fail to perform any of its obligations under the Agreement, then the undersigned shall promptly pay the same or perform the same in the place and stead of Client. This guaranty is not limited to any particular period of time, but shall continue until all of the terms, covenants, and conditions of the Agreement have been fully and completely performed by Client, and the undersigned shall not be released of any obligation or liability hereunder so long as there is any claim of Purchaser against Client arising out of or relating to the Agreement that has not been settled or discharged in full. The undersigned waive(s) any right to require Purchaser to proceed against Client, any account debtors or customers of Client, or any other person, debtor or guarantor, or to proceed against or exhaust any security or pursue any other remedy in Purchaser's power. Whether or not a suit is initiated, the undersigned shall pay all reasonable attorneys' fees and all other costs and expenses incurred by Purchaser in enforcing this guaranty and in any actions or proceedings arising out of or relating to this guaranty. This guaranty shall be governed and construed in accordance with the laws of the state of Kansas. The undersigned hereby consents to the sole and exclusive jurisdiction of any state or Federal court within the state of Kansas in connection with the enforcement of this guaranty.

Guarantor(s):

*Andrew J. Chapin*
DocuSigned by:
_____
[Signature]

Andrew J. Chapin
_____
[Printed Name]

3/25/2020
_____
[Date]

*Thomas Goode*
DocuSigned by:
_____
[Signature]

Thomas Goode
_____
[Printed Name]

3/25/2020
_____
[Date]

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Online Dept. - 888-507-4593

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

FIRST CORPORATE SOLUTIONS INC.
914 S STREET

SACRAMENTO CA 95811

UCC1-496543                            State of California

207769944341
3/26/2020
This acknowledgment reflects the information as transmitted
to the State of California.

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BENJA INCORPORATED | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 251 Little Falls Dr | Wilmington | DE | 19808 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BENJA INCORPORATED | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 10 LYON ST 210 | SAN FRANCISCO | CA | 94117 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| First Corporate Solutions, as representative | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 914 S Street / SPRS@FICOSO.COM | Sacramento | CA | 95811 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

"All existing and future accounts receivable arising from services performed in the regular course of Debtor's business ( i.e., any right to payment from any party for services rendered by or on behalf of Debtor (the "Accounts")), wherever located or situated, and whether now existing or arising in the future, and whether now owned or at any time in the future acquired by Debtor; all guaranties and security for such Accounts; all of Debtor's rights and interest in the goods giving rise to such Accounts, and the rights associated with or related or pertaining to such goods, including without limitation the right of stoppage in transit and any and all related insurance, any items substituted therefor as replacements and all additions thereto; all of Debtor's chattel paper, instruments, general intangibles, securities, contract rights, associated with or related to the Accounts; all proceeds of any of the foregoing Accounts, and all rights and interests and monies due or becoming due on such

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
[UCC1-496543]

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| OR | **9a. ORGANIZATION'S NAME**<br><br>BENJA INCORPORATED |
| | **9b. INDIVIDUAL'S SURNAME**<br><br>**FIRST PERSONAL NAME**<br><br>**ADDITIONAL NAME(S)/ NITIAL(S)** / SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**10. DEBTOR'S NAME:** Provide (10a or 10b) only <u>one</u> additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | | |
|---|---|---|---|---|---|
| OR | **10a. ORGANIZATION'S NAME** | | | | |
| | **10b. NDIV DUAL'S SURNAME**<br>Goode | | | | |
| | **INDIV DUAL'S FIRST PERSONAL NAME**<br>Thomas | | | | |
| | **INDIVIDUAL'S ADDITIONAL NAME(S)/ NITIAL(S)** | | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2901 Barton Skyway Apt 1105 | Austin | TX | 78746 | USA |

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** <u>or</u> ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only <u>one</u> name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| OR | **11a. ORGANIZATION'S NAME** | | | |
| | **11b. NDIV DUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 11c. MA L NG ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

Accounts; and  all other personal property in which Debtor has an interest, now or hereafter existing or acquired, and wheresoever located, tangible or intangible, including, but not limited to, all present and hereafter existing or acquired vehicles, equipment, tools, goods, inventory, furniture, fixtures, contract rights, chattel mortgages, deeds of trust, stocks, bonds, certificates of deposit, bank accounts, security deposits, intellectual property and other general intangibles."

**13.** ☐ This FINANC NG STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANC NG STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

MHC000468

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

**18. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|

OR **BENJA INCORPORATED**

| 18b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| Chapin | Andrew | | | |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 10 Lyons St 210 | San Francisco | CA | 94117 | USA |

**20. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/ NITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**21. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/ NITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**22.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**23.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/ NITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**24. MISCELLANEOUS:**

Case: 21-03036    Doc# 29    Filed: 07/15/22    Entered: 07/15/22 16:54:58    Page 43 of 241

MHC000469

**INFORMATION REQUEST**

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) | FILING OFFICE ACCT # |
|---|---|
| Online Dept. | |

B. E-MAIL CONTACT AT FILER (optional)

C. RETURN TO: (Name and Address)

FIRST CORPORATE SOLUTIONS INC.
914 S STREET

SACRAMENTO CA 95811
207769944341

State of California

207769944341
3/26/2020
This acknowledgment reflects the information as transmitted to the State of California.

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME to be searched: Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

OR

| 1a. ORGANIZATION'S NAME |
|---|
| BENJA INCORPORATED |

| 1b. INDIVIDUAL'S SURNAME |
|---|
| |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

2. INFORMATION OPTIONS relating to UCC filings and other notices on file in the filing office that include the Debtor name identified in item 1:

2a. SEARCH RESPONSE ☐ CERTIFIED (Optional)
Select <u>one</u> of the following two options: ☒ ALL (Check this box to request a response that is complete, including filings that have lapsed.) ☐ UNLAPSED

2b. COPY REQUEST ☐ CERTIFIED (Optional)
Select <u>one</u> of the following two options: ☐ ALL ☐ UNLAPSED

2c. SPECIFIED COPIES ONLY ☐ CERTIFIED (Optional)

| Record Number | Date Record Filed (if required) | Type of Record and Additional Identifying Information (if required) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

3. ADDITIONAL SERVICES:

4. DELIVERY INSTRUCTIONS (request will be completed and mailed to the address shown in item C unless otherwise instructed here):
4a. ☒ Pick Up
4b. ☐ Other
Specify desired method <u>here</u> (if available from this office); provide delivery information (e.g., delivery service's name, addressee's account # with delivery service, addressee's phone #, etc.)

FILING OFFICE COPY (1) — INFORMATION REQUEST (Form UCC11) (Rev. 07/19/12)     International Association of Commercial Administrators (IACA)

MHC000470

| | |
|---|---|
| **From:** | Murphy, Erin C |
| **To:** | patrick.ricke@busey.com |
| **Cc:** | Andrew Chapin |
| **Subject:** | FW: Message from FRANCHISE TAX (9168456121) |
| **Date:** | Tuesday, August 18, 2020 4:07:24 PM |
| **Attachments:** | VoiceMessage.wav |

Patrick—

Attached is the voicemail that we have received from the state of California regarding Benja's status with the state. Glen has been a very helpful contact so please feel free to reach out to him directly to confirm Benja's standing.

*Glen Duncan*

Compliance Representative
State of California Franchise Tax Board
Business Entity Late Stage - Team 8
Business Entity Collection Operations
PH: 916 845 6121 FAX: 916 843 2434

We appreciate your help in getting the wire out to MHC today.

**Erin Murphy** | Director of Commercial Finance
MHC Financial Services
(816) 912-5914 | mobile (913) 963-5665 | website

---

**From:** Anderson, Dan <Dan.Anderson@mhc.com>
**Sent:** Tuesday, August 18, 2020 3:54 PM
**To:** Murphy, Erin C <Erin.Murphy@mhc.com>
**Subject:** Fwd: Message from FRANCHISE TAX (9168456121)


Get Outlook for iOS

---

**From:** Cisco Unity Connection Messaging System <unityconnection@mhctruck.com>
**Sent:** Tuesday, August 18, 2020 3:42:06 PM
**To:** ddander@mhctruck.com <ddander@mhctruck.com>
**Subject:** Message from FRANCHISE TAX (9168456121)

# EXHIBIT B

1   RANDYE B. SOREF (State Bar No. 99146)
    rsoref@polsinelli.com
2   TANYA BEHNAM (State Bar No. 322593)
    tbehnam@polsinelli.com
3   Polsinelli LLP
    2049 Century Park East, Suite 2900
4   Los Angeles, CA 90067
    Telephone: (310) 556-1801
5   Facsimile:  (310) 556-1802
6
    JERRY L. SWITZER, JR. (pro hac vice pending)
7   jswitzer@polsinelli.com
    JEAN SOH (pro hac vice pending)
8   jsoh@polsinelli.com
    Polsinelli PC
9   150 North Riverside Plaza, Suite 3000
    Chicago, IL 60606
10  Telephone:   (312) 819-1900
    Facsimile:    (312) 819-1910
11  *Attorneys for Busey Bank*

12              UNITED STATES BANKRUPTCY COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15

16  **In re:**                              Case No. 20-30819

17  **BENJA INCORPORATED,**                 Chapter 11

18          **Debtor.**                      Judge Dennis Montali

19

20                                          **DECLARATION OF MICHAEL
                                            MCELHONE IN SUPPORT OF
21                                          CREDITOR BUSEY BANK'S MOTION
                                            FOR THE APPOINTMENT OF A
22                                          CHAPTER 11 TRUSTEE OR, IN THE
                                            ALTERNATIVE, FOR CONVERSION
23                                          OF CASE TO CHAPTER 7 OF THE
                                            BANKRUPTCY CODE**
24

25

26

27

28

Polsinelli LLP
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
310.556.1801

75119574.2

## DECLARATION OF MICHAEL MCELHONE

Pursuant to 28 U.S.C. § 1764, Michael McElhone declares as follows under the penalty of perjury:

1.     Except as otherwise indicated herein, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

2.     I am a resident of the State of Missouri.  I am over the age of twenty-one and have never been convicted of a felony or crime of moral turpitude.

3.     I make this Declaration in support of the Motion for the Appointment of a Chapter 11 Trustee or, in the Alternative, for Conversion of Case to Chapter 7 of the Bankruptcy Code (the "Motion") filed by Busey Bank (the "Bank") in this action.  Unless otherwise defined herein, capitalized terms have the meanings assigned to such terms in the Motion.

4.     I am a Vice President and Special Assets Officer of the Bank.  I am authorized to submit this Declaration on behalf of the Bank.

5.     Each of the documents referred to herein (a) was made at or near the time specified herein; (b) was made by, or based on information transmitted from, a person with knowledge of the facts and matters set forth in each such document; (c) is kept by the Bank in the ordinary course of its regularly conducted business; and/or (d) was made as a part of the regularly conducted business of the Bank.

6.     On July 16, 2019, Benja Incorporated ("Benja") executed a Promissory Note in favor of the Bank dated as of July 16, 2019, in the principal amount of $1,000,000.00, as replaced and superseded by a Promissory Note dated as of February 28, 2020, executed by Benja in favor of the Bank in the original principal amount of $3,000,000.00, as further replaced and superseded by a Promissory Note dated as of August 20, 2020, executed by Benja in favor of the Bank in the original principal amount of $5,000,000.00 (collectively, the "Note") evidencing a loan (the

75119574.2

"Loan") in the same amounts. A true and accurate copy of Note is attached hereto and incorporated herein by reference as **Exhibit 1**.

7.    The Loan is also evidenced by a Business Loan Agreement (Asset Based) dated July 16, 2019, executed by Benja and the Bank, as amended by a Modification to Business Loan Agreement (Asset Based) dated as of February 28, 2020, executed by Benja in favor of Bank in the original principal amount of $3,000,000.00, as replaced and superseded by a Business Loan Agreement (Asset Based) dated as of August 20, 2020, executed by Benja in favor of Bank in the original principal amount of $5,000,000.00 (collectively, the "BLA"). A true and accurate copy of the BLA is attached hereto and incorporated herein by reference as **Exhibit 2**.

8.    The Note is secured by a Commercial Security Agreement dated July 16, 2019 (the "Security Agreement") executed by Benja in favor of the Bank. Under the Security Agreement, and as security for the Loan, Benja granted to the Bank a security interest in the Collateral (as defined and as more particularly described therein), including, but not limited to, all of Benja's inventory, equipment, accounts, chattel paper, instruments, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles, and all proceeds, additions, substitutions, and replacements thereof. A true and accurate copy of the Security Agreement is attached hereto and incorporated herein by reference as **Exhibit 3**.

9.    To perfect the security interest arising under the Security Agreement, the Bank caused a UCC Financing Statement to be filed on July 19, 2019, with the Delaware Department of State as File Number 20195005348 (the "UCC Filing" and, together with the Security Agreement, the "Security Documents"), with respect to all assets and property of Benja as described therein. A true and accurate copy of the UCC Filing is attached hereto and incorporated herein by reference as **Exhibit 4**.

75119574.2

10.     Benja maintains a deposit account number XXXXX4766 at the Bank that is and has been used by Benja in connection its business. (The foregoing account, and any other accounts of Benja at the Bank, are collectively referred to herein as the "Bank Deposit Account"). The Bank funded the Loan by depositing monies directly into the Bank Deposit Account. The Bank Deposit Account and the funds on deposit therein are part of the Collateral securing the Loan.

11.     The Note is also secured by a Commercial Guaranty executed by Andrew J. Chapin ("Chapin") on or about July 16, 2019 (the "Chapin Guaranty"). Chapin is the founder of Benja, and at all relevant times (except as noted below) has acted as a Director and Chief Executive Officer of Benja.

12.     The Note is also secured by a Commercial Guaranty executed by Thomas L. Goode III ("Goode") on or about July 16, 2019 (the "Goode Guaranty" and, together with the Chapin Guaranty, the "Guarantees").

13.     The Note, BLA, Guarantees, Security Agreement, the UCC Filing, and all other agreements, instruments, and documents evidencing, securing, or otherwise relating to the Loan are collectively referred to herein as the "Loan Documents." Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Loan Documents.

14.     Pursuant to a letter dated September 29, 2020 (the "Default Letter"), the Bank notified Benja and the Guarantors of various Events of Default under the Loan Documents and reserved all rights and remedies on account thereof under the Loan Documents, at law or in equity. As reflected in the Default Letter, the outstanding Events of Default include, without limitation, that Benja violated the BLA and Security Agreement in the following respects:

75119574.2

a.  Benja borrowed money from First Corporate Solutions and E-Revshare Core, LLC, and in connection therewith granted security interests to those lenders in assets of Benja.

b.  Benja allowed certain state tax liens in favor of the California Employment Development Department to be recorded against Benja and its assets on or about January 14, 2020, and March 9, 2020.

c.  Benja allowed a judgment in favor of Peter A. Manderino to be recorded against Benja and its assets on or about October 30, 2018.

d.  Additionally, as reflected in the Default Letter, Goode contends that he did not execute and/or is not bound by the Goode Guaranty. Although the Bank disputes this contention, if it is ultimately determined that Goode did not execute and/or is not bound by the Goode Guaranty, Benja violated the BLA, which required the execution of the Goode Guaranty as a condition to the Bank making the Loan.[1]

e.  Finally, as reflected in the Default Letter, Benja violated the BLA by maintaining an operating account at JPMorgan Chase Bank, and not with the Bank, as the BLA requires that Benja maintain the Bank as its primary depository and cash management services institution.

A true and accurate copy of the Default Letter is attached hereto and incorporated herein by reference as **Exhibit 5**.

15.  As of October 1, 2020, the total balance due under the Note, exclusive of applicable late charges, default interest, and costs, expenses and attorneys' fees incurred by Busey Bank, is as follows:

---

[1] The Bank is currently investigating the issues raised by Goode with respect to the execution and enforceability of the Goode Guaranty, including Goode's belief that Chapin forged his signature to the Goode Guaranty.

|  |  |
|---|---|
| Principal: | $4,999,999.50 |
| Regular Interest: | $26,656.53 |
| **Total:** | **$5,026,656.03** |

Additionally, interest continues to accrue under the Note from and after October 1, 2020.

16. Following the issuance of the Default Letter, the Bank learned (and continues to learn) troubling information regarding the actions of Chapin on behalf of Benja.

17. Starting in September 2020, I and other officers of the Bank had communications with the Chief Financial Officer of the Benja, Joe Alouf. Mr. Alouf alerted us to his concerns regarding potential fraud committed by Chapin against the Bank, other lenders and investors. Some of our conversations included Benja's then-outside counsel, Scott Olson of Vedder Price LLP, who expressed similar concerns regarding Chapin's conduct.

18. We were advised that on September 28, 2020, Chapin had agreed to resign his positions as CEO and Director of Benja, and that Mr. Alouf would be appointed as Interim President (in addition to being CFO) and a shareholder, Pano Anthos, would be appointed as Board Chairman. However, we learned the following day, September 29, 2020, that Chapin had reversed course and announced that he intended, as majority shareholder, to reinstate himself as CEO and sole Director of Benja. As a result of Chapin's actions, Vedder Price withdrew as Benja's counsel.

19. On October 1, 2020, the Bank received an email from Chapin announcing the foregoing management changes and that neither Mr. Anthos nor Mr. Alouf were authorized to speak for Benja. A true and correct copy of Chapin's email is attached hereto as **Exhibit 6**.

20. During one of my conversations with Mr. Alouf, he advised me that he had received from another lender copies of monthly statements of Benja's Deposit Account at the Bank for the months of April through August 2020, which that lender had received from Chapin.

Mr. Alouf forwarded the monthly statements to me, true and correct copies of which are attached hereto as **Exhibit 7** (collectively, the "Chapin Bank Statements").

21. I then pulled copies of the actual monthly statements for the Bank Deposit Account for the months of April through August 2020, true and correct copies of which are attached hereto as **Exhibit 8** (collectively, the "Busey Bank Statements"). I sent the Busey Bank Statements to Mr. Alouf so that we could compare them to the Chapin Bank Statements I had received from him.

22. Upon our review of both sets of bank statements, Mr. Alouf and I determined that Chapin had altered the Chapin Bank Statements to reflect numerous large deposits to the Bank account from purported customers that do not appear in the actual Busey Bank Statements, the result of which is to substantially inflate the account balances appearing in the Chapin Bank Accounts. Below are the month-end account balances as reflected in each set of bank statements:

| | Account Balance in Busey Bank Statements | Account Balance in Chapin Bank Statements |
|---|---|---|
| April 30, 2020 | $195,406.71 | $1,371,516.57 |
| May 30, 2020 | $3,016.22 | $227,186.20 |
| June 30, 2020 | $17,983.54- | $4,804,007.63 |
| July 31, 2020 | $27,538.59- | $2,313,294.48 |
| August 31, 2020 | $1,974.80 | $1,272,044.92 |

23. Thus, it appears that Chapin overstated the balance of the Bank account in the Chapin Bank Statements, which Mr. Alouf indicated that Chapin had provided to the other lender, creditors and investors, by hundreds of thousands or millions of dollars, including by over $4.8 million in the June 2020 statement and approximately $1.27 million in the last (August 2020) statement.

75119574.2

24. Additionally, Chapin executed and delivered to the Bank monthly borrowing base certificates from March to July 2020 and provided related accounts receivable aging reports reflecting accounts receivable totaling between $4.7 million to $6 million, true and correct copies of which are attached hereto as **Exhibit 9**. Based on my ongoing investigation, I have determined that the borrowing base certificates and related accounts receivable aging reports are very likely materially inaccurate. For example, the attached Busey Bank Statements do not reflect any deposits made to the Bank Deposit Account from the purported customers appearing in the borrowing base certificates and related accounts receivable aging reports indicating that the accounts receivable are real. In fact, I have reviewed the monthly statements for the Bank Deposit Account dating from the inception of the Loan in July 2019, and there are no deposits from any of the purported customers appearing in the borrowing base certificates and the related accounts receivable aging reports the Bank received from Chapin since that date. This is extremely troubling to the Bank, as Benja's accounts receivable were to be the primary collateral for the Bank's Loan.

25. I also learned from Mr. Alouf that he had conversations with a Brett Bureck, who apparently is a former director and shareholder of Benja, who acknowledged to Mr. Alouf that he, either directly or through his company, Taco Corporation of America ("TCA"), had received approximately $4.6 million from Benja over the preceding year, apparently in repayment of his equity interests in Benja. I have reviewed the monthly statements of the Bank Deposit Account since the inception of the Loan, which reflect millions of dollars of transfers to Mr. Bureck and TCA. Most of these transfers were made immediately after the Bank made advances under the Loan which were deposited into the Bank Deposit Account. The advances by the Bank were intended to fund Benja's business operations, not to be diverted to an unknown individual and his company on account of his purported equity interest in Benja.

75119574.2

26.     Further, the Bank (through counsel) recently provided to Mr. Alouf a copy of Benja's 2018 federal tax return that Chapin had provided to the Bank when he originally applied for the Loan.  A true and correct copy of the tax return is attached hereto as **Exhibit 10**.  The tax return indicates that it was prepared by a Tom Dunn at Numbrstudio Financial Group, LLC ("Numbrstudio").  Mr. Alouf contacted the principal of Numbrstudio, who confirmed that there is no Tom Dunn affiliated with Numbrstudio, that Numbrstudio does not prepare tax returns (it outsources that work to another firm), and that the return appears to be fraudulent.

27.     The Bank continues to investigate what other documents and information provided by Chapin on behalf of Benja in connection with the origination of the Loan, and thereafter, are fraudulent.

28.     Based on the actions taken by Chapin to defraud the Bank (and other lenders and investors), the Bank believes that it is imperative for this Court to grant the Motion and appoint a trustee for Benja.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of October, 2020.

*/s/ Michael McElhone*
Michael McElhone

---

**DECLARATION OF MICHAEL MCELHONE**

# EXHIBIT 1

00010


ORIGINAL

*00006706741601086 5#########095507162019*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | 7416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

**Principal Amount: $1,000,000.00** **Date of Note: July 16, 2019**

**PROMISE TO PAY.** Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million & 00/100 Dollars ($1,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on July 15, 2020. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 16, 2019, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the one month London Interbank offered rate as published in the Money Rates section of the Wall Street Journal (or such other rate that is widely recognized as the successor to the London interbank offered rate, as published by the Wall Street Journal or another comparable service determined by Lender in its sole discretion, for the purpose of displaying the rates at which U.S. Dollars deposits are offered by leading banks in the London interbank deposit market or, if no such widely recognized successor rate exists at such time, such other rate as published by the Wall Street Journal or another comparable service that reflects an alternative index rate designated by Lender in its sole discretion); provided that in no event shall such rate be less than 0.00% (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on anniversary date of note. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 2.379% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 3.000 percentage points over the Index, resulting in an initial rate of 5.379%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL 61820.**

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false

or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President & CEO of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE.** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56 (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or

endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

BENJA INCORPORATED

By: _____
    Andrew J. Chapin, President/Secretary of Benja
    Incorporated



ORIGINAL



*6706744910865%#########%0955%02282020*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 02-28-2020 | 02-27-2021 | 6706744910865 | 130 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

**Principal Amount: $3,000,000.00**                                            **Date of Note: February 28, 2020**

**PROMISE TO PAY.** Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Million & 00/100 Dollars ($3,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on February 27, 2021. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning March 28, 2020, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the one month London interbank offered rate as published in the Money Rates section of the Wall Street Journal (or such other rate that is widely recognized as the successor to the London interbank offered rate, as published by the Wall Street Journal or another comparable service determined by Lender in its sole discretion, for the purpose of displaying the rates at which U.S. Dollars deposits are offered by leading banks in the London interbank deposit market or, if no such widely recognized successor rate exists at such time, such other rate as published by the Wall Street Journal or another comparable service that reflects an alternative index rate designated by Lender in its sole discretion); provided that in no event shall such rate be less than 0.00% (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on anniversary date of note. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 1.647% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 4.000 percentage points over the Index (the "Margin"), resulting in an initial rate of 5.647%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL 61820.**

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President/Secretary of Benja Incorporated, and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE.** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56 (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**PRIOR NOTE.** This Note represents a renewal, extension and modification of that Promissory Note dated July 16, 2019 of Borrower payable to Lender in the maximum principal amount of $1,000,000.00 (the "Prior Note"). This Note does not constitute a novation, payment and reborrowing, or termination of any of Borrower's obligations under the Prior Note and Borrower's obligations under the Prior Note are in all respects continuing (as renewed, extended and modified by this Note).

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**BENJA INCORPORATED**

By: _____
    Andrew J. Chapin, President/Secretary of Benja
    Incorporated

LaserPro, Ver 19.4.0.030 Copr. Finastra USA Corporation 1997, 2020 All Rights Reserved - MO C:\CFIWIN\CFI\LPL\D20.FC TR-95379 PR-771



"6706744910865%#########%0955%08202020"

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,000,000.00 | 08-20-2020 | 02-27-2021 | 6706744910865 | 130 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CLAYTON
175 CARONDELET PLAZA
CLAYTON, MO 63105

**Principal Amount: $5,000,000.00** **Date of Note: August 20, 2020**

**PROMISE TO PAY. Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Million & 00/100 Dollars ($5,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on February 27, 2021. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 28, 2020, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the rate of interest specified as the London Interbank offered rate for a one-month period in the "Money Rates" section of The Wall Street Journal or its successors or another comparable service determined by Lender in its sole discretion (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on the same day as the date of this note. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 0.152% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 4.000 percentage points over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.152%. Notwithstanding anything herein to the contrary, in the event that Lender, in its sole judgment, determines that (a) the Index is permanently or indefinitely unavailable or unascertainable, or the Index administrator or its successor has ceased or will cease publishing the Index, permanently or indefinitely, (b) the Index is determined to be no longer representative by the regulatory supervisor of the Index administrator or its successor, (c) the Index can no longer be lawfully relied upon in contracts of this nature by one or both of the parties, (d) the Index does not accurately or fairly reflect the cost of making or maintaining the type of loans under this Note, or (e) U.S. dollar-denominated credit facilities are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Index, then, at the election of Lender, all references to the Index herein will instead be to a replacement index determined by Lender in its sole judgment, including any adjustment to the replacement index to reflect a different credit spread, term or other mathematical adjustment deemed necessary by Lender in its sole judgment. Lender will provide reasonable notice to Borrower of such replacement rate and the date on which it will become effective. In no event shall the Index or any replacement index be less than 0.00%. Lender's determination of the Index or any replacement rate shall be conclusive, absent manifest error.
NOTICE: Under no circumstances will the interest rate on this Note be less than 3.500% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL 61820.**

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

# PROMISSORY NOTE
## (Continued)

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Andrew J. Chapin, President/Secretary of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE.** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56 (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

PRIOR NOTE. This Note will be used to renew, modify, extend and/or change the terms of an existing Promissory Note dated February 28, 2023 of Borrower

# PROMISSORY NOTE
## (Continued)

payable to Lender in the maximum principal amount of $3,000,000.00 (the "Prior Note"). This Note does not constitute a novation, payment and reborrowing, or termination of any of Borrower's obligations under the Prior Note and Borrower's obligations under the Prior Note are in all respects continuing (as renewed, extended and modified by this Note).

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

**BORROWER:**

**BENJA INCORPORATED**

By: _____
Andrew J. Chapin, President/Secretary of Benja Incorporated

LaserPro, Ver 20.2.20.003 Copr. Finastra USA Corporation 1997, 2020. All Rights Reserved. - MO C:\CFI\PROFILP\C20.FC TR-47331 PR-731

# EXHIBIT 2





ORIGINAL

*000067067416010865#########007007162019*

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | 7416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

**THIS BUSINESS LOAN AGREEMENT (ASSET BASED) dated July 16, 2019, is made and executed between Benja Incorporated ("Borrower") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of July 16, 2019, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President & CEO of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.**

**LINE OF CREDIT.** Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.** Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.** Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.** If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.** Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.** To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without

limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at Borrower's address as identified in this Agreement. The records are an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered 15 days after each month end.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 845 Market Street 450A, San Francisco, CA 94103. Unless Borrower has designated otherwise in writing, the principal office is at the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and

ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Compliance with Laws.** Borrower has complied in all material respects with all laws, orders, regulations, fees, decrees and ordinances affecting to any extent or in any manner it or any aspect of its business. There are no existing or, to Borrower's knowledge, proposed laws, orders, regulations, rules, decrees or ordinances of such a nature as could be expected to materially adversely affect the continued conduct of its business in the manner presently being carried on and conducted.

**Permits.** Borrower possesses all material permits, licenses, registrations, consents, certificates, authorizations, orders and approvals required under applicable law in connection with the ownership and operation of its Business. All such permits have been legally and validly obtained and are in full force and effect, no suspension or cancellation of such permit is pending or has been threatened, and there is no fact, event or condition which would cause any such permit not to be renewed upon expiration, except where failure to maintain any such permit could not reasonably be expected to have a material adverse effect on Borrower's financial condition.

**Business Loan.** The Advances, including interest rate, fees and charges as contemplated hereby, (a) are business loans within the purview of 815 ILCS 205/4(1)(c), as amended from time to time, (b) are an exempted transaction under the Truth In Lending Act, 15 U.S.C. 1601 et seq., as amended from time to time, and (c) do not, and when disbursed will not, violate the provisions of the Illinois usury laws, any consumer credit laws or the usury laws of any state which may have jurisdiction over this transaction, Borrower or any Collateral.

**Accuracy of Information.** No information provided to Lender by or on behalf of Borrower or any Guarantor contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading. There is no material fact known to Borrower or any Guarantor which has not been disclosed in writing to Lender, which has or, insofar as a Borrower or any Guarantor can reasonably foresee, is likely to have a material adverse effect on the financial condition of Borrower or any Guarantor. No representation or warranty made by Borrower or any Guarantor set forth herein or in any Related Document, or in any schedule hereto or thereto, or in any supplement to any schedule contains or will contain any untrue statement of a material fact, or omits to state any material fact, necessary in order to make the statement therein, in light of the circumstances in which it was made, not misleading.

**Anti-Corruption Laws and Sanctions.** Borrower, its subsidiaries and their respective officers and employees and, to the knowledge of Borrower, its directors and agents, are in compliance in all material respects with (1) all laws, rules, and regulations of any jurisdiction applicable to Borrower or its affiliates from time to time concerning or relating to bribery or corruption (collectively, "Anti-Corruption Laws") and (2) applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom (collectively, "Sanctions"). None of (1) Borrower, any subsidiary of Borrower or to the knowledge of Borrower or such subsidiary any of their respective directors, officers or employees, or (2) to the knowledge of Borrower, any agent of Borrower or any subsidiary of Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is (a) any person listed in any Sanctions-related list of designated persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any person operating, organized or resident in a country or territory which is itself the subject or target of any Sanctions or (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b). No Advance or use of proceeds of the Loan will violate any Anti-Corruption Law or applicable Sanctions.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** As soon as available, but in no event later than one hundred and twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended to be provided in form satisfactory to Lender.

As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Borrower(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each month end, Borrower(s)' accounts receivable aging and borrowing base certificate to be provided in form satisfactory to Lender when there is a principal balance.

As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Guarantor(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each calendar year, Guarantor(s)' personal financial statement to be provided in form satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Andrew J. Chapin | Unlimited |
| Thomas L. Goode III | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender within one hundred twenty (120) days after the end of each fiscal year, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property

owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Primary Depository.** Maintain Lender as its primary depository and cash management services financial institution for Borrower.

**Expenses.** Pay: (1) all reasonable out-of-pocket expenses incurred by Lender (including the reasonable fees, charges and disbursements of counsel), in connection with the documentation or administration of the credit facilities provided for herein, and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (2) all out-of-pocket expenses incurred by Lender (including the fees, charges and disbursements of any counsel for Lender) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Related Documents. The provisions of this section of the Agreement shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Indemnification.** Indemnify and defend Lender  and each director, officer, employee, agent and advisor of Lender (Lender and each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all claims, losses, liabilities, damages, penalties and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify, defend and hold harmless each Indemnitee from all fees and all time charges and disbursements for attorneys, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Borrower or any Guarantor arising out of, in connection with, or as a result of: (1) the execution or delivery of this Agreement, any other Related Document or any document contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (2) any Advance or the use or proposed use of the proceeds therefrom; or (3) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any Guarantor, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such claims, losses, liabilities damages, penalties and expenses have been determined by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A)  increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B)  reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C)  reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1)  Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases,  (2)  sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or  (3)  sell with recourse any of Borrower's accounts, except to Lender.

**Loans, Acquisitions and Guaranties.** (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2)  purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or

revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Change in Ownership.** Any change of twenty-five percent (25%) or more in the legal or beneficial ownership of Borrower without Lender's prior written consent.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**REST PERIOD.** Borrower must maintain a principal balance of $0.00 for thirty (30) consecutive days during the term of the Note.

**MINIMUM FIXED CHARGE COVERAGE RATIO.** Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 1.50 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash, plus (C) the aggregate dividends, distributions, redemptions or repurchases on or with respect to Borrower's equity in each case paid in cash, plus (D) the aggregate increase in any loans and/or advances made by Borrower to any of Borrower's equity holders or affiliates divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

**CONTINUITY OF OPERATIONS.** Borrower agrees that it shall not (A) engage in any business activities substantially different than those in which Borrower is presently engaged or (B) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the

terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of (1) **$1,000,000.00** or (2) **80.000%** of the aggregate amount of Eligible Accounts.

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Missouri.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word "Collateral" also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

(2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

(3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4) Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

(5) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(6) Accounts which are subject to dispute, counterclaim, or setoff.

(7) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(8) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(9) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(10) Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

(11) Accounts which have not been paid in full within **90 days** from the invoice date.

(12) That portion of the Accounts of any single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts.

(13) All Accounts of an Account Debtor for which more than 25% of its total Accounts have not been paid in full within 90 days from the invoice date.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and

interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated July 16, 2019 and executed by Benja Incorporated in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

WAIVE JURY. All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED JULY 16, 2019.

BORROWER:

BENJA INCORPORATED

By: _____
     Andrew J. Chapin, President/Secretary of Benja
     Incorporated

LENDER:

BUSEY BANK, AN ILLINOIS BANKING CORPORATION

By: _____
     Authorized Signer

# MODIFICATION OF BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal $3,000,000.00 | Loan Date 02-28-2020 | Maturity 02-27-2021 | Loan No 6706744910865 | Call / Coll 130 | Account | Officer *** | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

ORIGINAL

Principal Amount: 3,000,000.00                                    Date of Agreement: February 28, 2020

**DESCRIPTION OF EXISTING BUSINESS LOAN AGREEMENT (ASSET BASED).** Business Loan Agreement (Asset Based) dated July 16, 2019 between Borrower and Lender (the "Loan Agreement").

**DESCRIPTION OF CHANGE IN TERMS.**

1. **The Minimum Fixed Charge Coverage Ratio (Before Distributions).** covenant is hereby amended as follows:

**Minimum Fixed Charge Coverage Ratio (Before Distributions).** Beginning December 31, 2020, Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 2.00 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

2. **The Minimum EBITDA.** covenant is hereby added as follows:

**Minimum EBITDA.** Beginning December 31, 2020, Borrower shall not permit consolidated EBITDA for the 12-month period ending on such day to be less than $2 million. "Consolidated EBITDA" means, for any 12-month period, the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization.

**CONTINUING VALIDITY.** Except as expressly changed by this Modification, the terms of the Loan Agreement remain unchanged and in full force and effect and all terms, conditions and provisions thereof are hereby affirmed except as specifically modified herein. Consent by Lender to this Modification does not waive Lender's right to strict performance of the Loan Agreement as changed above, nor obligate Lender to make any future modifications. Nothing in this Modification will constitute a satisfaction of the obligations arising under the Loan Agreement or the Related Documents (as defined in the Loan Agreement). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligations under the Loan Agreement and the Related Documents, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Modification. If any person who signed the original obligation does not sign this Modification below, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Modification or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

BORROWER:

BENJA INCORPORATED

By: _____
Andrew J. Chapin, President/Secretary of Benja
Incorporated

LENDER:

BUSEY BANK, AN ILLINOIS BANKING CORPORATION

X _____
Authorized Signer

LaserPro, Ver. 19.4.0.030  Copr. Finastra USA Corporation 1997, 2020.  All Rights Reserved.  - MO  C:\CFIWIN\CFI\LPL\G60.FC  TR-95379  PR-771



ORIGINAL

*6706744910865%#########%0070%08202020*

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,000,000.00 | 08-20-2020 | 02-27-2021 | 6706744910865 | 130 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CLAYTON
175 CARONDELET PLAZA
CLAYTON, MO 63105

**THIS BUSINESS LOAN AGREEMENT (ASSET BASED) dated August 20, 2020, is made and executed between Benja Incorporated ("Borrower") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of August 20, 2020, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President/Secretary of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.**

**LINE OF CREDIT.** Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.** Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.** Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.** If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.** Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.** To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without

Case: 20-30830 Doc# 20 Filed: 10/26/20 Entered: 10/26/20 16:56:58 Page 31 of 259

limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at Borrower's address as identified in this Agreement. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered 30 days after each month end.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 845 Market Street 450A, San Francisco, CA 94103. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and

Case: 20-00030   Doc# 20   Filed: 00/26/20   Entered: 00/26/20 16:00:00   Page 32 of
259

00032

ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Compliance with Laws.** Borrower has complied in all material respects with all laws, orders, regulations, fees, decrees and ordinances affecting to any extent or in any manner it or any aspect of its business. There are no existing or, to Borrower's knowledge, proposed laws, orders, regulations, rules, decrees or ordinances of such a nature as could be expected to materially adversely affect the continued conduct of its business in the manner presently being carried on and conducted.

**Permits.** Borrower possesses all material permits, licenses, registrations, consents, certificates, authorizations, orders and approvals required under applicable law in connection with the ownership and operation of its business. All such permits have been legally and validly obtained and are in full force and effect, no suspension or cancellation of such permit is pending or has been threatened, and there is no fact, event or condition which would cause any such permit not to be renewed upon expiration, except where failure to maintain any such permit could not reasonably be expected to have a material adverse effect on Borrower's financial condition.

**Accuracy of Information.** No information provided to Lender by or on behalf of Borrower or any Guarantor contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading. There is no material fact known to Borrower or any Guarantor which has not been disclosed in writing to Lender, which has or, insofar as a Borrower or any Guarantor can reasonably foresee, is likely to have a material adverse effect on the financial condition of Borrower or any Guarantor. No representation or warranty made by Borrower or any Guarantor set forth herein or in any Related Document, or in any schedule hereto or thereto, or in any supplement to any schedule contains or will contain any untrue statement of a material fact, or omits to state any material fact, necessary in order to make the statement therein, in light of the circumstances in which it was made, not misleading.

**Anti-Corruption Laws and Sanctions.** Borrower, its subsidiaries and their respective officers and employees and, to the knowledge of Borrower, its directors and agents, are in compliance in all material respects with (1) all laws, rules, and regulations of any jurisdiction applicable to Borrower or its affiliates from time to time concerning or relating to bribery or corruption (collectively, "Anti-Corruption Laws") and (2) applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom (collectively, "Sanctions"). None of (1) Borrower, any subsidiary of Borrower or to the knowledge of Borrower or such subsidiary any of their respective directors, officers or employees, or (2) to the knowledge of Borrower, any agent of Borrower or any subsidiary of Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is (a) any person listed in any Sanctions-related list of designated persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any person operating, organized or resident in a country or territory which is itself the subject or target of any Sanctions or (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b). No Advance or use of proceeds of the Loan will violate any Anti-Corruption Law or applicable Sanctions.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, reviewed by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

**Additional Requirements.** As soon as available, but in no event later than one hundred and twenty (120) days after the end of each ~~calendar year~~, Borrower's Federal and State government tax returns prepared by a professional satisfactory to Lender.

Case 3-21 33050 Doc 16 Filed 02/16/21 Page 259 of 440

00033

As soon as available, but in no event later than thirty (30) days after the end of each month end, Borrower(s)' accounts receivable aging and borrowing base certificate to be provided in form satisfactory to Lender when line is in use.

As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Guarantor(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each calendar year, Guarantor(s)' personal financial statement to be provided in form satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
| --- | --- |
| Andrew J. Chapin | Unlimited |
| Thomas L. Goode III | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender within one hundred twenty (120) days after the end of each fiscal year, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental

authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Primary Depository.** Maintain Lender as its primary depository and cash management services financial institution for Borrower.

**Expenses.** Pay: (1) all reasonable out-of-pocket expenses incurred by Lender (including the reasonable fees, charges and disbursements of counsel), in connection with the documentation or administration of the credit facilities provided for herein, and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (2) all out-of-pocket expenses incurred by Lender (including the fees, charges and disbursements of any counsel for Lender) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Related Documents. The provisions of this section of the Agreement shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Indemnification.** Indemnify and defend Lender and each director, officer, employee, agent and advisor of Lender (Lender and each such person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all claims, losses, liabilities, damages, penalties and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify, defend and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Borrower or any Guarantor arising out of, in connection with, or as a result of: (1) the execution or delivery of this Agreement, any other Related Document or any document contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (2) any Advance or the use or proposed use of the proceeds therefrom; or (3) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any Guarantor, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such claims, losses, liabilities damages, penalties and expenses have been determined by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether

checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Change in Ownership.** Any change of twenty-five percent (25%) or more in the legal or beneficial ownership of Borrower without Lender's prior written consent.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**REST PERIOD.** Borrower must maintain a principal balance of $0.00 for thirty (30) consecutive days during the term of the Note.

**MINIMUM FIXED CHARGE COVERAGE RATIO.** Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 2.00 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash, plus (C) the aggregate dividends, distributions, redemptions or repurchases on or with respect to Borrower's equity in each case paid in cash, plus (D) the aggregate increase in any loans and/or advances made by Borrower to any of Borrower's equity holders or affiliates divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

**CONTINUITY OF OPERATIONS.** Borrower agrees that it shall not (A) engage in any business activities substantially different than those in which Borrower is presently engaged or (B) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business.

**MINIMUM EBITDA.** Borrower shall not permit Consolidated EBITDA for any 12-month period ending on the last day of a fiscal year to be less than $2,000,000.00. "Consolidated EBITDA" means, for any 12-month period, the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or

Case: 20-00030   Doc# 29   Filed: 00/20/20   Entered: 00/20/20 16:36:50   Page 83 of 259

00037

services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of (1) **$5,000,000.00** or (2) **80.000%** of the aggregate amount of Eligible Accounts.

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Missouri.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

(2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

(3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4) Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

(5) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(6) Accounts which are subject to dispute, counterclaim, or setoff.

(7) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(8) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(9) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(10) Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

(11) Accounts which have not been paid in full within **90 days** from the invoice date.

(12) That portion of the Accounts of any single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts.

(13) All Accounts of an Account Debtor for which more than 25% of its total Accounts have not been paid in full within 90 days from the invoice date.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or

Case: 20-00030   Doc# 20   Filed: 00/20/20   Entered: 00/20/20 16:56:50   Page 80 of
259
00038

waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated August 20, 2020 and executed by Benja Incorporated in the principal amount of $5,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**WAIVE JURY.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED AUGUST 20, 2020.**

**BORROWER:**

**BENJA INCORPORATED**

By:_____
   Andrew J. Chapin, President/Secretary of Benja
   Incorporated

**LENDER:**

**BUSEY BANK, AN ILLINOIS BANKING CORPORATION**

By:_____
   Authorized Signer

# EXHIBIT 3





*000670674160108654#######023507162019*

## COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | 7416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| Grantor: | Benja Incorporated<br>845 Market Street 450A<br>San Francisco, CA 94103 | Lender: | BUSEY BANK, AN ILLINOIS BANKING CORPORATION<br>CREVE COEUR<br>12300 OLIVE BLVD.<br>CREVE COEUR, MO 63141 |
|---|---|---|---|

### THE LIEN GRANTED PURSUANT TO THIS AGREEMENT MAY ALSO SECURE FUTURE ADVANCES

THIS COMMERCIAL SECURITY AGREEMENT dated July 16, 2019, is made and executed between Benja Incorporated ("Grantor") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender").

GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

COLLATERAL DESCRIPTION. The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments including but not limited to all promissory notes), letter of credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property; and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; (all goodwill relating to the foregoing property; all records and data and embedded software relating to the foregoing property,) and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles, and account proceeds).

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

CROSS-COLLATERALIZATION. In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

FUTURE ADVANCES. In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL. With respect to the Collateral, Grantor represents

00041

and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Missouri, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests of junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of

any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Agreement.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Missouri Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this

Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Benja Incorporated.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Note.** The word "Note" means the Note dated July 16, 2019 and executed by Benja Incorporated in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**WAIVE JURY.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JULY 16, 2019.

GRANTOR:

BENJA INCORPORATED

By: _____
Andrew J. Chapin, President/Secretary of Benja Incorporated

LaserPro, Ver. 19.2.0.042 Copr. Finastra USA Corporation 1997, 2019. All Rights Reserved. - MD C:\01\WIN\CFI\LPL\E40.FC TR-50597 PR-528

# EXHIBIT 4

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
   Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
   CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

49152 - Busey Bank

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

70865712
DEDE

File with: Secretary of State, DE

**This filing is Completed**
File Number : 20195005348
File Date   : 19-Jul-2019

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BENJA INCORPORATED | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 845 Market Street 450A | San Francisco | CA | 94103 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Busey Bank | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 12300 Olive Blvd | Creve Coeur | MO | 63141 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of debtor

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
70865712          33500          Dan Saettele

Case: 20-00030    Doc# 20    Filed: 08/20/20    Entered: 08/20/20 17:56:50    Page 93 of
241

# EXHIBIT 5

00049



150 N. Riverside Plaza, Suite 3000, Chicago, IL 60606 · (312) 819-1900

September 29, 2020

Jerry L. Switzer Jr.
(312) 873-3626
(312) 893-2005  Direct Fax
jswitzer@polsinelli.com

**<u>Via Certified Mail/Return Receipt Requested</u>**

Benja Incorporated
845 Market Street, 450A
San Francisco, CA 94103
Attn:  Joe Alouf

Andrew J. Chapin, Jr.
26 Cragmont Avenue
San Francisco, CA 94116

Thomas L. Goode, III
2901 Barton Skyway, #3002
Austin, TX 78746

>    **Re:    Outstanding Loan Owed to Busey Bank**
>    **<u>Borrower</u>:  Benja Incorporated**
>    **<u>Guarantors</u>:  Andrew J. Chapin, Jr., and Thomas L. Goode, III**

Gentlemen:

We represent Busey Bank ("<u>Lender</u>") in connection with the revolving loan referenced below (the "<u>Loan</u>") made by Lender to Benja Incorporated ("<u>Borrower</u>") and guaranteed by Andrew J. Chapin, Jr. ("<u>Chapin</u>") and Thomas L. Goode, III ("<u>Goode</u>" and, together with Chapin, "<u>Guarantors</u>") (Borrower and Guarantors shall be collectively referred to herein as "<u>Borrower Parties</u>").

Reference is made to the following notes, loan agreements, guarantees, security agreements, pledge agreements, mortgages, assignments of rents, and other agreements, instruments and documents by and between Lender and Borrower Parties, among others, evidencing, securing or otherwise relating to the Loan (collectively, the "<u>Loan Documents</u>"):

- a Business Loan Agreement (Asset Based) dated as of July 16, 2019, executed by Borrower in favor of Lender in the original principal amount of $1,000,000.00, as amended by a Modification to Business Loan Agreement (Asset Based) dated as of February 28, 2020, executed by Borrower in favor of Lender in the original principal amount of $3,000,000.00, as

polsinelli.com

Atlanta   Boston   Chicago   Dallas   Denver   Houston   Kansas City   Los Angeles   Miami   Nashville   New York
Phoenix   St. Louis   San Francisco   Seattle   Silicon Valley   Washington, D.C.   Wilmington

Polsinelli PC, Polsinelli LLP in California
74927984.1

Case 20-08020   Doc# 20   Filed 07/28/20   Entered 07/28/20 17:36:50   Page 96 of 259

00050



Benja Incorporated
September 29, 2020
Page 2

replaced and superseded by a Business Loan Agreement (Asset Based) dated as of August 20, 2020, executed by Borrower in favor of Lender in the original principal amount of $5,000,000.00 (collectively, the "<u>BLA</u>");

- a Promissory Note dated as of July 16, 2019, executed by Borrower in favor of Lender in the original principal amount of $1,000,000.00, as replaced and superseded by a Promissory Note dated as of February 28, 2020, executed by Borrower in favor of Lender in the original principal amount of $3,000,000.00, as replaced and superseded by a Promissory Note dated as of August 20, 2020, executed by Borrower in favor of Lender in the original principal amount of $5,000,000.00 (collectively, the "<u>Note</u>");

- a Commercial Security Agreement dated as of July 16, 2019, executed by Borrower in favor of Lender (the "<u>Security Agreement</u>"), pursuant to which Borrower granted a first lien and security interest in favor of Lender against all of Borrower's assets and property to secure the Loan;

- a Commercial Guaranty dated July 16, 2019, executed by Chapin in favor of Lender which secures the Loan; and

- a Commercial Guaranty dated July 16, 2019, executed by Goode in favor of Lender which secures the Loan.

The BLA provides in relevant part that:

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

> **Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

(*See* BLA, at p. 5.)  The Security Agreement includes similar provisions in the "Grantor's Representations and Warranties With Respect to the Collateral" section under the headings "Transactions Involving Collateral" and "Title".  (*See* Security Agreement, at pp. 1-2.)  Please be advised that Borrower has violated the foregoing provisions of the BLA and Security Agreement.  In particular, Borrower has incurred borrowed money debt from First Corporate Solutions and E-Revshare Core, LLC, and in connection therewith granted security interests in favor of these lenders in assets of Borrower.  Lender understands that these unauthorized secured loans remain outstanding.  Additionally, Borrower obtained other unauthorized secured loans from C&S Associates, Inc., Gibraltar Business Capital, LLC, and UMB Bank, N.A., which

74927984.1
00051



Benja Incorporated
September 29, 2020
Page 3

Lender understands have since been repaid and the related UCC financing statements terminated. Finally, the U.S. Small Business Administration filed a financing statement against Borrower on or about May 29, 2020, which remains pending.

Additionally, the BLA provides in relevant part that:

**Taxes, Charges and Liens.** [Borrower shall] pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or it properties, income, or profits, prior to the date on which penalties would attach…

(*See* BLA, at p. 4.) The Security Agreement includes a similar provision in the "Grantor's Representations and Warranties With Respect to the Collateral" section under the heading "Taxes, Assessments and Liens". (*See* Security Agreement, at p. 2.) Please be advised that Borrower has violated the foregoing provisions of the BLA and Security Agreement. In particular, Borrower has allowed certain state tax liens in favor of the California Employment Development Department to be recorded against Borrower and its assets on or about January 14, 2020, and March 9, 2020, and a judgment in favor of a Peter A. Manderino to be recorded against Borrower and its assets on or about October 30, 2018, which remain outstanding.

Further, the BLA provides in relevant part that:

**Guaranties.** Prior to disbursement of any Loan proceeds, [Borrower shall] furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Andrew J. Chapin | Unlimited |
| Thomas L. Goode III | Unlimited |

(*See* BLA, at p. 4.) Please be advised that Goode contends that he did not execute and/or is not bound by his Commercial Guaranty referenced above. Although Lender disputes Goode's contention, if it is ultimately determined that Goode did not execute and/or is not bound by his Commercial Guaranty, Borrower has violated the aforementioned provision of the BLA.

Finally, the BLA further provides in relevant part that:

**Primary Depository.** [Borrower shall] [m]aintain Lender as its primary depository and cash management services institution for Borrower.

74927984.1

00052



(*See* BLA, at p. 5.)  Please be advised that Borrower has violated the foregoing provision of the BLA because it is currently maintaining its operating and other accounts at JPMorgan Chase Bank, not with Lender.

Please be advised that Borrower's violations of the aforementioned provisions of the BLA, Security Agreement and other Loan Documents constitute Events of Default under the BLA, Security Agreement, Note and other Loan Documents.  Lender reserves the right to exercise any and all rights and remedies available to it under the BLA, Security Agreement, Note and other Loan Documents or at law or in equity, without further notice or demand.  Nothing herein shall constitute a waiver or a commitment to waive by Lender of its rights and remedies due to such Events of Default or any other existing or future Defaults or Events of Default or an agreement by Lender to forbear from exercising any of its rights or remedies arising out of the Events of Default or any other existing or future Defaults or Events of Default.

Any past or future negotiations between Borrower Parties or their representatives or agents on the one hand, and Lender and its representatives or agents on the other, do not and shall not constitute a waiver of Lender's right to exercise its rights and remedies under the Loan Documents or at law or in equity.  Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Lender.  Borrower Parties and any other obligor for the indebtedness owed under the Loan Documents are not entitled to rely upon any oral statements made or purported to be made by or on behalf of Lender or its agents in connection with any alleged agreement by or on behalf of Lender to refrain from exercising any of Lender's rights under the Loan Documents or otherwise at law or in equity.

Nothing set forth in this letter, no delay on the part of Lender in enforcing its rights with respect to any default, and no discussions between Lender and Borrower Parties regarding the matters addressed in this letter, the Loan Documents, or any other subject matter, are intended (and none shall be deemed) to modify, limit, release, reduce, or waive any of Lender's rights, remedies, or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved.  Furthermore, the enumeration of any specific default herein is not intended and shall not be deemed to waive other defaults that may currently exist under the Loan Documents.

Sincerely,

/s/ Jerry L. Switzer, Jr.
Jerry L. Switzer Jr.


cc:    Steve Henderson (via email)
       Larry Johnson (via email)
       Michael McElhone (via email)
       Mike Peluso (via email)



Benja Incorporated
September 29, 2020
Page 5

        John Powers (via email)
        Scott H. Olson, Esq. (via email)
        Johnny K. Merritt, Esq. (via email)

# EXHIBIT 6

00055

**From:** Andrew Chapin <andrew@benja.co>
**Date:** October 1, 2020 at 11:54:55 AM CDT
**To:** "Ricke, Patrick" <Patrick.Ricke@busey.com>
**Cc:** Joe Alouf <alouf@benja.co>, Pano Anthos <pano@xrclabs.com>
**Subject: State of Benja**

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Patrick,

As you are likely aware, there were a few management changes at Benja the last few days.

A long story made short — I am writing to inform you the move made early in the week (appointing Pano Anthos to the Board of Directors and Joe Alouf as Interim President) has been undone by vote of the majority of shareholders. I have returned to each of those roles effective yesterday.

Mr. Anthos and Mr. Alouf are no longer authorized to speak on behalf of Benja as it relates to this matter.

I would like to discuss the state of affairs between Benja and Busey. I come bearing a plan for resolution - and the sooner we can connect, the sooner we can put this in motion.

I'm available at (203) 695 4167 or (415) 326 4167. Give me a call, would be good to touch base briefly before a call with the full group.

Best,

**Andrew J. Chapin**
Co-Founder
Benja Incorporated

The information contained in this e-mail is privileged and confidential. Unless otherwise indicated or obvious from the message, this is intended only for the individual(s) listed above. Please see our Privacy Notices at http://www.busey.com.

# EXHIBIT 7



100 W University Ave
Champaign IL 61820

```
     7283947                      Date 4/30/2020        Page      1
     BENJA INC                    Primary Account               4766
     845 MARKET ST 450A
     SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS                      Number of Enclosures                 0
Account Number               4766      Statement Dates      4/01/20 thru 4/30/20
Previous Balance       353,222.03      Days in the statement period        30
      19 Deposits/Credits  1,944,608.17  Average Ledger             862,369.30
       4 Checks/Debits       926,313.63  Average Collected          862,369.30
Service Charge                  .00
Interest Paid                   .00
Ending Balance       1,371,516.57
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 4/1 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 1,990.00 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 3,734.22 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 15,630.00 |
| 4/1 | UNDER ARMOUR INC ACH/CRED 200401 OFA58223889962 | TRANSFER | 39,442.01 |
| 4/1 | ZAPPOS.COM, INC. ACH/CRED 200401 OFA51566133585 | TRANSFER | 49,100.65 |
| 4/1 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200401 OFA99403294665 | TRANSFER | 102,184.75 |

Case: 20-30863   Doc# 290   Filed: 07/25/22   Entered: 07/25/22 16:54:50   Page 104 of
241

00058



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 4/1 | COLUMBIA SPORTSWEAR<br>CO ACH/CRED 200401<br>OFA82401998473 | TRANSFER | 166,474.00 |
| 4/1 | NEW BALANCE<br>ATHLETICS, INC<br>ACH/CRED 200401<br>OFA83394855793 | TRANSFER | 322,445.49 |
| 4/1 | BACKCOUNTRY.COM,<br>LLC. ACH/CRED<br>200401<br>OFA87411909044 | TRANSFER | 357,309.60 |
| 4/2 | FANATICS INC.<br>ACH/CRED  200402<br>OFA78016096012 | TRANSFER | 479,383.68 |
| 4/30 | STRIPE TRANSFER X | TRANSFER | 1,990.00 |
| 4/30 | STRIPE TRANSFER X | TRANSFER | 1,998.75 |
| 4/30 | STRIPE TRANSFER X | TRANSFER | 3,425.50 |
| 4/30 | HELLY HANSEN<br>LEISURE INC.<br>ACH/CRED 200430<br>OFA69938477483 | TRANSFER | 16,780.00 |
| 4/30 | UNDER ARMOUR INC<br>ACH/CRED 200430<br>OFA33412878394 | TRANSFER | 46,862.86 |
| 4/30 | ZAPPOS.COM, INC.<br>ACH/CRED 20430<br>OFA34851134728 | TRANSFER | 53,091.76 |
| 4/30 | PATAGONIA<br>INTERNATIONAL, INC.<br>ACH/CRED 200430<br>OFA92715807823 | TRANSFER | 101,176.50 |
| 4/30 | COLUMBIA SPORTSWEAR<br>CO ACH/CRED 200430<br>OFA86925798887 | TRANSFER | 180,338.40 |



100 W University Ave
Champaign IL 61820

Date  4/30/2020        Page        3
Primary Account          4766

BUSINESS ANALYSIS                    4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---------|--------|
| 4/1 | BILL PAY FLIPBOARD BENJA CK ON 200401 | PAYMENT | 158,424.00- |
| 4/30 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR 0FA04166994160 | PAYMENT | 76,715.43- |
| 4/30 | BILL PAY FLIPBOARD BENJA CK ON 200430 | PAYMENT | 152,904.00- |
| 4/30 | BILL PAY PINTEREST INC BENJA CK ON 200430 | PAYMENT | 538,270.30- |



100 W University Ave
Champaign IL 61820

```
   7990492                      Date 5/31/2020        Page      1
BENJA INC                       Primary Account            4766
845 MARKET ST 450A
SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS                    Number of Enclosures                0
Account Number               4766    Statement Dates      5/01/20 thru 5/31/20
Previous Balance       1,371,516.57  Days in the statement period       31
         9 Deposits/Credits 1,659,965.67  Average Ledger            799,351.39
         9 Checks/Debits    2,804,296.04  Average Collected         799,351.39
Service Charge                  .00
Interest Paid                   .00
Ending Balance           227,186.20
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 5/1 | STRIPE TRANSFER X | TRANSFER | 2,317.50 |
| 5/1 | STRIPE TRANSFER X | TRANSFER | 3,984.12 |
| 5/1 | WOLVERINE WORLD WIDE C ACH/CRED 200501 OFA18474943192 | TRANSFER | 16,248.00 |
| 5/1 | STRIPE TRANSFER X | TRANSFER | 76,455.00 |
| 5/1 | NEW BALANCE ATHLETICS, INC ACH/CRED 200501 OFA47918205132 | TRANSFER | 324,408.11 |
| 5/1 | BACKCOUNTRY.COM, LLC. ACH/CRED 200501 OFA20349940646 | TRANSFER | 357,309.60 |

Case: 21-03069   Doc# 290   Filed: 07/25/22   Entered: 07/25/22 16:54:58   Page 107 of
241

00061



100 W University Ave
Champaign IL 61820

```
                                    Date  5/31/2020        Page      2
                                    Primary Account                4766
```

BUSINESS ANALYSIS                    4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|-------------|------------|
| 5/1 | NIKE INC. ACH/CRED | | |
| | 200501 | TRANSFER | 374,652.53 |
| | OFA95740208255 | | |
| 5/1 | FANATICS INC. | | |
| | ACH/CRED  200501 | TRANSFER | 483,094.95 |
| | OFA31706715418 | | |
| 5/2 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |



100 W University Ave
Champaign IL 61820

Date  5/31/2020        Page      3
Primary Account          4766


BUSINESS ANALYSIS                    4766 (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 5/1 | GUSTO Benja Incorporated n60lttz0rr8       PAYMENT | 124,332.29- |
| 5/1 | Online Domestic Wire Transfer Via:MUFG UNION BANK/122000496 A/C: JOMBOY MEDIA INC.       PAYMENT | 160,000.00- |
| 5/1 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803..       PAYMENT | 263,271.44- |
| 5/1 | BILL PAY SPORTSILLU xxxBENJA ON       PAYMENT | 576,807.00- |
| 5/31 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR OFA42515646530       PAYMENT | 79,198.13- |
| 5/31 | BILL PAY FLIPBOARD BENJA CK ON 200531       PAYMENT | 164,447.70- |
| 5/31 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803..       PAYMENT | 274,654.84- |
| 5/31 | BILL PAY PINTEREST INC BENJA CK ON 200531 OFA68401088588       PAYMENT | 583,664.64- |
| 5/31 | BILL PAY SPORTSILLU xxxBENJA ON       PAYMENT | 613,961.25- |

Case: 21-03083  Doc# 29  Filed: 07/15/22  Entered: 07/15/22 16:54:58  Page 109 of
241
00063



100 W University Ave
Champaign IL 61820

        8020564                          Date 6/30/2020          Page     1
        BENJA INC                        Primary Account                  4766
        845 MARKET ST 450A
        SAN FRANCISCO CA 94103

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates | 6/01/20 thru 6/30/20 |
| Previous Balance | 227,186.20 | Days in the statement period | 30 |
| 43 Deposits/Credits | 6,324,533.45 | Average Ledger | 1,483,076.64 |
| 8 Checks/Debits | 1,747,711.92 | Average Collected | 1,483,076.64 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 4,804,007.73 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 6/1 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,011.91 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,019.80 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,463.75 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 3,484.49 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 4,019.82 |
| 6/1 | HELLY HANSEN LEISURE INC. ACH/CRED 200601 OFA89924079043 | TRANSFER | 17,083.40 |
| 6/1 | WOLVERINE WORLD WIDE C ACH/CRED 200601 OFA49389309622 | TRANSFER | 17,400.00 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 20,582.88 |



100 W University Ave
Champaign IL 61820

Date  6/30/2020        Page      2
Primary Account          4766

BUSINESS ANALYSIS                    4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 6/1 | UNDER ARMOUR INC ACH/CRED 200601 OFA60545457583 | TRANSFER | 53,676.20 |
| 6/1 | ZAPPOS.COM, INC. ACH/CRED 200601 OFA61339634857 | TRANSFER | 53,837.69 |
| 6/1 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200601 OFA584739079394 | TRANSFER | 96,218.50 |
| 6/1 | COLUMBIA SPORTSWEAR CO ACH/CRED 200601 OFA54480887555 | TRANSFER | 212,473.85 |
| 6/1 | NEW BALANCE ATHLETICS, INC ACH/CRED 200601 OFA20683754258 | TRANSFER | 324,805.50 |
| 6/1 | BACKCOUNTRY.COM, LLC. ACH/CRED 200601 OFA60406856944 | TRANSFER | 358,864.45 |
| 6/1 | NIKE INC. ACH/CRED 200601 OFA54571761717 | TRANSFER | 380,281.86 |
| 6/1 | FANATICS INC. ACH/CRED  200601 OFA77381734722 | TRANSFER | 462,183.93 |
| 6/5 | WIRE TRANSFER ... | TRANSFER | 1,000,000.00 |
| 6/9 | ADVANCE TO ***4766 ADVANCE FROM ***0865 | TRANSFER | 1,100,000.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,140.03 |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|-------------------------|---|--------|
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,194.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,514.94 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 3,660.44 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 4,199.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 5,055.12 |
| 6/30 | COLUMBIA SPORTSWEAR CO ACH/CRED 200630 OFA29775116753 | TRANSFER | 13,967.72 |
| 6/30 | HELLY HANSEN LEISURE INC. ACH/CRED 200630 OFA23541722980 | TRANSFER | 17,255.90 |
| 6/30 | WOLVERINE WORLD WIDE C ACH/CRED 200630 OFA39202182771 | TRANSFER | 17,927.22 |
| 6/30 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200630 OFA60924447472 | TRANSFER | 18,768.25 |
| 6/30 | NEW BALANCE ATHLETICS, INC ACH/CRED 200630 OFA9647096787 | TRANSFER | 21,069.78 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 21,540.84 |
| 6/30 | NIKE INC. ACH/CRED 200630 OFA59642156022 | TRANSFER | 24,636.71 |
| 6/30 | BACKCOUNTRY.COM, LLC. ACH/CRED 200630 OFA49415436471 | TRANSFER | 24,847.80 |
| 6/30 | ZAPPOS.COM, INC. ACH/CRED 200630 OFA62443625650 | TRANSFER | 54,729.73 |
| 6/30 | UNDER ARMOUR INC ACH/CRED 200401 OFA58223889962 | TRANSFER | 55,206.36 |
| 6/30 | CHECK DEP | TRANSFER | 89,118.00 |



100 W University Ave
Champaign IL 61820

Date  6/30/2020         Page      4
Primary Account              4766

BUSINESS ANALYSIS                4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 6/30 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200630 OFA96259626036 | TRANSFER | 102,018.25 |
| 6/30 | COLUMBIA SPORTSWEAR CO ACH/CRED 200630 OFA94483634455 | TRANSFER | 208,453.60 |
| 6/30 | NEW BALANCE ATHLETICS, INC ACH/CRED 200630 OFA61261172972 | TRANSFER | 316,963.13 |
| 6/30 | NIKE INC. ACH/CRED 200630 OFA20383116002 | TRANSFER | 368,265.59 |
| 6/30 | BACKCOUNTRY.COM, LLC. ACH/CRED 200630 OFA42685451429 | TRANSFER | 371,854.80 |
| 6/30 | FANATICS INC. ACH/CRED  200630 OFA36495538206 | TRANSFER | 464,238.21 |



100 W University Ave
Champaign IL 61820

Date 6/30/2020      Page      5
Primary Account          4766

BUSINESS ANALYSIS                    4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---------|--------|
| 6/1 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR OFA81030497279 | PAYMENT | 98,364.57- |
| 6/1 | GUSTO Benja Incorporated n60lttz0rr8 | PAYMENT | 124,332.29- |
| 6/1 | CK #5009 | PAYMENT | 140,000.00- |
| 6/1 | BILL PAY PINTEREST INC BENJA CK ON 200102 OFA68401088588 | PAYMENT | 146,520.33- |
| 6/1 | Online Domestic Wire Transfer Via:MUFG UNION BANK/122000496 A/C: JOMBOY MEDIA INC. | PAYMENT | 170,000.00- |
| 6/1 | BILL PAY SPORTSILLU xxxBENJA ON | PAYMENT | 598,647.00- |
| 6/30 | BILL PAY FLIPBOARD BENJA CK ON 200630 | PAYMENT | 189,710.81- |
| 6/30 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803.. | PAYMENT | 280,136.92- |



100 W University Ave
Champaign IL 61820

8069609                          Date 7/31/2020         Page      1
BENJA INC                        Primary Account             4766
845 MARKET ST 450A
SAN FRANCISCO CA 94103

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates | 7/01/20 thru 7/31/20 |
| Previous Balance | 4,804,007.73 | Days in the statement period | 31 |
| 1 Deposits/Credits | 88,794.00 | Average Ledger | 3,494,585.87 |
| 12 Checks/Debits | 2,579,507.25 | Average Collected | 3,494,585.87 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 2,313,294.48 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 7/1 | COVERAGEGEAR ACH/CRED 200701 | TRANSFER | 88,794.00 |



100 W University Ave
Champaign IL 61820

Date 7/31/2020        Page      2
Primary Account              4766

BUSINESS ANALYSIS                    4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---------|--------|
| 7/1 | GUSTO Benja Incorporated | PAYMENT | 146,520.33- |
| 7/1 | PINTEREST INC BENJA CK ON PAYMENT OFA | PAYMENT | 585,795.60- |
| 7/2 | Amazon Az EDI PYMNTS BENJA INCOR PAYMENT OFA | PAYMENT | 95,509.47- |
| 7/2 | TIK TOK INC. TRANSFER OFA | PAYMENT | 138,000.00- |
| 7/2 | PINTEREST INC BENJA CK ON PAYMENT OFA | PAYMENT | 609,133.20- |
| 7/3 | NEXT DOOR BENJA CK ON PAYMENT | PAYMENT | 86,250.00- |
| 7/3 | Online Domestic Wire Transfer Via:MUFG UNION BANK A/C: JOMBOY MEDIA INC. | PAYMENT | 260,000.00- |
| 7/3 | CK PAYMENT | PAYMENT | 283,772.84- |
| 7/10 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,Benja June 2020 | PAYMENT | 3,597.44- |
| 7/14 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,20200714MMQFMP UN000137 | PAYMENT | 33,917.56- |
| 7/31 | SPOTIFY INT xxxBENJA ON PAYMENT | PAYMENT | 133,500.00- |
| 7/31 | FLIPBOARD CK ON PAYMENT | PAYMENT | 203,510.81- |



100 W University Ave
Champaign IL 61820

8102849                          Date 8/31/2020        Page      1
BENJA INC                        Primary Account                 4766
845 MARKET ST 450A
SAN FRANCISCO CA 94103

## CHECKING ACCOUNT SUMMARY & DETAIL

| | | | | |
|---|---|---|---|---|
| BUSINESS ANALYSIS | | Number of Enclosures | | 0 |
| Account Number | 4766 | Statement Dates | 8/01/20 thru 8/31/20 | |
| Previous Balance | 2,313,294.48 | Days in the statement period | | 31 |
| 23 Deposits/Credits | 2,275,275.28 | Average Ledger | | 2,400,566.19 |
| 13 Checks/Debits | 3,316,524.84 | Average Collected | | 2,400,566.19 |
| Service Charge | .00 | | | |
| Interest Paid | .00 | | | |
| Ending Balance | 1,272,044.92 | | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 8/3 | STRIPE TRANSFER X | TRANSFER | 1,500.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 1,950.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 2,080.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 2,250.00 |
| 8/3 | NIKE INC. ACH/CRED TRANSFER OFA | TRANSFER | 2,397.50 |
| 8/3 | NEW BALANCE ATHLETICS, INC. ACH/CRED | TRANSFER | 2,441.11 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 4,080.00 |
| 8/3 | PATAGONIA TRANSFER INTERNATIONAL INC. ACH/CRED OFA | TRANSFER | 4,625.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 5,137.37 |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
| 8/3 | SPORTSILLU xxxBENJA ON PAYMENT | TRANSFER | 5,542.08 |
| 8/3 | BACKCOUNTRY.COM LLC. ACH/CRED TRANSFER OFA | TRANSFER | 5,802.21 |
| 8/3 | HELLY HANSEN LEISURE INC. ACH/CRED TRANSFER OFA | TRANSFER | 16,090.00 |
| 8/3 | WOLVERWINE WORLD WIDE C ACH/CRED TRANSFER OFA | TRANSFER | 16,854.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 22,144.68 |
| 8/3 | FANATICS INC. ACH/CRED TRANSFER OFA | TRANSFER | 31,962.47 |
| 8/3 | COVERAGEGEAR ACH/CRED 200803 | TRANSFER | 89,946.00 |
| 8/3 | COLUMBIA SPORTSWEAR CO ACH/CRED | TRANSFER | 259,931.74 |
| 8/3 | NEW BALANCE ATHLETICS, INC. ACH/CRED | TRANSFER | 393,552.67 |
| 8/3 | NIKE INC. ACH/CRED TRANSFER OFA | TRANSFER | 451,048.68 |
| 8/3 | FANATICS INC. ACH/CRED TRANSFER OFA | TRANSFER | 457,464.90 |
| 8/3 | BACKCOUNTRY.COM LLC. ACH/CRED TRANSFER OFA | TRANSFER | 460,688.09 |
| 8/10 | Wire Transfer Credit WF EXC RTN TO SNDR 721 WIP MAC P6101-081 1300 SW 5TH AVE 8TH FL PORTLAND OR 97201- 566720200810I1B7031 R011337 | TRANSFER | 37,386.78 |



100 W University Ave
Champaign IL 61820

Date 8/31/2020          Page      3
Primary Account              4766


BUSINESS ANALYSIS                    4766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|----------|--------|
| 8/21 | Memo Credit PAYPAL TRANSFER ACH Entry | TRANSFER | 400.00 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|----------|--------|
| 8/3  | SPORTSILLU xxxBENJA ON PAYMENT | PAYMENT | 603,750.00- |
| 8/10 | Wire Transfer Debit E-Revshare Core LLC 121000248 026012881 WELLS FARGO BANK,20200810MMQFMP UN000097 | PAYMENT | 37,386.78- |
| 8/12 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,20200812MMQFMP UN000149 | PAYMENT | 37,386.78- |
| 8/31 | Amazon Az EDI PYMNTS BENJA INCOR PAYMENT OFA | PAYMENT | 96,758.43- |
| 8/31 | GUSTO Benja Incorporated | PAYMENT | 146,520.33- |
| 8/31 | NEXT DOOR BENJA CK ON PAYMENT OFA | PAYMENT | 149,533.00- |
| 8/31 | TIK TOK INC. TRANSFER OFA | PAYMENT | 164,000.00- |
| 8/31 | FLIPBOARD CK ON PAYMENT OFA | PAYMENT | 203,510.81- |
| 8/31 | CONDE xxxBENJA | PAYMENT | 208,484.54- |
| 8/31 | Online Domestic Wire Transfer Via:MUFG UNION BANK A/C: JOMBOY MEDIA INC. | PAYMENT | 260,000.00- |
| 8/31 | CK PAYMENT | PAYMENT | 283,772.84- |



100 W University Ave
Champaign IL 61820

Date  8/31/2020        Page      4
Primary Account              4766

BUSINESS ANALYSIS                4766 (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---------|--------|
| 8/31 | PINTEREST INC BENJA CK ON PAYMENT OFA | PAYMENT | 549,937.48- |
| 8/31 | SPOTIFY INT xxxBENJA ON PAYMENT | PAYMENT | 575,937.48- |

# EXHIBIT 8

00075



100 W University Ave
Champaign IL 61820

15810992
BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  8/31/20          Page      1
Primary Account               4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 2 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates  8/03/20 thru  8/31/20 | |
| Previous Balance | 27,538.59- | Days in the statement period | 29 |
| 38 Deposits/Credits | 2,289,795.77 | Average Ledger | 8,477.06 |
| 35 Checks/Debits | 2,260,282.38 | Average Collected | 8,477.06 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 1,974.80 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $910.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 8/03 | CGUSABENJA          TRANSFER<br>ANDREW CHAPIN<br>ST-M2D0B0E2U5B4 | 77.21 |
| 8/04 | Reverse OD Item Charge | 35.00 |
| 8/04 | CGUSABENJA          TRANSFER<br>ANDREW CHAPIN<br>ST-C2I2I7X5Q0F3 | 273.50 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200805B1QGC08C003144<br>20200805MMQFMPUN000082<br>08050914FT03 | 25,000.00 |
| 8/05 | CGUSABENJA          TRANSFER<br>ANDREW CHAPIN<br>ST-Q7Z8U4B8W7E5 | 127.47 |
| 8/06 | Reverse OD Item Charge | 35.00 |
| 8/06 | Reverse OD Item Charge | 35.00 |
| 8/06 | Wire Transfer Credit | 20,000.00 |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____
                                                                      (Account Number)

New Address: _____
                (Street Address)                                     (Unit #)

_____
(City)                        (State)                     (Zip Code)

_____
(Telephone Number)                                   (Social Security Number)

Member FDIC

_____
(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | |
|---|---|---|---|---|
| Check No. | $ | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |

ENDING BALANCE
Shown On This Statement $ _____

ADD (+)
Deposits, Loan Advances, Credit Memos, And $ _____
Other Automatic Deposits Not Shown On This $ _____
Statement $ _____

SUBTRACT (-) $ _____
Total of Checks Outstanding, Automatic Loan $ _____
Payments, Automatic Savings Transfers, Service $ _____
Charges, Debit Memos And Other Automatic $ _____
Deductions Not Shown On This Statement $ _____

BALANCE $ _____

Current Checkbook Balance $ _____

ADD (+)
Interest Earned From This Statement $ _____

SUBTRACT (-)
Misc. Charges From This Statement $ _____

NEW CHECKBOOK BALANCE
Should Agree With BALANCE Line $ _____

| Check No. | $ |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | $ |

### IMPORTANT INFORMATION

**In Case of General Statement Errors**

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

**In Case of Errors or Questions About Your Electronic Transactions**

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
   (1)  Tell us your name and account number.
   (2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
   (3)  Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

**In Case of Errors or Questions About Your Line of Credit or Home Equity Loan**

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
   (1)  Your name and account number.
   (2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
   (3)  The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

**Balance Subject to Interest Rate for Line of Credit**

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

**Telephone Number and Address to Be Notified in the Event of Errors**

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

00077

I446-STMT



BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200806B1QGC03C005761 | |
|      | 20200806MMQFMPUN000133 | |
|      | 08061035FTO3 | |
| 8/06 | CCUSABENJA      TRANSFER | 70.22 |
|      | ANDREW CHAPIN | |
|      | ST-Y3N2O6U8G3E5 | |
| 8/07 | Wire Transfer Credit | 134,000.00 |
|      | ANDREW J CHAPIN | |
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200807B1QGC05C009613 | |
|      | 20200807MMQFMPUN000204 | |
|      | 08071319FTO3 | |
| 8/07 | CCUSABENJA      TRANSFER | 111.32 |
|      | ANDREW CHAPIN | |
|      | ST-W5C3P6P5G5R8 | |
| 8/10 | Wire Transfer Credit | 25,000.00 |
|      | ANDREW J CHAPIN | |
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200810B1QGC06C002330 | |
|      | 20200810MMQFMPUN000037 | |
|      | 08100801FTO3 | |
| 8/10 | Wire Transfer Credit | 37,386.78 |
|      | WF EXC RTN TO SNDR 721 WIP | |
|      | MAC P6101-081 | |
|      | 1300 SW 5TH AVE 8TH FL | |
|      | PORTLAND OR 97201-5667 | |
|      | 2020081011B7031R011337 | |
|      | 20200810MMQFMPUN000177 | |
|      | 08101335FTO3 | |
| 8/10 | CCUSABENJA      TRANSFER | 20.21 |
|      | ANDREW CHAPIN | |
|      | ST-O6C6P2B7B2U4 | |
| 8/11 | Wire Transfer Credit | 4,000.00 |
|      | ANDREW J CHAPIN | |
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200811B1QGC05C005373 | |
|      | 20200811MMQFMPUN000141 | |
|      | 08111113FTO3 | |
| 8/11 | CCUSABENJA      TRANSFER | 155.35 |
|      | ANDREW CHAPIN | |
|      | ST-J9H7BOX1HOD5 | |
| 8/12 | CCUSABENJA      TRANSFER | 49.67 |
|      | ANDREW CHAPIN | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|------|------------------------|---|--------|
| | ST-E1N1O8T8K9W6 | | |
| 8/14 | CCUSABENJA | TRANSFER | 215.66 |
| | ANDREW CHAPIN | | |
| | ST-B21OO3L2W3X5 | | |
| 8/17 | CCUSABENJA | TRANSFER | 112.19 |
| | ANDREW CHAPIN | | |
| | ST-E5N8U1UOK8O3 | | |
| 8/18 | Wire Transfer Credit | | 11,000.00 |
| | ANDREW J CHAPIN | | |
| | 26 CRAGMONT AVE | | |
| | SAN FRANCISCO CA 94116-1308 US | | |
| | 20200818B1QGC01C007938 | | |
| | 202OO818MMQFMPUNO0O164 | | |
| | 08181252FT03 | | |
| 8/18 | CCUSABENJA | TRANSFER | 418.48 |
| | ANDREW CHAPIN | | |
| | ST-X6F7Z6A7F6Z3 | | |
| 8/19 | Wire Transfer Credit | | 20,803.49 |
| | ANDREW J CHAPIN | | |
| | 26 CRAGMONT AVE | | |
| | SAN FRANCISCO CA 94116-1308 US | | |
| | 20200819B1QGC02C008957 | | |
| | 202OO819MMQFMPUNO00279 | | |
| | 08191531FT03 | | |
| 8/19 | CCUSABENJA | TRANSFER | 181.67 |
| | ANDREW CHAPIN | | |
| | ST-X311C7POA7P8 | | |
| 8/20 | CCUSABENJA | TRANSFER | 130.35 |
| | ANDREW CHAPIN | | |
| | ST-U9Y3O6Y5T6X3 | | |
| 8/20 | FROM LOAN 0865 | | 1,979,296.50 |
| 8/21 | CCUSABENJA | TRANSFER | 93.62 |
| | ANDREW CHAPIN | | |
| | ST-H5D2Y3E4J5IO | | |
| 8/21 | From L 6706744910865 | | 20,803.00 |
| | To DDA 500764766 | | |
| 8/24 | CCUSABENJA | TRANSFER | 141.80 |
| | ANDREW CHAPIN | | |
| | ST-QOLOW9V7IOJ7 | | |
| 8/25 | CCUSABENJA | TRANSFER | 398.10 |
| | ANDREW CHAPIN | | |
| | ST-K8G5MOY6C8R5 | | |
| 8/26 | CCUSABENJA | TRANSFER | 32.80 |
| | ANDREW CHAPIN | | |
| | ST-H4R5F4Q7W9S8 | | |
| 8/27 | PAYPAL | TRANSFER | 8,410.46 |
| | ANDREW CHAPIN | | |
| | 1010139078579 | | |



100 W University Ave
Champaign IL 61820

Date  8/31/20          Page    4
Primary Account               4766

BUSINESS ANALYSIS                    4766  (Continued)

<table>
<tr><td colspan="3"><b>DEPOSITS AND OTHER CREDITS</b></td></tr>
<tr><td>DATE</td><td>TRANSACTION DESCRIPTON</td><td>AMOUNT</td></tr>
<tr><td>8/28</td><td>CCUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-L7S9T9J4R1Y0</td><td>85.56</td></tr>
<tr><td>8/31</td><td>CCUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-D1V4E7Y2O4G4</td><td>155.36</td></tr>
<tr><td>8/31</td><td>PAYPAL            TRANSFER<br>ANDREW CHAPIN<br>1010179433893</td><td>1,000.00</td></tr>
</table>

<table>
<tr><td colspan="3"><b>CHECKS AND OTHER DEBITS</b></td></tr>
<tr><td>DATE</td><td>TRANSACTION DESCRIPTION</td><td>AMOUNT</td></tr>
<tr><td>8/03</td><td>STRIPE            TRANSFER<br>ANDREW CHAPIN<br>ST-Y3D8S2FOR4C3</td><td>1,526.64-</td></tr>
<tr><td>8/03</td><td>Overdraft Item Charge</td><td>35.00-</td></tr>
<tr><td>8/04</td><td>GUSTO          FEE 275077<br>Benja Incorporated<br>6semjooc091</td><td>111.00-</td></tr>
<tr><td>8/04</td><td>STRIPE            TRANSFER<br>ANDREW CHAPIN<br>ST-X4Q7W9P7XOR4</td><td>170.57-</td></tr>
<tr><td>8/04</td><td>SSBTRUSTOPS    P/R Contr<br>BENJA INCORPORAT</td><td>5,703.75-</td></tr>
<tr><td>8/04</td><td>Overdraft Item Charge</td><td>140.00-</td></tr>
<tr><td>8/05</td><td>STRIPE            TRANSFER<br>ANDREW CHAPIN<br>ST-R5G11818A7G3</td><td>320.18-</td></tr>
<tr><td>8/05</td><td>AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>M4460</td><td>5,800.00-</td></tr>
<tr><td>8/05</td><td>Overdraft Item Charge</td><td>70.00-</td></tr>
<tr><td>8/06</td><td>Guideline Retire GUIDELINE.<br>BENJA INCORPORATED<br>ST-W1Z6D6R7G1C0</td><td>39.00-</td></tr>
<tr><td>8/06</td><td>STRIPE            TRANSFER<br>ANDREW CHAPIN<br>ST-K1T5Y5N3I4V2</td><td>60.06-</td></tr>
<tr><td>8/07</td><td>Wire Transfer Debit<br>Sports Byline USA<br>122016066<br>0450009504<br>CITY NATIONAL BANK<br>20200807MMQFMPUNO00270<br>20200807L2LFCK1CO03392<br>08071344FT03</td><td>2,000.00-</td></tr>
</table>

Case: 20-03084 Doc# 20 Filed: 07/25/20 Entered: 07/25/20 17:54:59 Page 126 of 259

00080


BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 8/07 | Wire Transfer Debit<br>Koosh Media<br>321370765<br>8103786531<br>AMERICAN SAVINGS B<br>INV AUGUST<br>20200807MMQFMPUN000313<br>20200807CMQFMPO1020788<br>08071428FT03 | 10,000.00- |
| 8/07 | Wire Transfer Debit<br>Sean C Fleming Rev Trust 5/1/0<br>026007993<br>101-WA-258641-000<br>UBS AG<br>Further Credit U2 32785 SCF Tr<br>20200807MMQFMPUN000312<br>20200807B1Q8051R000649<br>08071428FT03 | 12,500.00- |
| 8/07 | Wire Transfer Debit<br>MHC Financial Services, Inc.<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200807MMQFMPUN000348<br>20200807J1B7841C001254<br>08071459FT03 | 100,000.00- |
| 8/10 | Wire Transfer Debit<br>E-Revshare Core LLC<br>121000248<br>026012881<br>WELLS FARGO BANK,<br>20200810MMQFMPUN000097<br>2020081011B7033R010050<br>08101129FT03 | 37,386.78- |
| 8/10 | STR1PE          TRANSFER<br>ANDREW CHAPIN<br>ST-K1H7F8F2G2C0 | 401.43- |
| 8/12 | Wire Transfer Debit<br>E-Revshare Core LLC<br>121000248<br>1200787933<br>WELLS FARGO BANK,<br>20200812MMQFMPUN000149<br>2020081211B7031RO11373<br>08121206FT03 | 37,386.78- |
| 8/12 | STRIPE          TRANSFER<br>ANDREW CHAPIN<br>ST-I8D8U3A1D6Z5 | 41.89- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 8/13 | Wire Transfer Debit<br>TYZ LAW GROUP PC<br>321171184<br>206670879<br>CITIBANK, N.A.<br>20200813MMQFMPUN000021<br>20200813B1Q8021R009731<br>08130904FT03 | 4,500.00- |
| 8/14 | Account Analysis Charge | 230.26- |
| 8/17 | STRIPE        TRANSFER<br>ANDREW CHAPIN<br>ST-D3A1U6U218C0 | 135.82- |
| 8/18 | From DDA 500764766<br>to L 6706744910865 | 10,260.63- |
| 8/20 | Wire Transfer Debit<br>MHC Financial Services, Inc.<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200820MMQFMPUN000031<br>20200820J1B7841C000325<br>08200926FT03 | 1,941,298.12- |
| 8/20 | FEE AND INT DUE LOAN 0865 | 20,803.49- |
| 8/21 | Wire Transfer Debit<br>Andrew Chapin<br>322271627<br>555475257<br>JPMORGAN CHASE BAN<br>20200821MMQFMPUN000116<br>20200821B1QCC01R031442<br>08211128FT03 | 30,000.00- |
| 8/24 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-J1P7E3N518K0 | 571.75- |
| 8/24 | CHASE CREDIT CRD EPAY<br>ANDREW J CHAPIN<br>4842308773 | 8,000.00- |
| 8/24 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>MARTIJNKLEI | 8,410.46- |
| 8/25 | Wire Transfer Debit<br>Martinus Petrus Kleiweg<br>031176110<br>36105355930<br>CAPITAL ONE, NA<br>20200825MMQFMPUN000068<br>20200825MMQFMPCH001506<br>08251031FT03 | 9,065.00- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 8/27 | Wire Transfer Debit | 702.40- |
|      | Benja Incorporated | |
|      | 322271627 | |
|      | 599330732 | |
|      | JPMORGAN CHASE BAN | |
|      | 20200827MMQFMPUN000017 | |
|      | 20200827B1QCC01R021347 | |
|      | 08270920FT03 | |
| 8/27 | Wire Transfer Debit | 10,000.00- |
|      | MHC Financial Services Inc. | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200827MMQFMPUN000115 | |
|      | 20200827J1B7841C000678 | |
|      | 08271150FT03 | |
| 8/28 | Wire Transfer Debit | 2,500.00- |
|      | MHC Financial Services, Inc. | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200828MMQFMPUN000308 | |
|      | 20200828J1B7841C001659 | |
|      | 08281546FT03 | |

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 8/04 | 5015 | 110.46 | 8/07 | 5016 | .91 |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 8/03 | 29,023.02- | 8/04 | 34,950.30- | 8/05 | 15,873.01- |
| 8/06 | 4,168.15 | 8/07 | 13,778.56 | 8/10 | 38,397.34 |
| 8/11 | 42,552.69 | 8/12 | 5,173.69 | 8/13 | 673.69 |
| 8/14 | 659.09 | 8/17 | 635.46 | 8/18 | 1,793.31 |
| 8/19 | 22,778.47 | 8/20 | 40,103.71 | 8/21 | 31,000.33 |
| 8/24 | 14,159.92 | 8/25 | 5,493.02 | 8/26 | 5,525.82 |
| 8/27 | 3,233.88 | 8/28 | 819.44 | 8/31 | 1,974.80 |



Check 5015 Amount $110.46 Date 8/4/2020     Check 5016 Amount $0.91 Date 8/7/2020



100 W University Ave
Champaign IL 61820

14776286
BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  7/31/20          Page      1
Primary Account              4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates  7/01/20 thru  8/02/20 | |
| Previous Balance | 17,983.54- | Days in the statement period | 33 |
| 42 Deposits/Credits | 124,314.55 | Average Ledger | 5,614.76- |
| 67 Checks/Debits | 133,869.60 | Average Collected | 5,614.76- |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 27,538.59- | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $105.00 | $910.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 7/01 | Reverse OD Item Charge | 35.00 |
| 7/01 | Reverse OD Item Charge | 35.00 |
| 7/01 | CCUSABENJA        TRANSFER ANDREW CHAPIN ST-P2P7L9KOWOG3 | 125.09 |
| 7/02 | Reverse OD Item Charge | 35.00 |
| 7/02 | CCUSABENJA        TRANSFER ANDREW CHAPIN ST-B1T1Y9C8C7W7 | 45.73 |
| 7/03 | Reverse OD Item Charge | 35.00 |
| 7/03 | Reverse OD Item Charge | 35.00 |
| 7/06 | CCUSABENJA        TRANSFER ANDREW CHAPIN ST-Z2Z7A7V2X7LO | 56.96 |
| 7/07 | Reverse OD Item Charge | 35.00 |
| 7/07 | CCUSABENJA        TRANSFER ANDREW CHAPIN ST-L7D3I7O1M6K4 | 222.24 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/09 | Wire Transfer Credit | 17,850.00 |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

                                                          (Account Number)

New Address: _____

   (Street Address)                                                   (Unit #)

(City)                                (State)                           (Zip Code)

Member FDIC     (Telephone Number)                                          (Social Security Number)

(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | |
|---|---|
| Check No. | $ |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | $ |

ENDING BALANCE Shown On This Statement   $ _____

ADD (+)
Deposits, Loan Advances, Credit Memos, And   $ _____
Other Automatic Deposits Not Shown On This   $ _____
Statement   $ _____

SUBTRACT (-)   $ _____
Total of Checks Outstanding, Automatic Loan   $ _____
Payments, Automatic Savings Transfers, Service   $ _____
Charges, Debit Memos And Other Automatic   $ _____
Deductions Not Shown On This Statement   $ _____

BALANCE   $ _____

Current Checkbook Balance   $ _____

ADD (+)
Interest Earned From This Statement   $ _____

SUBTRACT (-)
Misc. Charges From This Statement   $ _____

NEW CHECKBOOK BALANCE
Should Agree With BALANCE Line   $ _____

### IMPORTANT INFORMATION

#### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

#### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

#### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

#### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

#### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

Case: 21-30085    Doc# 290    Filed: 07/20/22    Entered: 07/20/22 16:54:50    Page 132 of
259

00086



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200709B1QGC08C007019 | |
|      | 20200709MMQFMPUN000143 | |
|      | 07091148FT03 | |
| 7/09 | CGUSABENJA        TRANSFER | 92.93 |
|      | ANDREW CHAPIN | |
|      | ST-MOL6Y9Q8L4W8 | |
| 7/10 | Wire Transfer Credit | 19,600.00 |
|      | ANDREW J CHAPIN | |
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200710B1QGC07C004764 | |
|      | 20200710MMQFMPUN000155 | |
|      | 07101113FT03 | |
| 7/13 | CGUSABENJA        TRANSFER | 160.34 |
|      | ANDREW CHAPIN | |
|      | ST-L3P5K1H5O8G2 | |
| 7/13 | Benja - Affordab Benja - Af | 3,800.00 |
|      | ANDREW CHAPIN | |
|      | ST-C1Z3AOJ4V8F5 | |
| 7/13 | From L  6706744910865 | 3,800.00 |
|      | To DDA 500764766 | |
| 7/14 | Wire Transfer Credit | 32,818.09 |
|      | ANDREW J CHAPIN | |
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA 94116-1308 US | |
|      | 20200714B1QGC02C006404 | |
|      | 20200714MMQFMPUN000140 | |
|      | 07141147FT03 | |
| 7/14 | CGUSABENJA        TRANSFER | 254.97 |
|      | ANDREW CHAPIN | |
|      | ST-B8C4G2D3TOC3 | |
| 7/15 | Wire Transfer Credit | 40,000.00 |
|      | ANDREW J CHAPIN | |
|      | 26 CRAGMONT AVE | |
|      | SAN FRANCISCO CA  94116-1308 | |
|      | 20200715E6B7361CO00380 | |
|      | 20200715MMQFMPUN000040 | |
|      | 07150818FT03 | |
| 7/15 | CGUSABENJA        TRANSFER | 32.17 |
|      | ANDREW CHAPIN | |
|      | ST-G6E1B1Z9U6P3 | |
| 7/15 | Benja - Affordab Benja - Af | 550.00 |
|      | ANDREW CHAPIN | |
|      | ST-O9E2A6JOWO06 | |
| 7/16 | Benja - Affordab Benja - Af | 1,350.00 |
|      | ANDREW CHAPIN | |



100 W University Ave
Champaign IL 61820

Date 7/31/20          Page     3
Primary Account              4766

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|------|------------------------|---|--------|
| | ST-N7Z5F8V2F7J2 | | |
| 7/20 | CCUSABENJA | TRANSFER | 115.02 |
| | ANDREW CHAPIN | | |
| | ST-T2COS9X1K9N4 | | |
| 7/20 | Benja - Affordab Benja - Af | | 658.58 |
| | ANDREW CHAPIN | | |
| | ST-T1G3B4V6C2S4 | | |
| 7/21 | CCUSABENJA | TRANSFER | 462.71 |
| | ANDREW CHAPIN | | |
| | ST-N6Y6R6X8J5C5 | | |
| 7/22 | CCUSABENJA | TRANSFER | 32.80 |
| | ANDREW CHAPIN | | |
| | ST-H1D2M6V8M3E8 | | |
| 7/22 | Benja - Affordab Benja - Af | | 390.00 |
| | ANDREW CHAPIN | | |
| | ST-P0Z2N5H4O5T4 | | |
| 7/23 | CCUSABENJA | TRANSFER | 65.83 |
| | ANDREW CHAPIN | | |
| | ST-J1T0X5E6G1U3 | | |
| 7/24 | CCUSABENJA | TRANSFER | 257.08 |
| | ANDREW CHAPIN | | |
| | ST-F1WOO9T7Y7W7 | | |
| 7/27 | CCUSABENJA | TRANSFER | 58.18 |
| | ANDREW CHAPIN | | |
| | ST-S6Z9FOOOS1F4 | | |
| 7/27 | Benja - Affordab Benja - Af | | 640.00 |
| | ANDREW CHAPIN | | |
| | ST-I3O4ROR4R7W3 | | |
| 7/28 | CCUSABENJA | TRANSFER | 137.60 |
| | ANDREW CHAPIN | | |
| | ST-X4H6Y1K8C2G1 | | |
| 7/28 | Benja - Affordab Benja - Af | | 200.00 |
| | ANDREW CHAPIN | | |
| | ST-G3V715W514N8 | | |
| 7/30 | CCUSABENJA | TRANSFER | 57.06 |
| | ANDREW CHAPIN | | |
| | ST-C9M4N1V7H6I2 | | |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | CCUSABENJA | TRANSFER | 26.17 |
| | ANDREW CHAPIN | | |
| | ST-H2I5E0G6Q2P1 | | |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|



BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 7/01 | SHOPIFY CAPITAL   RLCTKHK5S Andrew Chapin R7581875 | 26.74- |
| 7/01 | Overdraft Item Charge | 35.00- |
| 7/02 | SHOPIFY CAPITAL   RAFYIHICX Andrew Chapin R7592370 | 54.52- |
| 7/02 | CUSTO            FEE 955354 Benja Incorporated 6semjol7uee | 117.00- |
| 7/02 | Overdraft Item Charge | 70.00- |
| 7/06 | SHOPIFY CAPITAL   RIQCVENQI Andrew Chapin R7603172 | 55.43- |
| 7/06 | Overdraft Item Charge | 35.00- |
| 7/07 | SHOPIFY CAPITAL   RUK26RHJG Andrew Chapin R7644096 | 21.80- |
| 7/07 | SHOPIFY CAPITAL   RX5AASE5C Andrew Chapin R7634750 | 35.98- |
| 7/07 | SHOPIFY CAPITAL   RPUOUZGDQ Andrew Chapin R7624759 | 46.25- |
| 7/07 | SHOPIFY CAPITAL   REFDLBBLF Andrew Chapin R7614041 | 57.00- |
| 7/07 | Overdraft Item Charge | 140.00- |
| 7/08 | SHOPIFY CAPITAL   R3YTE3HVO Andrew Chapin R7653886 | 38.60- |
| 7/08 | Overdraft Item Charge | 35.00- |
| 7/09 | SHOPIFY CAPITAL   RA6JN4TC4 Andrew Chapin R7664471 | 9.49- |
| 7/09 | WCB Warehouse    WCB Wareho BENJA INCORPORATED ST-SOK3N3Q8V9B7 | 729.38- |
| 7/09 | Overdraft Item Charge | 70.00- |
| 7/10 | Wire Transfer Debit Sports Byline USA 122016066 0450009504 CITY NATIONAL BANK 20200710MMQFMPUNO0O256 20200710L2LFCK1C003772 07101432FT03 | 2,000.00- |
| 7/10 | Wire Transfer Debit E-Revshare Core LLC | 3,597.44- |



BUSINESS ANALYSIS                    4766  (Continued)

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | 121000248 | |
| | 1200787933 | |
| | WELLS FARGO BANK, | |
| | Benja June 2020 | |
| | 20200710MMQFMPUN000119 | |
| | 2020071011B7031R009610 | |
| | 07101131FT03 | |
| 7/10 | SHOPIFY CAPITAL  RGY5P45I5 | 37.72- |
| | Andrew Chapin | |
| | R7675495 | |
| 7/10 | CCUSABENJA        TRANSFER | 48.17- |
| | ANDREW CHAPIN | |
| | ST-D7A4R1M2X3B5 | |
| 7/10 | to loan 6706744910865 | 11,199.54- |
| | from dda 500764766 | |
| 7/13 | SHOPIFY CAPITAL  RHOHWPCKL | 26.18- |
| | Andrew Chapin | |
| | R7686557 | |
| 7/14 | Wire Transfer Debit | 33,917.56- |
| | E-Revshare Core LLC | |
| | 121000248 | |
| | 1200787933 | |
| | WELLS FARGO BANK, | |
| | 20200714MMQFMPUN000137 | |
| | 2020071411B7031R011008 | |
| | 07141203FT03 | |
| 7/14 | SHOPIFY CAPITAL  RVXEXCCSD | 35.84- |
| | Andrew Chapin | |
| | R7708123 | |
| 7/14 | SHOPIFY CAPITAL  RFD7MTUJM | 38.65- |
| | Andrew Chapin | |
| | R7717989 | |
| 7/14 | PAYPAL           INST XFER | 47.44- |
| | ANDREW CHAPIN | |
| | REESE8453 EBAY | |
| 7/14 | SHOPIFY CAPITAL  RBKII5AXD | 51.93- |
| | Andrew Chapin | |
| | R7697558 | |
| 7/14 | GUSTO          CND 027771 | 75.00- |
| | Benja Incorporated | |
| | 6semjom9j1q | |
| 7/15 | Account Analysis Charge | 286.68- |
| 7/15 | Wire Transfer Debit | 13,125.00- |
| | Sean C Fleming Rev Trust 5/1/0 | |
| | 026007993 | |
| | 101WA258641000 | |
| | UBS AG | |
| | U2 32785 SCF Tr Alt Inv | |

00090



BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | 20200715MMQFMPUN000041 | |
|      | 20200715B1Q8052R000407 | |
|      | 07150921FT03 | |
| 7/15 | Wire Transfer Debit | 30,000.00- |
|      | UMB Bank NA | |
|      | 101000695 | |
|      | 9872215826 | |
|      | UMB BANK, N.A. | |
|      | 20200715MMQFMPUN000042 | |
|      | 20200715J1B7841C000337 | |
|      | 07150921FT03 | |
| 7/15 | SHOPIFY CAPITAL   RR3C3Z7R7 | 115.49- |
|      | Andrew Chapin | |
|      | R7728106 | |
| 7/15 | WCB Warehouse    WCB Wareho | 250.00- |
|      | BENJA INCORPORATED | |
|      | ST-D6Q8E9Y3S9O9 | |
| 7/15 | GUSTO            CND 063362 | 500.00- |
|      | Benja Incorporated | |
|      | 6semjomjc6q | |
| 7/16 | Wire Transfer Debit | 4,250.00- |
|      | CFOs2Go | |
|      | 121143260 | |
|      | 0101150100 | |
|      | WESTERN ALLIANCE B | |
|      | 20200716MMQFMPUN000249 | |
|      | 20200716L1LFB71C001608 | |
|      | 07161536FT03 | |
| 7/16 | CCUSABENJA       TRANSFER | 9.73- |
|      | ANDREW CHAPIN | |
|      | ST-UOF5Z7N1N4Q8 | |
| 7/16 | SHOPIFY CAPITAL   RNS6W7IBL | 70.61- |
|      | Andrew Chapin | |
|      | R7738730 | |
| 7/17 | CCUSABENJA       TRANSFER | .37- |
|      | ANDREW CHAPIN | |
|      | ST-S5N2F5BOR8U1 | |
| 7/17 | SHOPIFY CAPITAL   RZ6DPYVYF | 34.97- |
|      | Andrew Chapin | |
|      | R7749605 | |
| 7/20 | SHOPIFY CAPITAL   RBLUIHBSA | 48.48- |
|      | Andrew Chapin | |
|      | R7760752 | |
| 7/21 | SHOPIFY CAPITAL   R7MEQNSVL | 5.46- |
|      | Andrew Chapin | |
|      | R7771889 | |
| 7/21 | SHOPIFY CAPITAL   RQ7Y4LEKA | 13.22- |
|      | Andrew Chapin | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
|      | R7792529 | | |
| 7/21 | SHOPIFY CAPITAL   RCJSO5DIK | | 19.30- |
|      | Andrew Chapin | | |
|      | R7782568 | | |
| 7/21 | SMOOTHOSTING LTD IAT PAYPAL | | 110.00- |
|      | ANDREW CHAPIN | | |
| 7/22 | SHOPIFY CAPITAL   RKMAVDNTR | | 20.79- |
|      | Andrew Chapin | | |
|      | R7802761 | | |
| 7/22 | PAYPAL            INST XFER | | 148.30- |
|      | ANDREW CHAPIN | | |
|      | AIRBRUSHUNL | | |
| 7/24 | VENMO             PAYMENT | | 11.99- |
|      | ANDREW CHAPIN | | |
|      | 3806386704 | | |
| 7/24 | SHOPIFY CAPITAL   RZD7VLYFH | | 52.27- |
|      | Andrew Chapin | | |
|      | R7824477 | | |
| 7/24 | WCB Warehouse     WCB Wareho | | 250.00- |
|      | BENJA INCORPORATED | | |
|      | ST-U7T5A5U5I9H4 | | |
| 7/27 | PAYPAL            INST XFER | | 16.26- |
|      | ANDREW CHAPIN | | |
|      | SPORTSKARDC EBA | | |
| 7/27 | SHOPIFY CAPITAL   RRRRH62HX | | 47.87- |
|      | Andrew Chapin | | |
|      | R7835433 | | |
| 7/28 | SHOPIFY CAPITAL   RKFDGNVL3 | | 6.37- |
|      | Andrew Chapin | | |
|      | R7867135 | | |
| 7/28 | SHOPIFY CAPITAL   R673UTSRW | | 12.83- |
|      | Andrew Chapin | | |
|      | R7857229 | | |
| 7/28 | SHOPIFY CAPITAL   RKSIS5ECF | | 13.55- |
|      | Andrew Chapin | | |
|      | R7846553 | | |
| 7/29 | CCUSABENJA        TRANSFER | | 48.17- |
|      | ANDREW CHAPIN | | |
|      | ST-A2B3U3O7U3Z5 | | |
| 7/30 | CUSTO             CND 142790 | | 50.00- |
|      | Benja Incorporated | | |
|      | 6semjono4d1 | | |
| 7/30 | CUSTO             CND 142790 | | 150.00- |
|      | Benja Incorporated | | |
|      | 6semjono4eo | | |
| 7/30 | CUSTO             CND 142790 | | 200.00- |
|      | Benja Incorporated | | |
|      | 6semjono4ef | | |


100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 7/30 | GUSTO              CND 142790 | 300.00- |
|  | Benja Incorporated | |
|  | 6semjono4e1 | |
| 7/30 | GUSTO              CND 142790 | 400.00- |
|  | Benja Incorporated | |
|  | 6semjono4e3 | |
| 7/30 | GUSTO              CND 142790 | 450.00- |
|  | Benja Incorporated | |
|  | 6semjono4dn | |
| 7/30 | GUSTO              CND 142790 | 1,000.00- |
|  | Benja Incorporated | |
|  | 6semjono4en | |
| 7/30 | GUSTO              REM 142476 | 1,900.00- |
|  | Benja Incorporated | |
|  | 6semjonpvv5 | |
| 7/30 | GUSTO              TAX 142477 | 7,717.25- |
|  | Benja Incorporated | |
|  | 6semjonpvpo | |
| 7/30 | GUSTO              NET 142475 | 19,476.98- |
|  | Benja Incorporated | |
|  | 6semjonpvmu | |
| 7/30 | Overdraft Item Charge | 105.00- |

| DAILY BALANCE SECTION | | | | | |
|---|---|---|---|---|---|
| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
| 7/01 | 17,850.19- | 7/02 | 18,010.98- | 7/03 | 17,940.98- |
| 7/06 | 17,974.45- | 7/07 | 18,018.24- | 7/08 | 17,951.84- |
| 7/09 | 817.78- | 7/10 | 1,899.35 | 7/13 | 9,633.51 |
| 7/14 | 8,540.15 | 7/15 | 4,845.15 | 7/16 | 1,864.81 |
| 7/17 | 1,829.47 | 7/20 | 2,554.59 | 7/21 | 2,869.32 |
| 7/22 | 3,123.03 | 7/23 | 3,188.86 | 7/24 | 3,131.68 |
| 7/27 | 3,765.73 | 7/28 | 4,070.58 | 7/29 | 4,022.41 |
| 7/30 | 27,669.76- | 7/31 | 27,538.59- | | |

**AGREEMENT AND CONSENT TO ELECTRONIC DELIVERY OF BANK STATEMENTS, NOTICES AND OTHER ACCOUNT DOCUMENTS**

1. Welcome to Busey Bank's e-delivery service. Busey Bank's goal is to provide you with an easy and convenient way to receive electronically your periodic bank account statements ("Bank Statements"), notices and other account documents.

2. **Your consent:** For Busey Bank (the "Bank") to begin forwarding your Bank Statements and other account documents to you electronically, the Bank needs your consent. Your consent is given when you accept this Agreement and Consent to Electronic Delivery of Bank Statements and Other Account Documents (this "Agreement"). By agreeing to have these documents sent electronically, you also agree to notify the Bank immediately by telephone at the numbers set forth in this Agreement of any change in your email address or any errors or complications relating to your electronic receipt or access of your Bank Statements and other account documents. To the extent that you previously agreed to electronic delivery of your Bank Statements and other account documents, this Agreement hereby supersedes any prior agreement and your consent to electronic delivery remains in place unless you instruct the Bank otherwise within thirty (30) calendar days after receiving this Agreement by contacting the Bank at the phone number, email address or mailing address included below.

- **Statement delivery -** If you elect to receive your Bank Statements through electronic delivery, the Bank will no longer send you your Bank Statements through the mail.

- **Whether your consent applies only to a particular transaction or to categories of transactions –** Your consent will authorize the Bank to forward to you electronically your periodic Bank Statements, notices and other documents regarding your account(s), including but not limited to, Truth in Savings disclosures and other required disclosures and documents relating to your accounts.

- **The right to withdraw consent to have records provided electronically, including any consequences or fees associated with doing so -** To discontinue this electronic delivery service, you can log into the Busey online banking platform and navigate to the Documents section. Under the Sign Up/ Changes option you can elect to unenroll any accounts you wish to have paper delivery. It will take up to forty-five (45) days for the Bank to implement your request, and after such time you will no longer receive your Bank Statements, notices, disclosures, and other documents regarding your accounts electronically.

- **How the customer may obtain a paper copy of records upon request –** To obtain paper copies of a particular Bank Statement, notice or other account document contact the Bank at 1-800-672-8739. A fee per statement will be charged to your account. Please see Terms and Fees Disclosure for the fee amount.

- **Hardware and software requirements for access and retention of the electronic information -** The hardware and software requirements to enable you to receive and retain your Bank Statements, notices and other account documents electronically are discussed below in **The Bank's Requirements**.

3. **The Bank's Requirements:** First, the same terms apply with respect to electronically delivered Bank Statements, notices and other accounts documents as apply to those in paper form, and, except as set forth in **Your Consent** with respect to this Agreement, the account agreements and disclosures that you have previously entered into with or received from the Bank remain in effect.

Second, for you to be able to receive and view your documents effectively, you must use an Internet browser that supports 128-bit encryption. It is recommended that only certified/supported browsers be used to view Bank Statements. A list of supported browsers is available on the Bank's website at www.busey.com/personal/products-and-services/online---mobile/online-banking. To review your Bank Statements, you will need Adobe Acrobat Flash Player. This product is available for free at http:// www.adobe.com.

**You may print or download your eStatements to retain copies of them.**

4. **Privacy:** The Bank's privacy policy (that has been previously provided to you) will apply to this service and the policy is incorporated into and made a part of this Agreement.

5. **Service Availability:** The Bank may change, suspend or eliminate all or any aspect of this delivery service upon notice to you.

6. **Security:** You will access your Bank Statements, notices and other account documents through the Busey

online banking platform. To protect the security of your banking information, you must not disclose or share your Busey online banking password with any third party. In addition, your Bank Statements and notices will not be forwarded to you through email. Documents such as terms and conditions and similar disclosure agreements may be sent directly to you by email.

7.     **NO WARRANTY FOR CONTINUOUS OR UNINTERRUPTED SERVICE:** BECAUSE OF THE UNPREDICTABILITY OF THE INTERNET, THE BANK DOES NOT GUARANTEE CONTINUOUS OR UNINTERRUPTED ACCESS TO YOUR BANK STATEMENTS THROUGH THE INTERNET.

8.     **LIMIT OF LIABILITY:** YOU AGREE THAT IN NO EVENT WILL THE BANK OR THE BANK'S SUPPLIERS (OR ANY OF THE BANK'S OR ITS SUPPLIER'S SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS OR EMPLOYEES) BE LIABLE FOR LOST PROFITS OR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF THE BANK'S SERVICE, EVEN IF THE BANK HAS BEEN ADVISED OF THE POSSIBILITY THAT SUCH DAMAGE WILL OCCUR. FURTHER YOU AGREE THAT NEITHER THE BANK NOR THE BANK'S SUPPLIERS (OR ANY OF THE BANK'S OR THE BANK'S SUPPLIER'S SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS OR EMPLOYEES) WILL BE LIABLE FOR ANY TECHNICAL, HARDWARE OR SOFTWARE FAILURE OF ANY KIND, ANY INTERRUPTION IN THE AVAILABILITY OF THE BANK'S SERVICE, ANY DELAY IN OPERATION OR TRANSMISSION, ANY INCOMPLETE OR GARBLED TRANSMISSION, COMPUTER VIRUS, LOSS OF DATA, OR OTHER SIMILAR LOSS. TO THE EXTENT THE BANK MAY HAVE BREACHED ANY TERM OF THIS AGREEMENT, YOU AGREE THAT YOUR SOLE REMEDY IS TO DISCONTINUE USE OF THIS SERVICE. YOU FURTHER AGREE THAT THE BANK'S LIABILITY TO YOU IN ANY CASE (WHETHER IN CONTRACT OR TORT) WILL NOT EXCEED AMOUNTS PAID TO THE BANK WITHIN THE LAST NINETY (90) DAYS (IF ANY) FOR THIS SERVICE.

9.     **Notice:** If you want to send the Bank a notice in relation to this Agreement, you must send it by email or regular mail to the addresses listed below. The Bank may notify you by sending notice to your email address or by mailing you notice by U.S. mail to the most current mailing address that the Bank has for you. You agree that any notices sent by email will be deemed delivered and received 48 hours after being sent. You agree that any notices sent by U.S. mail as provided in this paragraph will be deemed delivered and received three days after the date of mailing.

10.     **Arbitration:** To the extent that your account(s) is one not already governed by another arbitration provision with the Bank, you agree that at any claim or controversy relating to this Agreement will be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. You agree that any claim or controversy you may have will be arbitrated on an individual basis and will not be consolidated in any arbitration with any claim or controversy of any other party. You agree that the arbitration will be conducted in the city in which the Bank's main office is located and that judgment on the arbitration award may be enforced by any court having proper jurisdiction.

11.     **Governing Law:** You agree that this Agreement is governed by the laws of the State of Illinois, excluding any application of conflicts of laws rules or principals. You agree that the sole jurisdiction and venue for any litigation arising from your use of the Bank's service shall be an appropriate federal or state court located in Champaign County, Illinois.

**12. Contact us:**

- Phone:    1-800-672-8739    Option    2
  Email: customersupport@busey.com
- Treasury Management Customers may contact us by phone at 1-800-749-7844 and by Email at
  treasurymanagement@busey.com
- Address: Attn: eStatements, Busey Bank, P.O. Box 17430, Urbana, IL 61803-9934.

# TERMS AND CONDITIONS
## OF YOUR ACCOUNT

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT -** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**AGREEMENT -** This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees which are incorporated herein by reference if they are not included in this document. If you have any questions, please call us. **This agreement requires that disputes be resolved in arbitration on an individual basis, rather than through jury trials or class actions. See section Dispute Resolution by Binding Arbitration below for details. If you do not wish to agree to arbitration, you must follow the rejection procedure set forth in the section Dispute Resolution by Binding Arbitration below.**

This agreement is subject to applicable federal laws, the laws of the state of the branch in which your account is located and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;

(2) establish rules to cover transactions or events which the law does not regulate;

(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and

(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document. Nothing in this document is intended to vary our duty to act in good faith and with ordinary care when required by law.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular. **In Florida,** "Party" means a person who, by the terms of an account, has a present right, subject to request, to payment from the account other than as a beneficiary or agent.

Throughout this document, when a provision is identified as being applicable to a certain state (for example, "in Illinois"), it means that the provision is only applicable if your account is held at a branch located in that particular state. Any provision which is not described as applying to a particular state, applies to your account.

**LIABILITY -** You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and we can deduct any amounts deposited into the account and apply those amounts to the shortage. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

**DEPOSITS -** We will give you provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of indorsement or lack of indorsement on the item and even though we provide you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned. Unless prohibited by law, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing indorsement, claim of alteration, encoding error, counterfeit cashier's check or other problem which in our judgment justifies reversal of credit. You authorize us to attempt to collect previously returned items without giving you notice, and in attempting to collect we may permit the payor bank to hold an item beyond the midnight deadline. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third party check or draft for deposit, we may require any third party indorsers to verify or guarantee their indorsements, or indorse in our presence.

**WITHDRAWALS -**

**Generally -** Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to indorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated checks -** A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it precisely identifies the number, date, amount and payee of the item.

**Checks and withdrawal rules -** If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. In addition, we may place limitations on the account until your identity is verified. Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify it as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. An item may be returned after the funds from the deposit of that item are made available for withdrawal. In that case, we will reverse the credit of the item. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**Cash withdrawals -** We recommend you take care when making large cash withdrawals because carrying large amounts of cash may pose a danger to your personal safety. As an alternative to making a large cash withdrawal, you may want to consider a cashier's check or similar instrument. You assume full responsibility of any loss in the event the cash you withdraw is lost, stolen, or destroyed. You agree to hold us harmless from any loss you incur as a result of your decision to withdraw funds in the form of cash.

**A temporary debit authorization hold affects your account balance -** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money when the merchant does not know the exact amount of the purchase at the time the card is authorized. The amount of the temporary hold may be more than the actual amount of your purchase.

Some common transactions where this occurs involve purchases of gasoline, hotel rooms, or meals at restaurants. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it could be three calendar days, or even longer in some cases, before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

Case 21-03000-hb Doc 290 Filed 07/20/21 Entered 07/20/21 16:54:58 Page 142 of 259

00096

even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase. An item that has been returned and subsequently resubmitted for payment is considered a new item that may result in an additional NSF fee each time the item is returned for non sufficient funds.

**Overdrafts** - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying, or not paying, discretionary overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line of credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts.

For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one time debit card transactions if you have not opted in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

**Multiple signatures, electronic check conversion, and similar transactions** - An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the check to examine the signatures on the item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures.

**Notice of withdrawal** - We reserve the right to require not less than 7 days' notice in writing before each withdrawal from an interest bearing account other than a time deposit or demand deposit, or from any other savings account as defined by Regulation D. (The law requires us to reserve this right, but it is not our general policy to use it.) Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your notice of penalty for early withdrawal.

**In Illinois, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION** - These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account** - is an account in the name of one person.

**Joint Account - With Survivorship (And Not As Tenants In Common)** - is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship (As Tenants In Common)** - This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Revocable Trust or Pay-on-Death Account** - If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries of either of these account types cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of the owner(s) of the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either a Pay On Death or Revocable Trust account reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**In Florida, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION** - These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Single-Party Account** - Such an account is owned by one party.

**Multiple-Party Account** - Such an account is payable on request to one or more of two or more parties, whether or not a right of survivorship is mentioned.

**Multiple-Party Account - Tenancy by the Entireties** - The account is owned by two parties who are married to each other and hold the account as tenants by the entirety.

**Rights At Death- Single-Party Account** - At the death of a party, ownership passes as part of the party's estate.

**Multiple-Party Account With Right of Survivorship** - At death of party, ownership passes to the surviving party or parties.

**Multiple-Party Account Without Right of Survivorship** - At death of party, deceased party's ownership passes as part of deceased party's estate.

**Single-Party Account With Pay-on-Death Designation** - At death of the party, ownership passes to the designated pay on death beneficiaries and is not part of the party's estate.

**Multiple-Party Account With Right of Survivorship and Pay-on-Death Designation** - At death of last surviving party, ownership passes to the designated pay on death beneficiaries and is not part of the last surviving party's estate.

**In Indiana, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION** - These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account** - is an account in the name of one person.

**Joint Account - With Survivorship (And Not As Tenants In Common)** - is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship (As Tenants In Common)** - This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Revocable Trust Account/In Trust For (pursuant to the Multiple Party Account statutes in *Indiana Code* ch. 32-17-11 et. seq.)** - If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Pay-on-Death Account with LDPS (pursuant to the Transfer on Death Property Act statutes in *Indiana Code* ch. 32-17-14 et. seq.)** - If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless all persons creating the account die. If a named beneficiary does not survive all persons that created the account, that beneficiary's right to a transfer on death transfer belongs to that beneficiary's lineal descendants per stirpes (LDPS) who survive all persons that created the account. LDPS means that group of people that are the lineal descendants of a beneficiary who will take, in place of the beneficiary they have survived, the beneficiary's share as determined under Indiana law. In order for a lineal descendant to take in place of a beneficiary, the lineal descendant must survive the death of that beneficiary. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Pay-on-Death Account No LDPS (pursuant to the Transfer on Death Property Act statutes in *Indiana Code* ch. 32-17-14 et. seq.)** - If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares unless otherwise designated in writing, without right of survivorship. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Additional Transfer on Death Property Act Rules -** If there are multiple primary beneficiaries and a primary beneficiary does not survive all persons creating the account and does not have a substitute under the LDPS rules, the share of the nonsurviving primary beneficiary is allocated among the surviving primary beneficiaries in the proportion that their shares bear to each other. If there are no surviving primary beneficiaries and there are no substitutes for the nonsurviving primary beneficiaries under the LDPS rules, the property belongs to the surviving contingent beneficiaries in equal shares or according to the percentages or fractional shares stated in the designation. If there are multiple contingent beneficiaries and a contingent beneficiary does not survive all persons creating the account and does not have a substitute under the LDPS rules, the share of the nonsurviving contingent beneficiary is allocated among the surviving contingent beneficiaries in the proportion that their shares bear to each other. If no beneficiary survives all persons creating the account, the property belongs to the estate of the owner unless directed to a substitute beneficiary under the LDPS rules.

**In Missouri, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION** - These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account** - is an account in the name of one person.

**Joint Account - With Survivorship (And Not As A Tenancy By The Entirety Or As Tenants In Common)** - is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - As Tenants In Common Without Survivorship (And Not As A Tenancy By The Entirety)** - This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Husband And Wife As A Tenancy By The Entirety -** is an account in the name of two persons who are husband and wife as tenants by the entirety.

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

Case 21-03038-JMC-7A Claim 2-1 Filed 07/25/22 Entered 07/25/22 16:54:50 Page 143 of 259

00097

**Revocable Trust or Pay-On-Death Account (not subject to the Nonprobate Transfers Law of Missouri) -** If two or more of you create such an account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either of these account types reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Registration in Beneficiary Form -** LDPS means a class of unnamed persons who are the lineal descendants per stirpes of a beneficiary and who are to take upon surviving, in place of and with the same priority as the named individual for whom they are indicated as substitutes.

**BUSINESS, ORGANIZATION AND ASSOCIATION ACCOUNTS -** Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. You represent that you have the authority to open and conduct business on this account on behalf of the entity. We may require the governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.

**In Illinois and Missouri, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop payment cutoff time. Because stop payment orders are handled by computers, to be effective, your stop payment order must precisely identify the number, date, and amount of the item, and the payee. You may stop payment on any item drawn on your account whether you sign the item or not. Generally, if your stop payment order is given to us in writing it is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six month period. If the original stop payment order was oral your stop payment order will lapse after 14 calendar days if you do not confirm your order in writing within that time period. We are not obligated to notify you when a stop payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop payment order.

Our stop payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**In Florida, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules. We may accept an order to stop payment on any item from any one of you. You must make any stop payment order in the manner required by law, it must be made in a signed and dated writing, and we must receive it in time to give us a reasonable opportunity to act on it before our stop payment cutoff time. Because stop payment orders are handled by computers, to be effective, your stop payment order must precisely identify the number, date, and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not. Your stop payment order is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six month period. We are not obligated to notify you when a stop payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop payment order.

Our stop payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**In Indiana, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop payment cutoff time. Because stop payment orders are handled by computers, to be effective, your stop payment order must precisely identify the number, date, and amount of the item,

and the payee. You may stop payment on any item drawn on your account whether you sign the item or not. Your stop payment order is effective for six months if it is given to us in writing or by another type of record (Generally, a "record" is information that is stored in such a way that it can be retrieved and can be heard or read and understood — you can ask us what type of stop payment records you can give us). Your order will lapse after that time if you do not renew the order in writing before the end of the six month period. If the original stop payment order was oral your stop payment order will lapse after 14 calendar days if it is not confirmed in writing or by another type of record within that time period. We are not obligated to notify you when a stop payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop payment order.

Our stop payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**TELEPHONE TRANSFERS -** A telephone transfer of funds from this account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Limitations on the number of telephonic transfers from a savings account are described elsewhere.

**AMENDMENTS AND TERMINATION -** We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth in Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

**NOTICES -** Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you.

**STATEMENTS - Your duty to report unauthorized signatures, alterations and forgeries -** You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60 day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

**Your duty to report other errors or problems -** In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error or problem such as an encoding error or an unexpected deposit amount. Also, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing indorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine your statement and items and report any errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours.

**Errors relating to electronic fund transfers or substitute checks -** For information on errors relating to electronic fund transfers (e.g., on line, mobile, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.

Case: 4:21-cv-00380-HEA Doc. #: 20 Filed: 07/20/20 Entered: 07/20/20 16:54:50 Page 144 of Page 3 of 6
259

00098

substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

**Duty to notify if statement not received -** You agree to immediately notify us if you do not receive your statement by the date you normally expect to receive it. Not receiving your statement in a timely manner is a sign that there may be an issue with your account, such as possible fraud or identity theft.

**ACCOUNT TRANSFER -** This account may not be transferred or assigned without our prior written consent.

**DIRECT DEPOSITS -** If we are required for any reason to reimburse the federal government for all or any portion of a benefit payment that was directly deposited into your account, you authorize us to deduct the amount of our liability to the federal government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**TEMPORARY ACCOUNT AGREEMENT -** If the account documentation indicates that this is a temporary account agreement, each person who signs to open the account or has authority to make withdrawals (except as indicated to the contrary) may transact business on this account. However, we may at some time in the future restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**SETOFF -** We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt any of you owe us now or in the future. If this account is owned by one or more of you as individuals, we may set off any funds in the account against a due and payable debt a partnership owes us now or in the future, to the extent of your liability as a partner for the partnership debt. If your debt arises from a promissory note, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note, and this amount may include any portion of the balance for which we have properly accelerated the due date.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

**In Illinois, Indiana and Missouri, AUTHORIZED SIGNER (Individual Accounts only) -** A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of an authorized signer.

**In Florida, CONVENIENCE ACCOUNT AGENT (Single-Party Accounts only) -** A convenience account, as defined by Florida law, means a deposit account other than a certificate of deposit, in the name of one individual, in which one or more individuals have been designated as agent with the right to make deposits to and withdraw funds from or draw checks on such account on the owner's behalf. A single individual is the owner, and the agent is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the agent may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the agent. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the agency at any time, and the agency is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the agent until: (a) we have received written notice or have actual knowledge of the termination of agency, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of a convenience account agent.

**RESTRICTIVE LEGENDS OR INDORSEMENTS -** The automated processing of the large volume of checks we receive prevents us from inspecting or looking for restrictive legends, restrictive indorsements or other special instructions on every check. For this reason, we are not required to honor any restrictive legend or indorsement or other special instruction placed on checks you write unless we have agreed in writing to the restriction or instruction. Unless we have agreed in writing, we are not responsible for any losses, claims, damages, or expenses that result from your placement of these restrictions or instructions on your checks. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." The payee's signature accompanied by the words "for deposit only" is an example of a restrictive indorsement.

**FACSIMILE SIGNATURES -** Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that

are drawn on us. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

**CHECK PROCESSING -** We process items mechanically by relying solely on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and indorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have exercised ordinary care if our automated processing is consistent with general banking practice, even though we do not inspect each item. Because we do not inspect each item, if you write a check to multiple payees, we can properly pay the check regardless of the number of indorsements unless you notify us in writing that the check requires multiple indorsements. We must receive the notice in time for us to have a reasonable opportunity to act on it, and you must tell us the precise date of the check, amount, check number and payee. We are not responsible for any unauthorized signature or alteration that would not be identified by a reasonable inspection of the item. Using an automated process helps us keep costs down for you and all account holders.

**CHECK CASHING -** We may charge a fee for anyone that does not have an account with us who is cashing a check, draft or other instrument written on your account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

**INDORSEMENTS -** We may accept for deposit any item payable to you or your order, even if they are not indorsed by you. We may give cash back to any one of you. We may supply any missing indorsement(s) for any item we accept for deposit or collection, and you warrant that all indorsements are genuine.

To ensure that your check or share draft is processed without delay, you must indorse it (sign it on the back) in a specific area. Your entire indorsement (whether a signature or a stamp) along with any other indorsement information (e.g. additional indorsements, ID information, driver's license number, etc.) must fall within 1½" of the "trailing edge" of a check. Indorsements must be made in blue or black ink, so that they are readable by automated check processing equipment.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all indorsement information within 1½" of that edge.



It is important that you confine the indorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed indorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your indorsement, another indorsement or information you have printed on the back of the check obscures our indorsement.

These indorsement guidelines apply to both personal and business checks.

**DEATH OR INCOMPETENCE -** You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or is adjudicated (determined by the appropriate official) incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or adjudication of incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or adjudication of incompetence for up to ten (10) days after your death or adjudication of incompetence unless ordered to stop payment by someone claiming an interest in the account.

**FIDUCIARY ACCOUNTS -** Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

Case: 21-30085  Doc# 290  Filed: 07/20/22  Entered: 07/20/22 16:54:30  Page 145 of
259

Page 195 of
00099

account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

**CREDIT VERIFICATION -** You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

**LEGAL ACTIONS AFFECTING YOUR ACCOUNT -** If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions.

**ACCOUNT SECURITY -**

**Duty to protect account information and methods of access -** It is your responsibility to protect the account numbers and electronic access devices (e.g., an ATM card) we provide you for your account(s). Do not discuss, compare, or share information about your account number(s) with anyone unless you are willing to give them full use of your money. An account number can be used by thieves to issue an electronic debit or to encode your number on a false demand draft which looks like and functions like an authorized check. If you furnish your access device and grant actual authority to make transfers to another person (a family member or coworker, for example) who then exceeds that authority, you are liable for the transfers unless we have been notified that transfers by that person are no longer authorized.

Your account number can also be used to electronically remove money from your account, and payment can be made from your account even though you did not contact us directly and order the payment.

You must also take precaution in safeguarding your blank checks. Notify us at once if you believe your checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself or share the loss with us (we may have to share some of the loss if we failed to use ordinary care and if we substantially contributed to the loss).

**Positive pay and other fraud prevention services -** Except for consumer electronic fund transfers subject to Regulation E, you agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered. You will not be responsible for such transactions if we acted in bad faith or to the extent our negligence contributed to the loss. Such services include positive pay or commercially reasonable security procedures. If we offered you a commercially reasonable security procedure which you reject, you agree that you are responsible for any payment order, whether authorized or not, that we accept in compliance with an alternative security procedure that you have selected. The positive pay service can help detect and prevent check fraud and is appropriate for account holders that issue: a high volume of checks, a lot of checks to the general public, or checks for large dollar amounts.

**TELEPHONIC INSTRUCTIONS -** Unless required by law or we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission or leave by voice mail or on a telephone answering machine.

**MONITORING AND RECORDING TELEPHONE CALLS AND CONSENT TO RECEIVE COMMUNICATIONS -** Subject to federal and state law, we may monitor or record phone calls for security reasons, to maintain a record and to ensure that you receive courteous and efficient service. You consent in advance to any such recording.

To provide you with the best possible service in our ongoing business relationship for your account we may need to contact you about your account from time to time by telephone, text messaging or email. However, we first obtain your consent to contact you about your account in compliance with applicable consumer protection provisions in the federal Telephone Consumer Protection Act of 1991 (TCPA), CAN SPAM Act and their related federal regulations and orders issued by the Federal Communications Commission (FCC).

- Your consent is limited to your account, and as authorized by applicable law and regulations.
- Your consent is voluntary and not conditioned on the purchase of any product or service from us.

With the above understandings, you authorize us to contact you regarding your account throughout its existence using any telephone numbers or email addresses that you have previously provided to us by virtue of an existing business relationship or that you may subsequently provide to us.

This consent is regardless of whether the number we use to contact you is assigned to a landline, a paging service, a cellular wireless service, a specialized mobile radio service, other radio common carrier service or any other service for which you may be charged for the call. You further authorize us to contact you through the use of voice, voice mail and text messaging, including the use of pre recorded or artificial voice messages and an automated dialing device.

If necessary, you may change or remove any of the telephone numbers or email addresses at any time using any reasonable means to notify us.

**CLAIM OF LOSS -** If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you.

You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

**EARLY WITHDRAWAL PENALTIES (and involuntary withdrawals) -** We may impose early withdrawal penalties on a withdrawal from a time account even if you don't initiate the withdrawal. For instance, the early withdrawal penalty may be imposed if the withdrawal is caused by our setoff against funds in the account or as a result of an attachment or other legal process. We may close your account and impose the early withdrawal penalty on the entire account balance in the event of a partial early withdrawal. See your notice of penalty for early withdrawals for additional information.

**ADDRESS OR NAME CHANGES -** You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

**RESOLVING ACCOUNT DISPUTES -** We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or (3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons.

**WAIVER OF NOTICES -** To the extent permitted by law, you waive any notice of non payment, dishonor or protest regarding any items credited to or charged against your account. For example, if you deposit an item and it is returned unpaid or we receive a notice of nonpayment, we do not have to notify you unless required by federal Regulation CC or other law.

**ACH AND WIRE TRANSFERS -** This agreement is subject to Article 4A of the Uniform Commercial Code Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A 403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. Credit entries may be made by ACH. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**TRUNCATION, SUBSTITUTE CHECKS, AND OTHER CHECK IMAGES -** If you truncate an original check and create a substitute check, or other paper or electronic image of the original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to retain the original check in conformance with our internal policy for retaining original checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute checks that have not previously been warranted by a bank or other financial institution in conformance with the Check 21 Act. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

**REMOTELY CREATED CHECKS -** Like any standard check or draft, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a check or draft that can be used to withdraw money from an account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). In place of a signature, the check usually has a statement that the owner authorized the check or has the owner's name typed or printed on the signature line.

You warrant and agree to the following for every remotely created check we receive from you for deposit or collection: (1) you have received express and verifiable

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019

authorization to create the check in the amount and to the payee that appears on the check; (2) you will maintain proof of the authorization for at least 2 years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned you owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount you owe us, and if there are insufficient funds in your account, you still owe us the remaining balance.

**UNLAWFUL INTERNET GAMBLING NOTICE -** Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

**DISPUTE RESOLUTION BY BINDING ARBITRATION -**

**Claims Subject to Arbitration:** Unless you opt out of this arbitration provision in accordance with the procedure set forth below, you and we agree that any dispute or claim between us, except for claims arising from bodily injury or death, must be arbitrated if either party elects arbitration of that dispute or claim. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

  • claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation or any other statutory or common law legal theory;

  • claims that arose before this or any prior agreement (including, but not limited to, claims relating to advertising or disclosures);

  • claims for mental or emotional distress or injury not arising out of bodily injury;

  • claims asserted in a court of general jurisdiction against you or us, including counterclaims, cross claims, or third party claim, that you or we elect to arbitrate;

  • claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and

  • claims that may arise after the termination of this agreement.

References to "you," and "us" in this arbitration provision include our respective parents, subsidiaries, affiliates, predecessors, successors, and assigns; our and those entities' agents and employees; and all authorized or unauthorized users or beneficiaries of your account, as well as your heirs, trustees, or other representatives. However, either party may elect arbitration of an action in small claims court seeking only individualized relief, so long as the action remains in that court and is not removed to a court of general jurisdiction. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf. Nor does this arbitration agreement preclude either you or we from exercising self help remedies (including setoff), and exercising such a remedy is not a waiver of the right to invoke arbitration of any dispute. **You and we each waive the right to a trial by jury or to participate in a class action whenever either you or we elect arbitration.** This agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this agreement.

**Pre-Arbitration Notice of Disputes:** Before either you or we commence arbitration, the claimant must first send to the other a written Notice of Dispute ("Notice"). The Notice to us must be sent by certified mail to: General Counsel, Busey Bank, 100 West University Avenue, Champaign, Illinois 61820 ("Notice Address"). The Notice to you will be sent to your address on file with your account. The Notice must (i) include your name and account number; (ii) describe the nature and basis of the claim or dispute; and (iii) set forth the specific relief sought.

If you and we do not reach an agreement to resolve the claim within 30 calendar days after the Notice is received, you or we may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you are entitled. If you have complied with the requirements of this paragraph and the arbitrator awards you an amount of money that exceeds the value of our last written settlement to you before the appointment of the arbitrator, then we will pay you $500 in lieu of any smaller award.

In determining whether you are entitled to the minimum $500 recovery, the arbitrator shall not consider amounts offered or awarded for attorneys' fees or costs. Any disputes as to recovery of the $500 minimum recovery shall be resolved by the arbitrator, and must be raised within 14 calendar days of the arbitrator's ruling on the merits.

**Arbitration Procedure:** The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by this arbitration provision, and will be administered by the AAA. (If the AAA is unavailable, another arbitration provider shall be selected by the parties or by the court.) The AAA Rules are available online at www.adr.org or by writing to the Notice Address. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide. The arbitrator may consider but shall not be bound by rulings in other arbitrations involving different customers. Unless you and we agree otherwise, any arbitration hearings will take place in the county of

your address on file with your account. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as provided below, the arbitrator can award the same damages and relief that a court can award under applicable law.

**Arbitration Fees:** If you complied with the notice requirements above, after we receive notice at the Notice Address that you have commenced arbitration, we will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $10,000 in value. (The filing fee currently is $200 but is subject to change by the arbitration provider. If you are unable to pay this fee, we will pay it directly upon receiving a written request at the Notice Address.) We also will pay all other AAA filing, administration, and arbitrator fees for that arbitration. If, however, the arbitrator finds that either the substance of your claim or the relief you seek is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse us for all monies previously disbursed that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek relief valued at greater than $10,000 (either to you or to us), the payment of these fees will be governed by the AAA rules. We will pay all AAA filing, administration, and arbitrator fees for any arbitration we commence against you.

**Requirement of Individual Arbitration:** The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING.** Further, unless both you and we agree otherwise, the arbitrator may not consolidate the claims of more than one person (except for the claims of co  or joint account owners pertaining to that account), and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non individualized declaratory or injunctive relief; class, representative, and private attorney general claims; and consolidation is found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then that claim or request for relief shall be severed and decided by a court, and all other claims and requests for relief shall be arbitrated.

**Future Changes to Arbitration Provision:** Notwithstanding any provision in this agreement to the contrary, we agree that if we make any future change to this arbitration provision (other than a change to the Notice Address), you may reject that change by sending us written notice within 30 calendar days of the change to the Notice Address provided above. By rejecting that future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this arbitration provision, as amended by any prior changes that you did not timely reject.

**Right to Reject Arbitration Provision:** If you do not wish to arbitrate, you have 30 calendar days to reject this arbitration provision by sending a rejection notice to the Notice Address above by certified mail ("Rejection Notice"). To be valid, a Rejection Notice must: (i) include your name, account number, and a statement that you are rejecting the arbitration provision in this agreement; and (ii) be received by us within 30 calendar days after the opening of your account or, if an arbitration provision has been added for the first time to this agreement for an existing account, within 30 calendar days after you received notice of the change in terms. If your Rejection Notice complies with these requirements, this arbitration provision will not apply to you with respect to any claims that you or we commence in litigation or arbitration after we receive your Rejection Notice. Rejecting this arbitration provision will not affect your other rights or responsibilities under this agreement. Nor will it affect any other arbitration agreements between us.

**Military Lending Act:** If you are a covered member of the armed forces or the dependent of a covered member within the meaning of the Military Lending Act and your contract with us involves an extension of consumer credit under that Act, then you are not required to arbitrate disputes.

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019



100 W University Ave
Champaign IL 61820

13548701
BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  6/30/20        Page      1
Primary Account          4766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 3 |
|---|---|---|---|
| Account Number | 4766 | Statement Dates   6/01/20 thru  6/30/20 | |
| Previous Balance | 3,016.22 | Days in the statement period | 30 |
| 29 Deposits/Credits | 1,845,252.06 | Average Ledger | 13,684.01 |
| 87 Checks/Debits | 1,866,251.82 | Average Collected | 13,684.01 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 17,983.54- | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $70.00 | $875.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 6/01 | Wire Transfer Credit | 25,000.00 |
| | BODIL ARLANDER REVOCABLE TRUST | |
| | 1/2008 CHECKING | |
| | 32 LAGOON ROAD | |
| | BELVEDERE CA  94920-2319 | |
| | RBC CAPITAL MARKETS CORPORATIO | |
| | 60 SOUTH SIXTH STREET | |
| | MINNEAPOLIS,MN,55402 | |
| | REF: BODIL ARLANDER | |
| | 20200601MMQFMP31005470 | |
| | 20200601MMQFMPUN000383 | |
| | 06011648FT03 | |
| 6/01 | guideline 401(k) AMTS:55,2 | .02 |
| | BENJA INCORPORATED | |
| | ST-M4K1G9Z7F806 | |
| 6/01 | guideline 401(k) AMTS:55,2 | .55 |
| | BENJA INCORPORATED | |
| | ST-S8L8M8O8Z2U2 | |
| 6/01 | CCUSABENJA     TRANSFER | 108.78 |
| | ANDREW CHAPIN | |
| | ST-K2H1D2D3Z4C3 | |
| 6/02 | CCUSABENJA     TRANSFER | 664.26 |
| | ANDREW CHAPIN | |
| 6/03 | CCUSABENJA     TRANSFER | 76.97 |
| | ANDREW CHAPIN | |

Case: 20-30819  Doc#20   Filed: 07/26/20   Entered: 07/26/20 16:54:50   Page 148 of
259
00102

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

                                   (Account Number)

New Address: _____

      (Street Address)                          (Unit #)

      (City)             (State)           (Zip Code)

**Member FDIC**

      (Telephone Number)            (Social Security Number)

      (Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | |
|---|---|---|---|---|
| Check No. | $ | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |

ENDING BALANCE
Shown On This Statement    $ _____

Current Checkbook Balance    $ _____

ADD (+)
Deposits, Loan Advances, Credit Memos, And   $ _____
Other Automatic Deposits Not Shown On This   $ _____
Statement   $ _____

ADD (+)
Interest Earned From This Statement   $ _____

SUBTRACT (-)
Total of Checks Outstanding, Automatic Loan   $ _____
Payments, Automatic Savings Transfers, Service   $ _____
Charges, Debit Memos And Other Automatic   $ _____
Deductions Not Shown On This Statement   $ _____

SUBTRACT (-)
Misc. Charges From This Statement   $ _____

NEW CHECKBOOK BALANCE
Should Agree With BALANCE Line   $ _____

| TOTAL | $ |
|---|---|

BALANCE   $ _____

### IMPORTANT INFORMATION

#### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

#### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

#### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

#### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded for figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

#### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

00103



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
|      | ST-Q8S5P6Q4C6F6 |  |
| 6/03 | Advance to ***4766 | 500,000.00 |
|      | Advance from ***0865 |  |
| 6/04 | CCUSABENJA        TRANSFER | 282.74 |
|      | ANDREW CHAPIN |  |
|      | ST-C2Y2TOC4B9E4 |  |
| 6/05 | Wire Transfer Credit | 1,000,000.00 |
|      | E-REVSHARE CORE, LLC |  |
|      | C O THE SCION GROUP |  |
|      | 223 WALL ST |  |
|      | HUNTINGTON, NY 11743-2060 |  |
|      | INVESTMENT |  |
|      | 2020060511B7032RO16138 |  |
|      | 2020O605MMQFMPUNO00325 |  |
|      | 06051637FT03 |  |
| 6/05 | CCUSABENJA        TRANSFER | 97.10 |
|      | ANDREW CHAPIN |  |
|      | ST-T1K4A7IOR6G6 |  |
| 6/08 | CCUSABENJA        TRANSFER | 332.83 |
|      | ANDREW CHAPIN |  |
|      | ST-L2V7O9W218V6 |  |
| 6/09 | CCUSABENJA        TRANSFER | 829.82 |
|      | ANDREW CHAPIN |  |
|      | ST-C3R6E7K9C3Y3 |  |
| 6/09 | to dda 5OO764766 | 55,000.00 |
|      | from loan 6706744910865 |  |
| 6/09 | to dda 5OO764766 | 250,000.00 |
|      | from loan 6706744910865 |  |
| 6/10 | CCUSABENJA        TRANSFER | 426.32 |
|      | ANDREW CHAPIN |  |
|      | ST-H9Z3G9S9M4S9 |  |
| 6/10 | Benja - Affordab Benja - Af | 5,000.00 |
|      | ANDREW CHAPIN |  |
|      | ST-N6W5P7N1Y3E9 |  |
| 6/11 | CCUSABENJA        TRANSFER | 411.46 |
|      | ANDREW CHAPIN |  |
|      | ST-Z5X2Z6W2U1Y6 |  |
| 6/12 | CCUSABENJA        TRANSFER | 228.30 |
|      | ANDREW CHAPIN |  |
|      | ST-Z7K6E3A3P7S4 |  |
| 6/15 | CCUSABENJA        TRANSFER | 197.32 |
|      | ANDREW CHAPIN |  |
|      | ST-Y1X2H3Z3Y9H2 |  |
| 6/16 | CCUSABENJA        TRANSFER | 757.74 |
|      | ANDREW CHAPIN |  |
|      | ST-W9T6M3R7O2A4 |  |
| 6/17 | CCUSABENJA        TRANSFER | 145.40 |
|      | ANDREW CHAPIN |  |



Date  6/30/20        Page    3
Primary Account            4766

BUSINESS ANALYSIS                    4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|------|------------------------|---|--------|
|      | ST-H4H5J5Y4K9J5 | | |
| 6/18 | CCUSABENJA  ANDREW CHAPIN | TRANSFER | 129.36 |
|      | ST-G1V5N7S2J2F6 | | |
| 6/19 | CCUSABENJA  ANDREW CHAPIN | TRANSFER | 194.56 |
|      | ST-W9N7W8M5B4P5 | | |
| 6/19 | Benja - Affordab  ANDREW CHAPIN | Benja | 1,750.00 |
|      | ST-V512L8J2G1H5 | | |
| 6/22 | CCUSABENJA  ANDREW CHAPIN | TRANSFER | 43.12 |
|      | ST-H611G9MOO4Q4 | | |
| 6/23 | CCUSABENJA  ANDREW CHAPIN | TRANSFER | 306.70 |
|      | ST-L2C818CO15VO | | |
| 6/25 | CCUSABENJA  ANDREW CHAPIN | TRANSFER | 71.10 |
|      | ST-COL7XOP2U1R4 | | |
| 6/30 | CCUSABENJA  ANDREW CHAPIN | TRANSFER | 97.61 |
|      | ST-E6W6L6R4QOW3 | | |
| 6/30 | Benja - Affordab  ANDREW CHAPIN  ST-O4X7O41302E3 | Benja - Af | 3,100.00 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|-------------------------|---|--------|
| 6/01 | PAYPAL  ANDREW CHAPIN  KENLESKO EBAY K | INST XFER | 12.17- |
| 6/01 | SHOPIFY CAPITAL  Andrew Chapin  R7255254 | R6ZIQCV35 | 19.31- |
| 6/01 | SHOP1FY CAPITAL  Andrew Chapin  R7253817 | R4NB32JCY | 28.08- |
| 6/02 | Wire Transfer Debit  Andrew Chapin Benja  322271627  555475257  JPMORGAN CHASE BAN  20200602MMQFMPUNOOO317  20200602B1QGCO1RO56571  06021535FT03 | | 10,500.00- |
| 6/02 | SHOPIFY CAPITAL  Andrew Chapin | RB6OVINIV | 1.57- |


BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | R7285160 | |
| 6/02 | SHOPIFY CAPITAL   RPE6WKHNB | 9.10- |
|      | Andrew Chapin | |
|      | R7274537 | |
| 6/02 | SHOPIFY CAPITAL   RSS2FHH44 | 9.49- |
|      | Andrew Chapin | |
|      | R7283929 | |
| 6/02 | SHOPIFY CAPITAL   RL4ULHEHY | 18.90- |
|      | Andrew Chapin | |
|      | R7264462 | |
| 6/02 | SHOPIFY CAPITAL   R4KWI3ACS | 49.09- |
|      | Andrew Chapin | |
|      | R7265957 | |
| 6/02 | SHOPIFY CAPITAL   R2ICUNCUO | 66.57- |
|      | Andrew Chapin | |
|      | R7275952 | |
| 6/02 | CUSTO              FEE 787806 | 117.00- |
|      | Benja Incorporated | |
|      | 6semjoigajn | |
| 6/03 | Wire Transfer Debit | 10,000.00- |
|      | Koosh Media | |
|      | 321370765 | |
|      | 8103786531 | |
|      | AMERICAN SAVINGS B | |
|      | 20200603MMQFMPUN000255 | |
|      | 20200603CMQFMPO1016423 | |
|      | 06031424FT03 | |
| 6/03 | Wire Transfer Debit | 12,500.00- |
|      | Sean C Fleming Rev Trust 5/1/0 | |
|      | 026007993 | |
|      | 101-WA-258641-000 | |
|      | UBS AG | |
|      | 20200603MMQFMPUN000259 | |
|      | 20200603B1Q8052R000571 | |
|      | 06031425FT03 | |
| 6/03 | Wire Transfer Debit | 102,018.25- |
|      | Murphy Hoffman Company | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200603MMQFMPUN000256 | |
|      | 20200603J1B7841C001027 | |
|      | 06031425FT03 | |
| 6/03 | Wire Transfer Debit | 380,281.86- |
|      | Murphy Hoffman Company | |
|      | 101000695 | |
|      | 9872224221 | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | UMB BANK, N.A. | |
|      | 20200603MMQFMPUN000257 | |
|      | 20200603J1B7841C001028 | |
|      | 06031425FT03 | |
| 6/03 | SHOPIFY CAPITAL   RXME4RTD4 | 13.66- |
|      | Andrew Chapin | |
|      | R7294951 | |
| 6/03 | SHOPIFY CAPITAL   RKZA6PX3L | 27.87- |
|      | Andrew Chapin | |
|      | R7293612 | |
| 6/04 | Wire Transfer Debit | 11,930.05- |
|      | Internet Escrow Services Inc | |
|      | 021000089 | |
|      | 31044399 | |
|      | CITIBANK, N.A. | |
|      | Reference Escrow Transaction # | |
|      | 20200604MMQFMPUN000089 | |
|      | 20200604B1Q8021R020404 | |
|      | 06041255FT03 | |
| 6/04 | SHOPIFY CAPITAL   RDSPHCV7P | 46.97- |
|      | Andrew Chapin | |
|      | R7303701 | |
| 6/04 | SHOPIFY CAPITAL   RJV5CT52P | 49.93- |
|      | Andrew Chapin | |
|      | R7305135 | |
| 6/04 | WCB Warehouse    WCB Wareho | 250.00- |
|      | BENJA INCORPORATED | |
|      | ST-E5M7M7L3F9M3 | |
| 6/05 | Wire Transfer Debit | 212,473.85- |
|      | Murphy Hoffman Company | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | Benja - INV-0517 | |
|      | 20200605MMQFMPUN000516 | |
|      | 20200605J1B7841C001639 | |
|      | 06051701FT03 | |
| 6/05 | Wire Transfer Debit | 324,805.50- |
|      | Murphy Hoffman Company | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200605MMQFMPUN000514 | |
|      | 20200605J1B7841C001637 | |
|      | 06051701FT03 | |
| 6/05 | Wire Transfer Debit | 462,183.93- |
|      | Murphy Hoffman Company | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | Benja - INV-0482 | |
| | 20200605MMQFMPUN000515 | |
| | 20200605J1B7841C001638 | |
| | 06051701FT03 | |
| 6/05 | guideline 401(k) AMTS:55,2<br>BENJA INCORPORATED<br>ST-04T6P6U4R8T9 | .57- |
| 6/05 | SHOPIFY CAPITAL  R4V2USQ7I<br>Andrew Chapin<br>R7315494 | 17.16- |
| 6/05 | SHOPIFY CAPITAL  R3D6VY2FQ<br>Andrew Chapin<br>R7313981 | 84.45- |
| 6/08 | SHOPIFY CAPITAL  RHP7JZL55<br>Andrew Chapin<br>R7324605 | 8.19- |
| 6/08 | SHOPIFY CAPITAL  RDBJQBSYN<br>Andrew Chapin<br>R7326147 | 58.47- |
| 6/08 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>BILLCORMALI | 800.00- |
| 6/09 | Wire Transfer Debit<br>Murphy Hoffman Company<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200609MMQFMPUN000235<br>20200609J1B7841C001024<br>06091422FT03 | 255,000.00- |
| 6/09 | SHOPIFY CAPITAL  RG5EHLNQD<br>Andrew Chapin<br>R7345473 | 16.97- |
| 6/09 | SHOPIFY CAPITAL  RJSRMF5PG<br>Andrew Chapin<br>R7354960 | 18.30- |
| 6/09 | SHOPIFY CAPITAL  RSN17UTCG<br>Andrew Chapin<br>R7336816 | 19.87- |
| 6/09 | SHOPIFY CAPITAL  RFJGP4WVH<br>Andrew Chapin<br>R7335272 | 34.45- |
| 6/09 | SHOPIFY CAPITAL  RBVTDSQSZ<br>Andrew Chapin<br>R7346921 | 49.67- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 6/09 | SHOPIFY CAPITAL  RVVZIO26E<br>Andrew Chapin<br>R7356268 | 76.87- |
| 6/10 | SHOPIFY CAPITAL  R6WGLTEEX<br>Andrew Chapin<br>R7366323 | 75.21- |
| 6/10 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>MARTIJNKLEI EBA | 89.38- |
| 6/10 | SHOPIFY CAPITAL  R7RUIEYUD<br>Andrew Chapin<br>R7368361 | 423.13- |
| 6/10 | APPLECARD GSBANK PAYMENT<br>Andrew Chapin<br>1749626 | 3,158.95- |
| 6/10 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>W4750 | 6,500.00- |
| 6/10 | CHASE CREDIT CRD EPAY<br>ANDREW J CHAPIN<br>4726092077 | 8,900.00- |
| 6/11 | SHOPIFY CAPITAL  RHQMK6SKP<br>Andrew Chapin<br>R7375301 | 20.33- |
| 6/12 | SHOPIFY CAPITAL  RVXTYS45D<br>Andrew Chapin<br>R7385992 | 35.11- |
| 6/15 | SHOPIFY CAPITAL  RRPIKU2MQ<br>Andrew Chapin<br>R7396746 | 26.78- |
| 6/15 | VZ WIRELESS VE   VZW WEBPAY<br>ANDREW *CHAPIN<br>9840064 | 534.64- |
| 6/15 | LIN XIAO LI      IAT PAYPAL<br>ANDREW CHAPIN | 2,068.99- |
| 6/15 | TO LN 6706744910865<br>FROM DDA 500764766 | 11,086.50- |
| 6/16 | Account Analysis Charge | 194.05- |
| 6/16 | SHOPIFY CAPITAL  RUMPYX7IM<br>Andrew Chapin<br>R7427659 | 18.04- |
| 6/16 | SHOPIFY CAPITAL  RVVJOZWJY<br>Andrew Chapin<br>R7417958 | 29.82- |
| 6/16 | SHOPIFY CAPITAL  RTZ3YKSKS<br>Andrew Chapin<br>R7407639 | 47.88- |
| 6/17 | Wire Transfer Debit<br>UMB Capital Finance | 20,000.00- |



BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|  | 101000695 | |
|  | 9872215826 | |
|  | UMB BANK, N.A. | |
|  | 2020O617MMQFMPUNOOO112 | |
| 6/17 | SHOPIFY CAPITAL  RTWRPSWHM<br>Andrew Chapin<br>R7437780 | 16.15- |
| 6/17 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-V8Z6LOC5P3B7 | 250.00- |
| 6/18 | SHOPIFY CAPITAL  RWZ4OTAAP<br>Andrew Chapin<br>R7448357 | 26.18- |
| 6/18 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>BILLCORMALI | 125.00- |
| 6/19 | SHOPIFY CAPITAL  RA7RUYS64<br>Andrew Chapin<br>R7459079 | 83.99- |
| 6/19 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-G4M5Y6R6VOW3 | 582.90- |
| 6/19 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-O9V6E4C8M5K6 | 619.54- |
| 6/22 | GUSTO            CND 884331<br>Benja Incorporated<br>6semjok9c2t | 50.00- |
| 6/22 | SHOPIFY CAPITAL  RQGWLUSYN<br>Andrew Chapin<br>R7469780 | 78.74- |
| 6/23 | SHOPIFY CAPITAL  R6O3DPXFV<br>Andrew Chapin<br>R75OO512 | 18.20- |
| 6/23 | SHOPIFY CAPITAL  R6RSELDZV<br>Andrew Chapin<br>R7480652 | 35.48- |
| 6/23 | SHOPIFY CAPITAL  REYVUKJYU<br>Andrew Chapin<br>R7491037 | 65.86- |
| 6/23 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-F5M6Z2V6B2T2 | 250.00- |
| 6/24 | SHOPIFY CAPITAL  RK3VP5ASX<br>Andrew Chapin<br>R7510126 | 40.95- |
| 6/25 | SHOPIFY CAPITAL  RL36ANLSC<br>Andrew Chapin | 9.10- |



100 W University Ave
Champaign IL 61820

Date 6/30/20          Page      9
Primary Account              4766

BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|-------------------------|--|--------|
| | R7520344 | | |
| 6/25 | VENMO              PAYMENT<br>ANDREW CHAPIN<br>3666252200 | | 1,490.00- |
| 6/26 | CGUSABENJA         TRANSFER<br>ANDREW CHAPIN<br>ST-S4T4K5G1T7E7 | | 15.42- |
| 6/26 | SHOPIFY CAPITAL    RFZJYVCBI<br>Andrew Chapin<br>R7530750 | | 26.09- |
| 6/29 | SHOPIFY CAPITAL    RS34R7QXL<br>Andrew Chapin<br>R7541406 | | 59.83- |
| 6/30 | SHOPIFY CAPITAL    RH3AOPWHV<br>Andrew Chapin<br>R7562436 | | 31.64- |
| 6/30 | CUSTO              CND 944380<br>Benja Incorporated<br>6semjolldok | | 50.00- |
| 6/30 | SHOPIFY CAPITAL    RPUVPV445<br>Andrew Chapin<br>R7552116 | | 53.31- |
| 6/30 | SHOPIFY CAPITAL    RTP7D627W<br>Andrew Chapin<br>R7571971 | | 55.76- |
| 6/30 | GUSTO              CND 944380<br>Benja Incorporated<br>6semjolldo6 | | 100.00- |
| 6/30 | GUSTO              CND 944380<br>Benja Incorporated<br>6semjolldpi | | 750.00- |
| 6/30 | GUSTO              CND 944380<br>Benja Incorporated<br>6semjolldp3 | | 800.00- |
| 6/30 | GUSTO              REM 944386<br>Benja Incorporated<br>6semjolldms | | 1,490.00- |
| 6/30 | GUSTO              TAX 944394<br>Benja Incorporated<br>6semjolld1g | | 5,814.16- |
| 6/30 | GUSTO              NET 944385<br>Benja Incorporated<br>6semjolldk7 | | 16,201.78- |
| 6/30 | Overdraft Item Charge | | 70.00- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 6/16 | 5006 | 67.57 | 6/10 | 5007 | 107.24 |
| 6/12 | 5013* | 10.00 | | | |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 6/01 | 28,066.01 | 6/02 | 17,958.55 | 6/03 | 13,193.88 |
| 6/04 | 1,199.67 | 6/05 | 1,731.31 | 6/08 | 1,197.48 |
| 6/09 | 51,811.17 | 6/10 | 37,983.58 | 6/11 | 38,374.71 |
| 6/12 | 38,557.90 | 6/15 | 25,038.31 | 6/16 | 25,438.69 |
| 6/17 | 5,317.94 | 6/18 | 5,296.12 | 6/19 | 5,954.25 |
| 6/22 | 5,868.63 | 6/23 | 5,805.79 | 6/24 | 5,764.84 |
| 6/25 | 4,336.84 | 6/26 | 4,295.33 | 6/29 | 4,235.50 |
| 6/30 | 17,983.54- | | | | |



Check 5006 Amount $67.57 Date 6/16/2020



Check 5007 Amount $107.24 Date 6/10/2020



Check 5013 Amount $10.00 Date 6/12/2020



100 W University Ave
Champaign IL 61820

12344742                              Date  5/29/20         Page      1
BENJA INC                             Primary Account                4766
845 MARKET ST 450A
SAN FRANCISCO CA 94117

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | | |
|---|---|---|---|
| Account Number | 4766 | Number of Enclosures | 6 |
| Previous Balance | 195,406.71 | Statement Dates  5/01/20 thru  5/31/20 | |
| 24 Deposits/Credits | 965,024.70 | Days in the statement period | 31 |
| 91 Checks/Debits | 1,157,415.19 | Average Ledger | 68,384.33 |
| Service Charge | .00 | Average Collected | 68,384.33 |
| Interest Paid | .00 | | |
| Ending Balance | 3,016.22 | | |

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $805.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|---|---|---|---|
| 5/01 | CCUSABENJA | TRANSFER | 31.91 |
| | ANDREW CHAPIN | | |
| | ST-U9D7AOPOR4R1 | | |
| 5/05 | CCUSABENJA | TRANSFER | 77.42 |
| | ANDREW CHAPIN | | |
| | ST-V7H305J9POQ5 | | |
| 5/06 | RAINY DAY PRINTI ACH | | .06 |
| | Benja Incorporated | | |
| 5/06 | RAINY DAY PRINTI ACH | | .08 |
| | Benja Incorporated | | |
| 5/06 | CCUSABENJA | TRANSFER | 6.73 |
| | ANDREW CHAPIN | | |
| | ST-Y9X1DOC8J7Y3 | | |
| 5/08 | CCUSABENJA | TRANSFER | 32.74 |
| | ANDREW CHAPIN | | |
| | ST-E5W6V4A3F1J1 | | |
| 5/11 | CCUSABENJA | TRANSFER | 82.34 |
| | ANDREW CHAPIN | | |
| | ST-YOX3C6L2W7T7 | | |
| 5/12 | CCUSABENJA | TRANSFER | 209.70 |
| | ANDREW CHAPIN | | |
| | ST-R1L7U8ZON5I6 | | |
| 5/13 | CCUSABENJA | TRANSFER | 259 |
| | ANDREW CHAPIN | | |
| | ST-WOF3M5J4E4O2 | | |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

_____
(Account Number)

New Address: _____
(Street Address)        (Unit #)

_____
(City)      (State)      (Zip Code)

Member FDIC _____
(Telephone Number)      (Social Security Number)

_____
(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | |
|---|---|---|---|---|
| Check No. | $ | | | |
| | | | | |

ENDING BALANCE Shown On This Statement    $ _____

Current Checkbook Balance    $ _____

ADD (+)
Deposits, Loan Advances, Credit Memos, And    $ _____
Other Automatic Deposits Not Shown On This    $ _____
Statement    $ _____

ADD (+)
Interest Earned From This Statement    $ _____

SUBTRACT (-)
Total of Checks Outstanding, Automatic Loan    $ _____
Payments, Automatic Savings Transfers, Service    $ _____
Charges, Debit Memos And Other Automatic    $ _____
Deductions Not Shown On This Statement    $ _____

SUBTRACT (-)
Misc. Charges From This Statement    $ _____

NEW CHECKBOOK BALANCE
Should Agree With BALANCE Line    $ _____

TOTAL    $

BALANCE    $ _____

### IMPORTANT INFORMATION

**In Case of General Statement Errors**

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

**In Case of Errors or Questions About Your Electronic Transactions**

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

**In Case of Errors or Questions About Your Line of Credit or Home Equity Loan**

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected error.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

**Balance Subject to Interest Rate for Line of Credit**

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

**Telephone Number and Address to Be Notified in the Event of Errors**

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

Case: 20-00016    Doc# 29    Filed: 07/26/20    Entered: 07/26/20 16:54:50    Page 165 of
259

00115


BUSINESS ANALYSIS                    4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| 5/14 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-V1Z6M5L6X1Z0 | 144.29 |
| 5/15 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Y1Q2P7N4D9H1 | 31.78 |
| 5/18 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Q1T2X1F3J2Y8 | 99.72 |
| 5/19 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-E2D7C1S814K8 | 426.26 |
| 5/20 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-B4N2Q2A7E8A6 | 84.03 |
| 5/21 | Benja - Affordab Benja - Af<br>ANDREW CHAPIN<br>ST-W9C2J8N3K8T5 | 3,000.00 |
| 5/22 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-V4V8F2Q9U4U4 | 208.25 |
| 5/26 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-O9B9J8ROG3I1 | 97.88 |
| 5/26 | SBAD TREAS 310    MISC PAY<br>Benja Incorporated<br>166317780073000<br>RMT*CT*1663177800 200 12668 F8<br>O41********\ | 149,900.00 |
| 5/27 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200527J1B7841C001627<br>20200527MMQFMPUNO000319<br>05271651FT03 | 268,872.52 |
| 5/27 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-M1C319M8R6O5 | 303.27 |
| 5/27 | MHC FIN SERVICES CHKNAM<br>Benja Incorporated<br>56762 | 540,572.25 |
| 5/28 | CCUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-C3DOQ4V5J9X7 | 175.75 |
| 5/28 | AMZN4F5DE52Z     Marketplac<br>Benja Incorporated | 340.64 |



BUSINESS ANALYSIS                 4766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
|      | 55YOZOMOS2NZMJY | |
| 5/29 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Z9W7T5R8O4D6 | 263.26 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 5/01 | Wire Transfer Debit<br>Andrew Chapin<br>322271627<br>555475257<br>JPMORGAN CHASE BAN<br>20200501MMQFMPUN000254<br>20200501B1QGC01R056608<br>05011340FT03 | 144,000.00- |
| 5/01 | SHOPIFY CAPITAL  RRM6N5WYM<br>Andrew Chapin<br>R6962604 | 5.64- |
| 5/01 | SHOPIFY CAPITAL  RIVLYGTYZ<br>Andrew Chapin<br>R6961211 | 21.55- |
| 5/04 | Wire Transfer Debit<br>Rainy Day Printing<br>102000021<br>103683925111<br>US BANK, NA<br>20200504MMQFMPUN000429<br>20200504J1Q5040C001340<br>05041706FT03 | 200.00- |
| 5/04 | SHOPIFY CAPITAL  RR6UA2ZSL<br>Andrew Chapin<br>R6971590 | 16.82- |
| 5/04 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>BESTAUTHENT EBA | 113.42- |
| 5/04 | GUSTO         FEE 629057<br>Benja Incorporated<br>6semjog3emg | 141.00- |
| 5/04 | GUSTO         REM 630913<br>Benja Incorporated<br>6semjog5pbv | 237.50- |
| 5/05 | Wire Transfer Debit<br>CFOS 2GO STAFFING<br>121143260<br>0101150100 | 2,500.00- |


BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | WESTERN ALLIANCE B 20200505MMQFMPUN000395 20200505L1LFB71C001847 05051725FT03 | |
| 5/05 | SHOPIFY CAPITAL  RWRDKDZYD Andrew Chapin R6993344 | 2.50- |
| 5/05 | SHOPIFY CAPITAL  RVWB5SBNW Andrew Chapin R6983473 | 11.21- |
| 5/05 | SHOPIFY CAPITAL  RKRDUT63D Andrew Chapin R6991951 | 18.20- |
| 5/05 | SHOPIFY CAPITAL  ROSGNXSN4 Andrew Chapin R7001455 | 33.97- |
| 5/05 | SHOPIFY CAPITAL  R6FPVKKMY Andrew Chapin R6981979 | 44.52- |
| 5/05 | PAYMENTECH       FEE AffordableJerseys 6470807 | 56.27- |
| 5/06 | SHOPIFY CAPITAL  RYSAUIT5O Andrew Chapin R7012844 | 1.23- |
| 5/06 | GUSTO           CND 636917 Benja Incorporated 6semjogcOkp | 250.00- |
| 5/07 | PAYPAL           INST XFER ANDREW CHAPIN SAYIT86 EBAY SA | 2.16- |
| 5/07 | SHOPIFY CAPITAL  RC5Q5D742 Andrew Chapin R7021722 | 7.28- |
| 5/08 | SHOPIFY CAPITAL  ROUB53ATT Andrew Chapin R7033526 | 5.84- |
| 5/08 | SHOPIFY CAPITAL  REMTFR5ZK Andrew Chapin R7032077 | 42.22- |
| 5/11 | SHOPIFY CAPITAL  RC6AKSNGA Andrew Chapin R7042453 | 8.54- |
| 5/11 | SHOPIFY CAPITAL  RWCX25WNO Andrew Chapin R7043877 | 14.57- |
| 5/11 | APPLECARD GSBANK PAYMENT Andrew Chapin | 1,134.01- |



BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------|------|------|
| | 1749626 | | |
| 5/12 | SHOPIFY CAPITAL  RTZT5QBJG | | 8.80- |
| | Andrew Chapin | | |
| | R7073189 | | |
| 5/12 | SHOPIFY CAPITAL  RT6JGRWDR | | 10.18- |
| | Andrew Chapin | | |
| | R7071994 | | |
| 5/12 | SHOPIFY CAPITAL  RV2BIHFYR | | 28.23- |
| | Andrew Chapin | | |
| | R7064179 | | |
| 5/12 | SHOPIFY CAPITAL  RMJN567IH | | 36.85- |
| | Andrew Chapin | | |
| | R7062811 | | |
| 5/13 | SHOPIFY CAPITAL  RSDJZGG6S | | 11.28- |
| | Andrew Chapin | | |
| | R7082765 | | |
| 5/13 | SHOPIFY CAPITAL  R2UPXEWI5 | | 18.95- |
| | Andrew Chapin | | |
| | R7081465 | | |
| 5/14 | SHOPIFY CAPITAL  R5YLV7CLO | | 9.16- |
| | Andrew Chapin | | |
| | R7091509 | | |
| 5/14 | SHOPIFY CAPITAL  RAOIR3ENS | | 25.59- |
| | Andrew Chapin | | |
| | R7092892 | | |
| 5/15 | Account Analysis Charge | | 346.34- |
| 5/15 | SHOPIFY CAPITAL  REOHWOJUZ | | 5.62- |
| | Andrew Chapin | | |
| | R7103053 | | |
| 5/15 | SHOPIFY CAPITAL  REPTKSAFM | | 26.18- |
| | Andrew Chapin | | |
| | R7101663 | | |
| 5/18 | SHOPIFY CAPITAL  RS2US7XZ7 | | 8.19- |
| | Andrew Chapin | | |
| | R7111979 | | |
| 5/18 | SHOPIFY CAPITAL  R7ITCP4RJ | | 17.68- |
| | Andrew Chapin | | |
| | R7113386 | | |
| 5/18 | PAYPAL           INST XFER | | 56.00- |
| | ANDREW CHAPIN | | |
| | THETRAVYTRA | | |
| 5/18 | PAYMENTECH       CHARGEBACK | | 72.99- |
| | AffordableJerseys | | |
| | 6470807 | | |
| 5/18 | PAYPAL           INST XFER | | 89.99- |
| | ANDREW CHAPIN | | |
| | TYLERPEDEN1 | | |
| 5/19 | SHOPIFY CAPITAL  R2CLCVRXH | | 10.27- |
| | Andrew Chapin | | |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
| | R7141938 | | |
| 5/19 | SHOPIFY CAPITAL | RTNX2T6NC | 11.24- |
| | Andrew Chapin | | |
| | R7143224 | | |
| 5/19 | SHOPIFY CAPITAL | ROFKYFNXD | 22.52- |
| | Andrew Chapin | | |
| | R7123927 | | |
| 5/19 | SHOPIFY CAPITAL | R3A22DAJ6 | 33.01- |
| | Andrew Chapin | | |
| | R7133895 | | |
| 5/19 | SHOPIFY CAPITAL | RJ46LB7HR | 58.57- |
| | Andrew Chapin | | |
| | R7132499 | | |
| 5/20 | SHOPIFY CAPITAL | RS4UXLJEP | 14.92- |
| | Andrew Chapin | | |
| | R7153201 | | |
| 5/20 | SHOPIFY CAPITAL | R7C3JR2MV | 20.12- |
| | Andrew Chapin | | |
| | R7151847 | | |
| 5/20 | AMEX EPAYMENT | ACH PMT | 8,999.27- |
| | Andrew Chapin | | |
| | W1786 | | |
| 5/21 | SHOPIFY CAPITAL | RDECYZKZU | 8.19- |
| | Andrew Chapin | | |
| | R7162064 | | |
| 5/21 | PAYMENTECH | CHARGEBACK | 63.00- |
| | AffordableJerseys | | |
| | 6470807 | | |
| 5/21 | WCB Warehouse | WCB Wareho | 250.00- |
| | BENJA INCORPORATED | | |
| | ST-P8NOP3W1R4I3 | | |
| 5/22 | SHOPIFY CAPITAL | RIIBBV3AR | 16.73- |
| | Andrew Chapin | | |
| | R7172513 | | |
| 5/22 | SHOPIFY CAPITAL | RIZFI24QF | 36.75- |
| | Andrew Chapin | | |
| | R7173938 | | |
| 5/26 | Wire Transfer Debit | | 600.00- |
| | Morning Blitz LLC | | |
| | 026009593 | | |
| | 898115416717 | | |
| | 921 Heron Court | | |
| | Marco Island, FL | | |
| | BANK OF AMERICA, N | | |
| | 20200526MMQFMPUNO00385 | | |
| | 20200526B6B7HU4RO11332 | | |
| | 05261424FT03 | | |
| 5/26 | Wire Transfer Debit | | 1,100.00- |
| | Koosh Media LLC | | |



Date 5/29/20          Page     7
Primary Account          4766

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | 321370765 | |
|      | 8103786531 | |
|      | AMERICAN SAVINGS B | |
|      | 20200526MMQFMPUN000386 | |
|      | 20200526CMQFMP01021050 | |
|      | 05261424FT03 | |
| 5/26 | SHOPIFY CAPITAL  R4YNZFLFY | 17.30- |
|      | Andrew Chapin | |
|      | R7184415 | |
| 5/26 | SHOPIFY CAPITAL  R4TE4DPAB | 61.12- |
|      | Andrew Chapin | |
|      | R7182983 | |
| 5/27 | Wire Transfer Debit | 250,500.00- |
|      | Andrew Chapin | |
|      | 322271627 | |
|      | 555475257 | |
|      | JPMORGAN CHASE BAN | |
|      | 20200527MMQFMPUN000123 | |
|      | 20200527B1QGC01R031842 | |
|      | 05271126FT03 | |
| 5/27 | SHOPIFY CAPITAL  RUJCBVNOE | 5.64- |
|      | Andrew Chapin | |
|      | R7214810 | |
| 5/27 | SHOPIFY CAPITAL  RRAX7ZZ3H | 9.10- |
|      | Andrew Chapin | |
|      | R7213542 | |
| 5/27 | SHOPIFY CAPITAL  RTW6AKAZU | 9.76- |
|      | Andrew Chapin | |
|      | R7204053 | |
| 5/27 | SHOPIFY CAPITAL  RPEBS4R3F | 12.17- |
|      | Andrew Chapin | |
|      | R7205454 | |
| 5/27 | SHOPIFY CAPITAL  RWH64DJXE | 12.57- |
|      | Andrew Chapin | |
|      | R7224204 | |
| 5/27 | SHOPIFY CAPITAL  RAQ67TISH | 21.35- |
|      | Andrew Chapin | |
|      | R7222908 | |
| 5/27 | SHOPIFY CAPITAL  RO7Q73UE7 | 23.27- |
|      | Andrew Chapin | |
|      | R7195257 | |
| 5/27 | SHOPIFY CAPITAL  RY6VJLH6N | 67.79- |
|      | Andrew Chapin | |
|      | R7193707 | |
| 5/27 | AMEX EPAYMENT    ACH PMT | 1,338.79- |
|      | Andrew Chapin | |
|      | W9564 | |
| 5/27 | LIN XIAO LI      IAT PAYPAL | 3,593.68- |
|      | ANDREW CHAPIN | |



BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 5/27 | JOMBOY CORP      SALE<br>BENJA INCORPORATED | 4,000.00- |
| 5/27 | CHASE CREDIT CRD EPAY<br>ANDREW J CHAPIN<br>4703131471 | 4,412.84- |
| 5/28 | SHOPIFY CAPITAL  REAU276XE<br>Andrew Chapin<br>R7234445 | 31.09- |
| 5/28 | from dda 500764766<br>to loan 6706744910865 | 700,000.00- |
| 5/29 | Wire Transfer Debit<br>Sports Byline USA<br>122016066<br>0450009504<br>CITY NATIONAL BANK<br>20200529MMQFMPUN000295<br>20200529L2LFCK1C003994<br>05291331FT03 | 2,500.00- |
| 5/29 | GUSTO            CND 783183<br>Benja Incorporated<br>6semjoibrth | 50.00- |
| 5/29 | SHOPIFY CAPITAL  RXHOAV62S<br>Andrew Chapin<br>R7244802 | 50.19- |
| 5/29 | SHOPIFY CAPITAL  RYL5OQIML<br>Andrew Chapin<br>R7243381 | 63.52- |
| 5/29 | GUSTO            CND 783183<br>Benja Incorporated<br>6semjoibrt8 | 150.00- |
| 5/29 | GUSTO            CND 783183<br>Benja Incorporated<br>6semjoibrt9 | 150.00- |
| 5/29 | GUSTO            CND 783183<br>Benja Incorporated<br>6semjoibrta | 350.00- |
| 5/29 | GUSTO            CND 783183<br>Benja Incorporated<br>6semjoibrt7 | 400.00- |
| 5/29 | GUSTO            CND 783183<br>Benja Incorporated<br>6semjoibrtk | 800.00- |
| 5/29 | GUSTO            CND 783183<br>Benja Incorporated<br>6semjoibrtd | 850.00- |
| 5/29 | GUSTO            REM 783186<br>Benja Incorporated<br>6semjoibrt4 | 2,187.50- |



100 W University Ave
Champaign IL 61820

Date 5/29/20    Page    9

Date 5/29/20    Page    9
Primary Account    4766

BUSINESS ANALYSIS    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 5/29 | CUSTO    TAX 783187 | 6,491.07- |
|      | Benja Incorporated |  |
|      | 6semjoibrss |  |
| 5/29 | CUSTO    NET 783185 | 17,892.04- |
|      | Benja Incorporated |  |
|      | 6semjoibrse |  |

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 5/28 | 5005 | 44.99 | 5/22 | 5008* | 107.24 |
| 5/29 | 5009 | 128.37 | 5/20 | 5011* | 134.99 |
| 5/18 | 5012 | 51.50 | 5/22 | 5014* | 12.24 |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 5/01 | 51,411.43 | 5/04 | 50,702.69 | 5/05 | 48,113.44 |
| 5/06 | 47,869.08 | 5/07 | 47,859.64 | 5/08 | 47,844.32 |
| 5/11 | 46,769.54 | 5/12 | 46,895.18 | 5/13 | 46,928.77 |
| 5/14 | 47,038.31 | 5/15 | 46,691.95 | 5/18 | 46,495.32 |
| 5/19 | 46,785.97 | 5/20 | 37,700.70 | 5/21 | 40,379.51 |
| 5/22 | 40,414.80 | 5/26 | 188,634.26 | 5/27 | 734,375.34 |
| 5/28 | 34,815.65 | 5/29 | 3,016.22 |  |  |



Check 5005 Amount $44.99 Date 5/28/2020



Check 5008 Amount $107.24 Date 5/22/2020



Check 5009 Amount $128.37 Date 5/29/2020



Check 5011 Amount $134.99 Date 5/20/2020



Check 5012 Amount $51.50 Date 5/18/2020



Check 5014 Amount $12.24 Date 5/22/2020



100 W University Ave
Champaign IL 61820

11386266                                    Date  4/30/20        Page     1
BENJA INC                                   Primary Account            4766
845 MARKET ST 450A
SAN FRANCISCO CA 94117

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | | |
|---|---|---|---|
| Account Number | 4766 | Number of Enclosures | 0 |
| Previous Balance | 11,599.47 | Statement Dates  4/01/20 thru  4/30/20 | |
| 28 Deposits/Credits | 4,290,724.02 | Days in the statement period | 30 |
| 101 Checks/Debits | 4,106,916.78 | Average Ledger | 143,808.36 |
| Service Charge | .00 | Average Collected | 143,808.36 |
| Interest Paid | .00 | | |
| Ending Balance | 195,406.71 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $805.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 4/02 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200401J1B7841C002985<br>20200401MMQFMPUN000330<br>04011745FTO1 | 414,950.54 |
| 4/03 | CGUSABENJA     TRANSFER<br>ANDREW CHAPIN<br>ST-E5B4L1WOV5J3 | 47.94 |
| 4/06 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200403J1B7841C001682<br>20200403MMQFMPUN000275<br>04031800FTO1 | 1,243,604.49 |
| 4/06 | CGUSABENJA     TRANSFER<br>ANDREW CHAPIN<br>ST-Y7O8Y1D4W4H2 | 27.05 |
| 4/08 | CGUSABENJA     TRANSFER<br>ANDREW CHAPIN | |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____
_____
(Account Number)

New Address: _____
(Street Address)                                    (Unit #)

_____
(City)                          (State)                 (Zip Code)

Member FDIC

_____
(Telephone Number)                         (Social Security Number)

_____
(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

**THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK**

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | |
|---|---|
| Check No. | $ |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL | $ |

ENDING  BALANCE
Shown On This Statement                         $ _____

Current Checkbook Balance                       $ _____

ADD (+)
Deposits, Loan Advances, Credit Memos, And     $ _____
Other Automatic Deposits Not Shown On This     $ _____
Statement                                       $ _____

ADD (+)
Interest Earned From This Statement            $ _____

SUBTRACT (-)
Misc. Charges From This Statement              $ _____

SUBTRACT (-)
Total of Checks Outstanding, Automatic Loan    $ _____
Payments, Automatic Savings Transfers, Service $ _____
Charges, Debit Memos  And Other Automatic      $ _____
Deductions Not Shown On This Statement         $ _____

**NEW CHECKBOOK BALANCE**
Should Agree With BALANCE Line                 $ _____

BALANCE                                         $ _____

**IMPORTANT INFORMATION**

### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

**IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS**

### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1)  Tell us your name and account  number.
(2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3)  Tell us the date and the dollar amount of the suspected  error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1)  Your name and account number.
(2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3)  The date and the dollar amount of the suspected  error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.



100 W University Ave
Champaign IL 61820

Date  4/30/20        Page    2
Primary Account              4766

BUSINESS ANALYSIS                    4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|------|------------------------|--|--------|
| | ST-M7W9W8G2D4P9 | | |
| 4/09 | CCUSABENJA | TRANSFER | 55.09 |
| | ANDREW CHAPIN | | |
| | ST-O8X9K3N4W2R8 | | |
| 4/10 | Wire Transfer Credit | | 322,963.00 |
| | MHC FINANCIAL SERVICES, INC. | | |
| | MHC FINANCIAL SERVICES INC DBA | | |
| | 11120 TOMAHAWK CREEK PKWY SUIT | | |
| | LEAWOOD, KS 662112695 | | |
| | ACCOUNT NAME: BENJA INCORPORAT | | |
| | 20200410J1B7841CO00516 | | |
| | 20200410MMQFMPUNO00166 | | |
| | 0401427FTO3 | | |
| 4/10 | CCUSABENJA | TRANSFER | 103.12 |
| | ANDREW CHAPIN | | |
| | ST-X2P9AOK6K2J7 | | |
| 4/13 | CCUSABENJA | TRANSFER | 68.97 |
| | ANDREW CHAPIN | | |
| | ST-WOI1BOP6N1A8 | | |
| 4/14 | CCUSABENJA | TRANSFER | 111.86 |
| | ANDREW CHAPIN | | |
| | ST-C2E2SOK5GOW4 | | |
| 4/16 | CCUSABENJA | TRANSFER | 31.91 |
| | ANDREW CHAPIN | | |
| | ST-J9ZONOBONOH3 | | |
| 4/17 | CCUSABENJA | TRANSFER | 6.66 |
| | ANDREW CHAPIN | | |
| | ST-YOE8Y8F5Q7T1 | | |
| 4/17 | PAYPAL | TRANSFER | 100.00 |
| | ANDREW CHAPIN | | |
| | 1008631391114 | | |
| 4/17 | ANDREW GLUCK | SENDER | 10,000.00 |
| | 463303580 | | |
| 4/20 | CCUSABENJA | TRANSFER | 61.50 |
| | ANDREW CHAPIN | | |
| | ST-POJ3W1N5D1PO | | |
| 4/20 | to dda 500764766 | | 400,000.00 |
| | from ln 6706744910865 | | |
| 4/21 | Wire Transfer Credit | | 200,000.00 |
| | DISTRIBUTION MANAGEMENT, INC. | | |
| | 5 RESEARCH PARK DR | | |
| | SAINT CHARLES,MO,63304 | | |
| | 20200421L3LF151CO03794 | | |
| | 20200421MMQFMPUNO00254 | | |
| | 0421170IFTO3 | | |
| 4/21 | CCUSABENJA | TRANSFER | 262.32 |
| | ANDREW CHAPIN | | |
| | ST-07S1K5F7J9F8 | | |

Case: 20-00030   Doc# 29   Filed: 00/26/20   Entered: 00/26/20 16:54:50   Page 173 of
259



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| 4/21 | SBAD TREAS 310      MISC PAY<br>Benja Incorporated<br>EIDG:3600140295<br>NTE*PMT*EIDG:3600140295\ | 6,000.00 |
| 4/23 | CCUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-B1FOS3ZOC9P1 | 138.84 |
| 4/24 | CCUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-S7B5Z4AOMOH6 | 187.05 |
| 4/27 | CCUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-U8L8T5D4T2R2 | 67.76 |
| 4/28 | CCUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-OOA7I7F4POP2 | 55.62 |
| 4/29 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200429J1B7841CO01317<br>20200429MMQFMPUNO00356<br>04291639FTO3 | 994,774.76 |
| 4/29 | CCUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-V6GOS5H2S4Q3 | 33.59 |
| 4/30 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200430J1B7841CO00733<br>20200430MMQFMPUNO00198<br>04301138FTO3 | 696,970.23 |
| 4/30 | CCUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-O2E7B5D4U6O4 | 5.19 |
| 4/30 | PAYMENTECH      CHARGEBACK<br>AffordableJerseys<br>6470807 | 75.06 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 4/01 | SHOPIFY CAPITAL  R64TJL6EE<br>Andrew Chapin<br>R6669278 | 59.11- |
| 4/01 | PAYPAL            INST XFER<br>ANDREW CHAPIN<br>JERSEYSTORE | 420.00- |
| 4/02 | Wire Transfer Debit<br>Taco Corp<br>265270413<br>20001214039<br>IBERIABANK<br>20200402MMQFMPUN000061<br>20200402MMQFMP9H000273<br>04021018FT01 | 350,000.00- |
| 4/02 | SHOPIFY CAPITAL  ROP72W4VP<br>Andrew Chapin<br>R6678837 | 17.21- |
| 4/02 | CUSTO           REM 521595<br>Benja Incorporated<br>6semjodiq7s | 50.00- |
| 4/02 | CUSTO           CND 521587<br>Benja Incorporated<br>6semjodiq8i | 100.00- |
| 4/02 | CUSTO           TAX 521606<br>Benja Incorporated<br>6semjodiq75 | 101.89- |
| 4/02 | CUSTO           FEE 520375<br>Benja Incorporated<br>6semjodfebr | 105.00- |
| 4/02 | CUSTO           CND 521587<br>Benja Incorporated<br>6semjodiq8s | 300.00- |
| 4/02 | CUSTO           NET 521594<br>Benja Incorporated<br>6semjodiq6d | 570.93- |
| 4/03 | Wire Transfer Debit<br>KEMA Partners LLC<br>021000021<br>606768692<br>JPMORGAN CHASE BAN<br>20200403MMQFMPUN000052<br>20200403B1QGC01R017533<br>04030914FT01 | 50,000.00- |
| 4/03 | SHOPIFY CAPITAL  RX4EW4OTJ<br>Andrew Chapin<br>R6689748 | 8.54- |
| 4/03 | SHOPIFY CAPITAL  RMYANBU3L<br>Andrew Chapin | 40.56- |



BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | R6688428 | |
| 4/03 | PAYMENTECH        FEE | 138.95- |
|      | AffordableJerseys | |
|      | 6470807 | |
| 4/03 | AMEX EPAYMENT    ACH PMT | 3,201.25- |
|      | Andrew Chapin | |
|      | W4154 | |
| 4/06 | Wire Transfer Debit | 100,000.00- |
|      | Andrew Chapin | |
|      | 322271627 | |
|      | 555475257 | |
|      | JPMORGAN CHASE BAN | |
|      | 20200406MMQFMPUN000032 | |
|      | 20200406B1QGC01R018097 | |
|      | 04060928FT03 | |
| 4/06 | Wire Transfer Debit | 600,000.00- |
|      | Taco Corp of America | |
|      | 265270413 | |
|      | 20001214039 | |
|      | IBERIABANK | |
|      | 20200406MMQFMPUN000033 | |
|      | 20200406MMQFMP9H000284 | |
|      | 04060929FT03 | |
| 4/06 | SHOPIFY CAPITAL  R7ZTBQ6R5 | 4.79- |
|      | Andrew Chapin | |
|      | R6699452 | |
| 4/06 | VZ WIRELESS VE   VZW WEBPAY | 672.59- |
|      | ANDREW *CHAPIN | |
|      | 5165198 | |
| 4/06 | CHASE CREDIT CRD EPAY | 1,234.80- |
|      | ANDREW J CHAPIN | |
|      | 4621558942 | |
| 4/07 | SHOPIFY CAPITAL  RNJWCDUZG | 18.03- |
|      | Andrew Chapin | |
|      | R6717418 | |
| 4/07 | SHOPIFY CAPITAL  RANYWFALH | 18.59- |
|      | Andrew Chapin | |
|      | R6707965 | |
| 4/07 | WCB Warehouse    WCB Wareho | 480.64- |
|      | BENJA INCORPORATED | |
|      | ST-C6Y7K9M6H8V6 | |
| 4/07 | PAYPAL           INST XFER | 1,111.27- |
|      | ANDREW CHAPIN | |
|      | ALEXFREEDMA EBA | |
| 4/08 | SHOPIFY CAPITAL  RR4MQL5JH | 3.86- |
|      | Andrew Chapin | |
|      | R6737042 | |
| 4/08 | SHOPIFY CAPITAL  RTJLEJUJ6 | 43.68- |
|      | Andrew Chapin | |



BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | R6735755 | |
| 4/08 | to loan 6706744910865 | 450,000.00- |
|      | from dda 500764766 | |
| 4/09 | SHOPIFY CAPITAL   R7NVYAWIU | 9.75- |
|      | Andrew Chapin | |
|      | R6746547 | |
| 4/09 | SHOPIFY CAPITAL   RMFPDTCYT | 23.72- |
|      | Andrew Chapin | |
|      | R6745236 | |
| 4/10 | Wire Transfer Debit | 100,000.00- |
|      | Andrew Chapin | |
|      | 322271627 | |
|      | 555475257 | |
|      | JPMORGAN CHASE BAN | |
|      | 20200410MMQFMPUN0001800 | |
|      | 20200410B1QGCO1R032183 | |
|      | 04101405FT03 | |
| 4/10 | SHOPIFY CAPITAL   RBNF33WE4 | 8.19- |
|      | Andrew Chapin | |
|      | R6754933 | |
| 4/10 | SHOPIFY CAPITAL   R5CK4YRHB | 18.22- |
|      | Andrew Chapin | |
|      | R6756274 | |
| 4/13 | Wire Transfer Debit | 7,100.00- |
|      | Fenwick & West | |
|      | 026009593 | |
|      | 1484401104 | |
|      | BANK OF AMERICA, N | |
|      | 20200413MMQFMPUN000036 | |
|      | 20200413B6B7HU3R002651 | |
|      | 04130912FT03 | |
| 4/13 | Wire Transfer Debit | 250,000.00- |
|      | Taco Corp of America | |
|      | 265270413 | |
|      | 20001214039 | |
|      | IBERIABANK | |
|      | 20200413MMQFMPUN000037 | |
|      | 20200413MMQFMP9HO00197 | |
|      | 04130912FT03 | |
| 4/13 | SHOPIFY CAPITAL   RYZGDWHL2 | 7.81- |
|      | Andrew Chapin | |
|      | R6764705 | |
| 4/13 | SHOPIFY CAPITAL   R2QPXBOOI | 12.23- |
|      | Andrew Chapin | |
|      | R6766051 | |
| 4/14 | SHOPIFY CAPITAL   R5L2AQJ4X | 1.36- |
|      | Andrew Chapin | |
|      | R6775914 | |



BUSINESS ANALYSIS                4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 4/14 | SHOPIFY CAPITAL  RPRGLTPBH<br>Andrew Chapin<br>R6785151 | 6.15- |
| 4/14 | SHOPIFY CAPITAL  RGSRI3P3A<br>Andrew Chapin<br>R6793699 | 12.30- |
| 4/14 | SHOPIFY CAPITAL  RTXYUMJZX<br>Andrew Chapin<br>R6792494 | 23.49- |
| 4/14 | CUSTO            CND 555619<br>Benja Incorporated<br>6semjoeds55 | 50.00- |
| 4/14 | PAYMENTECH       CHARGEBACK<br>AffordableJerseys<br>6470807 | 75.06- |
| 4/14 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>STEINERSPOR EBA | 147.00- |
| 4/14 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-I4Z5V403Y3O4 | 250.00- |
| 4/14 | CUSTO            CND 555619<br>Benja Incorporated<br>6semjoeds3i | 400.00- |
| 4/14 | CUSTO            CND 555619<br>Benja Incorporated<br>6semjoeds49 | 650.00- |
| 4/14 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>W6968 | 9,000.00- |
| 4/15 | Account Analysis Charge | 332.52- |
| 4/15 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>PJ721 | 41.99- |
| 4/16 | SHOPIFY CAPITAL  RCFQWO3IV<br>Andrew Chapin<br>R6812720 | 5.64- |
| 4/16 | SHOPIFY CAPITAL  R4XAOLOSG<br>Andrew Chapin<br>R6811377 | 24.92- |
| 4/16 | APPLECARD GSBANK PAYMENT<br>Andrew Chapin<br>1749626 | 1,336.71- |
| 4/17 | SHOPIFY CAPITAL  RZAYTZTYP<br>Andrew Chapin<br>R6823115 | 1.22- |
| 4/17 | SHOPIFY CAPITAL  RHDTNVIW3<br>Andrew Chapin | 35.38- |



BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | R6821632 | |
| 4/17 | PAYPAL            INST XFER<br>ANDREW CHAPIN<br>THOMASBARBI | 55.00- |
| 4/20 | Wire Transfer Debit<br>Andrew Chapin<br>322271627<br>555475257<br>JPMORGAN CHASE BAN<br>20200420MMQFMPUNO00285<br>20200420B1QGC01RO63780<br>04201554FT03 | 100,000.00- |
| 4/20 | SHOPIFY CAPITAL   RQNSADQC7<br>Andrew Chapin<br>R6833834 | 10.82- |
| 4/20 | SHOPIFY CAPITAL   R6ENGTIPG<br>Andrew Chapin<br>R6832349 | 58.81- |
| 4/21 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>20200421MMQFMPUNO00261<br>20200421MMQFMP9HO00845<br>04211516FT03 | 350,000.00- |
| 4/21 | SHOPIFY CAPITAL   RH4OCW5ER<br>Andrew Chapin<br>R6854362 | 11.28- |
| 4/21 | SHOPIFY CAPITAL   RGS465RSV<br>Andrew Chapin<br>R6863817 | 17.19- |
| 4/21 | SHOPIFY CAPITAL   RUIV6OLLW<br>Andrew Chapin<br>R6844403 | 17.88- |
| 4/21 | SHOPIFY CAPITAL   R3APRBEFB<br>Andrew Chapin<br>R6852901 | 25.10- |
| 4/22 | Wire Transfer Debit<br>Koosh Media LLC<br>321370765<br>8103786531<br>AMERICAN SAVINGS B<br>20200422MMQFMPUNO00017<br>20200422GMQFMP01O04587<br>04220915FT03 | 4,000.00- |
| 4/22 | Wire Transfer Debit<br>Taco Corp of America | 150,000.00- |



BUSINESS ANALYSIS     4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
| | 265270413 | | |
| | 20001214039 | | |
| | IBERIABANK | | |
| | 20200422MMQFMPUN000016 | | |
| | 20200422MMQFMP9H000209 | | |
| | 04220915FT03 | | |
| 4/22 | VENMO | PAYMENT | 706.00- |
| | ANDREW CHAPIN | | |
| | 3379376019 | | |
| 4/23 | SHOPIFY CAPITAL | RNHWSW655 | 9.10- |
| | Andrew Chapin | | |
| | R6882378 | | |
| 4/23 | SHOPIFY CAPITAL | RJHC6HFHG | 24.60- |
| | Andrew Chapin | | |
| | R6883777 | | |
| 4/23 | GUSTO | CND 589409 | 50.00- |
| | Benja Incorporated | | |
| | 6semjof7efh | | |
| 4/23 | PAYPAL | INST XFER | 170.25- |
| | ANDREW CHAPIN | | |
| | FURRYPAL EBAY F | | |
| 4/23 | APPLECARD GSBANK PAYMENT | | 384.43- |
| | Andrew Chapin | | |
| | 1749626 | | |
| 4/23 | AMEX EPAYMENT | ACH PMT | 6,250.00- |
| | Andrew Chapin | | |
| | W8840 | | |
| 4/24 | SHOPIFY CAPITAL | RHROD3XNC | 26.84- |
| | Andrew Chapin | | |
| | R6892419 | | |
| 4/24 | SHOPIFY CAPITAL | RQSBYQQOI | 33.02- |
| | Andrew Chapin | | |
| | R6893816 | | |
| 4/27 | SHOPIFY CAPITAL | RNLUNOKHW | 8.78- |
| | Andrew Chapin | | |
| | R6902528 | | |
| 4/27 | SHOPIFY CAPITAL | RO4ZPIVYH | 11.97- |
| | Andrew Chapin | | |
| | R6903941 | | |
| 4/27 | VENMO | PAYMENT | 2,000.00- |
| | ANDREW CHAPIN | | |
| | 3390259925 | | |
| 4/27 | CHASE CREDIT CRD EPAY | | 3,048.26- |
| | ANDREW J CHAPIN | | |
| | 4651188106 | | |
| 4/28 | SHOPIFY CAPITAL | RAKS3DJJG | 9.49- |
| | Andrew Chapin | | |
| | R6931462 | | |



BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 4/28 | SHOPIFY CAPITAL  RN4RUUU7B<br>Andrew Chapin<br>R6914127 | 9.84- |
| 4/28 | SHOPIFY CAPITAL  R34HUTHPL<br>Andrew Chapin<br>R6922251 | 18.38- |
| 4/28 | CUSTO            CND 599561<br>Benja Incorporated<br>6semjoffner | 50.00- |
| 4/28 | CUSTO            CND 599561<br>Benja Incorporated<br>6semjoffndr | 100.00- |
| 4/28 | CUSTO            CND 599561<br>Benja Incorporated<br>6semjoffnee | 150.00- |
| 4/28 | CUSTO            CND 599561<br>Benja Incorporated<br>6semjoffnc1 | 200.00- |
| 4/28 | CUSTO            CND 599561<br>Benja Incorporated<br>6semjoffnct | 200.00- |
| 4/28 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-J7K6J3A8V8G0 | 250.00- |
| 4/28 | CUSTO            CND 599561<br>Benja Incorporated<br>6semjoffndc | 300.00- |
| 4/28 | CUSTO            CND 599563<br>Benja Incorporated<br>6semjoffnf9 | 500.00- |
| 4/28 | to ln 6706744910865<br>from dda 500764766 | 5,909.74- |
| 4/28 | to ln 6706744910865<br>from dda 500764766 | 12,035.38- |
| 4/29 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>20200429MMQFMPUNO00415<br>20200429MMQFMP9HO01432<br>04291642FT03 | 1,000,000.00- |
| 4/29 | SHOPIFY CAPITAL  R7JJDFZ7C<br>Andrew Chapin<br>R6942475 | 5.93- |
| 4/29 | SHOPIFY CAPITAL  RBVZ3BZHK<br>Andrew Chapin<br>R6941126 | 27.36- |



100 W University Ave
Champaign IL 61820

BUSINESS ANALYSIS                    4766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 4/29 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>W6272 | 1,547.65- |
| 4/30 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>Close out<br>20200430MMQFMPUNO000131<br>20200430MMQFMP9HO00768<br>04301156FTO3 | 515,027.24- |
| 4/30 | SHOPIFY CAPITAL  R3J4C37ZY<br>Andrew Chapin<br>R6952301 | .96- |
| 4/30 | SHOPIFY CAPITAL  RFTVIYDOD<br>Andrew Chapin<br>R6950966 | 34.57- |
| 4/30 | CUSTO          REM 619626<br>Benja Incorporated<br>6semjofqu60 | 950.00- |
| 4/30 | CUSTO          TAX 619632<br>Benja Incorporated<br>6semjofqu5h | 6,503.53- |
| 4/30 | CUSTO          NET 619622<br>Benja Incorporated<br>6semjofqu4k | 17,892.03- |

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 4/01 | 11,120.36 | 4/02 | 74,825.87 | 4/03 | 21,484.51 |
| 4/06 | 563,203.87 | 4/07 | 561,575.34 | 4/08 | 111,549.27 |
| 4/09 | 111,570.89 | 4/10 | 334,610.60 | 4/13 | 77,559.53 |
| 4/14 | 67,056.03 | 4/15 | 66,681.52 | 4/16 | 65,346.16 |
| 4/17 | 75,361.22 | 4/20 | 375,353.09 | 4/21 | 231,543.96 |
| 4/22 | 76,837.96 | 4/23 | 70,088.42 | 4/24 | 70,215.61 |
| 4/27 | 65,214.36 | 4/28 | 45,537.15 | 4/29 | 38,764.56 |
| 4/30 | 195,406.71 | | | | |

# EXHIBIT 9

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on March 26, 2020 the following computations are true and correct.

| **Accounts Receivable** | | | | |
|---|---|---|---|---|
| 0-30 days from invoice date | 2,057,430 | | | |
| 31-60 days from invoice date | 2,046,872 | | | |
| 61-90 days from invoice date | 546,710 | | | |
| 90+ days from invoice date | - | | | |
| Total Accounts Receivable | | $ 4,651,012 | | |
| | | | | |
| Less:  accounts 90+ days from invoice date | - | | | |
| Less:  accounts with >25% 90+ days from invoice date | - | | | |
| Less:  portion of any account that exceeds 25% of total AR | 261,910 | | | |
| Less:  other ineligible accounts receivable | - | | | |
| Total ineligible accounts receivable | | $ 261,910 | | |
| | | | | |
| Net accounts receivable | | | $ 4,389,102 | |
| Margin rate | | | 80% | |
| **Total borrowing base on accounts receivable** | | | $ 3,511,282 | |
| | | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ 3,000,000 | |
| | | | | |
| Less:  outstanding balance on revolving line of credit | | | $ - | |
| Remaining availability | | | $ 3,000,000 | |

NAME:  Benja Inc.

By: _____
    Andrew Chapin, CEO

Received and reviewed

By: _____
    Dan Saettele, Vice President

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on April 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | | |
|---|---|---|---|---|
| 0-30 days from invoice date | 2,105,824 | | | |
| 31-60 days from invoice date | 2,057,430 | | | |
| 61-90 days from invoice date | 583,780 | | | |
| 90+ days from invoice date | - | | | |
| Total Accounts Receivable | | $ | 4,747,034 | |
| | | | | |
| Less:  accounts 90+ days from invoice date | - | | | |
| Less:  accounts with >25% 90+ days from invoice date | - | | | |
| Less:  portion of any account that exceeds 25% of total AR | 222,759 | | | |
| Less:  other ineligible accounts receivable | - | | | |
| Total ineligible accounts receivable | | $ | 222,759 | |
| | | | | |
| Net accounts receivable | | | $ | 4,524,275 |
| Margin rate | | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ | 3,619,420 |
| | | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ | 3,000,000 |
| | | | | |
| Less:  outstanding balance on revolving line of credit | | | $ | - |
| Remaining availability | | | $ | 3,000,000 |

NAME:  Benja Inc.

By: _____
    Andrew Chapin, CEO

Received and reviewed

By: _____
    Dan Saettele, Vice President

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on May 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | | |
|---|---|---|---|---|
| 0-30 days from invoice date | 2,238,579 | | | |
| 31-60 days from invoice date | 2,105,824 | | | |
| 61-90 days from invoice date | 575,581 | | | |
| 90+ days from invoice date | - | | | |
| Total Accounts Receivable | | $ | 4,919,984 | |
| | | | | |
| Less: accounts 90+ days from invoice date | - | | | |
| Less: accounts with >25% 90+ days from invoice date | - | | | |
| Less: portion of any account that exceeds 25% of total AR | 185,854 | | | |
| Less: other ineligible accounts receivable | - | | | |
| Total ineligible accounts receivable | | $ | 185,854 | |
| | | | | |
| Net accounts receivable | | | $ | 4,734,130 |
| Margin rate | | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ | 3,787,304 |
| | | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ | 3,000,000 |
| | | | | |
| Less: outstanding balance on revolving line of credit | | | $ | - |
| Remaining availability | | | $ | 3,000,000 |

NAME: Benja Inc.

By: _____
    Andrew Chapin, CEO

Received and reviewed

By: _____
    Dan Saettele, Vice President

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on June 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | |
|---|---|---|---|
| 0-30 days from invoice date | 2,501,037 | | |
| 31-60 days from invoice date | 2,333,265 | | |
| 61-90 days from invoice date | 606,555 | | |
| 90+ days from invoice date | - | | |
| Total Accounts Receivable | | $ | 5,440,857 |
| | | | |
| Less: accounts 90+ days from invoice date | - | | |
| Less: accounts with >25% 90+ days from invoice date | - | | |
| Less: portion of any account that exceeds 25% of total AR | 204,169 | | |
| Less: other ineligible accounts receivable | - | | |
| Total ineligible accounts receivable | | $ | 204,169 |
| | | | |
| Net accounts receivable | | $ | 5,236,688 |
| Margin rate | | | 80% |
| **Total borrowing base on accounts receivable** | | $ | 4,189,350 |
| | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | $ | 3,000,000 |
| | | | |
| Less: outstanding balance on revolving line of credit | | $ | - |
| Remaining availability | | $ | 3,000,000 |

NAME: Benja Inc.

By: _____

    Andrew Chapin, CEO

Received and reviewed

By: _____

# CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on June 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | | |
|---|---|---|---|---|
| 0-30 days from invoice date | 2,333,265 | | | |
| 31-60 days from invoice date | 2,238,579 | | | |
| 61-90 days from invoice date | 579,952 | | | |
| 90+ days from invoice date | 88,794 | | | |
| Total Accounts Receivable | | $ | 5,240,590 | |
| | | | | |
| Less: accounts 90+ days from invoice date | - | | | |
| Less: accounts with >25% 90+ days from invoice date | - | | | |
| Less: portion of any account that exceeds 25% of total AR | 217,430 | | | |
| Less: other ineligible accounts receivable | - | | | |
| Total ineligible accounts receivable | | $ | 217,430 | |
| | | | | |
| Net accounts receivable | | | $ | 5,023,161 |
| Margin rate | | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ | 4,018,528 |
| | | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ | 3,000,000 |
| | | | | |
| Less: outstanding balance on revolving line of credit | | | $ | - |
| Remaining availability | | | $ | 3,000,000 |

NAME: Benja Inc.

By: _____
    Andrew Chapin, CEO

Received and reviewed

By: _____
    Dan Saettele, Vice President

<h2 style="text-align:center">CERTIFICATE OF BORROWING BASE</h2>

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on June 1, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | |
|---|---:|---:|---:|
| 0-30 days from invoice date | 3,038,081 | | |
| 31-60 days from invoice date | 2,501,037 | | |
| 61-90 days from invoice date | 702,432 | | |
| 90+ days from invoice date | 88,794 | | |
| Total Accounts Receivable | | $ 6,330,343 | |
| | | | |
| Less: accounts 90+ days from invoice date | - | | |
| Less: accounts with >25% 90+ days from invoice date | - | | |
| Less: portion of any account that exceeds 25% of total AR | 63,641 | | |
| Less: other ineligible accounts receivable | - | | |
| Total ineligible accounts receivable | | $ 63,641 | |
| | | | |
| Net accounts receivable | | | $ 6,266,702 |
| Margin rate | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ 5,013,362 |
| | | | |
| **TOTAL BORROWING BASE (not to exceed $5,000,000)** | | | $ 5,000,000 |
| | | | |
| Less: outstanding balance on revolving line of credit | | | |
| Remaining availability | | | $ 5,000,000 |

NAME: Benja Inc.

By: _____
    Andrew Chapin, CEO

Received and reviewed

By: _____

## CERTIFICATE OF BORROWING BASE

To fulfill the requirements of the Credit Agreement dated as of July 16, 2019; between Benja Inc. and Busey Bank, the undersigned hereby certifies that, as of the close of business on July 31, 2020 the following computations are true and correct.

**Accounts Receivable**

| | | | |
|---|---|---|---|
| 0-30 days from invoice date | 2,862,812 | | |
| 31-60 days from invoice date | 2,501,037 | | |
| 61-90 days from invoice date | 702,432 | | |
| 90+ days from invoice date | - | | |
| Total Accounts Receivable | | $ 6,066,280 | |
| | | | |
| Less: accounts 90+ days from invoice date | - | | |
| Less: accounts with >25% 90+ days from invoice date | - | | |
| Less: portion of any account that exceeds 25% of total AR | 67,197 | | |
| Less: other ineligible accounts receivable | - | | |
| Total ineligible accounts receivable | | $ 67,197 | |
| | | | |
| Net accounts receivable | | | $ 5,999,083 |
| Margin rate | | | 80% |
| **Total borrowing base on accounts receivable** | | | $ 4,799,266 |
| | | | |
| **TOTAL BORROWING BASE (not to exceed $3,000,000)** | | | $ 3,000,000 |
| | | | |
| Less: outstanding balance on revolving line of credit | | | $ - |
| Remaining availability | | | $ 3,000,000 |

NAME: Benja Inc.

By: _____
    Andrew Chapin, CEO

Received and reviewed

By: _____
    Patrick Ricke

# Aged Receivables

## Benja Incorporated
## April 2020

| | Current | March | February | January | Older | Total |
|---|---|---|---|---|---|---|
| **Receivables** | | | | | | |
| Apple | - | 3,484 | 3,426 | - | - | 6,910 |
| Arc'teryx | - | 2,020 | 1,990 | - | - | 4,010 |
| Backcountry | - | 358,864 | 357,310 | - | - | 716,174 |
| Black Diamond | - | 21,541 | 20,583 | 20,246 | - | 62,370 |
| Columbia | - | 212,474 | 180,338 | - | - | 392,812 |
| Coverage Gear | - | 89,118 | 88,794 | 76,455 | - | 254,367 |
| Fanatics | - | 464,238 | 462,184 | 483,095 | - | 1,409,517 |
| Helly Hansen | - | 17,083 | 16,780 | - | - | 33,863 |
| Hunter Boots | - | 2,012 | 1,999 | - | - | 4,011 |
| Ibex | - | 2,464 | 2,318 | - | - | 4,781 |
| Lululemon | - | 1,250 | 1,250 | - | - | 2,500 |
| Michael Kors | - | 5,055 | 4,020 | 3,984 | - | 13,059 |
| New Balance | - | 324,806 | 324,408 | - | - | 649,214 |
| Nike | - | 380,282 | 374,653 | - | - | 754,934 |
| Patagonia | - | 96,219 | 101,177 | - | - | 197,395 |
| Sperry | - | 17,400 | 16,248 | - | - | 33,648 |
| Under Armour | - | 53,676 | 46,863 | - | - | 100,539 |
| Zappos | - | 53,838 | 53,092 | - | - | 106,929 |
| **Total Receivables** | **-** | **2,105,824** | **2,057,430** | **583,780** | **-** | **4,747,034** |
| | 0.0% | 44.4% | 43.3% | 12.3% | 0.0% | |

Case: 20-00030   Doc# 29   Filed: 07/26/20   Entered: 07/26/20 16:56:58   Page 191 of 259
00145

# Aged Receivables

## Benja Incorporated
## May 2020

| Receivables | Current | April | March | February | Older | Total |
|---|---|---|---|---|---|---|
| Apple | - | 4,199 | 3,484 | - | - | 7,683 |
| Arc'teryx | - | 2,194 | 2,020 | - | - | 4,214 |
| Backcountry | - | 396,703 | 358,864 | - | - | 755,567 |
| Black Diamond | - | 22,145 | 21,541 | 20,583 | - | 64,268 |
| Columbia | - | 222,421 | 212,474 | - | - | 434,895 |
| Coverage Gear | - | 89,946 | 89,118 | 88,794 | - | 267,858 |
| Fanatics | - | 489,427 | 464,238 | 462,184 | - | 1,415,850 |
| Helly Hansen | - | 17,256 | 17,083 | - | - | 34,339 |
| Hunter Boots | - | 2,140 | 2,012 | - | - | 4,152 |
| Ibex | - | 2,515 | 2,464 | - | - | 4,979 |
| Lululemon | - | 1,250 | 1,250 | - | - | 2,500 |
| Michael Kors | - | 5,137 | 5,055 | 4,020 | - | 14,212 |
| New Balance | - | 338,033 | 324,806 | - | - | 662,838 |
| Nike | - | 392,902 | 380,282 | - | - | 773,184 |
| Patagonia | - | 120,787 | 96,219 | - | - | 217,005 |
| Sperry | - | 17,927 | 17,400 | - | - | 35,327 |
| Under Armour | - | 55,206 | 53,676 | - | - | 108,883 |
| Zappos | - | 58,390 | 53,838 | - | - | 112,228 |
| **Total Receivables** | **-** | **2,238,579** | **2,105,824** | **575,581** | **-** | **4,919,983** |
| | 0.0% | 45.5% | 42.8% | 11.7% | 0.0% | |

Case: 20-00030   Doc# 29   Filed: 07/26/20   Entered: 07/26/20 16:56:50   Page 192 of
259

00146

# Aged Receivables

## Benja Incorporated
## June 2020

| | Current | May | April | March | Older | Total |
|---|---|---|---|---|---|---|
| **Receivables** | | | | | | |
| Apple | - | 4,080 | 4,199 | - | - | 8,279 |
| Arc'teryx | - | 2,080 | 2,194 | - | - | 4,274 |
| Backcountry | - | 466,490 | 396,703 | - | - | 863,193 |
| Black Diamond | - | 20,517 | 22,145 | 21,541 | - | 64,203 |
| Columbia | - | 265,474 | 222,421 | - | - | 487,895 |
| Coverage Gear | - | 103,005 | 89,946 | 89,118 | 88,794 | 370,863 |
| Fanatics | - | 573,912 | 489,427 | 464,238 | - | 1,527,577 |
| Helly Hansen | - | 16,090 | 17,256 | - | - | 33,346 |
| Hunter Boots | - | 1,950 | 2,140 | - | - | 4,090 |
| Ibex | - | 2,250 | 2,515 | - | - | 4,765 |
| Lululemon | - | 1,500 | 1,250 | - | - | 2,750 |
| Michael Kors | - | 4,998 | 5,137 | 5,055 | - | 15,190 |
| New Balance | - | 395,994 | 338,033 | - | - | 734,027 |
| Nike | - | 453,446 | 392,902 | - | - | 846,348 |
| Patagonia | - | 4,625 | 120,787 | - | - | 125,412 |
| Sperry | - | 16,854 | 17,927 | - | - | 34,781 |
| Under Armour | - | - | 55,206 | - | - | 55,206 |
| Zappos | - | - | 58,390 | - | - | 58,390 |
| **Total Receivables** | **-** | **2,333,265** | **2,238,579** | **579,952** | **88,794** | **5,240,590** |
| | 0.0% | 44.5% | 42.7% | 11.1% | 1.7% | |

Case: 20-00030    Doc# 29    Filed: 07/26/20    Entered: 07/26/20 16:56:58    Page 193 of
259
00147

# Aged Receivables

<div align="center">

## Benja Incorporated
## July 2020

</div>

|  | Current | June | May | April | Older | Total |
|---|---|---|---|---|---|---|
| **Receivables** | | | | | | |
| Apple | - | 4,165 | 4,080 | - | - | 8,245 |
| Arc'teryx | - | 2,000 | 2,080 | - | - | 4,080 |
| Backcountry | - | 487,409 | 466,490 | - | - | 953,899 |
| Black Diamond | - | 22,211 | 20,517 | 22,145 | - | 64,873 |
| Columbia | - | 211,628 | 265,474 | - | - | 477,101 |
| Coverage Gear | - | 133,546 | 103,005 | 89,946 | - | 326,497 |
| Fanatics | - | 501,044 | 573,912 | 489,427 | - | 1,564,383 |
| Helly Hansen | - | 17,540 | 16,090 | - | - | 33,630 |
| Hunter Boots | - | 1,950 | 1,950 | - | - | 3,900 |
| Ibex | - | 2,250 | 2,250 | - | - | 4,500 |
| Lululemon | - | 1,500 | 1,500 | - | - | 3,000 |
| Michael Kors | - | 4,998 | 4,998 | 5,137 | - | 15,133 |
| New Balance | - | 399,847 | 395,994 | - | - | 795,841 |
| Nike | - | 470,121 | 453,446 | - | - | 923,567 |
| Patagonia | - | 120,694 | 4,625 | - | - | 125,319 |
| Sperry | - | 18,555 | 16,854 | - | - | 35,409 |
| Stinky Lockers | 400 | - | - | - | - | 400 |
| Under Armour | - | 61,668 | - | - | - | 61,668 |
| Zappos | - | 39,911 | - | - | - | 39,911 |
| **Total Receivables** | **400** | **2,501,037** | **2,333,265** | **606,655** | **-** | **5,441,357** |
| | 0.0% | 46.0% | 42.9% | 11.1% | 0.0% | |

Case: 20-00030   Doc# 29   Filed: 07/26/20   Entered: 07/26/20 16:56:50   Page 194 of
259
00148

# Aged Receivables
### Benja Incorporated
### July 2020

| Receivables | Current | June | May | April |
|---|---|---|---|---|
| Apple | $4,292.50 | $4,165.00 | $4,080.00 | $0.00 |
| Arc'teryx | $2,000.00 | $2,000.00 | $2,080.00 | $0.00 |
| Backcountry | $493,350.00 | $487,409.10 | $466,490.30 | $0.00 |
| Black Diamond | $24,660.00 | $22,211.26 | $20,517.12 | $22,144.68 |
| Columbia | $220,800.00 | $211,627.60 | $265,473.82 | $0.00 |
| Coverage Gear | $135,000.00 | $133,545.51 | $103,005.00 | $89,946.00 |
| Fanatics | $508,812.21 | $501,044.03 | $573,911.57 | $489,427.37 |
| Helly Hansen | $20,000.00 | $17,540.00 | $16,090.00 | $0.00 |
| Hunter Boots | $1,950.00 | $1,950.00 | $1,950.00 | $0.00 |
| Ibex | $2,250.00 | $2,250.00 | $2,250.00 | $0.00 |
| Kohl's | $278,887.07 | $0.00 | $0.00 | $0.00 |
| Lululemon | $1,500.00 | $1,500.00 | $1,500.00 | $0.00 |
| Michael Kors | $4,998.00 | $4,998.00 | $4,998.00 | $5,137.37 |
| New Balance | $409,555.00 | $399,847.33 | $395,993.78 | $0.00 |
| Nike | $493,885.00 | $470,120.98 | $453,446.18 | $0.00 |
| Patagonia | $138,750.00 | $120,694.00 | $4,625.00 | $0.00 |
| Sperry | $18,000.00 | $18,555.00 | $16,854.00 | $0.00 |
| Stinky Lockers | $400.00 | $0.00 | $0.00 | $0.00 |
| Under Armour | $63,707.04 | $61,667.65 | $0.00 | $0.00 |
| Zappos | $40,014.92 | $39,911.10 | $0.00 | $0.00 |
| **Total Receivables** | **$2,862,811.74** | **$2,501,036.56** | **$2,333,264.77** | **$606,655.42** |
| | 34.4761% | 30.1193% | 28.0989% | 7.3058% |

| Older | Total |
|---|---|
| $0.00 | $12,537.50 |
| $0.00 | $6,080.00 |
| $0.00 | $1,447,249.40 |
| $0.00 | $89,533.06 |
| $0.00 | $697,901.42 |
| $0.00 | $461,496.51 |
| $0.00 | $2,073,195.18 |
| $0.00 | $53,630.00 |
| $0.00 | $5,850.00 |
| $0.00 | $6,750.00 |
| $0.00 | $278,887.07 |
| $0.00 | $4,500.00 |
| $0.00 | $20,131.37 |
| $0.00 | $1,205,396.11 |
| $0.00 | $1,417,452.16 |
| $0.00 | $264,069.00 |
| $0.00 | $53,409.00 |
| $0.00 | $400.00 |
| $0.00 | $125,374.69 |
| $0.00 | $79,926.02 |
| **$0.00** | **$8,303,768.49** |
| 0.0% | |

# Aged Receivables

## Benja Incorporated
## August 2020

| | Current | July | June | May | Older | Total |
|---|---|---|---|---|---|---|
| **Receivables** | | | | | | |
| Apple | - | 4,293 | 4,165 | - | - | 8,458 |
| Arc'teryx | - | 2,000 | 2,000 | - | - | 4,000 |
| Backcountry | - | 493,350 | 487,409 | - | - | 980,759 |
| Black Diamond | - | 24,660 | 22,211 | 20,517 | - | 67,388 |
| Columbia | - | 220,800 | 211,628 | - | - | 432,428 |
| Coverage Gear | - | 135,000 | 133,546 | 103,005 | - | 371,551 |
| Fanatics | - | 479,403 | 501,044 | 573,912 | - | 1,554,359 |
| Helly Hansen | - | 20,000 | 17,540 | - | - | 37,540 |
| Hunter Boots | - | 1,950 | 1,950 | - | - | 3,900 |
| Ibex | - | 2,250 | 2,250 | - | - | 4,500 |
| Kohl's | 278,678 | 278,887 | - | - | - | 557,566 |
| Lululemon | - | 1,500 | 1,500 | - | - | 3,000 |
| Michael Kors | - | 4,998 | 4,998 | 4,998 | - | 14,994 |
| New Balance | - | 409,555 | 399,847 | - | - | 809,402 |
| Nike | - | 493,885 | 470,121 | - | - | 964,006 |
| Patagonia | - | 64,750 | 120,694 | - | - | 185,444 |
| Sperry | - | 18,000 | 18,555 | - | - | 36,555 |
| Stinky Lockers | - | 400 | - | - | - | 400 |
| Under Armour | - | 63,707 | 61,668 | - | - | 125,375 |
| Zappos | - | 40,015 | 39,911 | - | - | 79,926 |
| **Total Receivables** | **278,678** | **2,759,403** | **2,501,037** | **702,432** | **-** | **6,241,549** |
| | 4.5% | 44.2% | 40.1% | 11.3% | 0.0% | |

Case: 20-00030    Doc# 29    Filed: 07/26/20    Entered: 07/26/20 16:56:58    Page 197 of
259
00151

# EXHIBIT 10

00152

# Form 1120

Depar men o he Treasury
n ernal Revenue Service

## U.S. Corporation Income Tax Return

For calendar year 2018 or tax year beginning **57** , 2018, ending **Dec 31** , 20 **18**

▶ Go to *www.irs.gov/Form1120* for instructions and the latest information.

OMB No 1545-0123

**2018**

| A Check i : | | | | |
|---|---|---|---|---|
| **1a** Consolida ed re urn (a ach Form 851) . ☐ | | | | |
| **b** Li e/nonli e consoli-da ed re urn . . ☐ | | | | |
| **2** Personal holding co. (a ach Sch. PH) . ☐ | | | | |
| **3** Personal service corp. (see instructions) . ☐ | | | | |
| **4** Schedule M-3 attached ☐ | | | | |

**TYPE OR PRINT**

Name: **Benja Incorporated**

Number s ree and room or sui e no f a P O box see ins ruc ions: **845 Market Street, 450A**

Ci y or own s a e or province coun ry and Z P or foreign pos al code: **San Francisco, CA 94117**

**B** Employer identi ication number: **2890**

**C** Da e incorpora ed: **3/25/2014**

**D** o al asse s (see ins ruc ions): $ **2,978,541 53**

**E** Check if **(1)** ☐ ni ial re urn **(2)** ☐ Final re urn **(3)** ☐ Name change **(4)** ☐ Address change

## Income

| | | | | |
|---|---|---|---|---|
| 1a | Gross rece pts or sa es | 1a | 6,284,518 | 04 |
| b | Returns and a owances | 1b | 0 | 00 |
| c | Ba ance Subtract ne 1b from ne 1a | 1c | 6,284,518 | 04 |
| 2 | Cost of goods so d (attach Form 1125 A) | 2 | 4,408,790 | 96 |
| 3 | Gross prof t Subtract ne 2 from ne 1c | 3 | 1,875,727 | 08 |
| 4 | D v dends and nc us ons (Schedu e C ne 23 co umn (a)) | 4 | | |
| 5 | nterest | 5 | | |
| 6 | Gross rents | 6 | | |
| 7 | Gross roya t es | 7 | | |
| 8 | Cap ta ga n net ncome (attach Schedu e D (Form 1120)) | 8 | | |
| 9 | Net ga n or (oss) from Form 4797 Part ne 17 (attach Form 4797) | 9 | | |
| 10 | Other ncome (see nstruc ons attach statement) | 10 | | |
| 11 | **Total income.** Add nes 3 through 10 ▶ | 11 | 1,875,727 | 08 |

## Deductions (See instructions for limitations on deductions.)

| | | | | |
|---|---|---|---|---|
| 12 | Compensat on of off cers (see nstruct ons attach Form 1125 E) ▶ | 12 | | |
| 13 | Salaries and wages (less employment credits) | 13 | 348,191 | 03 |
| 14 | Repa rs and ma ntenance | 14 | | |
| 15 | Bad debts | 15 | | |
| 16 | Rents | 16 | 35,000 | 00 |
| 17 | axes and censes | 17 | | |
| 18 | nterest (see nstruct ons) | 18 | | |
| 19 | Char tab e contr but ons | 19 | | |
| 20 | Deprec at on from Form 4562 not c a med on Form 1125 A or e sewhere on return (attach Form 4562) | 20 | | |
| 21 | Dep et on | 21 | | |
| 22 | Advert s ng | 22 | | |
| 23 | Pens on prof t shar ng etc p ans | 23 | | |
| 24 | Emp oyee benef t programs | 24 | | |
| 25 | Reserved for future use | 25 | | |
| 26 | Other deduct ons (attach statement) | 26 | | |
| 27 | **Total deductions.** Add nes 12 through 26 ▶ | 27 | 383,191 | 03 |
| 28 | axab e ncome before net operat ng oss deduct on and spec a deduct ons Subtract ne 27 from ne 11 | 28 | 1,492,536 | 05 |
| 29a | Net operat ng oss deduct on (see nstruct ons) | 29a | | |
| b | Spec a deduct ons (Schedu e C ne 24 co umn (c)) | 29b | | |
| c | Add nes 29a and 29b | 29c | 0 | 00 |

## Tax, Refundable Credits, and Payments

| | | | | |
|---|---|---|---|---|
| 30 | **Taxable income.** Subtract ne 29c from ne 28 See nstruct ons | 30 | 1,492,536 | 05 |
| 31 | ota tax (Schedu e J Part ne 11) | 31 | 313,432 | 57 |
| 32 | 2018 net 965 tax ab ty pa d (Schedu e J Part ne 12) | 32 | | |
| 33 | ota payments cred ts and sect on 965 net tax ab ty (Schedu e J Part ne 23) | 33 | 300,000 | 00 |
| 34 | Est mated tax pena ty See nstruct ons Check f Form 2220 s attached ▶ ☐ | 34 | | |
| 35 | **Amount owed.** f ne 33 s sma er than the tota of nes 31 32 and 34 enter amount owed | 35 | 13,432 | 57 |
| 36 | **Overpayment.** f ne 33 s arger than the tota of nes 31 32 and 34 enter amount overpa d | 36 | | |
| 37 | Enter amount from ne 36 you want **Credited to 2019 estimated tax** ▶ Refunded ▶ | 37 | | |

## Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration o preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signa ure of of icer — Da e **1/10/2019** — i le **President & CEO**

May he IRS discuss his re urn wi h he preparer shown below? See ins ruc ions. ☑ Yes ☐ No

## Paid Preparer Use Only

| Prin / ype preparer s name | Preparer s signa ure | Da e | Check ☐ if self-employed | P N |
|---|---|---|---|---|
| **Tom Dunn, CPA** | | **1/9/2019** | | |

Firm s name ▶ **Numbrstudio Financial Group LLC** — Firm s E N ▶

Firm s address ▶ **845 Market Street, 450A, San Francisco, CA 94103** — Phone no **(415) 367-1513**

For Paperwork Reduction Act Notice, see separate instructions.   Ca No 11450Q   Form **1120** (2018)

Case: 20-00030   Doc# 29   Filed: 00/26/20   Entered: 00/26/20 15:54:50   Page 199 of 259
00153

| **Schedule J** | **Tax Computation and Payment** (see instructions) | | | |
|---|---|---|---|---|
| **Part I–Tax Computation** | | | | |
| 1 | Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)) See instructions ▶ ☐ | | | |
| 2 | Income tax See instructions | 2 | 313,432 | 57 |
| 3 | Base erosion minimum tax (attach Form 8991) | 3 | | |
| 4 | Add lines 2 and 3 | 4 | 313,432 | 57 |
| 5a | Foreign tax credit (attach Form 1118) | 5a | | |
| b | Credit from Form 8834 (see instructions) | 5b | | |
| c | General business credit (attach Form 3800) | 5c | | |
| d | Credit for prior year minimum tax (attach Form 8827) | 5d | | |
| e | Bond credits from Form 8912 | 5e | | |
| 6 | **Total credits.** Add lines 5a through 5e | 6 | 0 | 00 |
| 7 | Subtract line 6 from line 4 | 7 | 313,432 | 57 |
| 8 | Personal holding company tax (attach Schedule PH (Form 1120)) | 8 | | |
| 9a | Recapture of investment credit (attach Form 4255) | 9a | | |
| b | Recapture of low income housing credit (attach Form 8611) | 9b | | |
| c | Interest due under the look back method completed long term contracts (attach Form 8697) | 9c | | |
| d | Interest due under the look back method income forecast method (attach Form 8866) | 9d | | |
| e | Alternative tax on qualifying shipping activities (attach Form 8902) | 9e | | |
| f | Other (see instructions attach statement) | 9f | | |
| 10 | **Total.** Add lines 9a through 9f | 10 | 0 | 00 |
| 11 | **Total tax.** Add lines 7 8 and 10 Enter here and on page 1 line 31 | 11 | 313,432 | 57 |
| **Part II–Section 965 Payments** (see instructions) | | | | |
| 12 | 2018 net 965 tax liability paid from Form 965 B Part II column (k) line 2 Enter here and on page 1 line 32 | 12 | | |
| **Part III–Payments, Refundable Credits, and Section 965 Net Tax Liability** | | | | |
| 13 | 2017 overpayment credited to 2018 | 13 | 0 | 00 |
| 14 | 2018 estimated tax payments | 14 | 300,000 | 00 |
| 15 | 2018 refund applied for on Form 4466 | 15 | ( | ) |
| 16 | Combine lines 13 14 and 15 | 16 | 300,000 | 00 |
| 17 | Tax deposited with Form 7004 | 17 | | |
| 18 | Withholding (see instructions) | 18 | | |
| 19 | **Total payments.** Add lines 16 17 and 18 | 19 | 300,000 | 00 |
| 20 | Refundable credits from | | | |
| a | Form 2439 | 20a | | |
| b | Form 4136 | 20b | | |
| c | Form 8827 line 8c | 20c | | |
| d | Other (attach statement see instructions) | 20d | | |
| 21 | **Total credits.** Add lines 20a through 20d | 21 | 0 | 00 |
| 22 | 2018 net 965 tax liability from Form 965 B Part II column (d) line 2 See instructions | 22 | | |
| 23 | **Total payments, credits, and section 965 net tax liability.** Add lines 19 21 and 22 Enter here and on page 1 line 33 | 23 | 300,000 | 00 |

Form **1120** (2018)

| Schedule K | Other Information (see nstruct ons) | | | | | | Yes | No |
|---|---|---|---|---|---|---|---|---|

**1** Check account ng method  **a** ☐ Cash   **b** ☑ Accrua   **c** ☐ Other (spec fy) ▶ ................................................

**2** See the nstruct ons and enter the

  **a** Bus ness act v ty code no ▶ **541519**

  **b** Bus ness act v ty ▶ **Software Development**

  **c** Product or serv ce ▶ **Software**

**3** s the corporat on a subs d ary n an aff l ated group or a parent subs d ary contro led group? .......... | | | | | | | | ✔

  f "Yes " enter name and E N of the parent corporat on ▶ ................................................

  ................................................

**4** At the end of the tax year

  **a** D d any fore gn or domest c corporat on partnersh p ( nc ud ng any ent ty treated as a partnersh p) trust or tax exempt organ zat on own d rect y 20% or more or own d rect y or nd rect y 50% or more of the tota vot ng power of a c asses of the corporat on s stock ent t ed to vote? f "Yes " comp ete Part Of Schedu e G (Form 1120) (attach Schedu e G) | | | | | | | | ✔

  **b** D d any nd v dua or estate own d rect y 20% or more or own d rect y or nd rect y 50% or more of the tota vot ng power of a c asses of the corporat on s stock ent t ed to vote? f "Yes " comp ete Part Of Schedu e G (Form 1120) (attach Schedu e G) | | | | | | | | ✔

**5** At the end of the tax year d d the corporat on

  **a** Own directly 20% or own directly or indirectly 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation not included on **Form 851,** Affiliations Schedule? For rules of constructive ownership see instructions | | | | | | | | ✔

  f "Yes " comp ete ( ) through ( v) be ow

| (i) Name of Corpora ion | | (ii) Employer den ifica ion Number (if any) | (iii) Coun ry of ncorpora ion | (iv) Percen age Owned in Vo ing S ock |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

  **b** Own directly an interest of 20% or more or own directly or indirectly an interest of 50% or more in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership see instructions | | | | | | | | ✔

  f "Yes " comp ete ( ) through ( v) be ow

| (i) Name of En i y | | (ii) Employer den ifica ion Number (if any) | (iii) Coun ry of Organiza ion | (iv) Maximum Percen age Owned in Profi Loss or Capi al |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**6** Dur ng th s tax year d d the corporat on pay d v dends (other than stock d v dends and d str but ons n exchange for stock) n excess of the corporat on s current and accumu ated earn ngs and prof ts? See sect ons 301 and 316 | | | | | | | | ✔

  f "Yes " f e **Form 5452,** Corporate Report of Nond v dend D str but ons See the nstruct ons for Form 5452

  f th s s a conso dated return answer here for the parent corporat on and on Form 851 for each subs d ary

**7** At any t me dur ng the tax year d d one fore gn person own d rect y or nd rect y at east 25% of the tota vot ng power of a c asses of the corporat on s stock ent t ed to vote or at east 25% of the tota va ue of a c asses of the corporat on s stock? | | | | | | | | ✔

  For ru es of attr but on see sect on 318 f "Yes " enter

  **(a)** Percentage owned ▶ .................... and **(b)** Owner's country ▶ ....................

  **(c)** he corporat on may have to f e **Form 5472,** nformat on Return of a 25% Fore gn Owned U S Corporat on or a Fore gn Corporat on Engaged n a U S rade or Bus ness Enter the number of Forms 5472 attached ▶ ....................

**8** Check th s box f the corporat on ssued pub c y offered debt nstruments w th or g na ssue d scount . . . . . . . . ▶ ☐

  f checked the corporat on may have to f le **Form 8281,** nformation Return for Publicly Offered Original ssue Discount nstruments

**9** Enter the amount of tax exempt nterest rece ved or accrued dur ng the tax year ▶ $ ....................

**10** Enter the number of shareho ders at the end of the tax year (f 100 or fewer) ▶ ....................

**11** f the corporat on has an NOL for the tax year and s e ect ng to forego the carryback per od check here (see nstruct ons) ▶ ☐

  f the corporat on s f ng a conso dated return the statement requ red by Regu at ons sect on 1 1502 21(b)(3) must be attached or the e ect on w not be va d

**12** Enter the ava ab e NOL carryover from pr or tax years (do not reduce t by any deduct on reported on page 1 ne 29a) . . . . . . . . ▶ $ ....................

Case: 20-00030   Doc# 29   Filed: 07/26/20   Entered: 07/26/20 16:54:50   Page 205 of 259

00155

| **Schedule K** | **Other Information** *(continued from page 4)* | | Yes | No |
|---|---|---|---|---|
| 13 | Are the corporation's total receipts (page 1, line 1a plus lines 4 through 10) for the tax year **and** its total assets at the end of the tax year less than $250,000? | | | ✔ |
| | If "Yes," the corporation is not required to complete Schedules L, M-1, and M-2. Instead, enter the total amount of cash distributions and the book value of property distributions (other than cash) made during the tax year ▶ $ _____ | | | |
| 14 | Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement? See instructions | | | ✔ |
| | If "Yes," complete and attach Schedule UTP. | | | |
| 15a | Did the corporation make any payments in 2018 that would require it to file Form(s) 1099? | | | ✔ |
| b | If "Yes," did or will the corporation file required Forms 1099? | | | ✔ |
| 16 | During this tax year, did the corporation have an 80% or more change in ownership, including a change due to redemption of its own stock? | | | ✔ |
| 17 | During or subsequent to this tax year, but before the filing of this return, did the corporation dispose of more than 65% (by value) of its assets in a taxable, non-taxable, or tax deferred transaction? | | | ✔ |
| 18 | Did the corporation receive assets in a section 351 transfer in which any of the transferred assets had a fair market basis or fair market value of more than $1 million? | | | ✔ |
| 19 | During the corporation's tax year, did the corporation make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474) of the Code? | | | ✔ |
| 20 | Is the corporation operating on a cooperative basis? | | | ✔ |
| 21 | During the tax year, did the corporation pay or accrue any interest or royalty for which the deduction is not allowed under section 267A? See instructions | | | ✔ |
| | If "Yes," enter the total amount of the disallowed deductions ▶ $ _____ | | | |
| 22 | Does the corporation have gross receipts of at least $500 million in any of the 3 preceding tax years? (See sections 59A(e)(2) and (3)) | | | ✔ |
| | If "Yes," complete and attach Form 8991. | | | |
| 23 | Did the corporation have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions | | | ✔ |
| 24 | Does the corporation satisfy **one** of the following conditions and the corporation does not own a pass-through entity with current year, or prior year carryover, excess business interest expense? See instructions | | | ✔ |
| a | The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year do not exceed $25 million and the corporation is not a tax shelter, or | | | |
| b | The corporation only has business interest expense from (1) an electing real property trade or business, (2) an electing farming business, or (3) certain utility businesses under section 163(j)(7). | | | |
| | If "No," complete and attach Form 8990. | | | |
| 25 | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund? | | | ✔ |
| | If "Yes," enter amount from Form 8996, line 13 ▶ $ | | | |

| Schedule L | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | Assets | (a) | (b) | (c) | (d) |
| 1 | Cash | | 104,870 00 | | 1,047,195.13 |
| 2a | Trade notes and accounts receivable | 682,185 48 | | 1,931,346.40 | |
| b | Less allowance for bad debts | ( ) | 682,185 48 | ( ) | 2,978,541.53 |
| 3 | Inventories | | | | |
| 4 | U S government obligations | | | | |
| 5 | Tax exempt securities (see instructions) | | | | |
| 6 | Other current assets (attach statement) | | | | |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments (attach statement) | | | | |
| 10a | Buildings and other depreciable assets | | | | |
| b | Less accumulated depreciation | ( ) | | ( ) | |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | ( ) | | ( ) | |
| 12 | Land (net of any amortization) | | | | |
| 13a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | ( ) | | ( ) | |
| 14 | Other assets (attach statement) | | | | |
| 15 | Total assets | | 787,055.48 | | 2,978,541.53 |
| | **Liabilities and Shareholders' Equity** | | | | |
| 16 | Accounts payable | | 0.00 | | 323,950.00 |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 | Other current liabilities (attach statement) | | | | |
| 19 | Loans from shareholders | | | | |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 21 | Other liabilities (attach statement) | | | | |
| 22 | Capital stock  a Preferred stock | | | | |
| | b Common stock | 1,125,000.00 | 1,125,000.00 | 1,500,000.00 | 1,500,000.00 |
| 23 | Additional paid in capital | | | | |
| 24 | Retained earnings Appropriated (attach statement) | | | | |
| 25 | Retained earnings Unappropriated | | (337,944.52) | | 1,478,541.53 |
| 26 | Adjustments to shareholders equity (attach statement) | | | | |
| 27 | Less cost of treasury stock | | ( ) | | ( ) |
| 28 | Total liabilities and shareholders equity | | 787,055.48 | | 2,978,541.53 |

**Schedule M-1**   Reconciliation of Income (Loss) per Books With Income per Return

Note: The corporation may be required to file Schedule M 3 See instructions

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | 1,179,103.48 | 7 | Income recorded on books this year not included on this return (itemize) | |
| 2 | Federal income tax per books | 313,432.57 | | Tax exempt interest $_____ | |
| 3 | Excess of capital losses over capital gains | | | | |
| 4 | Income subject to tax not recorded on books this year (itemize) _____ | | 8 | Deductions on this return not charged against book income this year (itemize) | |
| | | | a | Depreciation $_____ | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize) | | b | Charitable contributions $_____ | |
| a | Depreciation $_____ | | | | |
| b | Charitable contributions $_____ | | 9 | Add lines 7 and 8 | |
| c | Travel and entertainment $_____ | | | | |
| 6 | Add lines 1 through 5 | 1,492,536.05 | 10 | Income (page 1 line 28) line 6 less line 9 | 1,492,536.05 |

**Schedule M-2**   Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year | | 5 | Distributions a Cash | |
| 2 | Net income (loss) per books | | | b Stock | |
| 3 | Other increases (itemize) _____ | | | c Property | |
| | | | 6 | Other decreases (itemize) _____ | |
| | _____ | | 7 | Add lines 5 and 6 | |
| 4 | Add lines 1, 2 and 3 | | 8 | Balance at end of year (line 4 less line 7) | |

Case: 20-00030   Doc# 29   Filed: 00/26/20   Entered: 00/26/20 16:56:50   Page 203 of 259

00157

# CERTIFICATE OF SERVICE

I, the undersigned, declare that I am employed in the County of Los Angeles. I am over the age of 18 years and not a party to the within entitled action. My business address is 2049 Century Park East, Suite 2900, Los Angeles, California 90067.

A true and correct copy of the foregoing document entitled (specify): **DECLARATION OF MICHAEL MCELHONE IN SUPPORT OF CREDITOR BUSEY BANK'S MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, IN THE ALTERNATIVE, FOR CONVERSION OF CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

## 1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On October 20, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒      Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On October 20, 2020, I served the document by placing a true copy thereof in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Los Angeles, California, to all parties entitled to receive regularly mailed notices, addressed as follows:

☒      Service information continued on attached page

## 3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on October 20, 2020, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA OVERNIGHT MAIL
Hon. Dennis Montali
U.S. Bankruptcy Judge
Mail Box 36099
450 Golden Gate Avenue
San Francisco, CA 94102

☒      Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| October 20, 2020 | Cindy Cripe | |
| *Date* | *Printed Name* | *Signature* |

# ATTACHMENT TO SERVICE LIST

## 1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)

Jared A. Day on behalf of U.S. Trustee Office of the U.S. Trustee / SF jared.a.day@usdoj.gov
ankey.to@usdoj.gov

Mark K. Slater on behalf of Debtor Benja Incorporated mslater@slaterhersey.com
amoses@slaterhersey.com

Office of the U.S. Trustee / SF USTPRegion17.SF.ECF@usdoj.gov

Paul E. Manasian on behalf of Debtor Benja Incorporated manasian@mrlawsf.com
gradl@mrlawsf.com

Randye B. Soref on behalf of Creditor Busey Bank rsoref@polsinelli.com

Tanya Behnam on behalf of Creditor Busey Bank tbehnam@polsinelli.com
tanyabehnam@gmail.com

## 2. SERVED BY UNITED STATES MAIL:

| Debtor | Debtor's Attorney | |
|---|---|---|
| Benja Incorporated | Paul E. Manasian, Esq. | |
| 26 Cragmont Avenue | Law Offices of Paul E. Manasian | |
| San Francisco, CA 94116 | 1310 65th Street | |
| | Emeryville, CA 94608 | |

## 3. SERVED BY EMAIL

*Jared.A.Day@usdoj.gov*
Jared A. Day
U.S. Department of Justice
Office of the U.S. Trustee, Region 17
300 Booth Street, Suite 3009
Reno, NV 89509

2

# EXHIBIT C

# California Northern Bankruptcy Court
# Claims Register

### 20-30819 Benja Incorporated **Converted** 01/29/2021

**Judge:** Dennis Montali          **Chapter:** 7
**Office:** San Francisco          **Last Date to file claims:** 04/09/2021
**Trustee:** Kyle Everett          **Last Date to file (Govt):**

| | | |
|---|---|---|
| *Creditor:* (15227737) | **Claim No: 1** | *Status:* |
| Busey Bank | *Original Filed* | *Filed by:* CR |
| c/o Jean Soh, Polsinelli PC | *Date:* 10/27/2020 | *Entered by:* Randye B. Soref |
| 150 N. Riverside Plaza, Suite 3000 | *Original Entered* | *Modified:* 10/30/2020 |
| Chicago, IL 60606 | *Date:* 10/27/2020 | |
| | *Last Amendment* | |
| | *Filed:* 10/30/2020 | |
| | *Last Amendment* | |
| | *Entered:* 10/30/2020 | |

Amount  claimed: $5035579.96
Secured  claimed: $5035579.96

*History:*

| Details | 1-1 | 10/27/2020 Claim #1 filed by Busey Bank, Amount claimed: $5035579.96 (Soref, Randye) |
|---|---|---|
| Details | 1-2 | 10/30/2020 Amended Claim #1 filed by Busey Bank, Amount claimed: $5035579.96 (Soref, Randye) |

*Description:* (1-1) NOTE: Secured amount modified to match the PDF.
*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (15232065) | **Claim No: 2** | *Status:* |
| E-Rechare Core,LLC | *Original Filed* | *Filed by:* CR |
| c/o Jaspan Schlesinger LLP | *Date:* 11/05/2020 | *Entered by:* ePOC |
| 300 Garden City Plaza, 5th Floor | *Original Entered* | *Modified:* |
| Garden City, NY 11530 | *Date:* 11/05/2020 | |

Amount claimed: $1218968.27

*History:*

| Details | 2-1 | 11/05/2020 Claim #2 filed by E-Rechare Core,LLC, Amount claimed: $1218968.27 (ePOC) |
|---|---|---|

*Description:*
*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (15232201) | **Claim No: 3** | *Status:* |
| E-Revshare Core, LLC | *Original Filed* | *Filed by:* CR |
| c/o Jaspan Schlesinger | *Date:* 11/05/2020 | *Entered by:* Sophia Ashley Perna-Plank |
| Attn: S. Perna-Plank | *Original Entered* | *Modified:* 11/05/2020 |
| 300 Garden City Plaza, 5th Floor | *Date:* 11/05/2020 | |
| Garden City NY 11530 | *Last Amendment* | |
| | *Filed:* 01/25/2021 | |
| | *Last Amendment* | |
| | *Entered:* 01/25/2021 | |

*History:*

| Details | 3-1 | 11/05/2020 Claim #3 filed by E-Revshare Core, LLC, Amount claimed: $1218968.27 (tm) |
|---|---|---|
| Details | 3-2 | 11/05/2020 Amended Claim #3 filed by E-Revshare Core, LLC, Amount claimed: $1218968.27 (ePOC) |
| Details | 3-3 | 01/25/2021 Amended Claim #3 filed by E-Revshare Core, LLC, Amount claimed: $1218968.27 (Perna-Plank, Sophia) |

*Description:*
*Remarks:*

Amount claimed: $1218968.27

Secured claimed: $1218968.27

*History:*

| Details | 3-1 | 11/05/2020 | Claim #3 filed by E-Revshare Core, LLC, Amount claimed: $1218968.27 (tm) |
| Details | 3-2 | 11/05/2020 | Amended Claim #3 filed by E-Revshare Core, LLC, Amount claimed: $1218968.27 (ePOC) |
| Details | 3-3 | 01/25/2021 | Amended Claim #3 filed by E-Revshare Core, LLC, Amount claimed: $1218968.27 (Perna-Plank, Sophia) |

*Description:*

*Remarks:*

*Creditor:* (15238938)
MASSACHUSETTS DEPARTMENT OF
REVENUE
MASS. DEPT. OF REVENUE
ATTN:BANKRUPTCY UNIT
PO BOX 9564
BOSTON, MA 02114-9564

**Claim No: 4**
*Original Filed Date:* 11/17/2020
*Original Entered Date:* 11/17/2020

*Status:*
*Filed by:* CR
*Entered by:* ePOC
*Modified:*

Amount claimed: $1171.02

Priority claimed: $970.38

*History:*

| Details | 4-1 | 11/17/2020 | Claim #4 filed by MASSACHUSETTS DEPARTMENT OF REVENUE, Amount claimed: $1171.02 (ePOC) |

*Description:*

*Remarks:* (4-1) Account Number (last 4 digits):2890

*Creditor:* (15242931)
Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7316

**Claim No: 5**
*Original Filed Date:* 12/10/2020
*Original Entered Date:* 12/10/2020

*Status:*
*Filed by:* CR
*Entered by:* Mikeal Smith
*Modified:*

Amount claimed: $10450.00

Secured claimed: $0.00

Priority claimed: $10450.00

*History:*

| Details | 5-1 | 12/10/2020 | Claim #5 filed by Internal Revenue Service, Amount claimed: $10450.00 (Smith, Mikeal) |

*Description:*

*Remarks:*

*Creditor:* (15245149) History
XRC Growth Fund I, L.P.
Steven Soulios
c/o Ruta Soulios & Stratis LLP
211 E. 43rd Street, 24th Floor
New York, New York 10017

**Claim No: 6**
*Original Filed Date:* 12/15/2020
*Original Entered Date:* 12/15/2020

*Status:*
*Filed by:* CR
*Entered by:* Steven Soulios
*Modified:*

Amount claimed: $500000.00

*History:*

| Details | 6-1 | 12/15/2020 | Claim #6 filed by XRC Growth Fund I, L.P., Amount claimed: $500000.00 (Soulios, Steven) |

*Description:*

*Remarks:*

| | | | |
|---|---|---|---|
| *Creditor:* (15242971) <u>History</u> | **Claim No: 7** | *Status:* | |
| XRC Fund III, LLC | *Original Filed* | *Filed by:* AT | |
| Steven Soulios | *Date:* 12/15/2020 | *Entered by:* Steven Soulios | |
| c/o Ruta Soulios & Stratis LLP | *Original Entered* | *Modified:* | |
| 211 E. 43rd Street, 24th Floor | *Date:* 12/15/2020 | | |
| New York, New York 10017 | | | |

  Amount claimed: $125000.00

*History:*

| | | |
|---|---|---|
| <u>Details</u> | <u>7-1</u> | 12/15/2020 Claim #7 filed by XRC Fund III, LLC, Amount claimed: $125000.00 (Soulios, Steven) |

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (15247061) | **Claim No: 8** | *Status:* |
| 2007 Sklar Family Trust c/o Ruta Soulios | *Original Filed* | *Filed by:* AT |
| Stratis L | *Date:* 12/15/2020 | *Entered by:* Steven Soulios |
| 211 E. 43rd Street, 24th Floor | *Original Entered* | *Modified:* |
| New York NY 10017 | *Date:* 12/15/2020 | |
| | *Last Amendment* | |
| | *Filed*: 12/15/2020 | |
| | *Last Amendment* | |
| | *Entered:* 12/15/2020 | |

  Amount claimed: $150000.00

*History:*

| | | |
|---|---|---|
| <u>Details</u> | <u>8-1</u> | 12/15/2020 Claim #8 filed by 2007 Sklar Family Trust c/o Ruta Soulios Stratis L, Amount claimed: $50000.00 (Soulios, Steven) |
| <u>Details</u> | <u>8-2</u> | 12/15/2020 Amended Claim #8 filed by 2007 Sklar Family Trust c/o Ruta Soulios Stratis L, Amount claimed: $150000.00 (Soulios, Steven) |

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (15247081) | **Claim No: 9** | *Status:* |
| Mike Birkel c/o Ruta Soulios & Stratis LLP | *Original Filed* | *Filed by:* AT |
| 211 E. 43rd Street, 24th Floor | *Date:* 12/15/2020 | *Entered by:* Steven Soulios |
| New York NY 10017 | *Original Entered* | *Modified:* |
| | *Date:* 12/15/2020 | |

  Amount claimed: $212500.00

*History:*

| | | |
|---|---|---|
| <u>Details</u> | <u>9-1</u> | 12/15/2020 Claim #9 filed by Mike Birkel c/o Ruta Soulios & Stratis LLP, Amount claimed: $212500.00 (Soulios, Steven) |

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (15242916) <u>History</u> | **Claim No: 10** | *Status:* |
| Benjamin Lamb | *Original Filed* | *Filed by:* AT |
| c/o Ruta Soulios Stratis LLP | *Date:* 12/15/2020 | *Entered by:* Steven Soulios |
| 211 E. 43rd St., 24th Fl. | *Original Entered* | *Modified:* |
| New York, NY 10017 | *Date:* 12/15/2020 | |

  Amount claimed: $25000.00

*History:*

| | | |
|---|---|---|
| <u>Details</u> | <u>10-1</u> | 12/15/2020 Claim #10 filed by Benjamin Lamb, Amount claimed: $25000.00 (Soulios, Steven) |

*Description:*

*Remarks:*

*Creditor:* (15242935) <u>History</u>　　　**Claim No: 11**　　　*Status:*
Jonathan Lamb　　　　　　　　　　　　　*Original Filed*　　　*Filed by:* CR
c/o Ruta Soulios Stratis LLP　　　　　　*Date:* 12/15/2020　　*Entered by:* Steven Soulios
211 E. 43rd St., 24th Fl　　　　　　　　*Original Entered*　　*Modified:*
New York, NY 10017　　　　　　　　　　*Date:* 12/15/2020

　Amount claimed: $25000.00

*History:*
　<u>Details</u>　　<u>11-1</u>　12/15/2020 Claim #11 filed by Jonathan Lamb, Amount claimed: $25000.00 (Soulios, Steven)
*Description:*
*Remarks:*

---

*Creditor:* (15242942) <u>History</u>　　　**Claim No: 12**　　　*Status:*
Marie and Michael Bowers　　　　　　　*Original Filed*　　　*Filed by:* AT
c/o Ruta Soulios Stratis LLP　　　　　　*Date:* 12/16/2020　　*Entered by:* Steven Soulios
211 E. 43rd St., 24th FL　　　　　　　　*Original Entered*　　*Modified:*
New York, NY 10017　　　　　　　　　　*Date:* 12/16/2020

　Amount claimed: $25000.00

*History:*
　<u>Details</u>　　<u>12-1</u>　12/16/2020 Claim #12 filed by Marie and Michael Bowers, Amount claimed: $25000.00 (Soulios, Steven)
*Description:*
*Remarks:*

---

*Creditor:* (15239749)　　　　　　　　**Claim No: 13**　　　*Status:*
Sean Fleming　　　　　　　　　　　　　*Original Filed*　　　*Filed by:* AT
16817 Eagle Bluff Court　　　　　　　　*Date:* 12/16/2020　　*Entered by:* Steven Soulios
Chesterfield, MO 63005　　　　　　　　*Original Entered*　　*Modified:*
　　　　　　　　　　　　　　　　　　　*Date:* 12/16/2020

　Amount claimed: $385000.00

*History:*
　<u>Details</u>　　<u>13-1</u>　12/16/2020 Claim #13 filed by Sean Fleming, Amount claimed: $385000.00 (Soulios, Steven)
*Description:*
*Remarks:*

---

*Creditor:* (15242952) <u>History</u>　　　**Claim No: 14**　　　*Status:*
Nick Foppe　　　　　　　　　　　　　　*Original Filed*　　　*Filed by:* AT
c/o Ruta Soulios Stratis LLP　　　　　　*Date:* 12/16/2020　　*Entered by:* Steven Soulios
211 E. 43rd St., 24th Fl　　　　　　　　*Original Entered*　　*Modified:*
New York, NY 10017　　　　　　　　　　*Date:* 12/16/2020

　Amount claimed: $70000.00

*History:*
　<u>Details</u>　　<u>14-1</u>　12/16/2020 Claim #14 filed by Nick Foppe, Amount claimed: $70000.00 (Soulios, Steven)
*Description:*
*Remarks:*

| Creditor: (15247309) | Claim No: 15 | Status: |
|---|---|---|
| Hoskins/Frame Family Trust dated December 15, 1999 | Original Filed Date: 12/16/2020 | Filed by: AT |
| c/o Ruta Soulios Stratis LLP | Original Entered Date: 12/16/2020 | Entered by: Steven Soulios |
| 211 E. 43rd Street, 24th Floor | | Modified: |
| New York, NY 10017 | | |

Amount claimed: $100000.00

History:

Details    15-1    12/16/2020 Claim #15 filed by Hoskins/Frame Family Trust dated December 15, 1999, Amount claimed: $100000.00 (Soulios, Steven)

Description:
Remarks:

| Creditor: (15247310) | Claim No: 16 | Status: |
|---|---|---|
| David Hughes c/o Ruta Soulios Stratis LLP | Original Filed Date: 12/16/2020 | Filed by: AT |
| 211 E. 43rd Street, 24th Floor | Original Entered Date: 12/16/2020 | Entered by: Steven Soulios |
| New York, NY 10017 | | Modified: |

Amount claimed: $25000.00

History:

Details    16-1    12/16/2020 Claim #16 filed by David Hughes c/o Ruta Soulios Stratis LLP, Amount claimed: $25000.00 (Soulios, Steven)

Description:
Remarks:

| Creditor: (15247311) | Claim No: 17 | Status: |
|---|---|---|
| Kaveri Investment Management Company, LLC. c/o Rut | Original Filed Date: 12/16/2020 | Filed by: AT |
| 211 E. 43rd Street, 24th Floor | Original Entered Date: 12/16/2020 | Entered by: Steven Soulios |
| New York, NY 10017 | | Modified: |

Amount claimed: $100000.00

History:

Details    17-1    12/16/2020 Claim #17 filed by Kaveri Investment Management Company, LLC. c/o Rut, Amount claimed: $100000.00 (Soulios, Steven)

Description:
Remarks:

| Creditor: (15247312) | Claim No: 18 | Status: |
|---|---|---|
| Irving Ryba c/o Ruta Soulios Stratis LLP | Original Filed Date: 12/16/2020 | Filed by: AT |
| 211 E. 43rd Street, 24th Floor | Original Entered Date: 12/16/2020 | Entered by: Steven Soulios |
| New York, NY 10017 | | Modified: |

Amount claimed: $25000.00

History:

Details    18-1    12/16/2020 Claim #18 filed by Irving Ryba c/o Ruta Soulios Stratis LLP, Amount claimed: $25000.00 (Soulios, Steven)

Description:
Remarks:

*Creditor:*    (15242924)   <u>History</u>     **Claim No: 19**     *Status:*
Daniel Schurman                *Original Filed*       *Filed by:* AT
c/o Ruta Soulios Stratis LLP      *Date:* 12/16/2020    *Entered by:* Steven Soulios
211 43rd St, 24th Fl            *Original Entered*     *Modified:*
New York, NY 10017           *Date:* 12/16/2020

   Amount claimed: $10000.00

*History:*

   Details     <u>19-1</u>    12/16/2020   Claim #19 filed by Daniel Schurman, Amount claimed: $10000.00 (Soulios, Steven)

*Description:*

*Remarks:*

---

*Creditor:*    (15242955)   <u>History</u>     **Claim No: 20**     *Status:*
Polly Wong                  *Original Filed*       *Filed by:* AT
c/o Ruta Soulios Stratis LLP      *Date:* 12/16/2020    *Entered by:* Steven Soulios
211 E. 43rd St., 24th Fl         *Original Entered*     *Modified:*
New York, NY 10017           *Date:* 12/16/2020

   Amount claimed: $150000.00

*History:*

   Details     <u>20-1</u>    12/16/2020   Claim #20 filed by Polly Wong, Amount claimed: $150000.00 (Soulios, Steven)

*Description:*

*Remarks:*

---

*Creditor:*    (15251533)          **Claim No: 21**     *Status:*
City an County of San Francisco    *Original Filed*       *Filed by:* CR
1 Dr. Carlton B Goodlett Place     *Date:* 12/28/2020    *Entered by:* ePOC
San Francisco, CA 94102         *Original Entered*     *Modified:*
                                *Date:* 12/28/2020

   Amount claimed: $20283.91

   Priority   claimed: $20283.91

*History:*

   Details     <u>21-1</u>    12/28/2020   Claim #21 filed by City an County of San Francisco, Amount claimed: $20283.91 (ePOC)

*Description:*

*Remarks:*

---

*Creditor:*    (15256323)          **Claim No: 22**     *Status:*
Fenwick & West LLP              *Original Filed*       *Filed by:* CR
801 California Street           *Date:* 01/11/2021    *Entered by:* ePOC
Mountain View, CA 94041        *Original Entered*     *Modified:*
                                *Date:* 01/11/2021

   Amount claimed: $72897.77

*History:*

   Details     <u>22-1</u>    01/11/2021   Claim #22 filed by Fenwick & West LLP, Amount claimed: $72897.77 (ePOC)

*Description:*

*Remarks:*

*Creditor:* (15260579)  **Claim No: 23**  *Status:* Withdraw <u>84</u>
FRANCHISE TAX BOARD  *Original Filed*  *Filed by:* CR
BANKRUPTCY SECTION MS A340  *Date:* 01/20/2021  *Entered by:* Anthony Franklin
PO BOX 2952  *Original Entered*  *Modified:* 01/21/2021
SACRAMENTO CA 95812-2952  *Date:* 01/20/2021

Amount claimed: $1737.33

Priority  claimed: $1656.32

*History:*

| <u>Details</u> | <u>23-1</u> | 01/20/2021 | Claim #23 filed by FRANCHISE TAX BOARD, Amount claimed: $1737.33 (Franklin, Anthony) |
| | 84 | 01/26/2021 | Withdrawal of Claim: 23 Filed by Creditor FRANCHISE TAX BOARD. (Hutty, Kevin) Status: Withdraw |

*Description:* (23-1) Claim Filed

*Remarks:* (23-1) DEFECTIVE ENRY: The creditor name listed in the PDF does not match the creditor selected on the Claims Register & Dollar Amount

*Creditor:* (15260579)  **Claim No: 24**  *Status:*
FRANCHISE TAX BOARD  *Original Filed*  *Filed by:* CR
BANKRUPTCY SECTION MS A340  *Date:* 01/26/2021  *Entered by:* Rebecca Estonilo
PO BOX 2952  *Original Entered*  *Modified:*
SACRAMENTO CA 95812-2952  *Date:* 01/26/2021

Amount claimed: $1737.33

Priority  claimed: $1656.32

*History:*

| <u>Details</u> | <u>24-1</u> | 01/26/2021 | Claim #24 filed by FRANCHISE TAX BOARD, Amount claimed: $1737.33 (Estonilo, Rebecca) |

*Description:*

*Remarks:*

*Creditor:* (15265838)  <u>History</u>  **Claim No: 25**  *Status:*
UNITED STATES TRUSTEE  *Original Filed*  *Filed by:* CR
OFFICE OF THE UNITED STATES  *Date:* 02/02/2021  *Entered by:* U.S. Trustee (lg)
TRUSTEE  *Original Entered*  *Modified:* 05/25/2021
450 GOLDEN GATE AVE. 5TH FLOOR,  *Date:* 02/02/2021
STE #05-0153  *Last Amendment*
SAN FRANCISCO, CA 94102  *Filed:* 05/24/2021
  *Last Amendment*
  *Entered:* 05/24/2021

Amount claimed: $325.00

Priority  claimed: $325.00

*History:*

| <u>Details</u> | <u>25-1</u> | 02/02/2021 | Claim #25 filed by UNITED STATES TRUSTEE, Amount claimed: $650.00 (U.S. Trustee (lg)) |
| <u>Details</u> | <u>25-2</u> | 05/24/2021 | Amended Claim #25 filed by UNITED STATES TRUSTEE, Amount claimed: $325.00 (U.S. Trustee (lg)) |

*Description:*

*Remarks:*

*Creditor:* (15268627)  <u>History</u>  **Claim No: 26**  *Status:*

FRANCHISE TAX BOARD
**(ADMINISTRATIVE)**
BANKRUPTCY SECTION MS A340
PO Box 2952
SACRAMENTO, CA 95812-2952

*Original Filed Date:* 02/10/2021
*Original Entered Date:* 02/10/2021

*Filed by:* CR
*Entered by:* Kim Tho Nguyen
*Modified:*

  Admin claimed: $800.00

*History:*

Details    <u>26-1</u>    02/10/2021 Claim #26 filed by FRANCHISE TAX BOARD, Admin claimed: $800.00 (Nguyen, Kim)

*Description:*
*Remarks:*

---

*Creditor:*    (15281579)    <u>History</u>
Bodil Arlander Revocable Trust
Steven Soulios
c/o Ruta Soulios & Stratis LLP
211 E. 43rd Street, 24th Floor
New York NY 10017

**Claim No: 27**
*Original Filed Date:* 03/17/2021
*Original Entered Date:* 03/17/2021

*Status:*
*Filed by:* CR
*Entered by:* Steven Soulios
*Modified:*

  Amount claimed: $150000.00

*History:*

Details    <u>27-1</u>    03/17/2021 Claim #27 filed by Bodil Arlander Revocable Trust, Amount claimed: $150000.00 (Soulios, Steven)

*Description:*
*Remarks:*

---

*Creditor:*    (15283785)
U.S. Securities and Exchange Commission
Bankruptcy Group
200 Vesey Street Suite 400
New York, NY 10281

**Claim No: 28**
*Original Filed Date:* 03/25/2021
*Original Entered Date:* 03/25/2021

*Status:*
*Filed by:* CR
*Entered by:* ePOC
*Modified:*

  Amount claimed: $0.00

*History:*

Details    <u>28-1</u>    03/25/2021 Claim #28 filed by U.S. Securities and Exchange Commission, Amount claimed: $0.00 (ePOC)

*Description:*
*Remarks:* (28-1) Filer Comment: Not less than $2635000

---

*Creditor:*    (15288780)
BB Lending, LLC
Eavenson, Fraser & Lunsford, PLLC
225 South Lake Avenue, 3rd Floor
Pasadena, CA 91101

**Claim No: 29**
*Original Filed Date:* 04/08/2021
*Original Entered Date:* 04/08/2021

*Status:*
*Filed by:* CR
*Entered by:* tm
*Modified:*

  Amount  claimed: $750000.00
  Secured  claimed: $750000.00

*History:*

Details    <u>29-1</u>    04/08/2021 Claim #29 filed by BB Lending, LLC, Amount claimed: $750000.00 (tm)

*Description:*
*Remarks:*

| | | | |
|---|---|---|---|
| *Creditor:* (15242947) <u>History</u> | **Claim No: 30** | *Status:* | |
| Moosylvania Marketing, L.C. | *Original Filed* | *Filed by:* CR | |
| Steven Soulios | *Date:* 04/08/2021 | *Entered by:* Steven Soulios | |
| c/o Ruta Soulios Stratis LLP | *Original Entered* | *Modified:* | |
| 211 E. 43rd Street, 24th Floor | *Date:* 04/08/2021 | | |
| New York NY 10017 | | | |

Amount claimed: $100016.50

*History:*

<u>Details</u>   <u>30-1</u>   04/08/2021   Claim #30 filed by Moosylvania Marketing, L.C., Amount claimed: $100016.50 (Soulios, Steven)

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (15242948) | **Claim No: 31** | *Status:* |
| Morgan Reilly | *Original Filed* | *Filed by:* CR |
| 7790 Westlakd Dr., #310 | *Date:* 04/09/2021 | *Entered by:* Paul J. Leeds |
| San Diego, CA 92108 | *Original Entered* | *Modified:* |
| | *Date:* 04/09/2021 | |

Amount claimed: $28751.20
Priority  claimed:   $7500.00

*History:*

<u>Details</u>   <u>31-1</u>   04/09/2021   Claim #31 filed by Morgan Reilly, Amount claimed: $28751.20 (Leeds, Paul)

*Description:*

*Remarks:*

# Claims Register Summary

**Case Name:** Benja Incorporated
**Case Number:** 20-30819
**Chapter:** 7
**Date Filed:** 10/15/2020
**Total Number Of Claims:** 31

| | |
|---|---|
| **Total Amount Claimed\*** | $10538386.56 |
| **Total Amount Allowed\*** | |

*\*Includes general unsecured claims*

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| **Secured** | $7004548.23 | |
| **Priority** | $42841.93 | |
| **Administrative** | $800.00 | |

| PACER Service Center |
|---|
| **Transaction Receipt** |
| 09/20/2021 06:20:01 |

| PACER Login: | benreed81 | Client Code: | 065004-00066 |
|---|---|---|---|
| Description: | Claims Register | Search Criteria: | 20-30819 Filed or Entered From: 1/1/2020 Filed or Entered To: 9/20/2021 |
| Billable Pages: | 3 | Cost: | 0.30 |

# EXHIBIT D

Page 1

1

2

3                    UNITED STATES BANKRUPTCY COURT

4             FOR THE NORTHERN DISTRICT OF CALIFORNIA

5                        San Francisco Division

6

7    In re                    |         Case No. 20-30819 DM

8    BENJA INCORPORATED        |         Chapter 7

9              Debtor          |
     _____ |

10

11

12

13

14          REMOTE VIDEO EXAMINATION UNDER RULE 2004

15                        ANDREW CHAPIN

16               Thursday, September 23, 2021

17

18

19

20

21

22

23   ATKINSON-BAKER, a VERITEXT COMPANY

24   (800) 288-3376
     www.depo.com
25   FILE NO.: AF0652A

Case: 21-03036   Doc# 29   Filed: 07/15/22   Entered: 07/15/22 16:54:58   Page 218 of
241

Page 2

```
 1
 2
 3
 4
 5                          September 23, 2021
 6                             2:05 p.m.
 7
 8          REMOTE VIDEO EXAMINATION UNDER RULE 2004
 9   of ANDREW CHAPIN, held remotely via Zoom,
10   before Eduardo Lamela, a Stenographic Reporter
11   and Notary Public of the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S :
 2
 3   ST. JAMES LAW, P.C.
 4        Attorneys for Inverness Advisers, LLC
          and Tom Peters
 5        22 Battery Street, Suite 810
          San Francisco, California 94111
 6        BY:  MICHAEL ST. JAMES, ESQ.
               (Via Zoom)
 7        Tel: (415) 391-7566
          michael@stjames-law.com
 8
 9   FINESTONE HAYES, LLP
10        Attorneys for Trustee
          456 Montgomery St., 20th Fl.
11        San Francisco, California 94104
          BY:  STEPHEN D. FINESTONE, ESQ.
12             (Via Zoom)
          TEL: (415) 421-2624
13        www.fhlawllp.com
14
15   LAW OFFICES OF RANDY SUE POLLOCK
16        Attorneys for Andrew Chapin
          286 Santa Clara Ave
17        Oakland, California 94610
          BY:  RANDY SUE POLLOCK, ESQ.
18             (Via Zoom)
          Tel: (510) 763-9967
19
20   ALSO PRESENT:
21             Kyle Everett, Trustee
22             Tom Peters
23             Joseph Zagarjeski
24
25
```

Page 4

```
 1        THE COURT REPORTER:  Hello, counsel.  My
 2   name is Ed Lamela.  I will be your court
 3   reporter for today's proceeding.  Per the
 4   Federal Rules of civil procedure, please
 5   stipulate for me to be the court reporter today
 6   and to conduct this deposition remotely.
 7        MR. ST. JAMES:  So stipulated on behalf of
 8   Mr. Peters.
 9        MS. POLLOCK:  So stipulated on behalf of
10   Mr. Chapin.
11        MR. FINESTONE:  So stipulated on behalf of
12    the Trustee, Mr. Everett
13   A N D R E W   C H A P I N, the Witness
14        herein, being first duly sworn remotely by
15        a Notary Public, was examined and
16        testified as follows:
17   EXAMINATION
18        Q    Mr. Chapin, thank you for coming today.
19   You're here pursuant to a Rule 2004 order entered
20   into by the Bankruptcy Court.  Are you aware of that
21   order?
22        A    Yes.
23        Q    Is there any reason why you couldn't give
24   your best testimony today?
25        A    No.
```

Page 5

```
 1        Q    Illness or drugs or anything?
 2        A    No.
 3        Q    Could you start by telling me what Benja's
 4   business was.
 5        A    Benja was a collection of E-commerce
 6   companies, and also an advertising technology
 7   format.
 8        Q    What exactly did it do?
 9        A    It operated a number of E-commerce stores,
10   just traditionally commerce stores.  And then also
11   delivered an advertising technology product that
12   would, to various degrees, enable and encourage
13   E-commerce transactions through advertising.
14        Q    Did Benja engage Inverness Advisors in
15   December 2019?
16        MS. POLLOCK:  I couldn't hear all the
17   words.
18        Q    Did Benja engage Inverness Advisors in
19   December 2019?
20        A    Yes.
21        Q    Why did Benja engage Inverness Advisors?
22        A    We were interested in their services as we
23   were looking at future financing or potential
24   acquisition events down the road.
25        Q    So they were engaged as an investment
```

Case: 21-03036    Doc# 29    Filed: 07/15/22    Entered: 07/15/22 16:54:58    Page 219 of 241

Page 58

```
 1        C E R T I F I C A T E
 2  STATE OF NEW YORK   )
              SS.:
 3  COUNTY OF NEW YORK  )
 4
 5        I, EDUARDO LAMELA, a Notary Public and
 6  Stenographic Reporter within and for the State of
 7  New York, do hereby certify:
 8        That the witness whose deposition is
 9  hereinbefore set forth, was duly sworn by me and
10  that such deposition is a true record of the
11  testimony given by the witness.
12        I further certify that I am not related to
13  any of the parties to this action by blood or
14  marriage, and that I am in no way interested in the
15  outcome of this matter.
16        IN WITNESS WHEREOF, I have hereunto set my
17  hand this   th day of    , 2021.
18
19        _____
20            EDUARDO LAMELA
21
22
23
24
25
```

Page 59

```
 1            I N D E X
 2  WITNESS            EXAMINATION BY        PAGE
 3  Andrew Chapin      Mr. St. James          4
 4
 5          E X H I B I T S
 6  DEPOSITION                              PAGE
 7  Exhibit Chat 3, Text messages, 9/17/20...........17
 8  Exhibit Chat 4, Text messages, 9/18/20...........13
 9  Exhibit Chat 6, Text messages, 9/22/20...........23
10  Exhibit Chat 8, Text messages, 9/25/20...........29
11  Exhibit Chat 17, Text message, 9/14/20...........11
12  Exhibit Ben 115, E-mail dated 9/22/20............26
13  Exhibit Ben 124-5, E-mail dated 9/25/20..........30
14  Exhibit Docusign SAFE Repurchase, SAFE
    Repurchase Agreement.............................31
15
16  Exhibit Ben 38, Chapin Declaration
    and attachments..................................37
17
18  Exhibit Chapin Criminal Complaint................42
19      (Joe Alouf's Declaration mentioned on
20      page 36, but no document provided to court
21      reporter.)
22
23
24
25
```

Page 60

```
 1  A C K N O W L E D G E M E N T   O F   D E P O N E N T
 2
 3  STATE OF NEW YORK )
                      :SS
 4  COUNTY OF NEW YORK)
 5
 6
 7        I, ANDREW CHAPIN, hereby certify that I
 8  have read the transcript of my testimony taken under
 9  oath in my deposition of September 23, 2021; that
10  the transcript is a complete and correct record of
11  what was asked, answered and said during this
12  deposition, and that the answers on the record as by
13  me are true and correct.
14
15        _____
16                ANDREW CHAPIN
17
18
19  SUBSCRIBED AND SWORN BEFORE ME
20
21  THIS _____ DAY OF _____, 20___.
22
23  _____
24      NOTARY PUBLIC
25  My Commission Expires:_____
```

Case: 21-03036    Doc# 29    Filed: 07/15/22    Entered: 07/15/22 16:54:58    Page 220 of
241

# EXHIBIT E


Case: 21-03036   Doc# 29   Filed: 07/15/22   Entered: 07/15/22 16:54:58   Page 221 of
241

**Page 1**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN RE:

BENJA INCORPORATED,
Debtor,    Case No. 20-30819 DM
_____)

REMOTE EXAMINATION OF THOMAS GOODE III
MARCH 5 2021
10:00 A.M.
-oOo-

Reported by:  Krishanna DeRita
CSR No. 11945

**Page 3**

1        INDEX OF EXAMINATIONS
2    EXAMINATION         PAGE
3    EXAMINATION BY MR  FINESTONE    4
4    EXAMINATION BY MR  EVERETT    159
5    EXAMINATION BY MR  STERN    161
6    EXAMINATION BY MR  SOULIOS    162
7    FURTHER EXAMINATION BY MR  EVERETT    164
8    FURTHER EXAMINATION BY MR  FINESTONE    164
9    FURTHER EXAMINATION BY MR  EVERETT    166
10   FURTHER EXAMINATION BY MR  FINESTONE    167
11        INDEX OF EXHIBITS
12   Number  Description      Page
13   1    Order        Premarked
14   2    Insertions Contracts    Premarked
15   4    E Mail Re G Suite    Premarked
16   6    Patent Purchase    Premarked
17   8    E Mail re Wells Fargo    Premarked
18   9    MOU re License with Buerck    Premarked
19   10  General License Agreement    Premarked
20   12  2020 E Mail re: cap table    Premarked
21   16  Demand Letter from MHC    Premarked
22   17  Tiny Cables E Mail    Premarked
23   23  E Mail to Comerica Re: TG PFS    Premarked
24   24  E Mail with PFS    Premarked
25   25  Reopening Busey account PDF    Premarked

**Page 2**

1        APPEARANCES
2   FINESTONE HAYES LLP
    BY: STEPHEN FINESTONE, Attorney at Law
3   456 Montgomery Street
    Suite 2000
4   San Francisco CA 94104
    (415) 421-2624
5   sfinestone@fhlawllp.com
6
    RUTA SOULIOS & STRATIS LLP
7   BY: STEVEN SOULIOS, Attorney at Law
    211 E  43rd Street
8   24th Floor
    New York NY 10017
9   ssoulios@lawnynj.com
10
11  HAJJAR PETERS LLP
    BY:  BRIAN H  BUSTER, Attorney at Law
12  3144 Bee Cave Rd
    Austin, TX 78746
13  (512) 637-4956
    bbuster@legalstrategy.com
14
15  MICHAEL STERN
    INVESTMENT CAPITAL
16
17  KYLE EVERETT
    CHAPTER 11 TRUSTEE
18
19
20
21
22
23
24
25

**Page 4**

1   27  E Mail re Board Meeting    Premarked
2   28  E Mail re Uber card    Premarked
3   30  Job Offer 2019    Premarked
4   31  Ephe Contract    Premarked
5   32  2020 Payroll    Premarked
6   33  Cap Table of 2019    Premarked
7       (Continued)
8   37  Nike Term Sheet    Premarked
9   48  2017 Description Benja Patents    Premarked
10  49  MLB License Agreement    Premarked
11  50  Advisor Agreement Decentralized  Premarked
12  51  Advisor Agreement Lingo    Premarked
13  53  Evergreen Document    Premarked
14  55  Armstrong Teasdale Retainer    Premarked
15  56  E Mail Re: Seizure    Premarked
16  57  Benja Coin    Premarked
17  59  Bank Statements re Silvergate    Premarked
18  60  Bank Statement re Silvergate    Premarked
19  61  MHC Application    Premarked
20
21
22
23
24
25

1  Be it remembered that, on March 5, 2021,
2  at 10:00 a.m., via Zoom, before me, Krishanna
3  DeRita, Certified Shorthand Reporter for the County
4  of Contra Costa, appeared:
5          THOMAS GOODE III,
6  Who, having been first duly sworn by me, testified
7  to the following:
8          EXAMINATION
9  BY MR. FINESTONE:
10  Q.  Mr. Goode, as I said before, I'm Steve
11  Finestone.  I represent Kyle Everett as the Chapter
12  7 trustee and I'll be asking you a series of
13  questions today about Benja Incorporated and what
14  I'll call its predecessor.  How do you pronounce the
15  name of that company called Ephe?
16  **A.  Ephe.  Like the short for ephemeral.**
17  Q.  Got it.  Thank you.  I see a couple more
18  people joining in.
19  **MR. SOULIOS:**  That's actually my paralegal and
20  also my son Zach.
21  **MR. EVERETT:**  Question, Steve?
22  **MR. FINESTONE:**  Yes.
23  **MR. EVERETT:**  In Zoom, it's difficult
24  sometimes.  Things kind of cut in and out and it's
25  easier, and this is with any deposition, but most

Page 5

1  particularly with Zoom, if you wait to answer the
2  question until it's fully out there, and if there's
3  a technical problem, we'll have to deal with it.  So
4  there may be a little bit of a lag at some point.
5  BY MR. FINESTONE:
6  Q.  Thank you.  And I was going to add, Mr.
7  Goode, that I'll be asking you questions.  If you
8  don't you understand my question or are confused by
9  it in any way, it's not my intention to confuse you.
10  If you do answer a question, I'll assume that you
11  understood it and I'll be putting documents up on
12  the share screen and if you need time to review
13  them, some are lengthier than others.  Please take
14  the time to do so.  Okay?
15  **MR. EVERETT:**  My associate Joe Legejeski has
16  also joined audio.
17  BY MR. FINESTONE:
18  Q.  And one other item, Mr. Goode, which is
19  the court reporter is transcribing everything
20  that is said on the record today.  So even though we
21  can visually see you, you need to give a verbal
22  answer rather than shaking or nodding your head.
23  Understood?
24  **A.  Understood.**
25  Q.  Thank you.

Page 6

1      Here is our first adventure on share
2  screen.  It's not very successful so far.
3  **MR. EVERETT:**  While you are doing that, can I
4  ask a couple of questions?
5  **MR. FINESTONE:**  Please.
6  **MR. EVERETT:**  Tommy, is this the first time
7  you've been deposed?
8  **A.  Yes.**
9  Q.  Okay.  All right. and you are in Texas
10  right now?
11  **A.  Correct.**
12  Q.  And your full name is Thomas Lee Goode.
13  **A.  The third.  Thomas Lee Goode the third.**
14  Q.  Okay.  All right.  Thank you.
15  **MR. FINESTONE:**  I'm happy to take suggestions.
16  I have a document that's open and I can't seem to
17  find it.
18  **MR. STERN:**  As a stop gap, since I think others
19  here have access to the document, if you say the
20  name, maybe somebody else can put it up on the
21  screen.  If you enable them to do share screen, it
22  might be just as difficult as doing it yourself.
23  **MR. FINESTONE:**  That's a box I can check.  I
24  was going to show Mr. Goode Exhibit 1.
25  **MR. STERN:**  That's the one titled "Order"?

Page 7

1  **MR. FINESTONE:**  Yes.
2  **MR. STERN:**  Let's see if we have screen share.
3  BY MR. FINESTONE:
4  Q.  Thank you, Michael.  Mr. Goode, I'm
5  showing you what we are referring to as Exhibit 1,
6  which is an order from the bankruptcy court having
7  to do with your appearance here today and the
8  production of documents.  Can you see that?
9  **A.  Yes, I can.**
10  Q.  Michael, can you scroll down through it or
11  can I?
12  **MR. STERN:**  It's in my control until you figure
13  out how to have control.
14  BY MR. FINESTONE:
15  Q.  That's fine.  Let me just ask you, Mr.
16  Goode.  You've seen this document before.  Correct?
17  **A.  Yes, I have.**
18  Q.  And did you go through the number of
19  categories of documents that were on this order and
20  provide those documents to your counsel, Mr. Buster?
21  **A.  Yes.**
22  Q.  Can you tell us procedurally how you
23  looked for documents responsive to these requests
24  one through six?
25  **A.  I have different folders on my computer**

Page 8

**Page 13**

1    Q.   And give us a brief description of the
2   work you did after graduating from University of
3   Florida up until the time that you became connected
4   with Ephe or Benja?
5       A.   I mostly worked with start ups and other
6   small companies in the Gainesville area.  I actually
7   worked with -- I was the CTO of a start up.  I did
8   some website consulting for a company.  I worked at
9   a third start up for a little over a year, and when
10   I left that start up, which is called Feather, it
11   was right about the time I moved to Austin.  And
12   after, that I worked at a small business based in
13   Orlando that had a location in Round Rock, which is
14   north of Austin, for about a year.
15       Q.   Did you move for Austin for work or
16   unrelated to work?
17       A.   It was kind of both.  It was a move of
18   opportunity.  I had wanted to leave Gainesville and
19   I had a job opportunity here.
20       Q.   Okay.  And the work that you have just
21   briefly described, is that all, instead of my
22   guessing, how would you describe that work?
23   Engineering work?  Coding?  Design?  What sort of
24   work was included in that?
25       A.   I did both IT support and coding work.

**Page 14**

1       Q.   And tell us about the circumstances that
2   led to your leaving Mr. Chapin, Mr. Andrew Chapin,
3   and becoming involved with Ephe?
4       A.   Andrew and I actually worked together at
5   Feather.  He was hired to work for Feather after I
6   had worked there for a while and we just -- I knew
7   him because he came to visit Feather and I offered
8   up my apartment to let him stay with me and I think
9   he stayed for a few weeks, because he did not live
10   in Gainesville, which is where Feather was located.
11   So he stayed with me for a few weeks.  and that's how
12   I got to know him.  I believe that it was after I
13   had left Feather that we started discussing this
14   idea for a business that he had.
15       Q.   And when was that?  If you can give us a
16   year, if not a month.
17       A.   I started working with him on a contract
18   basis in 2014.  I don't recall if we started talking
19   about it in 2013 or 2014.
20       Q.   What was your understanding of the
21   business you were starting to work with?
22       A.   I'm sorry.  I don't understand the
23   question.
24       Q.   When you say you started working with him
25   in 2013 or 2014, that was at this new venture?

**Page 15**

1       A.   Ephe.  At the time, I believe it was
2   called Ephe Corp.  Yes.
3       Q.   What was your understanding of Ephe's
4   business or plans for business?
5       A.   We were building a mobile app to show
6   products to customers based on targeted information
7   that they gave us.
8       Q.   Can you be a little more explanatory?  I
9   guess I'm not sure what that means.
10       A.   We built an app that the user can sign
11   into and give us their shirt size, pants size, shoe
12   size, and some interests, you know, football teams
13   or sports or outdoor activity type things, and then
14   we would try to match them with products that we
15   thought would be interesting to them that were at a
16   discount.
17       Q.   Got it.  Okay.  And at the time you
18   started working, did you understand whether or not
19   Mr. Chapin had formed a new entity?  What was your
20   understanding of the status of the business?
21       A.   I don't recall.  I'm sorry.  I don't
22   recall.
23       Q.   And you said you were doing some contract
24   work.  Is that what you said?
25       A.   Yes.  I believe I was originally just

**Page 16**

1   being paid kind of on a contract, not an employee
2   basis, and then I later received an offer for
3   employment.
4       Q.   Do you recall what time that was that you
5   received the offer?
6       A.   I believe it was in 2015.
7       Q.   And was that an offer from Ephe?
8       A.   Yes.
9       Q.   And what was the offer for?  By that I
10   mean, what position were you being offered?
11       A.   I believe it was CTO.  I'm not positive.
12   At some point, I was offered the CTO position.
13       Q.   And I've seen, Mr. Goode, in various
14   places reference to you as a co-founder of Ephe or
15   Benja; is that a fair statement?
16       A.   That was my understanding, yes.  I, yes,
17   that's correct.
18       Q.   That's how you considered yourself, I take
19   it?
20       A.   Yes, it is.
21       Q.   Okay.  And when you joined as the CTO, can
22   you give us a general description of what your job
23   duties were?
24       A.   I was building the mobile app and also
25   working on the web advertising part of things and

**Page 17**

1 handling the server side, managing our servers
2 basically.
3   Q.  I take it -- well, let me give you my
4 uneducated understanding of what the idea was and
5 you can confirm or correct it, which is through the
6 app, the company would sort of act as a middle man
7 connecting the consumer with the retailer or the
8 wholesaler and you would make money as that middle
9 man.  Is that how it would work?
10   A.  I believe that our business model was that
11 we would be making basically a percentage based on
12 impressions.  So I don't think it was if we were
13 trying to make money off of the sales themselves by
14 marking it up, but by impressions, basically an
15 advertising model.
16   Q.  So when that consumer clicked on a link
17 for some vendor, that's how you would make your
18 money?
19   A.  I'm not quite certain, but I believe it
20 was every impression.
21   Q.  Okay.  And was that -- let me ask the
22 question this way.  Was that Ephe and Benja's
23 business model continuously or did the business
24 model change over time?
25   A.  It changed over time.  We kept that as

**Page 18**

1 part of the business and I believe pretty early on
2 added a web advertising component.  So Ephe would
3 buy ad space on sports blogs, things like that and
4 we would show sporting apparel and team gear and
5 other things that we could advertise from our --
6 from the publishers that we had access to.  Later,
7 Benja, we added new project basically, and different
8 things to try.
9   Q.  And it was -- and you were working on the
10 technical side of those things; is that correct?
11   A.  Yes, it is.
12   Q.  What involvement if any did you have on
13 the business side, meaning connection with the
14 customers or the vendors that Ephe would be involved
15 in?
16   A.  I did not have any direct connection with
17 customers or vendors, except when technical support
18 was required.
19   Q.  All right.  And give me an example, if you
20 could, of the sort of situation in which technical
21 support might be required?
22   A.  When we would onboard a web property that
23 was going to be showing our ads, I would have to
24 give them a snippet of code to put into their web
25 page so that it would show our ads, and sometimes

**Page 19**

1 they needed help with placement or fixing it to make
2 sure that it worked.
3   Q.  And can you remember any of the companies
4 that you did that with on this onboarding process?
5   A.  I can't specifically remember any
6 customers that I had to talk to directly to help,
7 no.
8   Q.  I wanted to jump out of order for a
9 second. I had asked you about Google docs and asked
10 you about Dropbox and your ability to access those
11 files.  Do you have access to Boardable if you know
12 what that is?
13   A.  I've heard it.  I do not believe I have
14 access to it.  I don't believe I have access to it.
15   Q.  Okay.  Did you use it at all in connection
16 with Ephe or Benja?
17   A.  I don't believe so, no.
18   Q.  What if any involvement did you have in
19 the financial part of the operations?  In other
20 words, access to bank accounts?  Do you have that?
21   A.  No.
22   Q.  Are you a signatory on any bank accounts?
23   A.  Not that I was aware of at the time.
24   Q.  Was the company's financial performance
25 shared with you on any basis, daily, monthly,

**Page 20**

1 quarterly, annually?
2   A.  Not on any basis, no.  I received a couple
3 of income statements, maybe three or four, over the
4 course of those years.
5   Q.  How if at all did you have a sense of
6 whether the company was economically, how it was
7 economically performing during your time there?
8   A.  I did not have any direct knowledge of it.
9 Just any -- just anything that Chapin would say.
10 But did I not have a good idea on my own.
11 BY MR. SOULIOS:
12   Q.  Can I ask a follow up question?  I think
13 it's on this thread.  Mr. Goode, I think you said
14 that you didn't specifically recall any customers in
15 connection with technical support that you may have
16 provided to onboard them, but can you recall any
17 specific customers of Benja at all?
18   A.  I don't know if they were considered
19 customers because these are -- what I was thinking
20 of was properties that I was onboarding, which I
21 believe we would be paying them to show our ads.  So
22 I think that's actually not a customer.  That's a
23 web property that we were going to be showing ads
24 on.  That's who I was involved with.
25   Q.  And who would those be?

1    A.  Yes.  I confronted him about it.
2    Q.  What did he say?
3    A.  He said it was a mistake, that he set it
4  up in order to basically delay meetings with
5  investors and to not have to bother me with things
6  while I wasn't working with the company.
7    Q.  You talked about a period when you were
8  not working at the company.  Could you tell us, my
9  understanding is that you worked at the company for
10  a while, left for a period and then came back; is
11  that correct?
12    A.  Yes, that's correct.
13    Q.  And can you give us the timing of those
14  events?
15    A.  I left the company for the first time in
16  November, 2017.  November was the last month that I
17  worked there.  I went and worked for another company
18  unrelated to Benja and then I believe it was right
19  around September, 2019 when I returned to Benja.
20    Q.  Why is it that you left Benja in 2017?
21    A.  My understanding at the time was that we
22  had run out of money and there was no money to pay
23  my paycheck.
24    Q.  And when you came back, what were the
25  circumstances that led to your return in 2019?

1    A.  The company that I was working for laid me
2  off.
3    Q.  And so you approached Mr. Chapin about
4  coming back to Benja at that point?
5    A.  Yes.
6    Q.  Tell us about those discussions if you
7  could.
8    A.  I let him know that I had been laid off
9  and he said that there was work that he needed a
10  technical person to do, so he would be interested in
11  rehiring me.
12    Q.  And what was the -- what were the terms of
13  your rehiring?  What was your position?
14    A.  I believe CTO.
15    Q.  And when, between the period when you left
16  in 2017 to when you returned in 2019, what was your
17  understanding of the company's business?  Was it
18  continuing to operate in some form?
19    A.  Yes.  That was my understanding.  I did a
20  limited amount of work for them, like once a week,
21  maybe five or ten minutes.  There was a small
22  technical procedure that I continued to do for them,
23  but I did not receive any compensation.
24    Q.  And then when you returned in 2019, if you
25  could give us in general terms what you started to

1  work on when you came back.
2    A.  When I came back, they had multiple
3  Shopify stores, and I administered the Shopify
4  stores, worked on Teams, did some work, basically
5  maintaining the Shopify stores as well as continuing
6  to maintain the servers and the IPhone app.
7    Q.  Tell us what a Shopify store is, if you
8  could, please.
9    A.  Shopify is a service that provides a web
10  storefront so you can sell items.
11    Q.  So was Affordable Jerseys a Shopify store?
12    A.  Yes.
13    Q.  What other stores do you recall being
14  there?  Was Coverage Gear a Shopify store?
15    A.  Yes.  Those are the two that I recall.
16    Q.  Okay.  And then so what work did you do
17  with respect to those two businesses?
18    A.  I helped load in product, set up imports
19  at times, worked on the changing the look and feel
20  of the website, technical support things.
21    Q.  Okay.  Did you have -- when you came back
22  and any time subsequent to that, did you have any
23  understanding about what business was being done
24  through those stores?
25    A.  I believe that they were selling jerseys

1  and selling hats through those stores.
2    Q.  Did you get a sense from Mr. Chapin or
3  anyone else about the amount of business that was
4  being done through those Shopify stores?
5    A.  Yes.  I could see the number of orders
6  when I logged into the administration panel.
7    Q.  Let me ask you about a couple of other
8  businesses that we've seen reference to and tell me
9  what you know about them.  Something called Sunny
10  Beach House?
11    A.  Yes.  Sunny Beach House was a blog that I
12  helped set up for Benja that was going to be a kind
13  of like a travel affiliate site which would make
14  money by linking customers to Verbo or Air BNB
15  properties for rental.
16    Q.  So somebody would go to Sunny Beach House
17  and click on a possible rental, and if they ended up
18  renting it, was that Verbo or Air BNB would pay a
19  commission or something like that to Benja?  Is that
20  how it worked?
21    A.  I'm not quite certain if it was impression
22  based or commission.  I believe it was commission.
23    Q.  And did you have any sense, Mr. Goode,
24  about, you know, whether or not that site was
25  bringing money into the company?  Did you get any

**Page 37**

1   information from Chapin or financial reports about
2   what kind of income is being generated by that?
3      **A.  My understanding is it wasn't generating**
4   **any income at the time because we launched it right**
5   **in the middle of the pandemic or the beginning, yes,**
6   **the pandemic was going on, I believe, when we**
7   **launched it.**
8      Q.  In terms of the business Affordable
9   Jerseys, you understood the site was selling sports
10  gear; is that right?
11     **A.  Yes.**
12     Q.  All right.  And did you ever discuss with
13  Mr. Chapin or anyone else at the company whether or
14  not it was licensed to do that whether or not the
15  company was licensed to sell the gear?
16     **A.  Yes.  I spoke with Chapin and he said they**
17  **were licensed.**
18     Q.  All right.
19     **MR. SOULIOS:**  Can I interject, Steve?
20     **MR. FINESTONE:**  Go ahead.  And while you are
21  doing that, Michael, I'll ask you if you could open
22  Exhibit 49.
23  BY MR. SOULIOS:
24     Q.  Mr. Goode, when you were able to log in
25  and see the orders for either Affordable Jerseys or

**Page 38**

1   Coverage Gear, what types of numbers did you observe
2   in terms of the sales?
3      **A.  There were sales.  There were, you know,**
4   **it wasn't just a dead site that didn't have any**
5   **sales.  We were making -- I don't have specific**
6   **numbers.**
7     Q.  Did you see like dozens?  Hundreds?
8   Thousands?  Tens of thousands?  I'm just trying to
9   get an order of the magnitude of sales.
10     **A.  Oh, I believe there were hundreds on both**
11  **sites, at least.**
12     Q.  And that was 2019 and 2020?
13     **A.  Yes.  That was -- I worked on the process**
14  **in 2019 into 2020.**
15     **MR. SOULIOS:**  Thank you.
16  BY MR. FINESTONE:
17     Q.  Take a look at what Mr. Stern has pulled
18  up.  Mr. Goode, that we are calling Exhibit 49,
19  which is identified as an MLB license agreement and
20  that's a multipage document, 16 pages, I think, in
21  all.  Have you ever seen that before?
22     **A.  I believe so, yes.**
23     Q.  Okay.  And what was the circumstances
24  under which you saw this?
25     **A.  I believe this is the license that Chapin**

**Page 39**

1   **gave to me when he -- so the date on that, sorry,**
2   **give me one moment to review this.**
3      Q.  Sure.
4      **A.  Yes, this looks like the document that**
5   **Chapin showed me after he renegotiated the MLB**
6   **license.**
7     Q.  And what purports to be a signature of
8   someone named Evan Kaplan is dated July 30, 2020.
9   Does that sound like the timing which you saw this
10  document?
11     **A.  Yes.**
12     Q.  So some time after that time or around
13  that time Mr. Chapin showed you that document?
14     **A.  Yes.**
15     Q.  And prior to this document, did you
16  understand that Mr. Chapin had a licensing agreement
17  with Major League Baseball?
18     **A.  Yes, I did.**
19     Q.  Did you ever receive any information from
20  Mr. Chapin or any other party suggesting that Benja
21  was not licensed to sell professional sports gear?
22     **A.  I believe I saw a few complaints from**
23  **customers that the quality wasn't up to par.  The**
24  **reason that we, our supplier, sorry, not the**
25  **supplier, our warehouse that did our fulfillment,**

**Page 40**

1   **expressed some concern after we received a seizure**
2   **notice from Customs and Border Patrol about a**
3   **shipment of our jerseys.**
4      Q.  And that was WCB.  If I recall, is that
5   the name of the warehouse?
6      **A.  Yes.**
7     Q.  Okay.  I believe I have a copy of that
8   e-mail.  I'm just looking for it.  Do you recall
9   what the timing of that was?
10     **A.  I believe it was May or June of 2020.**
11     Q.  So some time prior to the date, the
12  apparent date of this agreement?
13     **A.  Yes, that's correct.**
14     Q.  And when Mr. Chapin showed you this
15  agreement, was that supposed to be somehow in
16  response to the e-mail that you had received or what
17  led him to in your understanding to provide you with
18  this document?
19     **A.  He told me that he was renegotiating the**
20  **MLB license that we already had, or to add, I**
21  **believe he was trying to add the ability to hats or**
22  **license some other gear besides what we already had**
23  **a license for according to him.**
24     Q.  Michael, if you can pull up Exhibit 56,
25  please.

Bridget Mattos & Associates
www.bmareporting.com
Case: 21-03036   Doc# 29   Filed: 07/15/22   Entered: 07/15/22 16:54:58   Page 227 of 241

1    please.  This e-mail on Exhibit 8 is from Mr.
2    Fraser at this law firm in Jacksonville.  Eavenson
3    Fraser, et al.  Did you ever have conversations
4    either by phone or e-mail, Slack, et cetera, with
5    Mr. Fraser or anyone at that law firm?
6        A.  No.
7        Q.  How about the law firm of Armstrong
8    Teasdale?
9        A.  No.
10       Q.  Michael, if you can pull up Exhibit 55.
11   I'll show you what has been marked as Exhibit 55,
12   Mr. Goode, which is a document we received from your
13   production.  It purports to be a, in this case, I
14   have to say it purports to be just about any
15   document, but purports to be a retainer agreement
16   between this law firm Armstrong Teasdale LLP, and
17   that's T-E-A-S-D-A-L-E and Ephe Corp DBA Benjamin.
18   Does that ring a bell?
19       A.  The legal firm Armstrong Teasdale?  No,
20   not at all.
21       Q.  Okay.
22       MR. EVERETT:  I have a question.
23       MR. FINESTONE:  Fire away.
24   BY MR. EVERETT:
25       Q.  So this document is written to Mr. Chapin

Page 145

1    at Ephe Corp in St. Louis, Missouri.  Is that where
2    the entity at that time in 2015 was established?  My
3    understanding is that they were in Massachusetts and
4    they moved to California.  Can you shed any light on
5    that?
6        A.  I don't know where the company was.  I
7    mean, I'm not sure where it was incorporated at the
8    time, but I think it sounds correct that it was
9    started in Massachusetts and then moved to
10   California.  St. Louis, Missouri was where I believe
11   Moosylvania was and perhaps Chapin had an office
12   there for a bit.  I don't recall.
13       Q.  Okay.  Thank you.  Michael, if you can
14   pull up Exhibit 28.  Exhibit 28 is an e-mail, Mr.
15   Goode, the top one from you to Mr. Chapin on
16   March 22 of 2018 with the phrase, "Here is one," in
17   referring to an e-mail below.  Take a minute to look
18   at that and tell me if you remember seeing this.
19       A.  Yes.
20       Q.  And the statement "Here is one" suggests
21   to me that there was more than one that you were
22   sort of sending Mr. Chapin an example; is that
23   correct?
24       A.  Yes, that's correct.
25       Q.  And the e-mail to you from a woman named

Page 146

1    Emily has to do with Uber cards, Uber gift cards.
2    Were you receiving a number of e-mails along the
3    same line from customers not receiving what they had
4    paid for?
5        A.  Yes.  I believe somewhere on the order of
6    three to seven or so, five-ish.
7        Q.  And were they confined in a particular
8    time or were they spread out over months or years?
9        A.  I think they were spread out over a few
10   months, maybe.
11       Q.  And this one had to do with an Uber gift
12   card.  Were there other gift cards such as Starbucks
13   and things like that?
14       A.  Yes.  We sold a number of gift cards
15   throughout the years.
16       Q.  How did that work just as a business
17   model?  How did the company acquire the gift cards
18   and how did it make money selling them?
19       A.  I wasn't involved in the acquisition of
20   the gift cards, but my understanding from Chapin was
21   that he would basically work directly with the
22   vendor, which would offer us favorable gift card
23   rates and we would mark it up a bit and sell it.  So
24   the first one we did was Hulu and I think we offered
25   something like 50 percent off of a Hulu

Page 147

1    subscription.
2        Q.  I see.  And what did Mr. Chapin say to you
3    or respond to you with respect to this e-mail and
4    the concern expressed by this customer?
5        A.  That he would take care of it, either
6    refund or provide the Uber gift card.
7        Q.  Did this ever get up to a level where you
8    considered it a problem that, "Hey, wait a minute.
9    Why are we getting these complaints about not
10   delivering on these gift cards?"
11       A.  Yes.  It was -- there was an issue with
12   Uber for a while due to very, very popular items,
13   and it sold a lot and my understanding from Chapin
14   was that once we started delivering, we had an issue
15   with the supplier and they were not giving us the
16   volume of gift cards that we had originally been
17   promised or were now selling.  So it took a while to
18   clean up and make sure that we refunded or delivered
19   to all of our customers.
20       Q.  Okay.
21   BY MR. EVERETT:
22       Q.  Mr. Goode, did you have some other kind of
23   problems with -- similar kind of problems with other
24   cards?
25       A.  Yes.

Page 148

1     A.  No.  I wasn't employed by Benja at that
2  time, either.
3     Q.  Okay.  And seeing the name Scott Sklar and
4  Clifford Holkamp here, does that refresh your
5  recollection at all about them being on the board?
6     A.  As I said, I kind of saw Scott.  I
7  remember seeing Scott's name with either board or
8  investment stuff, but Clifford's, I see it here, but
9  I didn't recall that from seeing documents back in
10  October when I started searching through them.
11     Q.  Michael, if you can open Exhibit 50.
12  Exhibit 50, Mr. Goode, is a document that was in
13  your production entitled an advisor agreement
14  between Mr. Chapin as the advisor and a company
15  called Decentralized Acquisitions from December,
16  2017.  Do you recall seeing this prior to you
17  finding it through your document review?
18     A.  No.
19     Q.  Have you ever heard of Decentralized
20  Acquisitions?
21     A.  No.  Chapin mentioned that he was doing
22  some consulting for some cryptocurrency companies
23  for some ICO, I think, companies, after we did the
24  Benja ICO, and I think he even wrote a book, and for
25  a little bit of a time was kind of a popular figure

1  in the ICO scene and so he did some advising.  But I
2  don't remember any company names.
3     Q.  With respect to the company ICO, was there
4  ever a report issued, you know, an e-mail sent out,
5  "These are the results of our ICO, this is what we
6  received, this is what we sold," that sort of thing?
7     A.  Chapin, I believe, was sending or was
8  supposed to be sending quarterly updates.  I don't
9  believe I ever saw those.  I think he sent them
10  directly.
11     Q.  Directly to?
12     A.  People that had bought in the presale.
13     Q.  Do you know any of those people?  Do you
14  recall any of the names?
15     A.  No.
16     Q.  I take it you had not bought into the
17  presale?
18     A.  Correct.
19     Q.  Exhibit 51, please, Michael.  This is
20  another advisor agreement entered into November,
21  2017 between Mr. Chapin and someone named Mark
22  Lingo.  Do you recognize that name at all?
23     A.  No, I do not.
24     Q.  This is another cryptocurrency advisor
25  agreement.  Correct?

1     A.  That's what it looks like, yes.
2     Q.  And you did not discuss this with him?
3     A.  No.
4     Q.  All right.  Did the company to your
5  knowledge ever enter into any similar sort of
6  agreements or was it always Mr. Chapin individually?
7     A.  I don't know about any that the company
8  did.  I would assume they were just Chapin by
9  himself.
10     Q.  All right.  I want to turn it over to
11  anybody else for questions.  I want to do a quick
12  recap of my notes and my exhibits and see if there's
13  anything else I want to ask you about, Mr. Goode.
14           EXAMINATION
15  BY MR. EVERETT:
16     Q.  I have just maybe one question.  Mr.
17  Goode, I know you didn't know a lot about the
18  finances of the company, but are there any sources
19  of assets that you heard of in any way or saw
20  documents about that may not exist today, maybe they
21  were in the Slack, that we haven't asked you about?
22  Sources of funds.
23     A.  I think they would have been in the
24  documentation, but I feel like I've heard of more
25  loans or different companies, or maybe that was

1  just, I kind of learned about a bunch of them all at
2  once in October.  But it was all through the
3  paperwork.
4     Q.  So maybe Gibraltar?
5     A.  Right.  Yeah, I don't know of any other
6  sources of assets.
7     Q.  The merchandise that's in the warehouse or
8  that was in the warehouse in Texas, do you know if
9  that's owned by Benja or if it's signed to Benja?
10     A.  I believe it is owned by Benja.
11     Q.  And the person that manages that
12  warehouse, is that person related to Mr. Chapin?
13     A.  No.  He is my cousin.
14     Q.  Your cousin.  Okay.  Have you spoken to
15  him since last October?
16     A.  Yes.
17     Q.  Do you know if the assets are still in the
18  warehouse?
19     A.  I believe that they are still there, yes.
20     MR. EVERETT:  Do we have his contact
21  information?
22     MR. FINESTONE:  I don't, Kyle, but hopefully
23  Mr. Goode can give that to us.
24     THE WITNESS:  I have it.
25  BY MR. EVERETT:

1    DEPOSITION OFFICER'S CERTIFICATE
2    STATE OF CALIFORNIA        )
3    COUNTY OF CONTRA COSTA        ) ss.
4    .
5    I, KRISHANNA DERITA, hereby certify:
6        I am a duly qualified Certified Shorthand
7    Reporter in the State of California, holder of
8    Certificate Number CSR 11945 issued by the Court
9    Reporter's Board of California and which is in full
10   force and effect.  (Civ. Proc. 2025.320 (a))
11       I am authorized to administer oaths or
12   affirmations pursuant to California Code of Civil
13   Procedure, Section 2093 (b) and prior to being
14   examined, the witness was first placed under oath or
15   affirmation by me.  (Civ. Proc. 2025.320, 2025.540)
16       I am the deposition officer that
17   stenographically recorded the testimony in the
18   foregoing deposition and the foregoing transcript is
19   a full true record of the testimony given. (Civ.
20   Proc. 2025.540 (a))
21       I have not and shall not offer to provide any
22   services or products to any party's attorney nor
23   party who is financing all or part of the action
24   without first offering same to all parties or their
25   attorneys attending the deposition and making same

Page 169

1    available at the same time to all parties or their
2    attorneys. (Civ. Proc. 2025.320(b))
3        I shall not provide any service or product
4    consisting of the deposition officer's notations or
5    comments regarding the demeanor of any witness,
6    attorney or party present at the deposition to any
7    attorney or party present at the deposition to any
8    party or any party's attorney or third party who is
9    financing all or part of the action, nor shall I
10   collection any personal identifying information
11   about the witness as a service or product to be
12   provided to a party or third party who is financing
13   all or part of the action. (Civ. Proc. 2025.320 (c))
14
15   DATED March 21, 2021.
16
17   _____
18   KRISHANNA M. DERITA
19   CSR # 11945
20
21
22
23
24
25

Page 170

# EXHIBIT F

1  THEODORE B. STOLMAN (BAR NO. 52099)
   ted.stolman@ffslaw.com
2  CAROL CHOW (BAR NO. 169299)
   carol.chow@ffslaw.com
3  FREEMAN, FREEMAN & SMILEY, LLP
   1888 Century Park East, Suite 1500
4  Los Angeles, California 90067
   Telephone: (310) 255-6100
5  Facsimile: (310) 255-6200

6  Attorneys for Defendant
   MHC FINANCIAL SERVICES INC.
7

8           UNITED STATES BANKRUPTCY COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11  In re                              Case No. 20-30819 DM

12  BENJA INCORPORATED, aka EPHE       Chapter 7
    CORPORATION,
13                                     Adv No. 21-03036
              Debtor.
14                                     ANSWER OF MHC FINANCIAL
                                       SERVICES INC. TO COMPLAINT
15  KYLE EVERETT,
    TRUSTEE IN BANKRUPTCY,
16
              Plaintiff,
17
         vs.
18
    MHC FINANCIAL SERVICES, INC.,
19
              Defendant.
20

21

22

23

24

25

26

27

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6100

FAXED

5099856.1                    1

1  Defendant MHC Financial Services, Inc. ("**MHC**") answers Plaintiff's complaint as
2  follows:

3      1.      In response to Paragraph 1 of the Complaint, MHC admits the allegations in
4  Paragraph 1 of the Complaint.

5      2.      In response to Paragraph 2 of the Complaint, MHC admits the allegations in
6  Paragraph 2 of the Complaint.

7      3.      Paragraph 3 of the Complaint sets forth jurisdictional allegations and legal
8  conclusions to which no response is required.

9      4.      Paragraph 4 of the Complaint sets forth jurisdictional allegations and legal
10 conclusions to which no response is required.

11     5.      Paragraph 5 of the Complaint sets forth jurisdictional allegations and legal
12 conclusions to which no response is required.

13     6.      Paragraph 6 contains a statement concerning a consent by Plaintiff to which no
14 response is required.  To the extent a response is required, MHC states it reserves all of its rights
15 and remedies provided by the Bankruptcy Code and by law.

16     7.      In response to Paragraph 7 of the Complaint, MHC admits that Benja represented
17 to MHC that it had business relationships with Nike, Backcountry and Columbia related to online
18 advertising.  MHC is without sufficient information to admit or deny the remaining allegations in
19 Paragraph 7 of the Complaint and, as a result, denies the same.

20     8.      In response to Paragraph 8 of the Complaint, MHC admits that it is a Missouri
21 corporation that, at all times relevant, provided accounts receivable factoring services to its
22 customers.  The remaining allegations in Paragraph 8 are denied.

23     9.      In response to Paragraph 9 of the Complaint, MHC admits that on or about July 19,
24 2019 a UCC-1 Financing Statement was purportedly recorded with the Delaware Secretary of
25 State by Busey Bank.  The remaining allegations contained in Paragraph 9 of the Complaint
26 contain Plaintiffs' characterization of the UCC-1 Financing Statement and MHC denies any
27 allegation inconsistent with such UCC-1 Financing Statements.  MHC is without sufficient
28 information to admit or deny the remaining allegations in Paragraph 9 of the Complaint and, as a

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   result, denies the same.

2       10.    The allegations in Paragraph 10 contain the Trustee's legal conclusions to which no

3   response is required. To the extent that a response is required, MHC is without sufficient

4   information to admit or deny the allegations in Paragraph 10 of the Complaint and, as a result,

5   denies the same.

6       11.    In response to Paragraph 11 of the Complaint, MHC admits that on or about March

7   13, 2020, Benja submitted a Factoring Application to MHC, signed by Chapin and Goode for the

8   purposes of pursuing the sale of accounts receivable by Benja to MHC. MHC is without sufficient

9   information to admit or deny the remaining allegations in Paragraph 11 of the Complaint and, as a

10   result, denies the same.

11       12.    In response to Paragraph 12 of the Complaint, MHC admits the allegations

12   contained in Paragraph 12 of the Complaint.

13       13.    In response to Paragraph 13 of the Complaint, MHC admits that it discussed the

14   Busey Bank lien with Chapin and that Chapin made certain representations regarding the Busey

15   Bank lien. The remaining allegations contained in Paragraph 13 of the Complaint are denied.

16       14.    In response to Paragraph 14 of the Complaint, MHC admits that it generally desired

17   to purchase accounts receivable when there were no prior UCC-1 Statements filed against the

18   customer. MHC denies all other allegations contained in Paragraph 14 of the Complaint.

19       15.    In response to Paragraph 15 of the Complaint, MHC admits that it received a

20   document from Chapin which appeared, and MHC believed, to be a termination of the Busey

21   Bank Lien filed with the Delaware Secretary of State. MHC denies the remaining allegations in

22   Paragraph 15 of the Complaint.

23       16.    In response to Paragraph 16 of the Complaint, the allegations contained in

24   Paragraph 16 of the Complaint contain Plaintiffs' characterization of certain provisions of the

25   Factoring Services Agreement to which no response is required and MHC denies any allegations

26   in Paragraph 16 of the Complaint to the extent they are inconsistent with the Factoring Services

27   Agreement. MHC respectfully refers the Court to the entire Factoring Services Agreement for the

28   full meaning and terms thereof.

5099856.1         3

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

17.     In response to Paragraph 17 of the Complaint, MHC admits that it obtained information concerning Benja prior to entering into the Factoring Services Agreement and prior the purchase of any accounts receivable. The remaining allegations contained in Paragraph 17 contain the Trustee's characterization of the Factoring Services Agreement and legal conclusions and MHC denies all other allegations contained in Paragraph 17. MHC respectfully refers the Court to the entire Factoring Services Agreement for the full meaning and terms thereof.

18.     In response to Paragraph 18 of the Complaint, MHC admits that the Factoring Services Agreement was signed by MHC and Benja and that Mr. Chapin and Mr. Goode signed that certain Guaranty. MHC denies any allegations in Paragraph 18 of the Complaint to the extent they are inconsistent with the Factoring Services Agreement and Guaranty.

19.     In response to Paragraph 19 of the Complaint, MHC admits the allegations contained in Paragraph 19 of the Complaint.

20.     In response to Paragraph 20 of the Complaint, MHC admits that it agreed to purchase accounts receivable from Benja following the execution of the Factoring Services Agreement. MHC further admits, that based on certain representations from Chapin, that it permitted Chapin to issue notices of assignment to the account debtors directly and Chapin provided copies of those notices and confirmations to MHC. MHC denies the remaining allegations contained in Paragraph 20 of the Complaint.

21.     In response to Paragraph 21 of the Complaint, MHC admits that it purchased accounts receivables from Benja on or around the dates and for the amounts noted in Paragraph 21 of the Complaint. MHC denies all remaining allegations in Paragraph 21 of the Complaint.

22.     In response to Paragraph 22 of the Complaint, MHC is without sufficient information to admit or deny the allegations in Paragraph 22 of the Complaint and, as a result, denies the same.

23.     In response to Paragraph 23 of the Complaint, MHC is without sufficient information to admit or deny the allegations in Paragraph 23 of the Complaint and, as a result, denies the same.

24.     In response to Paragraph 24 of the Complaint, MHC admits to sending a letter

1 | dated July 17, 2020 to Benja.  The allegations in Paragraph 24 also contain Plaintiffs'
2 | characterization of the letter and MHC denies any allegations in Paragraph 24 of the Complaint to
3 | the extent they are inconsistent with the contents of the letter.

4 |      25.    In response to Paragraph 25 of the Complaint, MHC admits to receiving the
5 | "Promise to Pay" on or about July 21, 2020. With respect to any remaining allegations, MHC
6 | denies any allegations in Paragraph 18 of the Complaint to the extent they are inconsistent with
7 | the contents of the promise to pay.

8 |      26.    In response to Paragraph 26 of the Complaint, MHC admits that it entered into a
9 | certain Forbearance Agreement with Benja.  The remaining allegations of Paragraph 26 contain
10 | Plaintiffs' characterization of the Forbearance Agreement and MHC denies any allegations in
11 | Paragraph 26 of the Complaint to the extent they are inconsistent with the Forbearance Agreement
12 | and MHC respectfully refers the Court to the Forbearance Agreement for the full meaning and
13 | terms thereof.

14 |      27.    In response to Paragraph 27 of the Complaint, MHC admits the allegations
15 | contained in Paragraph 27 of the Complaint.

16 |      28.    In response to Paragraph 28 of the Complaint, MHC admits that it received the
17 | amounts identified in Paragraph 28 of the Complaint and that the wire information MHC received
18 | indicated that the source of the amounts was an account at Busey Bank.  MHC denies all other
19 | allegations in Paragraph 28, including, without limitation, any of Plaintiff's characterizations of
20 | such amounts and the allegations that these payments constitute preferential or fraudulent
21 | transfers.

22 |      29.    In response to Paragraph 29 of the Complaint, MHC admits it received a total
23 | amount of Four Million Nine Hundred Twenty Three Thousand Six Hundred Sixty Four and
24 | 05/100 Dollars ($4,923,664.05) and MHC denies all other allegations in Paragraph 29 of the
25 | Complaint, including, without limitation, any of Plaintiffs' characterizations of the amounts.

26 |      30.    In response to Paragraph 30 of the Complaint, MHC admits that MHC was told by
27 | Chapin that the source of the funds for certain amounts were payments on the accounts MHC
28 | purchased from Benja that Benja received from account debtors directly.  MHC is without

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

5099856.1

5

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 | sufficient information to admit or deny the remaining allegations in Paragraph 30 of the Complaint

2 | and, as a result, denies the same.

3 |      31.    In response to Paragraph 31 of the Complaint, MHC denies the allegations

4 | contained in Paragraph 31 of the Complaint.

5 |      32.    MHC restates its responses to Paragraph 1 through 31 of the Complaint.

6 |      33.    MHC denies the allegations in Paragraph 33 of the Complaint.

7 |      34.    MHC denies the allegations in Paragraph 34 of the Complaint.

8 |      35.    MHC restates its responses to Paragraph 1 through 31 of the Complaint.

9 |      36.    MHC denies the allegations in Paragraph 36 of the Complaint.

10 |      37.    MHC denies the allegations contained in Paragraph 37 of the Complaint.

11 |      38.    MHC restates its responses to Paragraph 1 through 31 of the Complaint.

12 |      39.    MHC denies the allegations contained in Paragraph 39 of the Complaint.

13 |      40.    MHC denies the allegations in Paragraph 40 of the Complaint.

14 |      41.    MHC restates its responses to Paragraph 1 through 31 of the Complaint.

15 |      42.    MHC denies the allegations in Paragraph 42 of the Complaint.

16 |      43.    MHC denies the allegations in Paragraph 43 of the Complaint.

17 |      44.    MHC denies the allegations in Paragraph 44 of the Complaint.

18 |      45.    MHC restates its responses to Paragraph 1 through 31 of the Complaint.

19 |      46.    MHC denies the allegations in Paragraph 46 of the Complaint.

20 |      47.    MHC denies the allegations in Paragraph 47 of the Complaint.

21 |      48.    MHC restates its responses to Paragraph 1 through 31 of the Complaint.

22 |      49.    Paragraph 49 of the Complaint states a legal conclusion to which no response is

23 | required.  To the extent a response is required, MHC denies all allegations contained in Paragraph

24 | 49 of the Complaint.

25 |      50.    MHC admits that it disputes Plaintiff's contention and MHC denies all remaining

26 | allegations contained in Paragraph 50 of the Complaint.

27 |      51.    Paragraph 51 of the Complaint states a legal conclusion to which no response is

28 | required.  To the extent a response is required, MHC denies all allegations in Paragraph 51 of the

5099856.1             6

1 | Complaint.

2 |      52.    MHC denies the allegations in Paragraph 52 of the Complaint.

3 |      53.    MHC restates its responses to Paragraph 1 through 31 of the Complaint.

4 |      54.    Paragraph 54 of the Complaint states a legal conclusion to which no response is

5 | required. To the extent a response is required, MHC denies all allegations contained in

6 | Paragraph 54 of the Complaint.

7 | <div align="center">**AFFIRMATIVE DEFENSES**</div>

8 |      Without waiving or excusing the burden of proof of Plaintiff, or admitting that Defendant

9 | has any burden of proof, Defendant hereby asserts the following separate affirmative defenses:

10 | <div align="center">**FIRST AFFIRMATIVE DEFENSE**</div>

11 |      55.    MHC specifically denies each and every allegation not expressly admitted herein.

12 | <div align="center">**SECOND AFFIRMATIVE DEFENSE**</div>

13 |      56.    Plaintiff's Complaint fails to state a claim upon which relief can be granted.

14 | <div align="center">**THIRD AFFIRMATIVE DEFENSE**</div>

15 |      57.    Plaintiff's claims are barred, in whole or in part, as the amounts MHC received

16 | from Benja were not made with an actual intent to hinder, delay or defraud Benja's creditors.

17 | <div align="center">**FOURTH AFFIRMATIVE DEFENSE**</div>

18 |      58.    Plaintiff's claims are barred, in whole or in part, as Benja's business operations did

19 | not constitute a Ponzi Scheme.

20 | <div align="center">**FIFTH AFFIRMATIVE DEFENSE**</div>

21 |      59.    Plaintiff's claims are barred, in whole or in part, as the amounts MHC received

22 | from Benja were for value and in good faith pursuant to 11 USC § 548(C).

23 | <div align="center">**SIXTH AFFIRMATIVE DEFENSE**</div>

24 |      60.    To the extent that the receivables sold to MHC by Benja were fraudulent, then any

25 | transfer of funds up to the amount of the initial purchases by MHC would have been in satisfaction

26 | of MHC's fraud claim against Benja and not subject to recovery as a fraudulent conveyance.

27 | <div align="center">**SEVENTH AFFIRMATIVE DEFENSE**</div>

28 |      61.    Plaintiff's claims are barred, in whole or in part, as MHC has a perfected security

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

5099856.1

7

Case: 21-03036   Doc# 29   Filed: 09/07/22   Entered: 09/07/22 16:54:58   Page 238 of
241

interest in the funds paid to MHC by Benja as the Factoring Services Agreement granted MHC a broad security interest in all of Benja's assets, including funds and proceeds, and, by taking possession of those assets, MHC had a first priority perfected security interest in the funds.

**EIGHTH AFFIRMATIVE DEFENSE**

62.     Plaintiff's claims are barred, in whole or in part, because, pursuant to the Factoring Services Agreement, MHC purchased accounts receivables of Benja. As a result, these sale transactions are not subject to a preference action.

**NINTH AFFIRMATIVE DEFENSE**

63.     Plaintiff's claims are barred, in whole or in part, by the earmarking doctrine as a third party made a loan to Benja for the known purpose of paying MHC.

**TENTH AFFIRMATIVE DEFENSE**

64.     A constructive trust in favor of MHC exists with respect to the funds paid by Benja under Sections 2223 and 2224 of the California Civil Code and pursuant to the terms of the Factoring Services Agreement.

**ELEVENTH AFFIRMATIVE DEFENSE**

65.     Plaintiff's claims are barred, in whole or in part, as the payments made by Benja to MHC constitute covered payments of supplier arrearages as set forth in 11 U.S.C. § 547(j).

**TWELFTH AFFIRMATIVE DEFENSE**

66.     The claims set forth in the Complaint are barred by the doctrine of recoupment.

**THIRTEENTH AFFIRMATIVE DEFENSE**

67.     To the extent Plaintiff's actions to recover the alleged transfers results in the avoidance of any transfers, which is vehemently denied, MHC will possess a claim in the Chapter 7 case. That claim will be in an amount no less than the value of the property transferred and avoided as a result of the Complaint.

**FOURTEENTH AFFIRMATIVE DEFENSE**

68.     Plaintiff's claims are barred on the grounds that the transfers at issue did not involve property of the estate.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FIFTEENTH AFFIRMATIVE DEFENSE**

69.　Plaintiff's claims are barred to the extent the transfers at issue were in contemporaneous exchange for new value.

**SIXTEENTH AFFIRMATIVE DEFENSE**

70.　Plaintiff's claims are barred to the extent new value was subsequently provided.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

71.　Plaintiff's claims are barred on the grounds of fraud.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

72.　Plaintiff's claims are barred on the grounds of estoppel.

**NINETEENTH AFFIRMATIVE DEFENSE**

73.　Plaintiff's claims are barred on the grounds of unclean hands.

**TWENTIETH AFFIRMATIVE DEFENSE**

74.　MHC reserves the right to add or amend any affirmative defense to the Complaint (or as otherwise amended or modified), including, but not limited to, adding or amending any affirmative defenses that it may discover during the course of discovery.

WHEREFORE, MHC denies that the Plaintiff is entitled to any relief as a result of the allegations contained in the Complaint and respectfully requests: (i) that judgment be entered in its favor; (ii) that it be awarded its costs in this action, including attorneys' fees, and (iii) that the Court grant such and other and further relief as is just and proper.

DATED: September 7, 2021　　　　　FREEMAN, FREEMAN & SMILEY, LLP

By: _____
　　THEODORE B. STOLMAN
　　CAROL CHOW
　　Attorneys for Defendant
　　MHC FINANCIAL SERVICES, INC.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# BANKRUPTCY COURT

Case: 21-03036    Doc# 8    Filed: 09/07/21    Entered: 09/08/21 10:12:10    Page 10 of 10

RECEIVED

SEP 08 2021

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

**Name:** _____

**Case #:** 20-30819 DM

RECEIVED
2021 SEP -1 P 4: 2╱
US BANKRUPTCY COURT
SAN FRANCISCO, CA 94102
450 GOLDEN GATE AVE.