Stephen D. Finestone (SBN 125675)
Jennifer C. Hayes (SBN 197252)
Ryan A. Witthans (SBN 301432)
FINESTONE HAYES LLP
456 Montgomery Street, Floor 20
San Francisco, CA 94104
Tel.:   (415) 414-0466
Fax:    (415) 398-2820
Email: sfinestone@fhlawllp.com
Email: jhayes@fhlawllp.com
Email: rwitthans@fhlawllp.com

Attorneys for Kyle Everett,
Trustee in Bankruptcy

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re BENJA INCORPORATED, *aka* EPHE CORPORATION,<br><br>   Debtor. | Case No. 20-30819-DM<br>Chapter 7 |
| KYLE EVERETT, TRUSTEE IN BANKRUPTCY,<br><br>   Plaintiff,<br><br>   v.<br><br>MHC FINANCIAL SERVICES, INC.,<br><br>   Defendant. | Adv. Proc. No. 21-03036-DM<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><u>Hearing:</u><br>Date:   July 29, 2022<br>Time:  10:30 a.m.<br>Place:  Tele/video conference<br><br>*Please check* www.canb.uscourts.gov *for information regarding the Court's operations due to the COVID-19 pandemic.* |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 1

II. THE MATERIAL UNDISPUTED FACTS SATISFY § 547(b) .............................. 3

    A. The Preferential Transfers Were Made on Account of Antecedent Debt ............. 3

    B. The Preferential Transfers Were of an Interest of the Debtor in Property ............ 5

    C. The Preferential Transfers Were Made to MHC ...................................................... 6

    D. The Debtor Was Insolvent at the Time of the Preferential Transfers .................... 6

    E. The Preferential Transfers Enabled MHC to Receive More than It Would Receive If the Preferential Transfers Had Not Been Made ........................................... 6

III. MHC'S ARGUMENTS AND AFFIRMATIVE DEFENSES FAIL ....................... 8

    A. The Preferential Transfers Were Not Held in Constructive Trust ......................... 8

        1. No constructive trust was formed by operation of California law .................... 9

        2. The Factoring Services Agreement did not create a trust ............................... 11

    B. The Earmarking Doctrine Does Not Apply ............................................................. 12

IV. CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004 (9th Cir. 2000)................................................................................................................................. 5, 13, 14, 15

*Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330 (B.A.P. 9th Cir. 2004) .......................................................................................................................... 10

*Begier v. IRS*, 496 U.S. 53 (1990)................................................................................................ 9

*BR Festivals, LLC v. Johnson (In re BR Festivals, LLC)*, Nos. 14-10175, 14-1024, 2015 Bankr. LEXIS 760 (Bankr. N.D. Cal. Mar. 11, 2015) ................................................................ 13

*Campbell v. Hanover Ins. Co. (In re ESA Envtl. Specialists)*, 709 F.3d 388 (4th Cir. 2013), *cert. denied*, 571 U.S. 881 (2013) ............................................................................................ 13

*Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries)*, 16 F.3d 313 (9th Cir. 1994)................................................................................................................................. passim

*Higgins v. Higgins*, 11 Cal. App. 5th 648 (2017) ........................................................................ 9

*In re Bohlen Enters., Ltd.*, 859 F.2d 561 (8th Cir. 1988).......................................................... 13

*In re Bullion Res. of N. Am.*, 836 F.2d 1214 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056 (1988)................................................................................................................................... 5, 9, 10

*In re Vance*, 721 F.2d 259 (9th Cir. 1983)................................................................................. 5

*Lange v. Inova Capital Funding, LLC (In re Qualia Clinical Serv.)*, 441 B.R. 325 (B.A.P. 8th Cir. 2011) .......................................................................................................................... 3, 4, 5

*Long v. Joe Romania Chevrolet (In re Loken)*, 175 B.R. 56 (B.A.P. 9th Cir. 1994)................... 7

*Metcalf v. Golden (In re Adbox, Inc.)*, 488 F.3d 836 (9th Cir. 2007) ....................................... 13

*NetBank, FSB v. Kipperman (In re Commer. Money Ctr., Inc.)*, 350 B.R. 465 (B.A.P. 9th Cir. 2006) .................................................................................................................................... 4

*Schoenmann v. Bank of the W. (In re Tenderloin Health, FKA)*, 849 F.3d 1231 (9th Cir. 2017)... 6

*Schuyler v. Littlefield*, 232 U.S. 707 (1914)............................................................................ 10

*Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111 (5th Cir. 1995)..................... 9

*Tawansy v. Leslie (In re Raymond Renaissance Theater, LLC)*, 583 B.R. 735 (Bankr. C.D. Cal. 2018) ..................................................................................................................................... 9

**Statutes**

11 U.S.C. § 502 ............................................................................................................................. 7
11 U.S.C. § 541 ............................................................................................................................. 8
11 U.S.C. § 547 ..................................................................................................................... passim
11 U.S.C. § 704 ............................................................................................................................. 5
26 U.S.C. § 7501 ........................................................................................................................... 9
Cal. Civ. Code § 2223 .................................................................................................................. 9
Cal. Civ. Code § 2224 .................................................................................................................. 9
Cal. Comm. Code § 9401(a)(2).................................................................................................... 7

**Rules**

Fed. R. Bankr. P. 7056............................................................................................................... 15
Fed. R. Civ. P. 56 ....................................................................................................................... 15

**Treatises**

5 Collier on Bankruptcy ¶ 547.03 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.)... 6, 8, 12

Kyle Everett (the "Trustee" or the "Plaintiff") submits this reply in response to the opposition of MHC Financial Services, Inc. ("MHC"). ECF 29. This reply is supported by the concurrently filed declaration of Kyle Everett (the "Everett Reply Decl.").

## I. INTRODUCTION

The Trustee's Motion seeks to avoid and recover $3,083,036.21 in known preferential transfers (the "Preferential Transfers") made from Benja Incorporated (the "Debtor" or "Benja") to MHC within the ninety-day preference period.

MHC does not dispute that the payments were within the preference period or that the Debtor was insolvent when it made the transfers. MHC argues that it is not liable because: (1) the Preferential Transfers were not on account of an antecedent debt—notwithstanding, among other things, the Forbearance Agreement[1] identified in the Motion; (2) MHC somehow had a perfected interest in the Preferential Transfers—a perfection allegedly achieved by its receipt of the transfers, which perfection itself would be avoidable as a preferential transfer; (3) the constructive trust doctrine prevents the Trustee's recovery; and (4) the earmarking doctrine is a defense as to one payment of $1,941,298.12 out of the total $3,083,036.21. As discussed below, the alleged defenses are not a basis to deny the Motion. MHC's arguments misconstrue the relevant facts and law and in certain instances are internally inconsistent.

The material undisputed facts establish that the Preferential Transfers may be avoided pursuant to § 547(b):

| **Element** | **Status** |
|---|---|
| Transfer of an interest of the debtor in property. § 547(b). | Applying the "diminution of estate" rule, the Preferential Transfers were property of the Debtor because the funds could otherwise be used to pay creditors. |
| To or for the benefit of a creditor. § 547(b)(1). | Undisputed. |

---

[1] All capitalized terms not defined in this reply have the meanings set forth in the Motion.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT 1

| | |
|---|---|
| For or on account of an antecedent debt owed by the debtor before such transfer was made. § 547(b)(2). | MHC argues that the Preferential Transfers were sales, not transfers made on account of an antecedent debt. Even if, as MHC argues, the Factoring Services Agreement effected a sale of receivables rather than a loan transaction, the payments from the Debtor were on account of the Forbearance Agreement, which established a debt between the Debtor and MHC. |
| Made while the debtor was insolvent. § 547(b)(3). | Insolvency is undisputed. MHC argues that the Debtor did not operate as a Ponzi scheme, but the existence of a Ponzi scheme is irrelevant to whether the transfers are avoidable as preferences. |
| Made on or within ninety days before the Petition Date. § 547(b)(4)(A). | Undisputed. |
| That enables such creditor to receive more than it would receive if the transfer had not been made and the creditor received payment on its debt pursuant to the Bankruptcy Code. § 547(b)(5). | MHC argues that it had a perfected security interest entitling it to full payment of its claim. However, the material undisputed facts establish that MHC's lien rights were, at best, junior to those of Busey Bank such that MHC would stand to receive less in a hypothetical Chapter 7 liquidation. |

None of the arguments or affirmative defenses advanced by MHC establish a material undisputed fact that changes this result.

| **Argument or Affirmative Defense** | **Counterargument** |
|---|---|
| MHC argues that the Preferential Transfers were never property of the Debtor because they were held in constructive trust due to the Debtor's misconduct. | The material undisputed facts establish that even if the Debtor held any of MHC's funds in constructive trust, those funds were exhausted by the time of the Preferential Transfers, thus extinguishing any trust. |
| MHC argues that the Factoring Services Agreement created a trust. | This argument is belied by the plain language of the Factoring Services Agreement, which is a material undisputed fact, but is anyway irrelevant due to the dissipation of all of MHC's payments to the Debtor prior to the Preferential Transfers. |

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT 2

| MHC contends that one of the transfers was earmarked by Busey Bank to be paid to MHC. | The material undisputed facts establish that the earmarking doctrine does not apply, because the Debtor controlled the funds borrowed from Busey Bank. |
|---|---|

## II. THE MATERIAL UNDISPUTED FACTS SATISFY § 547(b)

The elements of § 547(b) were set forth in the Motion. The material undisputed facts establish that the Preferential Transfers meet the elements of § 547(b).

### A. The Preferential Transfers Were Made on Account of Antecedent Debt

MHC leads off its opposition by arguing that the Preferential Transfers were not made on account of an antecedent debt and as such are not recoverable. It argues that its transactions with the Debtor were a "true sale of receivables." ECF 29 at 9–11. MHC asserts that the Factoring Services Agreement (1) describes the transactions as sales; (2) makes no mention of loans; (3) charged a fixed rate of 1.25%, rather than a fluctuating rate like a commercial loan; (4) did not authorize the Debtor to settle, adjust, or compromise the sold accounts; (5) required the Debtor to direct all account debtors to make payments directly to MHC; and that (6) MHC purchased certain accounts only after researching the credit of each account debtor and after receiving acknowledgement from the account debtors that payments would be made directly to MHC.

While the Trustee disagrees with MHC's analysis (at a minimum, the argument would require that the Debtor's account holders, if any, had paid MHC directly), MHC's position ignores the clear evidence of the Debtor's debt to MHC. MHC required Debtor to enter into the Forbearance Agreement precisely because the alleged account debtors never paid MHC.[2] MHC's position also contradicts its assertion that it had a security interest, which would only exist to secure the repayment of a debt.

Moreover, the cases cited by MHC show that the Factoring Services Agreement was actually a disguised loan agreement rather than a true sale. For example, in *Lange v. Inova Capital Funding, LLC (In re Qualia Clinical Serv.)*, the Court was faced with the question of

---
[2] *See* ECF 22 at ¶¶ 10, 12, Exhibits I, K.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT     3

Case: 21-03036    Doc# 33    Filed: 07/22/22    Entered: 07/22/22 17:19:33    Page 6 of 19

whether transactions made under an "Invoice Purchase Agreement" were loans or sales. 441 B.R. 325 (B.A.P. 8th Cir. 2011) (applying California law). The Invoice Purchase Agreement

> provided that Inova would purchase "acceptable accounts receivable at a discount below the face value thereof," and provided for an ongoing security interest in Qualia's property such as accounts, inventory, instruments, records, and general intangibles, in order to protect Inova from any chargeback of disputed or unpaid invoices or accounts and any liability resulting from any breach of Qualia's warranties.

*Id.* at 327. The court first determined that the Invoice Purchase Agreement was an unambiguous contract, and that unambiguous contracts present legal issues that are appropriate for summary judgment. *Id.* at 329. Under California law, the court then examined the "true nature of the transaction" to determine if the economic consequences bore greater similarity to a financing transaction or a sale. *Id.* at 329–30. The agreement provided recourse such that Inova could require Qualia to repurchase accounts in the event of various occurrences. The B.A.P. agreed with the bankruptcy court's reasoning that, if the transaction was a true sale, Inova would have accepted the accounts as they were, whether or not they were collectible. Because the agreement shifted all risk to Qualia, it was a disguised loan rather than a true sale. *Id.* at 330. *See also NetBank, FSB v. Kipperman (In re Commer. Money Ctr., Inc.)*, 350 B.R. 465, 484 (B.A.P. 9th Cir. 2006) (purported sale of payment stream was actually a loan where the seller "(1) has none of the potential benefits of ownership and (2) is contractually allocated none of the risk of loss.").

The Factoring Services Agreement is substantially similar to the Invoice Purchase Agreement at issue in *Qualia*. As a preliminary matter, it is unambiguous (a point which is not refuted by opposing meanings advanced by the parties), making the issues raised appropriate for summary judgment. *Qualia*, 441 B.R. at 329. The Factoring Services Agreement provides:

> All Factored Accounts are purchased with full recourse including [MHC's] right to require [Benja's] repurchase of Account(s) as set forth in this Section 5. . . . If [Benja] breaches any warranty or otherwise violates or defaults on any of its obligations hereunder, or if [MHC] reasonably determines after consultation with [Benja] at any time that any Account purchased by [MHC] is uncollectible, or if any Account purchased hereunder is not paid in full within 100 days after the Account invoice date (or such longer period as may be mutually agreed by [MHC] and [Benja] with respect to Accounts from specific Account Debtors) . . . , then upon request by [MHC], [Benja] shall immediately repurchase such Account(s) from [MHC] for an amount equal to the net amount of such

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT 4

Account(s), less any payments received by [MHC] on such
Account(s) from the Account Debtor(s).

ECF 22 at ¶ 2, Exhibit A (¶ 5 <u>Late Fees; Full Recourse</u>.). The Factoring Services Agreement required the Debtor to repurchase uncollectable accounts, thus shifting all risk to the Debtor, which is what happened and is the background to the Forbearance Agreement. The agreement's shifting of all risk to the Debtor requires the conclusion that it is not a true sale agreement. Other similarities with *Qualia* include describing the transactions as sales rather than loans and the charging of a fixed rate (which the agreement in *Qualia* described as a purchase at a discount). Thus, to the extent the nature of the Factoring Services Agreement is at issue, it created a disguised loan, a further basis to reject MHC's "no antecedent debt" argument.

B. <u>The Preferential Transfers Were of an Interest of the Debtor in Property</u>

The term "property of the estate" is defined broadly. *In re Bullion Res. of N. Am.*, 836 F.2d 1214, 1217 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056 (1988). Generally, property belongs to the debtor for purposes of § 547 if its transfer will deprive the bankruptcy estate of funds that could otherwise be used to satisfy the claims of creditors. *Id.*; *Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries)*, 16 F.3d 313, 316 (9th Cir. 1994); *Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004, 1007 (9th Cir. 2000).

Here, the material undisputed facts establish that the money used to make the Preferential Transfers came from the Debtor's bank account over which the Debtor exercised total control. *See* ECF 29 at 104–182. Because this money could have been used to pay other creditors, it presumptively constitutes property of the debtor's estate. *Bullion Res.*, 836 F.2d at 1217.[3]

---

[3] Moreover, the § 547 purposes of (1) discouraging creditors from racing to dismember a debtor and (2) advancing equality of distributions among creditors are served by finding the Preferential Transfers were property of the Debtor. *See In re Vance*, 721 F.2d 259, 260 (9th Cir. 1983); *Bullion Res.*, 836 F.2d at 1217. The material undisputed facts establish that MHC received the Preferential Transfers when it knew or should have known the Debtor was facing financial difficulties, evidenced by the Promise to Pay and Forbearance Agreement. ECF 22 at ¶¶ 10, 12, Exhibits I, K. More importantly, the Preferential Transfers allowed MHC to be paid all or most of its claim while other creditors were left to share equally in the Debtor's meager remaining assets. The Trustee is mindful of MHC's plight as a victim of the Debtor's fraud, but that does not change the Trustee's obligation to avoid preferential transfers and administer the estate for the benefit of all creditors. *See* §§ 547, 704.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT 5

MHC contends that the Preferential Transfers were never property of the Debtor because (1) they were held in constructive trust due to the Debtor's misconduct and pursuant to the terms of the Factoring Services Agreement and (2) the funds for one of the transfers were earmarked by Busey Bank to be paid to MHC. For the reasons set forth below, the material undisputed facts establish that these arguments are without merit.

### C. The Preferential Transfers Were Made to MHC

The Trustee has presented undisputed evidence that the Preferential Transfers were made by the Debtor to MHC. ECF 22 at ¶ 13, Exhibit L (bank statements showing transfers to MHC). MHC has not presented any controverting evidence and has not disputed that it received the Preferential Transfers. *See* ECF 29. As such, this element is fulfilled.

### D. The Debtor Was Insolvent at the Time of the Preferential Transfers

A debtor is presumed to have been insolvent on and during the ninety days immediately preceding the petition date. § 547(f). MHC does not dispute that the Debtor was insolvent during this period. ECF 29 at 11 ("To be clear, MHC is not asserting that Benja was solvent at the time of the Payments."). Because MHC failed to raise a material undisputed fact to rebut the presumption of insolvency, this element is established.

MHC's dispute is limited to the Trustee's assertion that the Debtor operated as a Ponzi scheme. ECF 29 at 11–14. A Ponzi scheme finding, however, is not relevant to whether the Transfers are avoidable preferences, and MHC does not cite to any case law to the contrary. In any event, the Debtor operated as a Ponzi Scheme. ECF 22 at ¶ 7, Exhibit F (plea agreement).

### E. The Preferential Transfers Enabled MHC to Receive More than It Would Receive If the Preferential Transfers Had Not Been Made

Section 547(b)(5) requires a comparison between what the preferred creditor actually received and what it would have received in Chapter 7 if the transfer had not been made. 5 Collier on Bankruptcy ¶ 547.03[7] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.). This element is fulfilled if the Trustee shows that MHC received more as a result of the Preferential Payments than it would in a hypothetical Chapter 7 distribution. *Schoenmann v. Bank of the W. (In re Tenderloin Health, FKA)*, 849 F.3d 1231, 1235 (9th Cir. 2017).

MHC asserts that by taking possession of the Preferential Transfers, it perfected its security interest in the funds, meaning that it is entitled to full repayment of its claim from its "collateral." This is incorrect. Moneys in a deposit account are not covered by a UCC-1 financing statement and require that the debtor, secured party, and bank have entered into a deposit control agreement. Cal. Comm. Code § 9401(a)(2). Even if MHC's assertions were true, and its receipt of the Preferential Transfers perfected it security interest, the perfection of the security interest itself is an avoidable transfer under § 547(b). *Long v. Joe Romania Chevrolet (In re Loken)*, 175 B.R. 56, 60 (B.A.P. 9th Cir. 1994). Furthermore, MHC omits any discussion regarding its position as compared to Busey Bank, which held a senior security interest at the time of the Preferential Transfers. Under MHC's analysis, any creditor with a debt that was unsecured, under-secured, or subject to a senior security interest could jump in line ahead of other secured creditors merely because it received payment first. This argument is illogical.

It is undisputed that Busey Bank filed a UCC-1 financing statement covering all the Debtors assets on July 19, 2019 (the "Busey UCC"). Claim 1 at Exhibit 4. MHC does not provide any evidence to dispute that Busey Bank's lien is valid and enforceable and that it has never been reconveyed. Busey Bank has an allowed secured claim in the sum of $5,035,579.96 based on the Busey UCC. Claim 1; § 502(a). It is also undisputed that MHC's UCC-1 financing statement was not filed until March 26, 2020. Given these undisputed facts, MHC's lien rights are, at best, junior to those of Busey Bank. Because Busey Bank's lien rights are senior to MHC's, MHC would receive less than the full amount of its claim in bankruptcy if it did not obtain the Preferential Transfers.

The estate currently has funds totaling $1,601,647.57, primarily obtained from the Trustee's recovery of $1.5 million from Brett Buerck. Everett Reply Decl. at ¶ 3; Main Case ECF 108. Additional assets to pay claims will derive from litigation recoveries. *See* Main Case ECF 52 (Schedule A/B). The Trustee has two pending adversary proceedings: one against Thomas Peters seeking recovery of $250,000, Adv. Proc. No. 21-03060; and this lawsuit against MHC, which seeks damages totaling $4,923,664.05. Filed claims total $10,538,386.56, not including the potential claims of preference defendants such as MHC. *See* Claims Register. This

sum also excludes significant administrative claims anticipated to total no less than $500,000. Everett Reply Decl. at ¶ 4.

Even based on these incomplete and developing facts, and even if the Trustee fully prevails in his adversary proceedings, it is clear that general unsecured creditors will not be paid in full, and that MHC cannot recover the full amount of the Preferential Transfers through the anticipated Chapter 7 distributions. *Id.* at ¶ 5. For this reason, § 547(b)(5) is fulfilled. Furthermore, while MHC may disagree with the Trustee's legal conclusion regarding the validity and enforceability of Busey Bank's higher-priority lien, it provides no controverting evidence to support an alternative position. There is no dispute of material fact, and a determination of the parties' lien rights is appropriate on summary judgment.

### III. MHC'S ARGUMENTS AND AFFIRMATIVE DEFENSES FAIL

The Motion is based on reasonable due diligence given the circumstances of the case and after taking into account MHC's known or reasonably knowable affirmative defenses. Everett Reply Decl. at ¶ 2; *see* § 547(b). Section § 547(c) sets forth several affirmative defenses that may be asserted by a creditor against whom avoidance is sought. MHC has the burden of proving that the Preferential Transfers are non-avoidable by reason of the defenses set forth in § 547(c). For the reasons set forth below, MHC has failed to do so, and the Preferential Transfers may be avoided under § 547.

#### A. The Preferential Transfers Were Not Held in Constructive Trust

A preferential transfer must be of "an interest of the debtor in property." § 547(b). Under § 541(d), property in which a debtor has only legal title and not an equitable interest becomes property of the estate only to the extent of such legal title. When a debtor holds property in constructive trust under applicable non-bankruptcy law, the equitable interest in that property belongs to the trust beneficiary, not the debtor. 5 Collier on Bankruptcy at ¶ 547.03[2][b]. MHC advances the argument that the Debtor held the funds it obtained from MHC in constructive trust, and that those funds never belonged to the Debtor such that the Preferential Transfers are immunized from § 547. MHC's arguments are flawed.

*1. No constructive trust was formed by operation of California law*

MHC argues that the funds it provided to Debtor were wrongly obtained by the Debtor's misconduct. MHC urges the Court to find that this creates a constructive trust under California law. *See* Cal. Civ. Code § 2223 ("One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner."); Cal. Civ. Code § 2224 ("One who gains a thing by fraud . . . or other wrongful act, is . . . an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."). MHC then concludes that the funds it provided to the Debtor were never property of the Debtor or the estate because they were held in constructive trust for the benefit of MHC.

Where a non-debtor alleges a constructive trust, the non-debtor bears the burden of proving the existence of the trust. *Tawansy v. Leslie (In re Raymond Renaissance Theater, LLC)*, 583 B.R. 735, 744 (Bankr. C.D. Cal. 2018) (citing *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1118 (5th Cir. 1995)). To determine whether a debtor holds property in trust for another, courts look to applicable state law to see whether or not an enforceable trust exists. *Bullion Res.*, 836 F.2d at 1217–18. To impose a constructive trust under California Civil Code §§ 2223 and 2224, three conditions must be met: "(1) a specific, identifiable property interest, (2) the plaintiff's right to the property interest, and (3) the defendant's acquisition or detention of the property interest by some wrongful act." *Higgins v. Higgins*, 11 Cal. App. 5th 648, 659 (2017).

MHC cannot satisfy the first element of this test because the funds used to make the Preferential Transfers were not the funds previously provided by MHC. A debtor does not hold funds subject to a floating trust and can only hold specific and traceable amounts in trust. "Under common-law principles, a trust is created in property; a trust therefore does not come into existence until the settlor identifies an ascertainable interest in property to be the trust res." *Begier v. IRS*, 496 U.S. 53, 62 (1990) (contrasting standard common-law principals requiring specific and identifiable trust property with the "radically different" paradigm permitting a trust in abstract funds under 26 U.S.C. § 7501 for certain taxes that an employer must deduct from employees' income and hold in trust for the United States). Because the funds the Debtor used to

make the Preferential Transfers were commingled in an account under the Debtor's control, they presumptively constitute property of the Debtor (rather than funds held in constructive trust for MHC). *Bullion Res.*, 836 F.2d at 1217. To overcome this presumption, MHC bears the burden to trace the funds through the Debtor's commingled account to demonstrate that the Preferential Transfers were made from the same funds that the Debtor had received from MHC. *Id.* at 1218. MHC fails to provide any evidence that the funds used for the Preferential Transfers were traceable to the funds it provided Debtor. Moreover, as discussed in the Everett Reply Decl., it is undisputed that the funds MHC provided were exhausted well before Debtor made the Preferential Transfers. Everett Reply Decl. at ¶ 6–7.

Courts apply the "lowest intermediate balance rule" ("LIBR") to trace comingled funds. *Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330, 338 (B.A.P. 9th Cir. 2004) (collecting cases).

> The LIBR assumes that traced proceeds are the last funds withdrawn from a contested account. If the traced proceeds are withdrawn and spent, they are treated as lost and no longer available. If the balance in the account falls below the amount of funds subject to the secured creditor's interest deposited into the account, the secured creditor is allowed only the lowest intermediate balance between the time of commingling and the time the rights in the account are determined.

*Id. See also Schuyler v. Littlefield*, 232 U.S. 707, 710 (1914) ("[W]here one has deposited trust funds in his individual bank account and the mingled fund is at any time wholly depleted the trust fund is thereby dissipated, and cannot be treated as reappearing in sums subsequently deposited to the credit of the same account.").

There is no dispute regarding the existence, amount, and timing of the transfers identified in the Debtor's bank account statements.[4] According to the LIBR analysis of the Debtor's transactions, the funds that the Debtor received from MHC were entirely depleted before they

---

[4] MHC admits that it paid $4,482,707.79 to the Debtor on or about April 2 through May 27, 2020. ECF 8 at 4 (¶ 21); ECF 1 at 4 (¶ 21). MHC also admits that it received $4,923,664.05 from the Debtor between June 3 and September 25, 2020. ECF 8 at 5 (¶¶ 28–29); ECF 1 at 6–7 (¶¶ 28–29).

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT — 10

could be used to make any of the payments back to MHC.[5] Everett Reply Decl. at ¶ 6–7, Exhibit B. The last of the payments traceable to MHC were exhausted no later than June 2, 2020, which is prior to the first repayment made to MHC on June 3, 2020. *Id.* Therefore, any alleged constructive trust was lost and MHC is not entitled to assert a constructive trust over money that subsequently entered the Debtor's account at Busey Bank. *Id.*

Because none of the Preference Payments that are the subject of this Motion came from funds the Debtor received from MHC, no constructive trust can remain.

### 2. The Factoring Services Agreement did not create a trust

In addition to the fact that the Preferential Transfers were not made with funds received from MHC, the agreement between MHC and Benja did not create a trust. Under the Factoring Services Agreement, the Debtor sold certain accounts receivable to MHC at a discount, and MHC expected to profit by collecting on the accounts.[6] If MHC was unable to collect on an account, then it could compel the Debtor to repurchase that account. Because the Debtor's accounts receivable were fraudulent and nonexistent, MHC was unable to collect and it "resold" the accounts receivable to the Debtor.

MHC asserts that the Factoring Services Agreement "establishes that until MHC collected on the accounts receivable that it purchased from Benja, the funds MHC transferred to Benja to pay for the accounts receivable were held in trust for MHC." ECF 29 at 18–19. However, the plain language of the Factoring Services Agreement reveals that this is not true. The Factoring Services Agreement sets forth that MHC had the right to require the Debtor to repurchase accounts that were uncollectible. ECF 22 at ¶ 2, Exhibit A (¶ 5 <u>Late Fees; Full Recourse</u>.). The Factoring Services Agreement does not, however, state that the Debtor generally

---

[5] The Trustee notes that this aligns with MHC's argument that a large portion of the funds used to repay MHC came from Busey Bank. *See* ECF 29 at 4–6 (used to support MHC's earmarking defense).

[6] The Trustee does not concede that the Factoring Services Agreement operated as a true sale agreement, but rather discusses the agreement using its terms for convenience. In actuality, it was a disguised loan agreement as discussed above. Regardless, the characterization of the transactions as transfers or sales does not change the conclusion that no constructive trust was created by the Factoring Services Agreement.

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT 11

held all funds from MHC in trust until MHC collected on the underlying accounts receivable. Moreover, there is no evidence or suggestion that the Debtor agreed to hold any funds that it received from MHC in trust. The only time that a trust is contemplated by the Factoring Services Agreement is if the Debtor were to receive a payment on an account that was sold to MHC:

> All remittances received by [Benja] for payment of Factored Accounts are the property of [MHC], and [Benja] shall hold such proceeds in trust for [MHC], and shall immediately deliver to [MHC], in the identical form, all payments received by [Benja] on each such Accounts, together with all documents accompanying the remittance to [Benja].

*Id.* (¶ 1.1 3 <u>Notice to Account Debtors</u>.). However, since the underlying accounts receivable were fraudulent and did not actually exist, the Debtor did not receive any payments that would be held in trust for MHC.

For these reasons, the funds paid to the Debtor by MHC were not held in trust (express, constructive, or otherwise) pursuant to the terms of the Factoring Services Agreement.

B. <u>The Earmarking Doctrine Does Not Apply</u>

MHC asserts that one payment—the $1,941,298.12 payment from the Debtor to MHC on August 20, 2022—was made from funds the Debtor received from Busey Bank that were earmarked for the specific purpose of paying MHC. MHC argues that, under the earmarking doctrine, this payment never became part of the Debtor's property and cannot be avoided as a preference. MHC does not argue that the earmarking doctrine applies to protect any other Preferential Transfers.

The earmarking doctrine is a widely accepted judicially created exception to § 547. It holds that when a third party makes a loan to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor, the proceeds never become a part of the debtor's property and no preference is created. 5 Collier on Bankruptcy at ¶ 547.03[2][a]. The Ninth Circuit has held that the earmarking doctrine applies "when a third party lends money to a debtor for the specific purpose of paying a selected creditor." *Kemp*, 16 F.3d at 316. The proper inquiry is not whether the funds entered the debtor's account, but whether the debtor had the right to disburse the funds to whomever it wished, or whether their disbursement was limited to a particular old creditor or

creditors under an agreement with the new creditor. *Superior Stamp*, 223 F.3d at 1009.[7] If the trustee establishes that a transfer of disputed funds was from one of the debtor's accounts over which the debtor ordinarily exercised total control, then the burden shifts to the defendant to show that the funds were earmarked. *Metcalf v. Golden (In re Adbox, Inc.)*, 488 F.3d 836, 842 (9th Cir. 2007). As a judicially created exception to a statutory rule, the earmarking doctrine must be narrowly construed. *Campbell v. Hanover Ins. Co. (In re ESA Envtl. Specialists)*, 709 F.3d 388, 394 n.5 (4th Cir. 2013), *cert. denied*, 571 U.S. 881 (2013); *BR Festivals, LLC v. Johnson (In re BR Festivals, LLC)*, Nos. 14-10175, 14-1024, 2015 Bankr. LEXIS 760, at *6 (Bankr. N.D. Cal. Mar. 11, 2015) ("However it is characterized, the Earmarking Doctrine is to be narrowly construed.").

Two Ninth Circuit cases are particularly instructive: *Kemp*, 16 F.3d at 313; and *Superior Stamp*, 223 F.3d at 1004. In *Kemp*, the debtor owed a supplier for purchased foodstuffs. The debtor had an existing line of credit with a lender, and it borrowed against that line of credit to pay off the supplier. The debtor wrote a check to the supplier two days before the new loan funds were deposited into the debtor's bank account. The bank honored the check that same day, at a point when the debtor's account was overdrawn, and within the preference period. The trustee sued to avoid the transfer as a preference, and the supplier argued that the earmarking doctrine applied because the new loan was used to pay the supplier's old debt. The bankruptcy court rejected the supplier's argument and granted summary judgment in favor of the trustee, which was affirmed by the district court and circuit court. In coming to its conclusion, the Ninth Circuit focused on the issue of control of the funds. It articulated that

> If the debtor controls the disposition of the funds and designates the creditor to whom the monies will be paid independent of a third party whose funds are being used in . . . payment of the debt, then the payments made by the debtor to the creditor constitute a preferential transfer.

---

[7] *See also In re Bohlen Enters., Ltd.*, 859 F.2d 561, 566 (8th Cir. 1988) (holding that the earmarking doctrine requires: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt; (2) performance of that agreement according to its terms; (3) the transaction viewed as a whole . . . does not result in any diminution of the estate").

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT  13

*Kemp*, 16 F.3d at 316. The court found that the bank did not exercise control over the funds or place any limits on the parties to whom the debtor could present checks. Because the debtor exercised requisite control over the funds by independently designating a recipient and achieving payment, the earmarking doctrine did not apply.

The facts in *Kemp* stand in contrast to those in *Superior Stamp*, a case in which the Ninth Circuit found that the earmarking doctrine did apply. 223 F.3d at 1004. In that case, the debtor auction house, Superior Stamp, auctioned the coin collection of Carolyn Adams but failed to pay her the proceeds as agreed. Superior and Adams negotiated a repayment schedule. Superior then became financially distressed and its largest creditor, the Bank of California, assumed management of its business. Superior agreed to submit monthly budgets to the bank for approval, and would not pay unapproved obligations, including the one to Adams. The bank also agreed to fund any cash shortfall of Superior to pay Adams up to the monthly payment amount. The bank approved payments to Adams and advanced funds to Superior's account before transferring the funds to Adams. Superior subsequently filed for Chapter 11 bankruptcy and the trustee sued Adams to recover two installment payments she received as preferences. The bankruptcy court, as affirmed by the district court, held that the earmarking doctrine did not apply as the debtor controlled the borrowed funds because (1) the debtor requested the loan to pay Adams and (2) the bank did not pay Adams directly. The Ninth Circuit reversed, distinguishing "control" from "power." It reasoned that possession of the funds may have given the debtor "power" to divert loan proceeds for another use, but that the debtor did not have "control" because (1) it did not have the right to divert the funds pursuant to its agreement with the bank, (2) the debtor was required to obtain the bank's written approval before making each payment to Adams, and (3) the bank advanced the disputed funds for the specific and express purpose of paying Adams.

Here, as a preliminary matter, there is no dispute that the Debtor paid MHC from its account at Busey Bank over which the Debtor exercised total control. The burden thus shifts to MHC to demonstrate a dispute of material fact as to whether the funds were earmarked. In an attempt to do so, MHC relies on inadmissible hearsay evidence to speculate that Busey Bank had some knowledge or understanding that the Debtor would use a portion of the new loan from

Busey Bank to pay MHC. *See* ECF 29 at 18–20. Even accepting this assertion as true for the purposes of this Motion, such knowledge is insufficient to invoke the earmarking doctrine. There is no evidence or suggestion that Busey Bank and the Debtor had any agreement requiring the Debtor to use the new funds to pay MHC. To the contrary, the Debtor had the right to use the funds as it desired, and it independently paid MHC without Busey Bank's approval or supervision. The facts are more similar to *Kemp* than to *Superior Stamp* because Busey Bank extended the additional $2 million in credit to the Debtor without any limitations placed on the Debtor's use of those funds. Furthermore, when the transaction is viewed as a whole, it results in diminution of the value of the estate because it removes funds that could otherwise be used to pay the estate's creditors.

For these reasons, and given the narrow construction required for a judicially created exceptions to a statutory provision, the earmarking doctrine does not apply to the one preferential payment of $1,941,298.12 to which MHC argues that it applies.

## IV. CONCLUSION

For the reasons stated above and in the Motion, the Trustee has established his right to avoid and recover the Preferential Transfers. MHC has not produced any controverting evidence and no dispute of material fact exists, even when viewing the evidence in the light most favorable to MHC and drawing any reasonable inferences in MHC's favor. Avoidance of the Preferential Transfers does not require any credibility determination, weighing of competing evidence, or drawing of inferences in favor of the Trustee. As such, the Trustee requests that the Court enter an order granting summary judgment in favor of the Trustee to avoid and recover the Preferential Transfers totaling $3,083,036.21.

To the extent that the Court is not inclined to grant partial summary judgment to avoid and recover the Preferential Transfers, the Trustee requests that the Court enter an order making findings of undisputed fact pursuant to Civil Rule 56(f) (as incorporated by Bankruptcy Rule 7056).

Dated July 22, 2022

FINESTONE HAYES LLP

*/s/ Ryan A. Witthans*
Ryan A. Witthans
Attorneys for Kyle Everett,
Trustee in Bankruptcy